UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:                                            Chapter 11 Cases

ADINATH CORP. and SIMPLY                          Case No. _____
FASHION STORES, LTD.,[1]                           (Joint Administration Pending)

      Debtors.
_____/

### DECLARATION IN SUPPORT OF FIRST DAY PLEADINGS

I, Soneet R. Kapila, hereby declare that the following is true to the best of my knowledge, information, and belief:

### I.        INTRODUCTION

1.        My name is Soneet R. Kapila. I am over the age of eighteen and am competent to testify.

2.        I am a founding partner of KapilaMukamal, LLP ("KMLLP") which, through me, serves as the Chief Restructuring Officer for Adinath Corp. ("Adinath") and Simply Fashion Stores, Ltd ("Simply Fashion," with Adinath, the "Debtors").

3.        Simply Fashion has 247 stores in 25 states across the country in major markets such as Detroit, Miami, New Orleans, St. Louis, Chicago, Atlanta, Baltimore, Nashville and Dallas.  Simply Fashion has been in the fashion industry since 1991, and focuses on providing affordable closing options for urban women.  Simply Fashion offers styles and the latest trends as well as essentials for all shapes and sizes of women, including Plus and Super Plus (up to size

---

[1]    The Debtors in these cases, along with the addresses and last four digits of each Debtor's federal tax identification number are: (i) Adinath Corp., 2110 N.W.95th Avenue, Miami FL 33172 (4843); and (ii) Simply Fashion Stores, Ltd., 2500 Crestwood Boulevard, Birmingham, AL 35210 (6230).

36) as well as Juniors and Misses.  Simply Fashion also offers accessories, shoes and lingerie in both Plus and Super Plus sizes.

4.      I am a Certified Public Accountant, Certified Insolvency & Restructuring Advisor, Certified Fraud Examiner, Certified in Financial Forensics, and I have a Master's in Business Administration from Cranfield School of Management Studies, England.  I am also a Chapter 7 Panel Trustee, and I have been for 22 years.  In my capacity as a Chapter 7 Panel Trustee, I have served in that capacity in several thousand cases.  During my career, I have also served as a chapter 11 trustee in numerous cases in the Southern and Middle Districts of Florida.

5.      KMLLP is based in South and Central Florida. I am a member of KMLLP. I formed KMLLP's predecessor, Kapila & Company in 1993.  KMLLP professionals are CPAs, Forensic and Insolvency Advisors and are highly qualified and experienced in providing restructuring management services, including in the areas of insolvency, bankruptcy, reorganization and corporate restructuring.  KMLLP has provided well respected restructuring management and advisory services, including corporate finance, turnaround consulting, forensic accounting, and litigation support to distressed, insolvent, and reorganizing business, and supplied senior executives to financially troubled companies on an interim basis.

6.      I have more than 20 years of experience in the Chapter 11 process and in providing restructuring management services.  I serve as Bankruptcy Trustee, Examiner, Chief Restructuring Officer, S.E.C. Corporate Monitor and Receiver, and State Court and Federal Court Receiver in numerous matters in the Southern and Middle Districts of Florida. Additionally, I have advised and represented debtors and creditors' committees in formulating, analyzing and negotiating plans of reorganization.  I am a sitting member of the Chapter 7 Panel of Trustees in the Southern District of Florida.  My restructuring and bankruptcy experience includes serving, among others, as: (i) CRO to one of the largest manufacturers in Florida of

2

patio enclosures and aluminum windows and sliding glass doors; (ii) CRO to several jointly administered Chapter 11 companies which owned and harvested several acres of orange groves in the West Coast of Florida; (iii) CRO to a Florida public company in the mobile fueling industry with revenues of $250 million over multiple states; (iv) appointed corporate monitor by the S.E.C. and Federal District Court to oversee and monitor the business operations of a major premium tool manufacturer in the United Kingdom; (v) the Chief Administrator to one of South Florida's largest real estate development companies; (vi) liquidating Trustee/Creditor Agent to a Volusia County hotel developer and operator; (vii) plan administrator to a chain of cafeteria-style restaurants with over 130 locations in 15 states; (viii) examiner for an international company which operates and franchises a chain of approximately 15 showbiz-themed restaurants offering casual –dining fare, along with a collection of movie memorabilia and celebrity merchandise; (ix) Examiner/Plan Administrator to one of Miami's not-for-profit hospital facilities operating in Chapter 11 proceedings; (x) the Chapter 11 trustee for an individual Debtor's estate and corporate Ponzi scheme case filed in the Middle District of Florida involving issues of fraud and securities violations; (xi) Chapter 11 Trustee to multi-store, specialty, retail, wireless communications operations across multiple states in the Southeast Region of the United States, which retail cellular and personal communication systems, wireless telephone services for various carriers, pager services and associated products and accessories; (xii) Chapter 11 operating trustee of a public company on the NYSE, and its eleven subsidiaries, with debt exceeding $30 million, which provide waste management services for construction and demolition debris, as well as environmental remediation and waste recycling; and (xii) appointed Chapter 11 Trustee in the jointly administered cases involving complex commercial litigation concerning the partially completed Fontainebleau hotel/casino in Las Vegas.

3

7.      I was appointed the Chief Restructuring Officer ("CRO") of the Company on March 26, 2015, and I have served in such capacity for the Debtors since that time. In my capacity as CRO, I have knowledge of, and experience (gained since my appointment as CRO), with the business and financial affairs of the Debtors and I have been actively engaged in the Debtors' business and efforts to restructure their business and finances since March 26, 2015, as described herein.

8.      To minimize any adverse effects on their business as a result of the commencement of these chapter 11 cases (the "Chapter 11 Cases"), the Debtors intend to request various types of relief in certain "first day" applications and motions (collectively, the "First Day Motions"). The First Day Motions seek relief, among other things, to: (a) continue the Debtors' ordinary course retail sales practices and procedures; (b) the continuation of employee benefits and compensation practices in order to maintain the confidence, morale, and support of the Debtors' employees; and (c) establish procedures for the smooth and efficient administration of these cases. The relief requested in the First Day Motions is crucial to the success of the Debtors' goal of maximizing the value of its enterprise for all constituents.

9.      In that regard, the Debtors anticipate that numerous notices, applications, motions and other filings in these Chapter 11 Cases will or may affect both of the Debtors. Accordingly, joint administration of these cases for procedural purposes will reduce fees and costs, avoid needless duplicative filings, and will enable a more efficient and economical administration of the Chapter 11 Cases.

10.      I am advised by counsel that this Court has jurisdiction over these Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334 and venue is proper in the United States Bankruptcy Court for the Southern District of Florida pursuant to 28 U.S.C. §§ 1408 and 1409.

11.     I submit this declaration (the "Declaration") in support of the Debtors' petitions and First Day Motions. In addition to the personal knowledge that I have acquired while working with the Debtors, I also have general knowledge of Debtors' books and records, and I am familiar with the Debtors' financial and operational affairs. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees or advisors, or my opinion based upon my experience with the Debtors' operations and financial condition and information provided to me by other members of KMLLP. In making the statements herein based upon my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees, I have relied upon these employees to accurately record, prepare and collect any such documentation and other information.

12.     If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or my personal opinion.

13.     I am authorized to submit this Declaration on behalf of the Debtors.

14.     Part II of this Declaration describes the business of the Debtors and the developments which led to the Debtors filing of the voluntary chapter 11 petitions. Part III sets forth the relevant facts in support of the various emergency first-day motions and applications filed by the Debtors concurrently herewith. Part IV summarizes the Debtors' objectives in these Chapter 11 Cases.

## II.  BACKGROUND

**A.      The Chapter 11 Filings.**

15.      On the date hereof (the "<u>Petition Date</u>"), the Debtors commenced their bankruptcy cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C §§ 101 <u>et.</u> <u>seq.</u> (the "<u>Bankruptcy Code</u>").

16.      The Debtors intend to operate their business and to manage their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

17.      The Debtors commenced these Chapter 11 cases in order to stabilize their operations and to facilitate a sale of their assets as a going concern for the benefit of their customers, their secured creditors, their employees, their vendors, and their other unsecured creditors. The Debtors will work diligently to file a Chapter 11 plan within the exclusive period in order to minimize fees, preserve the value of its assets, and maximize recovery for its stakeholders.

**B.      Overview of the Debtors.**

18.      Adinath is a Florida corporation and was formed in 1992 for the purpose of being a general partner of Simply Fashion.  It is owned 100% by Bhavana Shah.

19.      Simply Fashion is an Alabama limited partnership.  The general partner of Simply Fashion is Adinath, which owns a 1.99264670% interest.  The limited partners are Swapnil Shah Revocable Trust (DTD 11/8/2002) with a 39.4495507% interest; Shail Shah Revocable Trust (DTD 7/10/2004) with a 39.4495506% interest; Bhavana Shah Revocable Trust (DTD 5/6/1999) with a 6.70032600% interest.  The remaining 12.407926% limited partnership interest is owned by four individuals, each of whom owns a 3.1019815% interest.

20.     Simply Fashion is primarily a brick and mortar[2] retailer of Junior, Plus and Super Plus women's fashion catering to African-American women between the ages of 25 and 55, with locations in 25 states.  In addition to clothing, Simply Fashion also sells shoes, accessories, and lingerie.  Simply Fashion's motto is "to help women look good and feel great for less."

21.     As of the Petition Date, Simply Fashion employs a total of 1332 employees, of which 607 are full time employees and 725 are part time employees. Of the 1332 Employees, 1080 are hourly wage earners and 252 are salaried personnel.

**C.     History of the Debtors' Growth and Expansion.**

22.     Simply Fashion was originally formed to acquire the assets of Amret, Inc., (which operated under the name "Simply 6" and which sold merchandise at a retail price of $6 or less) out of its bankruptcy case which was filed in 1991 in the U.S. Bankruptcy Court for the Middle District of Alabama (Montgomery Division).  The assets acquired were primarily 100 leases located throughout the Southeast United States.  From its inception, Simply Fashion has catered to the plus size market, which was significantly underserved by other retailers.

23.     Simply Fashion also acquired approximately 20 leases from the Pic 'N Pay Stores, Inc. bankruptcy case which was commenced in 1996 in the Bankruptcy Court for the District of Delaware.  In 2005, Simply Fashion acquired approximately 80 leases from the Norstan Apparel Shops, Inc. bankruptcy case (which operated under the brand name of "Fashion Cents").  Norstan's bankruptcy case was commenced in 2001 in the United States Bankruptcy Court for the Eastern District of New York (Brooklyn Division).

24.      In addition to acquiring blocks of leases from the bankruptcy cases of other retailers, Simply Fashion has also acquired locations that fit its demographic profile on a one-off basis.  Historically, Simply Fashion has acquired locations with a footprint of 3,000 to 3,500

---

[2] From 2013 to January 2015 SFS had an ecommerce site.  During this period ecommerce sales were insignificant. Beginning in January 2015 to present, DOTS has an ecommerce site.  Ecommerce sales on the DOTS' site are

square feet, in areas where there is an African American population of at least 5,000 in a one mile radius and an African American population of at least 25,000 in a three mile radius.

25.     Beginning in 2012 and continuing through year-end 2014, Simply Fashion evaluated the profitability of its locations and began closing unprofitable stores.  In total, 120 stores were closed during this period.

26.     In June 2014, Simply Fashion became a licensee of the intellectual property of Dots, LLC ("DOTS") from an affiliated entity that acquired the intellectual property from the DOTS bankruptcy estate (another retail chain that filed for bankruptcy protection in 2014 in the United States Bankruptcy Court for the District of New Jersey).  As a result of the license, the Debtors approached the former DOTS landlords, entered into new leases, and opened in excess of 60 DOTS stores.

**D.      Present Day Structure of Operations.**

27.     The majority of the employees at the corporate offices have been with Simply Fashion for more than 10 years, and some employees have been with Simply Fashion since its inception.  Even its employees at the store level have a much lower than average turnover rate from Simply Fashion's competitors.

28.     Simply Fashion is a family owned business, and this is evident by the care and benefits it gives to its employees, including, among others, medical, dental, vision, automobile, homeowners, business, travel & accident, life & disability and legal insurance coverages, 401(k), interest free loans and Tuition Assistance Programs.

29.     At the store level, Simply Fashion is run by well-seasoned, impeccably trained, and tenured managers.  In addition to store managers, Simply Fashion has 16 district managers, 2 regional managers, and a director of store operations.  Simply Fashion also has employed the former DOTS managers to run the DOTS stores.

likewise insignificant.

30.     Simply Fashion has a distribution center where goods are brought in, processed, and shipped to the stores.   Simply Fashion has three employees who are responsible for purchasing merchandise on behalf of Simply Fashion.   The majority of these employees are located in New York.   These employees report to the Vice President of Sportswear.   In addition, there is one employee responsible for purchasing all accessories for Simply Fashion.   The accessory employee reports to the Senior Vice President of Merchandising.

31.     Simply Fashion's senior management team includes: (i) Swapnil Shah, its President and CEO, (ii) Shail Shah, its Vice President, and (iii) Soneet R. Kapila, its CRO. Adinath's senior management team includes: (i) Swapnil Shah, its President and Director, (ii) Bhavana Shah its Vice President and Director, (iii) Shail Shah, its Secretary, Treasure and Director, and (iii) Soneet R. Kapila, its CRO.

**E.     The Debtors' Debt Structure.**

32.     JNS INVT, LLC, a Florida limited liability company (the "Lender") is Simply Fashion's primary senior secured lender.   The Lender has a lien on virtually all of Simply Fashion's assets.   The outstanding principal balance due to the Lender is approximately $9 million.   The managers of the Lender are Swapnil Shah and Shail Shah, both of whom are insiders of Simply Fashion.

33.     In addition, IberiaBank provided financing for, and has purchase money security interest in Simply Fashion's Cash Register System.   IberiaBank is owed approximately $400,000.

34.     As of the Petition Date, there was approximately $3,739,000 in general unsecured debt owed to non-insider creditors, and $9,859,000 in general unsecured debt owed to insiders.

**F.     Events Leading to the Filing of the Chapter 11 Cases.**

   **a. The "great recession" and the impact on the Debtors and retailers in general.**

35.     During the "great recession," Simply Fashion's clientele were hit hard. Beginning in 2012, Simply Fashion experienced a decrease in sales' volume.  Store traffic declined considerably.  Simply Fashion's clientele were simply not shopping.

36.     In addition, Simply Fashion relies heavily on February and March sales, and its clientele spending their income tax refunds on purchases at its stores.  In 2015, due to unseasonably cold weather, as well as an overall decrease in the income tax refunds received by its clientele, Simply Fashion failed to meet its sales projections.

37.     Simply Fashion's financial struggles are not unique.  In recent months there has been a staggering increase in the number of retail companies seeking bankruptcy protection, including clothing retailers, both large and small.  Recent clothing related bankruptcies include DOTS, Alco Stores, Deb Shops, Wet Seal and dELIA*s.  A common thread among all includes the challenges faced by traditional brick and mortar stores as customers shift to more on-line shopping with expedited shipping.

   **b. The Debtors' Financial Overview**

38.     Simply Fashion's total annual revenues and earnings for the prior fiscal years was:

| FYE: | Total Revenue | Net from Loss | Average Number of Stores | Average Revenue per Stores | Average Net Income (Loss) per Store |
|---|---|---|---|---|---|
| Average (2006-2011) | $114,335,274 | $      (92,194) | | | |
| 2012 | $92,578,462 | $(13,251,440) | 281 | 329,461 | $      (47,158) |
| 2013 | $66,894,282 | $  (6,895,943) | 248 | 269,735 | $      (27,806) |
| 2014 | $65,496,869 | $  (9,112,455) | 237 | 276,358 | $      (38,449) |

39.    For the first quarter of 2015, the total revenue was $20,288,341.  Due to the loss of its CFO, the Debtor has not been able to close its books for February and March 2015.

40.    Adinath's total income or loss as reported on its tax returns was as follows:

| FYE | Total Income/[loss] |
|-----|---------------------|
| 2010 | $5,562 |
| 2011 | ($21,346) |
| 2012 | ($5,252,427) |

**G.    Objectives of Chapter 11 Filing.**

41.    The Debtors commenced these Chapter 11 Cases in order to preserve and maximize their enterprise value for the benefit of their consumers, their secured creditors, their vendors and other unsecured creditors, and their employees. The Debtors' immediate objective is to stabilize their operations by obtaining the relief requested in the First Day Motions and to work with interested parties to obtain a sale of their for the benefit of their customers, their secured creditors, their employees, their vendors, and their other unsecured creditors.

**H.    The Proposed Sale.**

42.    The Debtors are pursuing a process to maximize value and returns for all constituencies, whereby the Debtors will seek approval of a form of "stalking horse" agreement with Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC.  The stalking horse agreement, described more fully in the Sale and Bid Procedures Motion to be filed either concurrently herewith or shortly after the first day filings, seeks approval of the stalking horse as agent for the liquidation of substantially all of the Debtors' assets, subject to higher and better offers at an auction.  As part of this process, the Debtors anticipate that some locations will be forced to close.  The Debtors' exact plan will be refined in connection with and as a result of negotiations that are occurring and ongoing with the stalking horse and other potential purchasers and other interested parties.

## III.  <u>FIRST-DAY MOTIONS</u>

43.     Concurrently with the filing of these Chapter 11 Cases, the Debtors will be filing a number of First Day Motions.  The Debtors request that the Court conduct a hearing as soon as possible after the commencement of the Debtors' bankruptcy cases (the "<u>First Day Hearing</u>"), during which the Court will hear arguments of counsel with respect to the First Day Motions.

44.     I have reviewed each of the First Day Motions, including the exhibits thereto and I believe that the relief sought in each of the First Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to preserve their going concern value, to maximize the value of their assets for all creditors of their estates, and to avoid immediate and irreparable harm to the Debtors' estates.

**A.      Debtors' *Ex Parte* Motion for Joint Administration (the "Joint Administration Motion").[3]**

45.     The Debtors believe that it would be more efficient for the administration of these cases if joint administration were authorized.  The Debtors anticipate that a significant portion of the activity during these cases and most hearings will be substantially identical for both of the Debtors resulting in duplicative pleadings repeatedly being filed should joint administration be denied.  Consequently, joint administration would reduce costs and facilitate the economical, efficient and convenient administration of the Debtors' estates.

46.     The Debtors submit that the rights of the creditors of each of the Debtors will not be adversely affected by joint administration of these cases.  The Debtors filed the Joint Administration Motion on an *ex parte* basis as contemplated by Local Rule 1015-1(B)(2)(a). The Debtors submit that the entry of an Order approving joint administration of the Debtors' Chapter 11 Cases will be in their best interests and those of their creditors.

---

[3]  Capitalized terms used by not otherwise defined herein shall have the meanings ascribed to them in the respective motion or application, as defined, in this section of the Declaration.

**B.    Debtors' Application for Approval, on an Interim and Final Basis, of the Employment of Paul Steven Singerman and the Law Firm of Berger Singerman LLP as Counsel for Debtors in Possession *Nunc Pro Tunc* to Petition Date (the "BSLLP Application").**

47.    The Debtors seek authority to retain, on an interim basis, Paul Steven Singerman and the law firm of Berger Singerman LLP ("BSLLP") as general bankruptcy counsel *nunc pro tunc* to the Petition Date.  As detailed in the BSLLP Application, the Debtors understand that Mr. Singerman and BSLLP have extensive experience representing chapter 11 debtors in this district (and other districts across the country) and that they are well-qualified to serve as general bankruptcy counsel to the Debtors.  The Debtors believe it is in their best interests, and those of their creditors, that Mr. Singerman and BSLLP be retained to serve as Debtors' general bankruptcy counsel in their Chapter 11 Cases.

48.    To the best of the Debtors' knowledge, except as disclosed in the Declaration of Paul Steven Singerman on Behalf of Berger Singerman LLP as Proposed Counsel for Debtors-In-Possession, *Nunc Pro Tunc* to the Petition Date, affirmed by Mr. Singerman and filed by BSLLP which accompanies the BSLLP Application to retain it, neither Mr. Singerman nor BSLLP has any connection with the Debtors' creditors or other parties in interest or their respective attorneys.  Counsel has informed me that corporations may not appear in a Florida or federal court *pro se*, and that only a licensed attorney may appear on their behalf.  Because there is a myriad of relief that must be sought from the Court immediately, the Debtors will suffer immediate and irreparable harm if they are unable to obtain the services of counsel before a final hearing on the application for approval of counsel's employment can be convened.  For example, the Debtors require the Court's approval use their existing cash management system.  Without the ability to continue using their cash management system, the Debtors will be unable to operate and maximize value for the benefit of their estates.  It is, therefore, my belief that only with the granting of interim approval of counsel's employment will such immediate and irreparable injury

13

be avoided.  In that regard, counsel advises that this relief, as contemplated by Bankruptcy Rule 6003, has been granted in numerous chapter 11 cases in this District, including large chapter 11 cases.  *See*, *e.g.*, *In re McGuire Holdings*, Chapter 11 Case No. 11-39347-RAM (Bankr. S.D. Fla. Oct. 27, 2011); *In re HearUSA, Inc.*, Chapter 11 Case No. 11-23341-EPK (Bankr. S.D. Fla. May 20, 2011); *In re Gulfstream International Group, Inc.*, Chapter 11 Case No. 10-44131-BKC-JKO (Bankr. S.D. Fla. Nov. 8, 2010); *In re Medical Staffing Network Holdings, Inc., et al.*, Chapter 11 Case No. 10-29101-BKC-EPK (Bankr. S.D. Fla. July 8, 2010); *In re Gemini Cargo Logistics, Inc., et al.*, Chapter 11 Case No. 08-18173-BKC-PGH (Bankr. S.D. Fla. June 20, 2008); *In re First NLC Financial Services, LLC*, Chapter 11 Case No. 08-10632-BKC-PGH (Bankr. S.D. Fla. Jan. 28, 2008); *In re Tousa, Inc.*, Chapter 11 Case No. 08-10928-BKC-JKO (Bankr. S.D. Fla. Jan. 31, 2008) and by other bankruptcy courts throughout the country.  Accordingly, in the exercise of my business judgment, it is in the best interests of the Debtors, their estates and creditors to retain BSLLP as the Debtors' corporate restructuring counsel.

**C.    Debtors' Application for Approval of Employment of Prime Clerk LLC as Notice, Claims and Solicitation Agent of the Bankruptcy Court, *Nunc Pro Tunc* to Petition Date.**

49.    The Debtors seek approval of their agreement with Prime Clerk LLC and appointment of Prime Clerk LLC as notice, claims, and solicitation agent of the Court.  The Debtors believe that Prime Court LLC has substantial experience in noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of Chapter 11 cases.  The Debtors also believe that Prime Clerk LLC has substantial experience in cases of this size and complexity, and has acted as the official notice, claims, and balloting agent in many large bankruptcy cases pending in districts nationwide. The approval of the Debtors' agreement with Prime Clerk LLC and Prime Clerk LLC's appointment as notice, claims, and balloting agent of the Court will facilitate the orderly and efficient management of these chapter 11 cases.

**D. Debtors' Application for an Order Authorizing  Employment and Retention of KapilaMukamal, LLP and Soneet R. Kapila as Chief Restructuring Officer to the Debtor, *Nunc Pro Tunc* to the Petition Date.**

50.     In the ordinary course, the Debtors seek authority to retain KapilaMukamal LLP ("KMLLP"), *nunc pro tunc* to the Petition Date, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.  The Debtors understand that Soneet R. Kapila ("Kapila") and KMLLP have significant and extensive experience in providing interim management services in a Chief Restructuring Officer capacity.  The Debtors understand that KMLLP and Kapila have an excellent reputation for providing such services throughout the United States in restructuring matters, and that they are well-qualified to provide services to the Debtors in this case.  The Debtors believe that it is in their best interests, and those of their creditors, that KMLLP and Kapila be retained to serve as Chief Restructuring Officer to the Debtors in their Chapter 11 cases.

51.     Mr. Kapila and KMLLP were employed by the Debtors prepetition on March 26, 2015.  In that capacity, KMLLP reviewed the financial and operating performance of the Debtors, reviewed and helped manage the Debtors' operating budgets and liquidity, and advised the Debtors in regard to maximizing the value of the organization for all creditors and constituencies.  The continued post-petition retention of KMLLP is in the best interests of the Debtors.

52.     Due to KMLLP's extensive experience acting as interim Chief Restructuring Officer in restructuring matters, and in light of the prepetition work done for the Debtors by KMLLP, the Debtors will suffer immediate and irreparable harm if it is unable to obtain the services of KMLLP and Kapila in these cases.  It is, therefore, my belief that only with the granting of an order approving KMLLP's and Kapila's employment will such immediate and irreparable injury be avoided.

E.    **Debtors' Emergency Motion for Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility.**

53.    The Debtors receive certain utility services from various utility companies (the "Utility Companies").  The Debtors seeks to (a) prohibit Utility Companies from altering, refusing, or discontinuing service on account of unpaid prepetition invoices; (b) establish procedures to determine requests for additional adequate assurance of payment; and (c) approve deposits as adequate assurance of payment for utility services.

F.    **Debtors' Emergency Motion for Order (I) Authorizing Debtors to Pay (A) Certain Prepetition Employee Obligations and (B) Prepetition Withholding Obligations, (II) Authorizing the Debtors to Maintain Employee Benefit Programs, and (III) Directing Banks to Honor Related Prepetition Transfers (the "Employee Motion").**

54.    The Debtors seek the relief requested in the Employee Motion because any delay in paying employee compensation, deductions, or benefits will destroy the Debtors' relationships with the employees and irreparably impair employee morale at the very time when the dedication, confidence, and cooperation of these employees are most critical.  The Debtors face the imminent risk that their operations may be severely impaired if the Debtors are not immediately granted authority to make the payments described in the Employee Motion. Employee support for the Debtors' reorganization efforts is crucial to the success of those efforts, particularly given the unique knowledge of the employees regarding the Debtors' product lines, customers and operations.  At this critical early stage of these Chapter 11 Cases, the Debtors simply cannot risk the substantial disruption to their business operations that would inevitably attend any decline in work force morale attributable to the Debtors' failure to pay employee compensation, deductions, and benefits in the ordinary course.   Finally, to remain in a position to maintain necessary operational integrity, oversight, and quality control, the Debtors must continue their corporate policies of permitting certain employees to incur business-related

expenses and thereafter to seek reimbursement by submitting appropriate invoices or vouchers evidencing such out-of-pocket disbursements.

55.     The Debtors also are requesting authority to file under seal the schedule disclosing, among other things, the names of its 1,332 employees, amount of compensation sought to be paid, and withholding amounts.  Disclosing payroll information to all the employees and the general public may cause widespread employee anxiety and discord. Accordingly the Debtors are seeking authority to file under seal the employee schedule, and deliver the employee schedule to the Office of the United States Trustee.

**G.     Debtors' Emergency Motion Pursuant to Sections 105(a), 363, 1107 and 1108 of the Bankruptcy Code for an Order (A) Authorizing, But Not Directing, the Debtors to (I) Maintain and Administer Customer Programs, and (II) To Honor or Pay Certain Prepetition Obligations to Their Customers in the Ordinary Course of Business and (B) Granting Certain Related Relief (the "Customer Programs and Practices Motion").**

56.     Through the Debtors' Customer Programs and Practices Motion, the Debtors seek authorization to continue in the ordinary course, various customer programs designed to attract new customers and/or enhance product loyalty among the Debtors' existing customer base.  These programs include a return policy providing for the full refund or exchange of unworn items with original tags, store gift card for merchandise returned without a receipt and gift cards.  As of the Petition Date, the Debtors had outstanding a total of $331,576.66 in gift cards.  The Debtors seek to continue these customer programs in order to support the Debtors sales efforts and prevent alienation of its customers.

**H.     Debtors' Emergency Motion for (A) Authority to (I) Maintain Bank Accounts and to Continue to Use Existing Bank Forms and Checks, and (II) Continue to Use Existing Cash Management System, and (B) Waiver of Certain Investment and Deposit Guidelines (the "Cash Management Motion").**

57.     I understand from counsel that the U.S. Trustee has established certain operating guidelines for debtors-in-possession in order to supervise the administration of Chapter 11

cases. These guidelines require chapter 11 debtors to, among other things, close all existing bank accounts and open new debtor-in-possession ("DIP") bank accounts, establish one DIP account for all estate monies required for the payment of taxes (including payroll taxes), maintain a separate DIP account for cash collateral, and obtain checks for all DIP accounts that bear the designation "debtor-in-possession," the bankruptcy case number, and the type of account. These requirements are designed to provide a clear line of demarcation between prepetition and postpetition transactions and operations and to prevent the inadvertent postpetition payment of prepetition claims. In the Cash Management Motion, the Debtors seek a waiver of these requirements so that its operations are not further disrupted by the need to alter the cash management system.

58. Prior to the commencement of these Chapter 11 Cases, in the ordinary course of their business, the Debtors utilized a network of banks to efficiently collect, transfer and disburse funds generated on a daily basis from their operations (collectively, the "Bank Accounts"). A list of the Debtors' Bank Accounts and the amount on deposit in each such Bank Account as of April 16, 2015 is set forth on **Exhibits A. 1 and A.2** attached to the Cash Management Motion. The Debtor utilizes 75 bank accounts at the store level and five bank accounts at the corporate level. In addition to checks, the Debtors also conduct banking transactions by debit, wire or ACH payments, and other similar methods.

59. Through the utilization of the existing cash management system the Debtors are able to facilitate cash forecasting and reporting, monitor collection and manage disbursement of funds, and maintain control over the administration of the various bank accounts required to effect the collection, disbursement, and movement of cash. The movement of funds through the Debtors' cash management system is illustrated in the chart attached as **Exhibit "B"** attached to the Cash Management Motion.

60.    The cash management systems used by the Debtors constitute ordinary, usual, and essential business practices.  These systems allow the Debtors to (a) control corporate funds centrally, (b) ensure availability of funds when necessary, and (c) reduce administrative expenses.

61.    The Debtors' operations require that the cash management systems continue during the pendency of these Chapter 11 Cases.  If the Debtors were required to adopt a new cash management system, their operations would be severely disrupted, which would have an adverse impact on the Debtors' ability to finance their operations in the ordinary course and maximize the value of their enterprise.  Further, the establishment of new cash accounts and a new collection and disbursement system would result in substantial additional costs to the Debtors' bankruptcy estates.  Accordingly, maintenance of the existing cash management system is essential and in the best interests of all creditors and other parties in interest.

62.    The Debtors request authority to maintain their existing bank accounts and cash management systems in accordance with their usual and customary practices to ensure a smooth transition into chapter 11 with minimal disruption to operations.

63.    The Debtors seek a waiver of certain operating Guidelines established by the office of the U.S. Trustee.  For example, the Debtors seek a waiver of the requirements that they: (i) close all existing bank accounts; (ii) open new debtor in possession ("DIP") bank accounts; (iii) establish one DIP account for all estate monies required for the payment of taxes (including payroll taxes); (iv) maintain a separate DIP account for cash collateral; (v) obtain checks for all DIP accounts that bear the designation, "debtor in possession," the bankruptcy case number, and the type of account; and (vi) open a new set of books and records as of the Petition Date.  Closing and opening new bank accounts and books and records would create unnecessary administrative burdens and hardship and would cause unnecessary expense,

utilization of resources, and delay.  With the use of computer technology, it is now easy to differentiate between pre- and post-petition transactions by date.  The Debtors, in the ordinary course of their businesses, use many checks, invoices, stationery, and other business forms.  By virtue of the nature and scope of the businesses in which the Debtors are engaged and the numerous other parties with whom the Debtors deal, the Debtors need to use their existing bank accounts and business forms without alteration or change.  A substantial amount of time and expense would be required in order to close and open new bank accounts and print new checks and other business forms.  Fulfillment of the requirement would likely delay payment of post-petition claims and negatively affect operations.  Accordingly, the Debtors request that they be authorized to continue to use their existing bank account and business forms and to maintain their existing business records.

64.    I further understand that section 345 of the Bankruptcy Code and the U.S. Trustee establishes certain requirements with respect to all deposits and investments of money of the estate.  The Debtors believe that the banks at which they maintain their accounts are financially stable banking institutions, are FDIC insured and authorized depository pursuant to 11 U.S.C. § 345(b).  Additionally, as explained above, the Debtors' Bank Accounts comprise an established cash management system that the Debtors need to maintain in order to ensure that collections and disbursements from the Bank Accounts are not disrupted.  The Debtors will note, in their respective records, the date and times the chapter 11 petitions were filed, and the records will reflect each post-petition receipt and disbursement.  Therefore, a waiver of the section 345 deposit guidelines would not pose a risk to the Debtors' estates nor their creditors.

65.    The Debtors should be granted further relief from the Guidelines to the extent that they require the Debtors to make all disbursements by check.  In particular, the Guidelines require that all receipts and all disbursements of estate funds be by check with a notation

representing the reason for the disbursement. Considering the complexity of the Debtors' operations, the Debtors must conduct transactions by debit, wire, or ACH payments and other similar methods, as discussed above. In addition, the Debtors' receive a portion of their customer receipts from credit card purchases through ACH payments from the credit card companies. To deny the Debtors the opportunity to conduct transactions by debit, wire or ACH payments or other similar methods would interfere with the Debtors' performance of their contracts and unnecessarily disrupt the Debtors' business operations, as well as create additional costs to the Debtors. Therefore, the Debtors request a waiver of this requirement.

66.    The Debtors and I have been advised by counsel that the relief requested in the Cash Management Motion has been granted in other large chapter 11 cases in this District. Therefore, I submit that the entry of an order authorizing the relief sought will be in the Debtors' best interests and those of their creditors.

I.    **Debtors' Emergency Motion For Authorization to (I) Continue to Administer Insurance Policies and Related Agreements; and (II) Honor Certain Obligations in Respect Thereto (the "<u>Insurance Motion</u>").**

67.    The Debtors filed the Insurance Motion seeking authorization to continue to continue administering insurance policies and agreements relating thereto, and paying certain claims, in the Debtors' discretion to the extent they become due and payable during the pendency of these Chapter 11 Cases.

68.    The Debtor's maintain Workers' Compensation and Employers Liability Insurance; Management Liability Insurance; Fiduciary Liability Insurance; Commercial/General/Auto Liability Insurance; Umbrella Liability Insurance; and Excess Liability Insurance (collectively the "<u>Insurance Policies</u>").

69.    It is essential for the Debtors to maintain the Insurance Policies, which provide a comprehensive range of coverage for the Debtors. If the Insurance Policies are allowed to lapse,

the Debtors will be exposed to substantial liability for any damages resulting to persons or property of the Debtors and others, and the Debtors would have to bear the costs and expenses of defense litigation.  Moreover, maintenance of the Insurance Policies is mandatory under the guidelines of the U.S. Trustee and various state and federal laws.

70.     The Debtors' continued operations and liquidation efforts require that the Insurance Policies be maintained on an ongoing and uninterrupted basis.  In maintaining those obligations, it is crucial that the administrative fees paid to providers and the premiums paid for the Insurance Policies are continued and maintained by the Debtors.  For example, the risk that eligible claimants will not receive payments with respect to employment-related injuries may have a devastating effect on the financial well-being and morale of the employees, and their willingness to remain in the Debtors' employ.  Departures by employees at this critical time may result in a severe disruption of the Debtors' business to the detriment of all parties in interest.

71.     To the extent that the Insurance Policies may be deemed executory contracts, the Debtors do not at this time seek authority to assume these contracts.  The Debtors request only authorization to continue the programs, pay certain claims in accordance with the programs, and pay such premiums and administrative expenses as may be necessary to keep the Insurance Policies in force.

**J.      Debtors' Emergency Motion for Order Authorizing Debtors to Pay Prepetition Sales, Use, Trust Fund, Property, and Other Taxes and Similar Obligations (the "Tax Motion").**

72.     The Debtors are requesting that the Court enter an order authorizing, but not directing, the Debtors to pay prepetition sales, use, trust fund, property, and other taxes and similar obligations, as detailed in the Tax Motion, in the ordinary course of the Debtors' businesses.  In addition, the Debtors are requesting that (i) to the extent Debtors have paid certain taxes which should not have been paid, the Court authorize the Debtors to seek a refund

of such taxes, and (ii) to the extent that the Debtors dispute any such pre-petition tax, the Court authorize the Debtors to set aside, in a segregated account, funds to pay the subject tax until a final determination is made as to whether the Debtors are obligated to pay the subject tax.

73.     In connection with the operation of their businesses, the Debtors: (a) incur certain sales, use, trust fund and property taxes, and collect or incur payroll and employment-related taxes in favor of various taxing authorities (collectively, the "Taxes"), and (b) are charged fees, licenses, and other similar charges and assessments by various licensing authorities (collectively, the "Fees").  The Taxes and Fees are paid to various taxing, licensing, and other authorities (collectively, the "Authorities") on a periodic basis (whether monthly, quarterly, or yearly) that are established for each particular Tax or Fee.

74.     As of the Petition Date, the Debtors estimate that they have incurred prepetition payroll and employment-related Taxes in the ordinary course of business and that such Taxes are owed (but have not yet been paid) to the Authorities.  Those payroll and employment-related taxes will be paid in conjunction with the Debtors' upcoming payroll, which payroll is subject of a separate first day motion.  Other than amounts owed related to the upcoming payroll, the Debtors are current on their payroll and employment-related Taxes.

75.     Separate and apart from the payroll and employment-related taxes, the Debtors estimate that as of the Petition Date, Simply Fashion owes the various Authorities approximately $546,279.51 in prepetition Taxes and Fees as described in detail on **Exhibit "A"** to the Tax Motion.  Adinath does not owe any prepetition Taxes and Fees.  Through the Tax Motion, the Debtors seek only the authorization to pay the Authorities the amounts described therein.  Other than amounts currently due, the Debtors are current on all other Taxes and Fees and are not otherwise in arrears.

76.     If the Taxes and Fees are not paid, it is possible that some, if not all, of the Authorities may, pursuant to Bankruptcy Code § 362(b)(9), cause the Debtors to be audited and subjected to various administrative proceedings.  Such audits and administrative proceedings and the accompanying disruption in business activities would materially and adversely affect the Debtors' reorganization prospects and unnecessarily divert the Debtors' attention away from this case.  In the event that such action is taken by the Authorities, the Debtors need the authority of this Court to pay, if necessary, the various Taxes and Fees.

77.     Accordingly, the Debtors request that they be authorized, but not directed, to pay the Taxes and Fees to the relevant Authorities in the ordinary course of business.  Nothing herein, however, shall preclude the Debtors from contesting, in their sole discretion, the validity and amount of any Taxes or Fees under bankruptcy or non-bankruptcy law.

78.     The Debtors further request that all depositories on which checks were drawn in payment of prepetition amounts to the Authorities be directed to clear such checks as and when presented for payment, if appropriate.  For the above reasons, I believe that granting the relief requested in the Insurance Motion is in the best interests of the Debtors, the estates, their creditors and other interested parties.

**K.      Debtors' Emergency Motion for Order (I) For Authorization To (A) Obtain Postpetition Secured Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, and 364, and (B) to Use Cash Collateral on an Interim Basis Pursuant to 11 U.S.C. § 363, (II) to Grant Adequate Protection in Connection Therewith Pursuant to 11 U.S.C. §§ 361, 363 and 507, and (III) Scheduling a Final Hearing Under Bankruptcy Rule 4001(the "<u>DIP Financing Motion</u>").**

79.     The Debtors have filed the DIP Financing Motion to request that the Court enter an interim order (the "<u>Interim Order</u>") substantially in the form attached to the DIP Financing Motion as **<u>Exhibits "A"</u>** and final order (the "<u>Final Order</u>", together with the Interim Order, collectively, the "<u>DIP Financing Orders</u>"), pursuant to sections 105, 361, 362, 363, and 507(b)

of the Bankruptcy Code, Bankruptcy Rule 4001(b), Local Rules 4001-2, 4001-3 and the Guidelines (i) authorizing the Debtors (a) to obtain postpetition financing and (b) use cash collateral, (ii) granting adequate protection in connection therewith, and (iii) scheduling an emergency interim hearing and final hearing on the DIP Financing Motion.

80.    I am informed by counsel that the following disclosures are provided in conformance with the requirements of Bankruptcy Rule 4001(b), Local Rules 4001-2 and 4001-3, 9013-1(F) and (G), and the Guidelines:

| Material Provision | Location in Interim Order | Summary Description |
|---|---|---|
| Prepetition Lender, only party with interest in cash collateral | p.2, ¶(i) | JNS INVT, LLC.  The managers of the Lender are Swapnil Shah and Shail Shaw, who are  indirect owners of Simply Fashion |
| DIP Lender | p.2, ¶(i) | JNS INVT, LLC. |
| Principal balance due Prepetition Lender | p.6, ¶E.(iii) | Approximately $9,000,000 |
| Loan Amount | p.2, ¶(ii) | Not to exceed $1,250,000 |
| Interest Rate | p.2, ¶(ii) | 6% (with no fees) |
| Liens/Super priority and priming liens | p.2, ¶(iii); p. 17, ¶11 | Priming lien, subject to Iberiabank Lien |
| Post-Petition Collateral | p.3, ¶(iii) | First priority, priming lien (subject to Iberiabank Lien) on all tangible and intangible assets, |
| Cash Collateral | P10, ¶E(vi) | All of Debtors' cash and cash equivalents, including the cash in its deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral |
| Proposed Use of DIP Loan/ Cash Collateral | p.3, ¶(iv); p. 19, ¶14, Exhibit A- Budget | working capital and general corporate purposes; payment of certain administrative costs as set forth in the Budget; payment of interest and fees to DIP Lender; payment of insurance on Collateral, with disbursements not to exceed the sum of (x) 120% of the disbursements projected for such week in the Budget, plus (y) (except for the first week) any unused portion of the disbursements projected for any prior week in the Budget (but excluding, for avoidance of doubt, any amounts in excess of 100% of the projected disbursements for any week).  For the Period April 16, 2015 through the anticipated final hearing on cash collateral (on or before May 8, 2015)  the Debtors seek to use $1,250,000  in proceeds from the DIP Loan and cash collateral. The Debtors' Chief Restructuring Officer, Soneet R. Kapila, prepared the Budget. |
| Termination Date | | The Interim Period shall be through May 8, 2015, and subject to termination provisions in paragraphs 16 and 17 |
| Termination Provisions | p. 20-23, ¶¶16-17 | Debtors ability to borrow funds  and/or use Cash Collateral shall terminate upon an event of default including: |

| | | |
|---|---|---|
| | | (i) failure to comply with the terms of this Interim Order (including the Budget);<br>(ii) the obtaining of credit or the incurring of indebtedness that is equal to or senior to the Lender, or entitled to priority administrative status which is equal or senior to that granted to the Lender herein;<br>(iii) subject to the institution of a Challenge;<br>**(iv)** Termination of Lender's lien or security interest or assertion by Debtor that Lender's lien is not valid or perfected;<br><br>(v) relief from stay granted (a) to allow any creditor to execute upon or enforce a lien on or security interest in any Collateral, or (b) with respect to any lien of or the granting of any lien on any Collateral to any state or local environmental or regulatory agency or authority, which would have a material adverse effect on the business, operations, property, assets, or condition, financial or otherwise, of the Debtors;<br><br>(vi) the reversal, vacatur, or modification (without the express prior written consent of the Lender, in its sole discretion) of this Interim Order;<br><br>(vii) dismissal or conversion of the Cases, or appointment of a chapter 11 trustee or examiner;<br><br>(viii) the sale of any portion of the Debtor'' assets outside the ordinary course of business without the prior written consent of the Lender, in its sole discretion;<br><br>(ix) the Debtors' failure to obtain entry of a Final Order by May 8, 2015;<br><br>(x) the granting of any motion providing for reconsideration, stay, or vacatur of the Interim Order; or<br><br>(xi) the Debtors assertion in any pleading filed in any court that any material provision of the Interim Order is not valid and binding for any reason, or (2) any material provision of the Interim Order shall, for any reason, cease to be valid and binding without the prior written consent of the Lender**.** |
| Remedies Notice Period | p. 22-23, ¶17 | Within 7 business days after a Termination Declaration Date, the Debtors and/or the Statutory Committee may seek an emergency hearing to determine if an Event of Default has occurred. |
| Adequate Protection | p. 26-29, ¶21 | (i) Adequate Protection Liens.  Prepetiton Lender granted additional and replacement continuing valid, binding, enforceable, non-avoidable, and automatically perfected postpetition security interests in and liens  on the Postpetition Collateral, excluding any causes of action arising under chapter 5 of the Bankruptcy Code. The Adequate Protection Liens shall be subject and subordinate in priority to (i) the Carve Out, (ii) Postpetition Liens, and (iii) liens senior to Prepetition Senior Liens in favor of Prepetition Lender.<br>(ii) Administrative Expense Claim.  To the extent of any Diminution in the Value of the Collateral, Prepetition Lender shall have an administrative expense claim with priority over all other administrative expense claims against Simply Fashion subject and subordinate to the Carve Out. |

| | | |
|---|---|---|
| | | (iii) <u>Payment</u>. The Debtors shall pay to the Lender (a) commencing on May 1, 2015, interest accrued on the Prepetition Obligations from and after the Petition Date, in arrears, and (ii) reasonable fees and expenses of Prepetition Lender's attorneys and financial advisors in connection with the Cases incurred from and after the Petition Date in accordance with the Interim Order.<br><br>(iv) <u>Reporting</u>.  The Debtors shall provide weekly reporting to the Prepetition Lender reconciling Simply Fashion's sources, uses and disbursement of cash with the Budget; financial, operational and related reports and documents required under the terms of the Loan Agreement or reasonably requested by Prepetition Lender; and reasonable access to all places of business officers, consultants and employees. |
| Debtor's Acknowledgements and Agreement | p.6, ¶ E | Among other things, the Debtors acknowledge amount of Prepetition Lender's loan, validity, priority and extent of lien on Prepetition Collateral, subject only to Iberiabank Lien |
| Waiver /modification of stay | p. 21, ¶16(E) | Entry of an order granting relief from stay to allow any creditor to execute or enforce a lien on Postpetition Collateral is an Event of Default |
| Limitation on use of proceeds | p.29, ¶ 22 | Neither Cash Collateral not proceeds from DIP Loan nor Carve Out Funds may be used (a) to pursue (i) any action adverse to interests of DIP Lender or Prepetition Lender; (ii) invalidate, set aside, avoid, subordinate DIP Lien, Interim Order, or Prepetition Loan Documents; (iii) for monetary, injunctive or other affirmative relief against the DIP Lender or Prepetition Lender; (iv) preventing, hindering, delaying DIP lender and Prepetition Lender's exercise of any right or remedy; (b) for objecting to, contesting, interfering with DIP Lender and Prepetition Lender's enforcement or realization upon any Collateral once Event of Default occurred; (c) using, selling or disposing of Collateral without consent of DIP Lender or Prepetition Lender; (d) objecting to or challenging liens or interest held by DIP Lender or Prepetition Lender;  (e) asserting, commencing, prosecuting any claim or cause of action, including Chapter 5 claims against DIP Lender, Prepetition Lender or Lender Parties; (f) prosecuting an objection or contesting the validity, priority, extent or enforceability of any of the Prepetition Obligations under the Prepetition Loan Documents or Prepetition Senior Liens or any other rights or interests of DIP Lender or Prepetition Lender; or (g) for preventing, hindering or otherwise delaying the exercise by the DIP Lender and Prepetition Lender of any rights and remedies granted under this Interim Order. |
| Waiver of right to file a plan | | none |
| Deadlines for filing a plan | | none |
| Waiver/modification of nonbankruptcy law re perfection | p.6, ¶ E | Debtors acknowledge Prepetition Senior Liens on Prepetition Collateral are valid, biding, enforceable, nonavoidable, and properly perfected. |
| Release/waiver of claims | p.6, ¶ E | Debtors waive right to assert lender liability or equitable subordination claims or defenses; offsets, challenges, objections, defenses or claims of any kind to Prepetition Senior Liens or Prepetition Obligations, and right to assert any claims related to validity, priority, perfection or avoidability of liens or claims of |

| | | Prepetition Lender; and right to challenge any of Prepetition Senior Liens or Prepetition Obligations |
|---|---|---|
| indemnification | | none |
| Limitation of rights of parties under section 506(c) | p. 18, ¶12, p. 18, ¶ 13 p. 26, ¶ 20 p. 27, ¶ 21(c) | Postpetition Liens, Adequate Protection Liens, DIP Obligations and Postpetition Collateral shall not be subject to section 506(c) |
| Granting of lien on claims/causes of action | p. 17, ¶ 11, | The Postpetition Liens shall not encumber the Debtors' avoidance claims or causes of action arising under Chapter 5 of the Bankruptcy Code. |
| Carve Out | p. 19-20, ¶15 | Lender's Adequate Protection Liens and Super-Priority Claim shall be subordinate to<br>(i) the claims of retained professionals of the Debtors in these Cases and the Chief Restructuring Officer and his professional firm (the "Retained Professionals").  From and after receipt of a Carve-Out Trigger Notice, the Carve-Out shall be capped at $300,000 in the aggregate for all Retained Professionals plus up to $5,000 for any professionals engaged by any successor to the Debtors, including an trustee or examiner with expanded powers.<br><br>(ii) unpaid fees and expenses of the United States Trustee and the Clerk of the Court (or any agent thereof).. |
| Binding Effect | p.30, ¶23, p. 31, ¶23 | Subject to the Challenge, Debtors' Stipulations shall be binding upon the Debtors Debtors' bankruptcy estates, Lender, and Statutory Committee, all creditors of the Debtors, any subsequently appointed trustee.<br>The Statutory Committee, or any other party in interest granted standing by the Court (other than the Debtors) may assert claims against the Prepetition Lender or object to or challenge the findings, or stipulations, including validity, priority  or extent of the Prepetition Lender's liens within the earlier of (a) 60 days following the formation of the Committee and  (ii) if no Committee is appointed, 75 days from the Petition Date. |
| Interim Order | | The proposed form of Interim Order is attached to the Motion as **Exhibit A.** |

81.    Through the DIP Financing Motion, and in an abundance of caution, the Debtors seek to obtain financing and utilize cash collateral in order to maintain their businesses.  The Debtors' request for financing and use of cash collateral is meant to cover the Debtors' essential expenses contained in the Budget, and to ensure successful operations to allow the Debtors to promptly file a plan of reorganization.  Those expenses include payment of wages, taxes, insurance and other expenses that are needed to perform under the Debtors' commercial retail business.  The Debtors request financing and the use of the cash collateral through the time that

the Lender is paid in full, the Debtors emerge from chapter 11 under a confirmed plan or further order of the Court.

82.     Unless authorized to obtain financing and use the cash received in the ordinary course of business, the Debtors will be unable to remain in business.  The Debtors will default under their obligations and will have no ability to liquidate their inventory.

83.     I am informed by counsel that, pursuant to Bankruptcy Rule 4001(b)(2) and Rule 4001(c), a final hearing on a motion to use cash collateral may not be commenced earlier than 14 days after service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral to the extent "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Bankruptcy Rule 4001(b)(2) & (c)(2).  I believe that it is essential to the continued operation of the Debtors' business that they be authorized by this Court to obtain financing and use cash collateral as set forth in the Interim Order pending the final hearing on the DIP Financing Motion.  Unless the DIP Financing Motion is approved on an interim basis, the Debtors will have difficulty paying their suppliers and satisfying their customer obligations, which would have a devastating effect on the Debtors' operations, customer base and revenues.  Thus, funds are urgently needed to meet all of the Debtors' working capital and other liquidity needs.  In the absence of immediate relief, the Debtors' attempts to continue their businesses in the ordinary course will be immediately and irreparably jeopardized.

84.     Such interim relief is essential to enable the Debtors to fulfill their existing obligations, as specifically detailed in the Budget.  These sums will be required to pay employees, and other operating expenses that are the very minimum necessary for the Debtors to continue as a going concern for the benefit of all of its creditor constituencies.  If the Debtors are unable to obtain financing and use cash collateral or obtain such additional liquidity, they will

not be able to meet essential obligations thereby forcing a shutdown of their operations. Accordingly, I believe that the Debtors and their creditors face a substantial risk of immediate and irreparable harm if the relief sought in the DIP Financing Motion is not permitted on an interim as well as final basis. For all of these reasons, I believe that the relief requested in the DIP Financing Motion will inure to the benefit of the Debtors, their estates, creditors and all other interested parties.

**L.      Debtor's Emergency Motion Pursuant To Sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006, and Local Rule 6004-1, for (I) Approval of Procedures in Connection with the Sale of all or Substantially all of the Debtors' Assets; (II) Authorization to Enter into Stalking Horse Agreement in Connection Therewith; (III) Approval of the Payment of Stalking Horse Protections; and (IV) the Setting of Related Auction and Hearing Dates (the "Sale Motion")**

85.      The Debtors have filed or will file shortly the Sale Motion seeking approval of (a) the form of agency agreement to be attached as **Exhibit A** to the Sale Motion (the "Stalking Horse Agreement") with a stalking horse ("Agent" or "Stalking Horse Bidder") pursuant to which the Stalking Horse Bidder will serve as agent for the liquidation of substantially all of the Debtors' assets, subject to higher and better offers received at an auction; (b) the bidding procedures with respect to the Stalking Horse Agreement; and (c) shortened notice of the proposed sale in order to meet the timeline proposed in the Sale Motion. The Debtors believe that an accelerated sale of all of its assets pursuant to arrangements with the Stalking Horse Bidder or to a bidder or group of bidders submitting higher or otherwise better bids pursuant to the proposed bidding procedures will maximize the value of the Debtors' estate for the benefit of all parties in interest, and should be approved.

86.      Pursuant to the Stalking Horse Agreement, the Stalking Horse Bidder (or a bidder or group of bidders submitting higher or otherwise better bids) agrees to act as the Debtors' exclusive agent for the sale or other disposition of the Merchandise, free and clear of

liens, claims, encumbrances and interests, with such liens, claims, encumbrances and interests to attach to the sale proceeds.

87.     The Stalking Horse Agreement represents the culmination of an extensive negotiation process conducted by the Debtors and their advisors and the Stalking Horse Bidder and its advisors.  The Debtors initially contacted numerous groups regarding liquidation bids, and established an electronic data room accessible to all parties who executed a confidentiality agreement with the Debtors.  Ultimately three interested parties executed the confidentiality agreement and accessed the data room.  This process culminated in the Stalking Horse Agreement with the Stalking Horse Bidder.

88.     The Debtors desire to effectuate the sale of their assets on the terms and conditions set forth in the Stalking Horse Agreement, or on higher or otherwise better terms pursuant to a competitive marketing process and Auction.

89.     The Debtors desire to receive the greatest value for their assets and seek to capitalize on possible sale opportunities before any devaluation of the Merchandise and the Debtors believe that they must promptly move forward with an auction process in order to generate higher and better offers for the Merchandise.  Accordingly, the Bidding Procedures (As summarized in the Sale Motion) were developed consistent with the Debtors' need to expedite the sale process, and with the objective of promoting further active bidding that will result in the highest or best offer the marketplace can generate for the Merchandise.  Moreover, the Bidding Procedures reflect the Debtors' objectives of conducting the Auction in a controlled, fair, and open process that promotes interest in the Merchandise and other assets by financially-capable, motivated bidders who are likely to close a transaction.

90.     In order to induce the Stalking Horse Bidder to sign the Stalking Horse Agreement, and recognizing the considerable time and resources the Stalking Horse Bidder has

expended and will continue to expend pursuing their right to serve as Agent for the liquidation

of the Debtors' assets, the Debtor has agreed to provide certain customary bid protections

typically afforded to stalking horse bidders in chapter 11 sales including a combined break-up

fee and expense reimbursement of in the event the Stalking Horse Bidder is not the Successful

Bidder.  In addition, the Stalking Horse shall be entitled to receive its documented, actual out-

of-pocket costs of signage and freight to be reimbursed directly to the Stalking Horse Bidder by

the Successful Bidder.

91.     If the Stalking Horse Bidder becomes entitled to receive the Break-Up Fee, then

such Break-Up Fee shall be the sole and exclusive remedy of the Stalking Horse Bidder,

whether at law or in equity, for any breach by the Debtors of the terms of the Stalking Horse

Agreement.  The Break-Up Fee was a material inducement for, and a condition of, the Stalking

Horse Bidder's entry into the Stalking Horse Agreement.

92.     The Debtors believe that the Break-Up Fee is fair and reasonable in view of the

(a) analysis, due diligence, investigation, and negotiation undertaken by the Stalking Horse

Bidder in connection with the Sale, (b) the fact that the Stalking Horse Bidder's efforts have

increased the chances that the Debtors will receive the highest or otherwise best offer for their

assets, and (c) the modest size of the Break-Up Fee when considered in light of such fees often

approved b bankruptcy courts in similar cases.

93.     Pursuant to Bankruptcy Rule 9006(c), the Debtors also request that the Court

shorten the notice for the Sale and Auction.  Pursuant to Rule 2002(a)(2), a proposed use, sale or

lease of property outside the ordinary course of business requires 21 days' notice.  Rule 9006(c),

permits the Court, for cause shown, to shorten the notice of a proposed sale.  Given the Debtors'

limited liquidity, the Debtors submit that there is sufficient cause to shorten the notice of the

proposed sale.

94.     Ample business justification exists in these cases to approve the proposed Bidding Procedures and any transaction effectuated in accordance therewith.  The Debtors have considered all alternatives, with the assistance of its advisors, and determined that the immediate sale of substantially all of their assets through an agency agreement with a liquidator, is in the best interests of their estates and creditors.  In order to preserve and maximize the value of the Debtors' assets, the Debtors believe that the disposition of their assets must be completed in the time frame described in the Sale Motion.

**M.     Debtors' Motions to Reject Leases**

95.     The Debtors have filed two motions to reject leases.  The first motion, filed on an emergency basis, is to reject 5 leases as of the Petition Date. The Debtor executed these lease pre-petition with the intent of opening new stores.  In light of the economic circumstances the Debtors found themselves as a result of lower than projected sales during its "busy" season, the Debtor decided not to open these stores.  Accordingly, the Debtor has no use for these leases and they would constitute an administrative burden to the estate.

96.     In addition, as part of the Sale Motion, 50 stores have been identified by the Stalking Horse as stores that must close prior to the beginning of the "GOB" sales on May 1. Accordingly, the Debtor filed its motion to reject these 50 leases as of close of business on April 30, 2015.

**IV.  DEBTORS' OBJECTIVES IN THESE CASES**

97.     The primary purpose of the filing of these Chapter 11 Cases is to preserve and maximize the value of the Debtors' business through an orderly sale process for the benefit of all of the Debtors' stakeholders.    In the interim, through the motions described above and other motions and applications the Debtors intend to file shortly after the Petition Date, the Debtors hope to minimize any adverse affects that these Chapter 11 Cases might otherwise have on their

business.  For all of these reasons, I respectfully request that this Court grant the relief requested in each of the First Day Motions filed concurrently herewith.

## V.  <u>CONCLUSION</u>

98.    To successfully reorganize, the Debtors' immediate objective is to maintain "business as usual" following the commencement of these cases by minimizing any adverse impact of the filing of these Chapter 11 Cases on the Debtors' assets and operations and protect the interests of their employees, creditors and other stakeholders.  For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if the Court grants the relief requested in each of the First Day Motions.

<u>**28 U.S.C.  § 1746 Declaration**</u>

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this ___18th___ day of April, 2015 in Birmingham, Alabama.

Soneet R. Kapila, Chief ~~Restructuring~~ Officer, Adinath Corp., and Simply Fashion Stores, Ltd.