UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:                                              Chapter 11 Cases

ADINATH CORP. and SIMPLY                            Case No. _____
FASHION STORES, LTD.,[1]                            (Jointly Administration Pending)

          Debtors.

_____/

**DEBTORS' EMERGENCY MOTION (I) FOR AUTHORIZATION TO (A) OBTAIN
POSTPETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362,
AND 364, AND (B) TO USE CASH COLLATERAL ON AN INTERIM BASIS
PURSUANT TO 11 U.S.C. § 363, (II) TO GRANT ADEQUATE PROTECTION IN
CONNECTION THEREWITH PURSUANT TO 11 U.S.C. §§ 361, 363 AND 507,
AND (III) SCHEDULING A FINAL HEARING UNDER BANKRUPTCY RULE 4001**

**(Emergency Hearing Requested)**

**Statement of Exigent Circumstances**

      The Debtors seek to continue to operate their businesses in the ordinary course, to preserve the value of the estates, to preserve jobs and to facilitate an orderly liquidation. Without the immediate authorization to obtain financing and use cash collateral, the Debtors will not be able to meet payroll and other obligations necessary for their day-to-day operations. The Debtors respectfully request that the Court conduct a hearing on this Motion within two business days of the Petition Date (as defined herein), consistent with Local Rule 9013-1(F), as the Debtors believe that a hearing on this Motion is needed as soon as possible in order for them to continue to operate. The Debtors respectfully request that the Court waive the provisions of Local Rule 9075-1(B) which requires an affirmative statement that a bona fide effort was made in order to resolve the issues raised in the Motion, as the relief requested herein is urgent in nature and does not lend itself to advance resolution.

      Adinath Corp. ("Adinath") and Simply Fashion Stores, Ltd. ("Simply Fashion", and together with Adinath, each, a "Debtor", and collectively, the "Debtors"), by and through their proposed undersigned counsel, hereby file this emergency motion (the "Motion") requesting this

---

[1]  The Debtors in these cases, along with the addresses and last four digits of each Debtor's federal tax identification number are: (i) Adinath Corp., 2110 N.W.95th Avenue, Miami FL 33172 (4843); and (ii) Simply Fashion Stores, Ltd., 2500 Crestwood Boulevard, Birmingham, AL 35210 (6230).

Court to enter an interim order (the "Interim Order"), substantially in the form attached hereto as **Exhibit "A"**[2], and final order (the "Final Order", together with the Interim Order, collectively, the "DIP Financing Orders) pursuant to sections 105, 361, 362, 363,  364 and 507(b) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 4001-2 and 4001-3 of the Local Rules of United States Bankruptcy Court for the Southern  District of Florida (the "Local Rules"), and this Court's Guidelines for Motions Seeking Authority to Use Cash Collateral and Motions Seeking Approval of Postpetition Financing (the "Guidelines"), (i) authorizing the Debtors (a) to obtain postpetition financing and (b) to use cash collateral, (ii) granting adequate protection in connection therewith, and (iii) scheduling an emergency interim hearing and final hearing on the Motion.  In support of this Motion, the Debtors rely upon the *Declaration in Support of First Day Pleadings* (the "First Day Declaration") filed on the Petition Date (as defined below), and respectfully state as follows:

## I.  JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief sought herein are sections 105(a), 361, 362, 363, 364, 507(a)(8), 541, 1107(a) and 1108 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 2014(a), 2016, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 4001-2 and 4001-3.

---

[2] In the event of any inconsistency between the summary of the terms contained in this Motion and the terms set forth in the Interim Order, the terms of the Interim Order shall control.

## II.  DISCLOSURES UNDER BANKRUPTCY RULES, LOCAL RULES AND GUIDELINES

4.      Pursuant to Bankruptcy Rule 4001(b), Local Rules 4001-2, 4001-3, 9013-1(F) and

(G), and the Guidelines, the Debtors submit the following list and summary of the material terms

of its proposed secured financing and use of cash collateral pursuant to the proposed Interim

Order, setting forth the location of such material terms[3] in the Interim Order.

| Material Provision | Location in Interim Order | Summary Description |
|---|---|---|
| Prepetition Lender, only party with interest in cash collateral | p.2, ¶(i) | JNS INVT, LLC.  The managers of the Lender are Swapnil Shah and Shail Shaw, who are  indirect owners of Simply Fashion |
| DIP Lender | p.2, ¶(i) | JNS INVT, LLC. |
| Principal balance due Prepetition Lender | p.6, ¶E.(iii) | Approximately $9,000,000 |
| Loan Amount | p.2, ¶(ii) | Not to exceed $1,250,000 |
| Interest Rate | p.2, ¶(ii) | 6% (with no fees) |
| Liens/Super priority and priming liens | p.2, ¶(iii); p. 17, ¶11 | Priming lien, subject to Iberiabank Lien |
| Post-Petition Collateral | p.3, ¶(iii) | First priority, priming lien (subject to Iberiabank Lien) on all tangible and intangible assets, |
| Cash Collateral | P10, ¶E(vi) | All of Debtors' cash and cash equivalents, including the cash in its deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral |
| Proposed Use of DIP Loan/ Cash Collateral | p.3, ¶(iv); p. 19, ¶14, Exhibit A- Budget | working capital and general corporate purposes; payment of certain administrative costs as set forth in the Budget; payment of interest and fees to DIP Lender; payment of insurance on Collateral, with disbursements not to exceed the sum of (x) 120% of the disbursements projected for such week in the Budget, plus (y) (except for the first week) any unused portion of the disbursements projected for any prior week in the Budget (but excluding, for avoidance of doubt, any amounts in excess of 100% of the projected disbursements for any week).  For the Period April 16, 2015 through the anticipated final |

---

[3] The following summary contains truncated descriptions of material terms and is qualified in its entirety by the actual terms of the proposed Interim Order.  Capitalized but undefined terms shall have the meanings given to such terms in the Interim Order and/or this Motion, as applicable.

| | | |
|---|---|---|
| | | hearing on cash collateral (on or before May 8, 2015) the Debtors seek to use $1,250,000 in proceeds from the DIP Loan and cash collateral. The Debtors' Chief Restructuring Officer, Soneet R. Kapila, prepared the Budget. |
| Termination Date | | The Interim Period shall be through May 8, 2015, and subject to termination provisions in paragraphs 16 and 17 |
| Termination Provisions | p. 20-23, ¶¶16-17 | Debtors ability to borrow funds and/or use Cash Collateral shall terminate upon an event of default including:<br>(i) failure to comply with the terms of this Interim Order (including the Budget);<br>(ii) the obtaining of credit or the incurring of indebtedness that is equal to or senior to the Lender, or entitled to priority administrative status which is equal or senior to that granted to the Lender herein;<br>(iii) subject to the institution of a Challenge;<br>(iv) Termination of Lender's lien or security interest or assertion by Debtor that Lender's lien is not valid or perfected;<br>(v) relief from stay granted (a) to allow any creditor to execute upon or enforce a lien on or security interest in any Collateral, or (b) with respect to any lien of or the granting of any lien on any Collateral to any state or local environmental or regulatory agency or authority, which would have a material adverse effect on the business, operations, property, assets, or condition, financial or otherwise, of the Debtors;<br>(vi) the reversal, vacatur, or modification (without the express prior written consent of the Lender, in its sole discretion) of this Interim Order;<br>(vii) dismissal or conversion of the Cases, or appointment of a chapter 11 trustee or examiner;<br>(viii) the sale of any portion of the Debtor'' assets outside the ordinary course of business without the prior written consent of the Lender, in its sole discretion;<br>(ix) the Debtors' failure to obtain entry of a Final Order by May 8, 2015;<br>(x) the granting of any motion providing for reconsideration, stay, or vacatur of the Interim Order; or<br>(xi) the Debtors assertion in any pleading filed in any court that any material provision of the Interim Order is not valid and binding for any reason, or (2) any material provision of the Interim Order shall, for any reason, cease to be valid and binding without the prior written consent of the Lender. |
| Remedies Notice Period | p. 22-23, ¶17 | Within 7 business days after a Termination Declaration Date, the Debtors and/or the Statutory Committee may seek an emergency hearing to determine if an Event of Default has occurred. |
| Adequate Protection | p. 26-29, ¶21 | (i) Adequate Protection Liens. Prepetiton Lender granted additional and replacement continuing valid, binding, enforceable, non-avoidable, and automatically perfected postpetition security interests in and liens on the Postpetition Collateral, excluding any causes of action arising under chapter 5 of the Bankruptcy Code. The Adequate Protection Liens shall be subject and subordinate in priority to (i) the Carve Out, (ii) Postpetition Liens, and (iii) liens senior to Prepetition Senior Liens in favor of Prepetition Lender.<br><br>(ii) Administrative Expense Claim. To the extent of any Diminution in |

|  |  | the Value of the Collateral, Prepetition Lender shall have an administrative expense claim with priority over all other administrative expense claims against Simply Fashion subject and subordinate to the Carve Out.

(iii) <u>Payment</u>. The Debtors shall pay to the Lender (a) commencing on May 1, 2015, interest accrued on the Prepetition Obligations from and after the Petition Date, in arrears, and (ii) reasonable fees and expenses of Prepetition Lender's attorneys and financial advisors in connection with the Cases incurred from and after the Petition Date in accordance with the Interim Order.

(iv) <u>Reporting</u>.  The Debtors shall provide weekly reporting to the Prepetition Lender reconciling Simply Fashion's sources, uses and disbursement of cash with the Budget; financial, operational and related reports and documents required under the terms of the Loan Agreement or reasonably requested by Prepetition Lender; and reasonable access to all places of business officers, consultants and employees. |
| Debtor's Acknowledgements and Agreement | p.6, ¶ E | Among other things, the Debtors acknowledge amount of Prepetition Lender's loan, validity, priority and extent of lien on Prepetition Collateral, subject only to Iberiabank Lien |
| Waiver /modification of stay | p. 21, ¶16(E) | Entry of an order granting relief from stay to allow any creditor to execute or enforce a lien on Postpetition Collateral is an Event of Default |
| Limitation on use of proceeds | p.29, ¶ 22 | Neither Cash Collateral not proceeds from DIP Loan nor Carve Out Funds may be used (a) to pursue (i) any action adverse to interests of DIP Lender or Prepetition Lender; (ii) invalidate, set aside, avoid, subordinate DIP Lien, Interim Order, or Prepetition Loan Documents; (iii) for monetary, injunctive or other affirmative relief against the DIP Lender or Prepetition Lender; (iv) preventing, hindering, delaying DIP lender and Prepetition Lender's exercise of any right or remedy; (b) for objecting to, contesting, interfering with DIP Lender and Prepetition Lender's enforcement or realization upon any Collateral once Event of Default occurred; (c) using, selling or disposing of Collateral without consent of DIP Lender or Prepetition Lender; (d) objecting to or challenging liens or interest held by DIP Lender or Prepetition Lender; (e) asserting, commencing, prosecuting any claim or cause of action, including Chapter 5 claims against DIP Lender, Prepetition Lender or Lender Parties; (f) prosecuting an objection or contesting the validity, priority, extent or enforceability of any of the Prepetition Obligations under the Prepetition Loan Documents or Prepetition Senior Liens or any other rights or interests of DIP Lender or Prepetition Lender; or (g) for preventing, hindering or otherwise delaying the exercise by the DIP Lender and Prepetition Lender of any rights and remedies granted under this Interim Order. |
| Waiver of right to file a plan |  | none |

| | | |
|---|---|---|
| Deadlines for filing a plan | | none |
| Waiver/modification of nonbankruptcy law re perfection | p.6, ¶ E | Debtors acknowledge Prepetition Senior Liens on Prepetition Collateral are valid, biding, enforceable, nonavoidable, and properly perfected. |
| Release/waiver of claims | p.6, ¶ E | Debtors waive right to assert lender liability or equitable subordination claims or defenses; offsets, challenges, objections, defenses or claims of any kind to Prepetition Senior Liens or Prepetition Obligations, and right to assert any claims related to validity, priority, perfection or avoidability of liens or claims of Prepetition Lender; and right to challenge any of Prepetition Senior Liens or Prepetition Obligations |
| indemnification | | none |
| Limitation of rights of parties under section 506(c) | p. 18, ¶12, p. 18, ¶ 13 p. 26, ¶ 20 p. 27, ¶ 21(c) | Postpetition Liens, Adequate Protection Liens, DIP Obligations and Postpetition Collateral shall not be subject to section 506(c) |
| Granting of lien on claims/causes of action | p. 17, ¶ 11, | The Postpetition Liens shall not encumber the Debtors' avoidance claims or causes of action arising under Chapter 5 of the Bankruptcy Code. |
| Carve Out | p. 19-20, ¶15 | Lender's Adequate Protection Liens and Super-Priority Claim shall be subordinate to (i) the claims of retained professionals of the Debtors in these Cases and the Chief Restructuring Officer and his professional firm (the "Retained Professionals").  From and after receipt of a Carve-Out Trigger Notice, the Carve-Out shall be capped at $300,000 in the aggregate for all Retained Professionals plus up to $5,000 for any professionals engaged by any successor to the Debtors, including an trustee or examiner with expanded powers. (ii) unpaid fees and expenses of the United States Trustee and the Clerk of the Court (or any agent thereof).. |
| Binding Effect | p.30, ¶23, p. 31, ¶23 | Subject to the Challenge, Debtors' Stipulations shall be binding upon the Debtors Debtors' bankruptcy estates, Lender, and Statutory Committee, all creditors of the Debtors, any subsequently appointed trustee. The Statutory Committee, or any other party in interest granted standing by the Court (other than the Debtors) may assert claims against the Prepetition Lender or object to or challenge the findings, or stipulations, including validity, priority  or extent of the Prepetition Lender's liens within the earlier of (a) 60 days following the formation of the Committee and  (ii) if no Committee is appointed, 75 days from the Petition Date. |
| Interim Order | | The proposed form of Interim Order is attached to the Motion as **Exhibit A.** |

## III. BACKGROUND

5.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

6.     The Debtors are operating their businesses and managing their affairs as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

7.     For a detailed description of the Debtors and their operations, the Debtors respectfully refer the Court and parties in interest to the First Day Declaration.

8.     Pursuant to a loan and security agreement, promissory note, and UCC financing statements, each as amended (the "Loan Documents") between Simply Fashion as Borrower and JNS INVT, LLC as Lender ("Lender"), Lender provided to Simply Fashion a revolving credit facility secured by a prepetition continuing and unconditional first priority lien and security interest (collectively the "Senior Liens")[4] in favor of the Lender in and to any and all property of Simply Fashion, of any kind or description, whether tangible or intangible, whether now existing or hereafter arising or acquired, and wherever now or hereafter located, together with all additions and accessions thereto, substitutions, betterments and replacements therefor, products and proceeds therefrom, and all of Simply Fashion's books and records and recorded data relating thereto (regardless of the medium of recording or storage), including, without limitation, the following (all of which property, along with the products and proceeds therefrom, are individually and collectively referred to as the "Prepetition Collateral") (each capitalized term set forth below having the meaning set forth for such term in the Loan Agreement, defined below, except as otherwise indicated):

(i)     Any and all leasehold interests under Simply Fashion's Leases and in its

---

[4]     The Senior Liens are subject only to the Iberiabank Lien.

parcels of leased real property;

(ii)     All Accounts and all Goods whose sale, lease or other disposition by Simply Fashion has given rise to Accounts and have been returned to, or repossessed or stopped in transit by, Simply Fashion, or rejected or refused by an Account Debtor;

(iii)    All Inventory, including, but not limited to, raw materials, work-in-process, finished goods, merchandise, articles of clothing, adornments, accessories or jewelry being offered for sale or about to be so offered whether in transit, or in Simply Fashion's possession, custody and/or control, including, without limitation, located in any of Simply Fashion's warehouses or other premises leased or owned by Simply Fashion;

(iv)    All Consumer Goods and Goods (other than Inventory), including embedded software, Equipment vehicles, furniture and Fixtures of Simply Fashion;

(v)     All Software and computer programs of Simply Fashion;

(vi)    All Securities, Investment Property, Financial Assets and Deposit Accounts of Simply Fashion;

(vii)   All Chattel Paper, Electronic Chattel Paper, Instruments, Documents. Letter of Credit Rights, all proceeds of letters of credit, Health-Care Insurance Receivables. Supporting Obligations, notes secured by real estate, Commercial Tort Claims and General Intangibles, including Payment Intangibles, of the Debtor-Borrower; and

(viii)  All Proceeds (whether Cash Proceeds or Noncash Proceeds) of the foregoing property of the Debtor-Borrower, including all insurance policies and proceeds of insurance payable by reason of loss or damage to the foregoing property, including unearned premiums, and of eminent domain or condemnation awards.

A description of the Loan Documents are as follows:

9.      Original Loan Agreement:

(i)     Loan and Security Agreement dated July 29, 2013.
(ii)    Promissory Note dated July 29, 2013.
(iii)   UCC -1 Financing Statement recorded with the Alabama Secretary of State on August 30, 2013, at 13-04114576.
(iv)    revolving line of credit facility in an amount of up to $1.5 million.

10.     First Amendment:

     (i)     Amendment to Loan Documents dated September 19, 2013.
     (ii)    Amendment to Loan and Security Agreement dated September 19, 2013.
     (iii)   Amended and Restated Promissory Note dated September 19, 2013.
     (iv)   UCC -1 Financing Statement recorded with the Alabama Secretary of State on December 30, 2013, at 14-0000471.
     (v)    revolving line of credit facility in an amount of up to $3 million.

11.     Second Amendment:

     (i)     Second Amendment to Loan and Security Agreement dated January 8, 2014.
     (ii)    Second Amended and Restated Promissory Note dated January 8, 2014.
     (iii)   UCC -1 Financing Statement recorded with the Alabama Secretary of State on February 3, 2014, at 14-0043412.
     (iv)   revolving line of credit facility in an amount of up to $5 million.

12.     Third Amendment:

     (i)     Third Amendment to Loan and Security Agreement dated January 20, 2014.
     (ii)    Third Amended and Restated Promissory Note dated January 20, 2014.
     (iii)   revolving line of credit facility in an amount of up to $6 million.

13.     Fourth Amendment:

     (i)     Fourth Amendment to Loan Documents dated January 27, 2014.
     (ii)    Fourth Amended and Restated Promissory Note dated January 27, 2014.
     (iii)   UCC -1 Financing Statement recorded with the Alabama Secretary of State on February 28, 2014, at 14-0076664.
     (iv)   revolving line of credit facility in an amount of up to $7 million.

14.     Fifth Amendment:

     (i)     Fifth Amendment to Loan Documents dated September 10, 2014.
     (ii)    Fifth Amended and Restated Promissory Note dated September 10, 2014.
     (iii)   revolving line of credit facility in an amount of up to $8 million.

15.     Sixth Amendment:

     (i)     Sixth Amendment to Loan and Security Agreement dated November 13, 2014.
     (ii)    Sixth Amended and Restated Promissory Note dated November 13, 2014.
     (iii)   UCC -1 Financing Statement recorded with the Alabama Secretary of State on December 29, 2014, at 14-0553152.
     (iv)   revolving line of credit facility in an amount of up to $10 million.

16.    Seventh Amendment:

    (i)    Seventh Amendment to Loan Documents dated December 17, 2014.
    (ii)    Seventh Amended and Restated Promissory Note dated December 17, 2014.
    (iii)    UCC -1 Financing Statement recorded with the Alabama Secretary of State on January 5, 2015, at 15-008098.
    (iv)    revolving line of credit facility in an amount of up to $12 million.

17.    Eight Amendment:

    (i)    Eighth Amendment to Loan Documents dated February 3, 2015.
    (ii)    Eight Amended and Restated Promissory Note dated February 3, 2015.
    (iii)    UCC -1 Financing Statement recorded with the Alabama Secretary of State on March 20, 2015, at 15-0126833.
    (iv)    revolving line of credit facility in an amount of up to $14 million.

18.    Upon information and belief, the amounts obtained under the revolving credit facility with the Borrower have been used solely by the Debtors with respect to funding their operations.  The principal balance due to the Lender on the Petition Date was approximately $9,000,000.

19.    Pursuant to the terms and conditions of the Loan Documents, Simply Fashion is required to make interest payments on a monthly basis, on the 1st day of each month until the Maturity Date (June 1, 2015), with the principal balance due on the Maturity Date.  Simply Fashion is current on its interest payments and no default has been declared under the Loan Agreement.

20.    Iberiabank provided financing for, and has a purchase money security interest in Simply Fashion's Cash Register System.  Iberiabank is owed approximately $400,000 (the "IberiaBank Obligations").  Iberiabank does not have a secured interest in Cash Collateral.

### IV. POSTPETITION FINANCING AND CASH COLLATERAL

21.    Through this Motion, the Debtors:

(i)    seek to obtain senior secured post-petition financing from JNS INVT, LLC, a

Florida limited liability company (in its capacity as the debtor-in-possession lender, the "DIP Lender" and in its capacity as the prepetition senior secured lender to Simply Fashion Stores, the "Prepetition Lender")),[5] pursuant to the terms and conditions as set forth in the proposed Interim Order and any promissory note and loan and security documents to be executed by the Debtors in connection with and consistent with the terms and conditions of such financing (collectively, the "DIP Loan Documents").

(ii)    borrow on a revolving line of credit basis, pursuant to this Interim Order and the DIP Loan Documents, one or more interim initial advances in an amount not to exceed $1,250,000 outstanding at any time during the Interim Period (as defined below) and pursuant to the Budget attached hereto as **Exhibit "A"** (the "DIP Loan") at an annual interest rate of six (6%) percent with no commitment fee, exit fee, unused line fee or similar fee to the DIP Lender;

(iii)    grant to the DIP Lender, pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code and the terms of the DIP Loan Documents, but subject in all events to the Carve Out (set forth below), perfected and enforceable liens and security interests comprised of (a) a first priority valid, binding, enforceable priming lien and security interest, pursuant to section 364(d) of the Bankruptcy Code, on and against all tangible and intangible assets of the Debtors, whether owned as of the Petition Date or acquired thereafter, including all assets comprising the Prepetition Collateral, the Debtor-Borrower's rights under section 506(c) of the Bankruptcy Code, and all rights, claims and causes of action of the Debtor-Borrower (collectively the "Collateral"), senior in priority to any prior perfected and/or duly enforceable lien of any person or entity existing as of the Petition Date, including the Prepetition Lender, but subject only to the Iberiabank Lien, (b) a first priority valid, binding, enforceable priority lien and security interest, pursuant to section 364(c)(2) of the Bankruptcy Code, on and against the

---

[5] The DIP Lender is affiliated with the Debtors through certain common owners.

Collateral that is not otherwise subject of a prior perfected and duly enforceable lien or security interest as of the Petition Date, (c) a junior priority valid, binding, enforceable lien and security interest, pursuant to section 364(c)(3) of the Bankruptcy Code, on and against the Collateral that is otherwise subject of a prior perfected and duly enforceable lien or security interest as of the Petition Date, and (d) all proceeds and products of and from the Collateral, and all substitutions, renewals, improvements and replacements of any of the Collateral; and further including all proceeds and products of any of the foregoing Collateral, including without limitation, all insurance policies insuring the foregoing Collateral or any part thereof and proceeds of said insurance, and including unearned premiums (collectively, the "Proceeds")(the Collateral and the Proceeds are collectively referred to herein as "Postpetition Collateral");

(iv)    incur all of the obligations, liabilities and indebtedness under and in respect of the DIP Loan, including attorneys' fees and expenses and financial advisory fees and expenses of the DIP Lender (collectively, the "DIP Obligations") and pay all amounts contemplated to be paid thereunder;

(iv)    use the proceeds of the DIP Loan in a manner consistent with the terms and conditions of this Interim Order, the DIP Loan Documents and in accordance with the Budget, subject to the Permitted Budget Variance (as defined below), solely for the purposes set forth in the Budget, including for (a) working capital and general corporate purposes, (b) payment of certain of the costs of administration of the Cases, to the extent set forth in the Budget, (c) payment of interest, fees and costs to the DIP Lender under this Interim Order, and d) payment of insurance on the Collateral;

(v)    grant to the DIP Lender, pursuant to section 364(c)(1) of the Bankruptcy Code, a super-priority administrative expense claim in respect of all DIP Obligations with priority over

all administrative expenses, subject only to the Carve-Out and the other terms and conditions contained herein;

(vi)    authorizing the Debtors to use the Cash Collateral of the Prepetition Lender and grant adequate protection in connection therewith as more fully set forth below;

(vii)    vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the this Interim Order;  and

(viii)    schedule a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") granting the relief requested in the Motion on a final basis and approve the form of notice with respect to the Final Hearing.¶

22.    The cash collateral proposed to be used by the Debtors may include cash-on-hand and cash to be generated from the continued operations of the Debtors' businesses, including the collection of their accounts receivable.  The Debtors believe that the cash may constitute "Cash Collateral" as that term is defined in the Bankruptcy Code.  See 11 U.S.C. § 363(a).  As section 363(a) states, cash collateral includes:

> cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11  U.S.C. § 363(a).

23.    Through this Motion, and in an abundance of caution, the Debtors seek to utilize cash collateral in order to maintain their businesses.  The Debtors' request for use of cash collateral is meant to cover the Debtors' essential expenses contained in the Budget, and to

ensure successful operations to allow the Debtors to promptly file a plan of liquidation.  Those expenses include payment of wages, taxes, insurance and other expenses that are needed to operate the Debtors' commercial retail business.  The Debtors request the use of the cash collateral through the time that the Lender is paid in full, the Debtors emerge from chapter 11 under a confirmed plan or further order of the Court.

24.      The Lender has consented to the Debtors' use of cash collateral.

25.      Unless authorized to use the cash received in the ordinary course of business, the Debtors will be unable to remain in business.  The Debtors will default under their obligations and will have no ability to liquidate their inventory.

26.      As adequate protection for the use of cash collateral, the Debtors shall, with the Court's permission, grant the Lender, nunc pro tunc as of the commencement of the Debtors' chapter 11 cases the following:

(i)      Adequate Protection Liens.  a replacement liens (the "Adequate Protection Liens" on and in all property of the Debtors acquired or generated after the Petition Date, including rights under section 506(c) of the Bankruptcy Code, and all rights, claims, or causes of action, excluding any causes of action arising under chapter 5 of the Bankruptcy Code.  The Adequate Protection Liens shall be subject and subordinate in priority to the Carve Out, and (ii) senior to the Lender's lien.

(ii)     Administrative Expense Claim.  To the extent of any Post Petition Diminution in the Value of the Collateral, Lender shall have an administrative expense claim with priority over all other administrative expense claims against Simply Fashion.

(iii)    Payment. The Debtors shall pay to the Lender (a) commencing on May 1, 2015, interest accrued on the Obligations from and after the Petition Date, in arrears, and (ii) reasonable fees and expenses of Lender's attorneys and financial advisors in connection with the Cases incurred from and after the Petition Date.

(iv)     Reporting.  The Debtors shall provide weekly reporting to the Lender reconciling Simply Fashion's sources, uses and disbursement of cash with the Budget; financial, operational and related reports and documents

required under the terms of the Loan Agreement or reasonably requested by Lender; and reasonable access to all places of business officers, consultants and employees.

## V.  REQUEST FOR PRELIMINARY HEARING TO CONSIDER GRANTING INTERIM ORDER AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING AND TO USE CASH COLLATERAL

27.    Pursuant to Bankruptcy Rule 4001(b)(2) and (c), a final hearing on a motion to obtain postpetition financing and to use cash collateral may not be commenced earlier than 14 days after service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize postpetition financing and the use of cash collateral to the extent "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Bankruptcy Rule 4001(b)(2) & (c)(2).  It is essential to the continued operation of the Debtors' business that they be authorized by this Court to obtain postpetition financing and to use cash collateral as set forth in the Interim Order pending the final hearing on the Motion.  Unless this Motion is approved on an interim basis, the Debtors will have difficulty paying their employees and landlords and satisfying their customer obligations, which would have a devastating effect on the Debtors' operations, customer base and revenues.  Thus, funds are urgently needed to meet all of the Debtors' working capital and other liquidity needs.  In the absence of immediate relief, the Debtors' attempts to continue their business in the ordinary course will be immediately and irreparably jeopardized.

28.    The Debtors have been informed that the Lender is willing to provide the DIP Loan, subject to the conditions set forth in the Interim Order, including, without limitation, the provisions of the Interim Order assuring that the security interests and liens pursuant to section 364(c) and (d) of the Bankruptcy Code and the various claims, superpriority claims, and other protections granted pursuant to the Interim Order will not be affected by any subsequent reversal

or modification of the Interim Order, or by any other order that is applicable to the DIP Loan (including with respect to the Cash Collateral), as provided in section 364(e) of the Bankruptcy Code.

29.     The Debtors believe that the Lender has acted in good faith in consenting to and in agreeing to provide the financing, and the reliance of the Lender on the assurances referred to above is in good faith.  The Lender and the Debtors have negotiated at arms' length and in good faith regarding the DIP Financing and the Debtors' use of Cash Collateral to fund the continued operations of the Debtors.  The Lender will not agree to provide the DIP Loan, or agree to the Debtors' use of Cash Collateral, absent the approval of the terms and conditions set forth in the Interim Order.

30.     Given the extent of outstanding secured and unsecured indebtedness owing by the Debtors and the extreme time constraints resulting from the Debtors' liquidity problems, the Debtors' range of realistic financing alternatives is extremely limited.[6]  The Debtors submit that the terms and conditions of the DIP Loan, taken as a whole, are fair and reasonable under the circumstances; reflect the Debtors' and their managements' exercise of prudent business judgment consistent with their fiduciary duties; and are supported by reasonably equivalent value and fair consideration.

31.     The Prepetition Lender is entitled to receive adequate protection, pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code, for any diminution in the value of the Prepetition Collateral, including Cash Collateral, resulting from, without limitation: (i) the Debtors' use of such Prepetition Collateral, (ii) the sale or lease of such Prepetition Collateral, (iii) the automatic stay imposed by section 362 of the Bankruptcy Code, (iv) the priming liens

---

[6] The Debtors submit that it has been unable to obtain financing from other sources on the same or better terms than provided by the Lender.

granted to the Postpetition Lender, and (v) the exclusion of Avoidance Claims and Proceeds from their collateral and superpriority claims. In view of the foregoing, the Debtors respectfully requests entry of an Interim Order in substantially the form attached hereto as <u>Exhibit A</u>, together with such amendments and modifications as may be made by Debtor and Postpetition Lender prior to, at or as a result of the Interim Hearing.

32.    Such interim relief is essential to enable the Debtors to fulfill their existing obligations, as specifically detailed in the Budget. These sums will be required to pay landlords, employees, and other operating expenses that are the very minimum necessary for the Debtors to continue as a going concern for the benefit of all of its creditor constituencies, including the Lender. Accordingly, the Debtors respectfully request approval of the Motion, pending a final hearing on the Motion, on an emergency interim basis, on the terms and subject to the conditions set forth in the Interim Order and Budget, or on such other terms that the Court may deem appropriate.

## VI. <u>BASES FOR THE RELIEF REQUESTED</u>

### A.    <u>Incurrence of Secured Debt Pursuant to Bankruptcy Code Section 364</u>

33.    Section 364(c) of the Bankruptcy Code provides as follows:

(c)    If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable under § 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

(1)    with priority over any and all administrative expenses of the kind specified in § 503(b) or 507(b) of this title;

(2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)    secured by a junior lien on property of the estate

that is subject to a lien.

11 U.S.C. § 364(c).

34.     In addition, section 364(d)(1), which governs the incurrence of post-petition debt secured by senior or "priming" liens, provides that, the Court may, after notice and a hearing:

> (1)     authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –
>
>> (A)     the trustee is unable to obtain such credit otherwise; and
>>
>> (B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

35.     Pursuant to section 364 of the Bankruptcy Code, a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the estate.  *See* 11 U.S.C. §§ 364(c), (d); *In re Nat'l Litho, LLC*, 2013 WL 2303786 (Bankr. S.D. Fla. 2013) (Isicoff, J.); *In re Trigeant Holdings, Ltd.*, 2014 WL 5789926, at*3 (Bkrtcy.S.D.Fla. Oct. 10, 2014); *In re Ames Dep't Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtor[s]-in-possession to exercise their basic business judgment consistent with their fiduciary duties"); 3 COLLIER ON BANKRUPTCY  364.03, at 364-7-18 (15th ed. rev. 2001).

36.     To satisfy the standards of section 364 of the Bankruptcy Code, a debtor is not required to seek credit from every possible source: "the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."   *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). Rather, a debtor need only demonstrate "by a good faith effort that credit was not available

without" the protections of section 364(c).  *Id.; see also In re Ames*, 115 B.R. 38, 40 (Bankr. S.D.N.Y. 1990).  Where there are few lenders likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988).  In general, a bankruptcy court should defer to a debtor's business judgment regarding the need for and proposed use of funds unless such judgment is arbitrary and capricious.  *In re Curlew Valley Associates*, 14 B.R. 507, 511-14 (Bankr. D. Utah 1981).

37.    There are no prohibitions in the Bankruptcy Code for an insider or an affiliate of an insider to make a debtor-in-possession loan, including with priming liens.  In addition, there are no requirements other than those set forth in section 364 of the Bankruptcy Code for a debtor to obtain a priming debtor-in-possession loan from an insider or an affiliate of an insider.  *See In re Devlin*, 185 B.R. 376 (Bankr. M.D. Fla. 1995)(Court allowed a priming debtor- in-possession loan from the debtor's mother under section 364(d)(1)); *In re 495 Central Park Avenue Corp.*, 136 B.R. 626 (Bankr. S.D.N.Y 1992)(Court allowed priming debtor-in-possession loan from shareholders of the debtor); *Bland v. Farmworker Creditors (In re Bland)*, 308 B.R. 109 (S.D. Ga. 2003)(Recognizing that courts can approve priming loans from insiders); *In re Phase-I Molecular Toxicology, Inc.*, 285 B.R. 494 (Bankr. D.N.M. 2002)(Court denied debtor-in-possession loan from an insider because debtor did not satisfy the provisions of section 364 of the Bankruptcy Code).

38.    The Debtors have satisfied the requirements of sections 364(c) and (d) because, under current circumstances, it is unable to obtain credit other than as provided herein.  The liens granted to the Postpetition Lender shall, except as provided in the Interim Order, be (a) first

priority liens on all property that is not subject to properly perfected liens, and (b) a second priority lien on all property that is subject to PrepetitionLiens.

39.     The Debtors firmly believe that the financing to be provided as contemplated by the Interim Order represent the best — and only — financing available to them at this time, warranting approval of the proposed Interim Order on an emergency basis, pending a final hearing thereon (the "Final Hearing").

40.     In the exercise of its business judgment, the Debtors have concluded that the Lender is the only lender able to offer a post-petition credit facility that meets the Debtors' working-capital needs on the terms, and within the time frame, required by the Debtors.  Courts routinely defer to the business judgment of the debtors on most business decisions, including borrowing decisions.  *See, e.g., In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("business judgments should be left to the board room and not to this Court"); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same); *In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981) (courts generally will not second-guess a debtor's business decisions where those decisions constitute "a business judgment made in good faith, upon a reasonable basis, and within the scope of its authority under the Code"); *In re Weaver Oil Co., Inc.*, 2008 WL 8202063, at *2 (Bkrtcy.N.D.Fla.,2008) ("Under the "business judgment rule", the Bankruptcy Court recognizes that it is "no more equipped to make subjective business decisions for insolvent businesses than [the Court is] for solvent businesses," and the formulation of the business judgment rule in corporate litigation is also the appropriate formulation of the business judgment rule in the Bankruptcy Court"). "More exacting scrutiny would slow the administration of the debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for

private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

41.     In the instant case, the Debtors' granting of the priming liens to the Postpetiton Lender (which will be subject to the certain perfected and unavoidable prepetition liens as set forth in the proposed Interim Order) are essential to maintain the value of the Prepetition Collateral and the Debtors' estates.   Further, access to the proceeds of the DIP Loan will preserve the value of the Debtors' business to the greatest extent practicable under the circumstances.

42.     More fundamentally, unless the Debtors have access to the DIP Loan, they will not have sufficient funds to continue to operate its business and to preserve its assets.  Indeed, in the absence of such financing, it will not continue as a going concern, resulting in a dramatic decrease in the value of the Prepetition Collateral and the overall estate.  Accordingly, the use of funds provided by the DIP Loan to avert an immediate shutdown and liquidation of the Debtors, and to enable the Debtors to effect a preservation of the value of the Prepetition Collateral is clearly in the best interests of the Debtors' estates.

43.     Based on the circumstances present here, and the grounds and authorities set forth above, the Debtors firmly believes that the financing sought is the best financing available, and that it is in the best interests of their estates and creditors to enter into the DIP Loan.  It respectfully requests authority to do so.

### B.        Request For Modification Of Automatic Stay

44.     The proposed Interim Order contemplates that, as adequate protection, Prepetition Lender will be entitled to apply proceeds of its prepetition collateral to its prepetition debt.  In addition, the proposed Interim Order includes a modification of the automatic stay imposed by

section 362(a) of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and conditions of the Interim Order.  Moreover, under the terms of the proposed Interim Order, upon the occurrence and during the continuance of any event of default as defined in the Interim Order ("Event of Default"), the Lender and the Prepetition Lender may file a motion to terminate the automatic stay.  The Interim Order further provides that the Court shall conduct a hearing on an expedited emergency basis in order to act on the motion to terminate the automatic stay under section 362 for the purpose of allowing the Lender and the Prepetition Lender to exercise all of their rights and remedies under the Interim Order, the Loan Documents, and applicable law.  Finally, the Interim Order provides that the only issue that may be raised or addressed at such hearing is whether an Event of Default has occurred.

45.    Stay modifications of this sort are ordinary and typical features under these circumstances and, in the Debtors' business judgment, are reasonable.  Accordingly, the Debtors respectfully requests that the Court modify the automatic stay as provided in the proposed Interim Order.

46.    No trustee, examiner or creditors' committee has been appointed in these chapter 11 cases.  Notice of this Motion has been given by overnight mail, hand delivery or facsimile to the following: (i) the Office of the United States Trustee, (ii) the Office of the United States Attorney for the Southern District of Florida, (iii) the Internal Revenue Service, (iv) those entities or individuals included on the Debtors' list of twenty (20) largest unsecured creditors, (v) counsel to the Lender, and (vi) IberiaBank.  In light of the nature of the relief requested, the Debtors submit, and request that the Court find, that such notice is appropriate and that no further notice need be given.

## C.    Use of Cash Collateral

47.    Bankruptcy Code section 363(c)(2), which governs the postpetition use of cash collateral by a debtor in possession, provides as follows:

> (2)    The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless —
>
> (A)    each entity that has an interest in such cash collateral consents; or
>
> (B)    the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2)(A), (B).

48.    The Debtors seek authorization to use cash collateral pursuant to 11 U.S.C. § 363(c)(2)(B).  The cash collateral proposed to be used by the Debtors may include cash-on-hand and cash to be generated from the continued operations of the Debtors' businesses, including the collection from the credit card merchants.  If the Debtors are unable to use cash collateral or obtain such additional liquidity, they will not be able to meet essential obligations thereby forcing a shutdown of their operations.  Accordingly, the Debtors and their creditors face a substantial risk of immediate and irreparable harm if the relief sought herein is not permitted on an interim as well as final basis.

49.    Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief.  11 U.S.C. § 361(1)-(3); *In re Fountainbleau Las Vegas Holdings, LLC*, 434 B.R. 716, 748 (S.D. Fla. 2010) (Altonaga, J.).  What constitutes adequate protection must be decided on a case-by-case basis.  *See MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396-12397 (10th Cir. 1987); *Martin v. U.S. (In re Martin)*, 761 F.2d 472, 474 (8th Cir. 1985); *In re Shaw Indus., Inc.*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003).

50.     The focus of the adequate protection requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("[t]he whole purpose of adequate protection for a creditor is to insure that the creditor receives the value of which he bargained prebankruptcy") (internal citations omitted); *see also In re Carbone Companies, Inc.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) ("[t]he test is whether the secured party's interest is protected from diminution or decrease as a result of the proposed use of cash collateral").  It is well-established that a bankruptcy courts grant the use of cash collateral in order to preserve or enhance a debtor's ability to remain a going-concern.  *In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017, 1019 (11th Cir. 1984).  In addition, the grant of a replacement lien provides ample adequate protection of a secure creditor's interest in cash collateral. *O'Connor*, 808 F.2d at 1397; *In re Harbour E. Dev., Ltd.*, 2011 WL 6097063, at *4 (Bankr. S.D. Fla. Dec. 6, 2011) (Cristol, J.).

51.     In exchange for the use of cash collateral and other transactions contemplated hereby, the Debtors propose, as adequate protection pursuant to sections 361 and 363 of the Bankruptcy Code, as applicable, to grant the Lender a valid, perfected and enforceable replacement lien to, on and in all property of the Debtors acquired or generated after the Petition Date, but solely to the same extent and priority, and of the same kind and nature, as the property of the Debtors securing the prepetition obligations to the Lender under the Loan Agreement.

52.     In the event that diminution occurs in the value of the cash collateral in which Lender has an interest from and after the Petition Date as a result of the Debtors' use thereof in an amount in excess of the replacement lien granted herein, the Lender shall have an

24

administrative expense claim under section 507(b) of the Bankruptcy Code with priority over all other relevant administrative expense claims, subject to the Carve-Out (defined herein).

53.     The Debtors request that the replacement lien granted to the Lender, as well as any administrative expense claim granted to the Lender pursuant to the terms of the Interim Order, be at all times subject and subordinate to the following:

(i)     the claims of the respective retained professionals of the in these Cases, as well as the Chief Restructuring Officer and his professional firm (collectively, the "Retained Professionals") for fees and expenses incurred at any time on and after the delivery of the Petition Date and prior to the delivery of a Carve-Out Trigger Notice[7]; provided that, in each case, such fees and expenses of the Retained Professionals are ultimately allowed, if and as applicable, on a final basis by this Court under sections 330 or 331 or allowed pursuant to the Court-approved terms applicable to the retention of the Debtors' Chief Restructuring Officer and his professional firm (such fees and expenses described in this clause (i), the "Pre-Termination Date Expenses" and the permitted amount thereof, the "Pre-Termination Date Amount");

(ii)    the claims of the Retained Professionals for fees and expenses which were incurred on and after the delivery of a Carve-Out Trigger Notice; provided that, in each case, such fees and expenses of the Retained Professionals are ultimately allowed, if and as applicable, on a final basis by this Court under sections 330 or 331 of the Bankruptcy Code, or allowed pursuant to the Court-approved terms applicable to the retention of the Debtors' Chief Restructuring Officer and his professional firm, and do not exceed $300,000 in the aggregate for all of the Retained Professionals, plus the fees and expenses incurred by any professionals engaged by any successor to the Debtors, including, without limitation, any trustee appointed under chapter 11 or 7 of the Bankruptcy Code or any examiner with expanded powers, in an aggregate amount not to exceed $5,000 (such fees and expenses described in this clause "(ii)" the "Post-Termination Date Expenses" and the permitted amount thereof, the "Post-Termination Amount" and, together with the Pre-Termination Date Amount, the "Professional Fees");

---

[7]     As used herein, "Carve-Out Trigger Notice" means, upon the occurrence of an Event of Default, a written notice delivered by the Lender to respective counsel for the Debtors expressly stating that the Carve-Out has been invoked and terminating the right of the Debtors to pay professional fees incurred after such date outside of the Carve-Out. Upon receipt of the Carve-Out Trigger Notice, the Debtors shall provide immediate notice by facsimile (or other electronic means) to the professionals retained in the Cases informing them that a Carve-Out Trigger Notice has been received and further advising them that the Debtors' ability to pay professional fees incurred subsequent to the date thereof is subject to the Carve-Out.

      (iii)    the reasonable and documented expenses payable to the members of any Statutory Committee;

      (iv)    the unpaid fees and expenses of the United States Trustee and the Clerk of the Court (or any agent thereof) pursuant to 28 U.S.C. § 1930(a)(6) or otherwise; and

      (v)    unpaid operating expenses (including the Chief Restructuring Officer and his professional firm) in accordance with the Budget that were incurred prior to the delivery of a Carve-Out Trigger Notice, solely to the extent that such claims would have been authorized to be paid by the Debtors prior to such date, pursuant to the Budget, if the Carve-Out Trigger Notice had not been delivered.

54.    The Debtors submit that the foregoing protections, and the fact that the use of cash collateral will enable the Debtors to preserve value by continuing to operate in the ordinary course of business should adequately protect the Lender from any diminution in the value of any interests in its prepetition collateral, including any cash collateral

55.    Notice of this motion was served, in compliance with Federal Rule of Bankruptcy Procedure 4001(b), upon the Lender (the only secured creditor that has an interest in the cash collateral), the prepetition counsel for the Lender, the Office of the United States Trustee, the Internal Revenue Service, and the persons and/or entities identified in the list of 20 largest unsecured creditors of the Debtors, as no unsecured creditors' committee has been appointed.

56.    A proposed order authorizing the Debtors' to obtain postpetition financing and use cash collateral pending a final hearing is attached hereto as **Exhibit A**.

**WHEREFORE**, the Debtors respectfully request that the Court enter an Order: (i) authorizing the Debtors on an interim basis as set forth herein (a) to obtain postpetition financing and (b) to use cash collateral; (ii) setting an emergency interim hearing and final hearing; and (iii) granting the Debtors such other and further relief as may be proper and just.

Dated: April 16, 2015                          Respectfully submitted,

                                               BERGER SINGERMAN LLP
                                               *Proposed Counsel for the Debtors and Debtors in*
                                               *Possession*
                                               1450 Brickell Avenue, Ste. 1900
                                               Miami, FL  33131
                                               Telephone:  (305) 755-9500
                                               Facsimile:  (305) 714-4340

                                               By:    */s/  Paul Steven Singerman*
                                                      Paul Steven Singerman
                                                      Florida Bar No. 378860
                                                      singerman@bergersingerman.com
                                                      Christopher A. Jarvinen
                                                      Florida Bar No. 21745
                                                      cjarvinen@bergersingerman.com

# **EXHIBIT A**
## **PROPOSED INTERIM ORDER**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**
www.flsb.uscourts.gov

In re:

ADINATH CORP. and SIMPLY
FASHION STORES, LTD.,

       Debtors.
_____/

Chapter 11 Cases

Case No. _____
(Joint Administration Pending)

**INTERIM ORDER PURSUANT TO SECTIONS 361, 363, 364(c) AND (d) OF THE**
**BANKRUPTCY CODE AND RULE 4001 OF THE FEDERAL RULES OF**
**BANKRUPTCY PROCEDURE AUTHORIZING (A) DEBTORS IN POSSESSION TO**
**OBTAIN SENIOR SECURED POST-PETITION FINANCING, (B) GRANTING**
**CERTAIN PRIMING LIENS, (C) MODIFYING THE AUTOMATIC STAY, (D)**
**GRANTING SUPER-PRIORITY ADMINISTRATIVE CLAIM STATUS, (E)**
**AUTHORIZING USE OF CASH COLLATERAL AND GRANTING ADEQUATE**
**PROTECTION THEREFOR, AND**
**(F) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

   This matter came on for hearing on April ___, 2015 at ___ a.m./p.m. (the "Interim

Hearing") upon the Emergency Motion of Adinath Corp. ("Adinath") and Simply Fashion

Stores, Ltd. (the "Borrower", "Debtor-Borrower" or "Simply Fashion Stores" and together with

Adinath, each a "Debtor" and collectively, the "Debtors") in the above captioned chapter 11

cases (together with any successor cases, the "Cases"), seeking entry of an interim order (this

1

"Interim Order") and a Final Order (as defined below) authorizing, inter alia, the Debtors to:

(i)     obtain senior secured post-petition financing from JNS INVT, LLC, a Florida limited liability company (in its capacity as the debtor-in-possession lender, the "DIP Lender" and in its capacity as the prepetition senior secured lender to Simply Fashion Stores, the "Prepetition Lender")),[1] pursuant to the terms and conditions of this Interim Order and any promissory note and loan and security documents to be executed by the Debtors in connection with and consistent with the terms and conditions of such financing (collectively, the "DIP Loan Documents").

(ii)    borrow on a revolving line of credit basis, pursuant to this Interim Order and the DIP Loan Documents, one or more interim initial advances in an amount not to exceed $1,250,000 outstanding at any time during the Interim Period (as defined below) and pursuant to the Budget attached hereto as Exhibit "A" (the "DIP Loan") at an annual interest rate of six (6%) percent with no commitment fee, exit fee, unused line fee or similar fee to the DIP Lender;

(iii)   grant to the DIP Lender, pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code and the terms of the DIP Loan Documents, but subject in all events to the Carve Out (set forth below), perfected and enforceable liens and security interests comprised of (a) a first priority valid, binding, enforceable priming lien and security interest, pursuant to section 364(d) of the Bankruptcy Code, on and against all tangible and intangible assets of the Debtors, whether owned as of the Petition Date or acquired thereafter, including all assets comprising the Prepetition Collateral (as defined below), the Debtor-Borrower's rights under section 506(c) of the Bankruptcy Code, and all rights, claims and causes of action of the Debtor-Borrower (collectively the "Collateral"), senior in priority to any prior perfected and/or duly

---

[1] The Debtors have disclosed and the Court notes that the DIP Lender is affiliated with the Debtors through certain common owners.

enforceable lien of any person or entity existing as of the Petition Date, including the Prepetition

Lender, but subject only to the Iberiabank Lien, (b) a first priority valid, binding, enforceable

priority lien and security interest, pursuant to section 364(c)(2) of the Bankruptcy Code, on and

against the Collateral that is not otherwise subject of a prior perfected and duly enforceable lien

or security interest as of the Petition Date, (c) a junior priority valid, binding, enforceable lien

and security interest, pursuant to section 364(c)(3) of the Bankruptcy Code, on and against the

Collateral that is otherwise subject of a prior perfected and duly enforceable lien or security

interest as of the Petition Date, and (d) all proceeds and products of and from the Collateral, and

all substitutions, renewals, improvements and replacements of any of the Collateral; and further

including all proceeds and products of any of the foregoing Collateral, including without

limitation, all insurance policies insuring the foregoing Collateral or any part thereof and

proceeds of said insurance, and including unearned premiums (collectively, the "Proceeds")(the

Collateral and the Proceeds are collectively referred to herein as "Postpetition Collateral");

     (iv)    incur all of the obligations, liabilities and indebtedness under and in respect of

the DIP Loan, including attorneys' fees and expenses and financial advisory fees and expenses

of the DIP Lender (collectively, the "DIP Obligations") and pay all amounts contemplated to be

paid thereunder;

     (iv)    use the proceeds of the DIP Loan in a manner consistent with the terms and

conditions of this Interim Order, the DIP Loan Documents and in accordance with the Budget,

subject to the Permitted Budget Variance (as defined below), solely for the purposes set forth in

the Budget, including for (a) working capital and general corporate purposes, (b) payment of

certain of the costs of administration of the Cases, to the extent set forth in the Budget, (c)

payment of interest, fees and costs to the DIP Lender under this Interim Order, and d) payment

of insurance on the Collateral;

(v)      grant to the DIP Lender, pursuant to section 364(c)(1) of the Bankruptcy Code, a super-priority administrative expense claim in respect of all DIP Obligations with priority over all administrative expenses, subject only to the Carve-Out (as defined below) and the other terms and conditions contained herein;

(vi)      authorizing the Debtors to use the Cash Collateral (as defined below) of the Prepetition Lender and grant adequate protection in connection therewith as more fully set forth below;

(vii)      vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order;  and

(viii)      schedule a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") granting the relief requested in the Motion on a final basis and approve the form of notice with respect to the Final Hearing.

The Court, having considered the Motion, the First Day Declaration of Soneet R. Kapila, the Debtors' Chief Restructuring Officer, in support of the chapter 11 petitions and first day motions and applications which was filed contemporaneously with the Motion, and the evidence submitted, adduced or proffered at the Interim Hearing, the notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b) and (d) and 9014, and all objections, if any to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court, and it appearing to the Court that granting the interim relief and entering this Interim Order is necessary to avoid immediate and irreparable harm to the Debtors, their creditors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates and their creditors, and equity holders, and is essential for the continued operation of the Debtors' business; and after due deliberation and

4

consideration, and for good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.    **Petition Date**.  On April 16, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Florida (the "Court").  The Debtors are continuing in the management and operation of their business and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B.    **Jurisdiction and Venue**.  This Court has jurisdiction over the Cases pursuant to 28 U.S.C. §§ 157 and 1334 and over the persons and property affected hereby.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue of the Debtors' Cases is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

C.    **No Committee Formation**.  No official committee of unsecured creditors has been appointed in the Cases.

D.    **Notice**.  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, e-mail, overnight courier or hand delivery, to certain parties in interest, including: (i) the U.S. Trustee; (ii) Internal Revenue Service; (iii) the parties included on the Debtors' list of the twenty (20) largest unsecured creditors; (iv) counsel to the Prepetition Lender and the DIP Lender, (v) any known secured creditors of record; (vi) any known parties asserting liens against the Debtors' assets; and (vii) any parties required to be served under any applicable Bankruptcy Rule or Local Rules. The Debtors have made reasonable efforts to afford the best notice possible under the circumstances

5

and such notice is good and sufficient to permit the interim relief set forth in this Interim Order, and no other or further notice is or shall be required.

E.    **Debtors Acknowledgements and Agreements**.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest as set forth in paragraph 23 herein, the Debtors (on behalf of and for themselves and their estates) admit, stipulate, acknowledge and agree that (collectively, paragraphs E(i) through E(viii) below are referred to herein as the "Debtors' Stipulations").

(i)    Prior to the Petition Date, the Prepetition Lender provided loans and other financial accommodations to or for the benefit of Simply Fashion Stores, as the Borrower, pursuant to the terms of (a) that certain Loan and Security Agreement, dated July 29, 2013, as amended thereafter (collectively, the "Prepetition Loan Agreement"), (b) that certain Promissory Note (Line of Credit), dated August 22, 2013, as amended or amended and restated thereafter (collectively, the "Prepetition Note"), (c) those certain Uniform Commercial Code Financing Statements filed with the Alabama Secretary of State from time to time (the "UCC-1s"), and (d) any and all other documents executed and delivered in connection therewith (collectively, the "Prepetition Loan Documents");

(ii)    As of the Petition Date, the Note provided for the Borrower to borrow under a line of credit up to a maximum amount equal to $14,000,000;

(iii)    As of the Petition Date, the outstanding principal balance due under the Note was approximately $9,000,000 (collectively, together with any amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition Loan Documents, plus (without limitation) accrued and unpaid interest, any fees, expenses, and disbursements (including, without limitation, attorneys' fees, consultant fees, related expenses and disbursements), indemnification obligations, and other charges or amounts of whatever nature,

6

whether or not contingent, whenever arising, as provided in the Loan Documents, the "Prepetition Obligations");

(iv)    The Prepetition Obligations are secured by a prepetition continuing and unconditional first priority lien and security interest (collectively the "Prepetition Senior Liens")[2] in favor of the Prepetition Lender in and to any and all property of the Debtor-Borrower, of any kind or description, whether tangible or intangible, whether now existing or hereafter arising or acquired, and wherever now or hereafter located, together with all additions and accessions thereto, substitutions, betterments and replacements therefor, products and proceeds therefrom, and all of the Debtor-Borrower's books and records and recorded data relating thereto (regardless of the medium of recording or storage), including, without limitation, the following (all of which property, along with the products and proceeds therefrom, are individually and collectively referred to as the "Prepetition Collateral") (each capitalized term set forth below having the meaning set forth for such term in the Prepetition Loan Agreement except as otherwise indicated):

(i)    Any and all leasehold interests under the Debtor-Borrower's Leases and in its parcels of leased real property;

(ii)    All Accounts and all Goods whose sale, lease or other disposition by the Debtor-Borrower has given rise to Accounts and have been returned to, or repossessed or stopped in transit by, the Debtor-Borrower, or rejected or refused by an Account Debtor;

(iii)    All Inventory, including, but not limited to, raw materials, work-in-process, finished goods, merchandise, articles of clothing, adornments, accessories or jewelry being offered for sale or about to be so offered whether in transit, or in the Debtor-Borrower's possession, custody and/or control, including, without limitation, located in any of the Debtor-Borrower's warehouses or other premises leased or owned by the Debtor-Borrower;

---

[2]    The Prepetition Senior Liens are subject only to a lien in favor of Iberiabank in respect of the Iberiabank Obligations, as defined in in the Motion.

(iv)  All Consumer Goods and Goods (other than Inventory), including embedded software, Equipment vehicles, furniture and Fixtures of the Debtor-Borrower;

(v)  All Software and computer programs of the Debtor-Borrower;

(vi)  All Securities, Investment Property, Financial Assets and Deposit Accounts of the Debtor-Borrower;

(vii)  All Chattel Paper, Electronic Chattel Paper, Instruments, Documents. Letter of Credit Rights, all proceeds of letters of credit, Health-Care Insurance Receivables. Supporting Obligations, notes secured by real estate, Commercial Tort Claims and General Intangibles, including Payment Intangibles, of the Debtor-Borrower; and

(viii)  All Proceeds (whether Cash Proceeds or Noncash Proceeds) of the foregoing property of the Debtor-Borrower, including all insurance policies and proceeds of insurance payable by reason of loss or damage to the foregoing property, including unearned premiums, and of eminent domain or condemnation awards.

(v)  Subject to the provisions of paragraph 23 of this Interim Order, the Debtors (for themselves and their estates) acknowledge and agree that: (a) as of the Petition Date, the Prepetition Senior Liens on the Prepetition Collateral were valid, binding, enforceable, nonavoidable and properly perfected; (b) the Prepetition Senior Liens have priority over any and all other liens on the Prepetition Collateral, subject only to certain liens otherwise permitted by the Prepetition Loan Agreement and the Iberiabank Lien (as defined in the Motion) and only to the extent any such permitted liens and Iberiabank Lien were valid, binding, enforceable, non-avoidable, properly perfected and senior in priority to the Prepetition Senior Liens as of the Petition Date, (c) the Prepetition Obligations constitute legal, valid, binding, and nonavoidable obligations of the Debtor-Borrower, enforceable in accordance with the terms of the applicable Prepetition Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code and as set forth in this Interim Order); (d) no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the

Prepetition Senior Liens or the Prepetition Obligations exist, and no portion of the Prepetition Senior Liens or Prepetition Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement or subordination (whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors expressly, forever and irrevocably waive, discharge, release and acquit the Prepetition Lender and each of its respective former, current and future affiliates, agents, attorneys, advisors, professionals, members, managers, officers, directors and employees respective officers, directors, employees, managers, owners, shareholders, members, partners, agents, representatives, attorneys, advisors, consultants, accountants and other professionals, affiliates, predecessors and successors in interest (collectively, the "Lender Parties") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, defenses, offsets, objections, counterclaims, causes of actions, choses of action, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened, including, without limitation, all legal and equitable theories of recovery arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the Prepetition Loan Documents and/or the transactions contemplated hereunder or thereunder, including, without limitation, (1) any so-called "lender liability" or equitable subordination claims or defenses and (2) any and all claims and causes of action with respect to the Prepetition Senior Liens or Prepetition Obligations, including, without limitation, to the validity, priority, perfection or avoidability of the liens or claims of the Prepetition Lender; and (f) the Debtors expressly, forever and irrevocably waive, discharge, and release rights they may have to challenge any of the

Prepetition Senior Liens or the Prepetition Obligations.

(vi)    The Debtors represent that all of the Debtor-Borrower's cash and cash equivalents, including the cash in its deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitute the "cash collateral" of the Prepetition Lender (as such term is defined in section 363(a) of the Bankruptcy Code) (the "<u>Cash Collateral</u>"), and is Prepetition Collateral of the Prepetition Lender.

(vii)    The Debtors hereby agree that until such time as all DIP Obligations are indefeasibly paid in full in cash (or otherwise satisfied according to such terms as may be mutually agreed among the Debtors and the DIP Lender), the Debtors shall not in any way prime or seek to prime the Postpetition Liens (as defined below) provided to the DIP Lender under this Interim Order by offering a subsequent lender or a party-in-interest a superior or <u>pari passu</u> lien or claim on the Postpetition Collateral (as defined below) or a claim pursuant to section 364(d) of the Bankruptcy Code or otherwise.

(viii)    Without the prior express written approval of the DIP Lender, the Debtors shall not (i) file with the Bankruptcy Court any pleading or request to (A) limit, alter, modify, or terminate any provision of this Interim Order, or any protection granted to DIP Lender hereunder, or (B) extinguish, subordinate or diminish any security interest, lien or claim of the DIP Lender, or (ii) seek, consent to, or join in the approval of any matter or any plan of reorganization which purports to do any of the things prohibited by this Interim Order.

F.    <u>**Findings Regarding the Post-Petition Financing**</u>.    The ability of the Debtors to finance their operations requires the use of the DIP Loan and Cash Collateral, absent which immediate and irreparable harm will result to the Debtors, their estates and their creditors. In the absence of the DIP Loan and the use of Cash Collateral, the continued operation of the Debtors' business would not be possible and serious and irreparable harm to the Debtors, their estates and

their creditors would occur. The Debtors do not have sufficient available sources of working capital and financing to operate their business in the ordinary course of business or to maintain their property without the DIP Loan or the use of Cash Collateral.  The relief requested in the Motion is therefore necessary, essential, and appropriate for the continued operation of the Debtors' business and the management and preservation of their property. The DIP Lender and the Debtors (through the Chief Restructuring Officer) have negotiated at arms' length and in good faith regarding the DIP Loan and the Debtors' use of Cash Collateral to fund the continued operation of the Debtors' business interim period covered by this Order.  As a result, the Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2).  Good and sufficient cause has been shown for the entry of this Interim Order. Among other things, the entry of this Interim Order is in the best interests of the Debtors, their creditors and their estates because it will enable the Debtors to (i) continue the orderly operation of their business and avoid an immediate shutdown of operations; (ii) meet their obligations for payroll, necessary ordinary course expenditures, and other operating expenses; (iii) pay necessary fees and expenses under the Bankruptcy Code and make payments authorized under other Orders entered by this Court; all in accordance with the Budget (as defined herein); (iv) obtain needed goods and services; and (v) retain customer, supplier and employee confidence by demonstrating that they have the financial ability to maintain normal operations; thereby avoiding immediate and irreparable harm to the Debtors' estates.

G.    **No Credit Available on More Favorable Terms**.  The Debtors have been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors have also been unable to obtain secured credit, allowable only under sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code on more favorable terms and conditions than those provided in the DIP Loan Documents and this Interim

Order.  The Debtors are unable to obtain credit for borrowed money without granting to the DIP Lender the DIP Protections (as defined below).

H.      **Use of Cash Collateral**.  The Prepetition Lender is entitled to receive adequate protection to the extent of any diminution in value of its interests in the Prepetition Collateral (including the Cash Collateral) resulting from the use of Cash Collateral, the authorized use, sale or lease of Prepetition Collateral, the subordination of the Prepetition Senior Liens to the Carve Out (as described herein), and the imposition or the automatic stay (collectively, the "Diminution in Value") pursuant to sections 361, 362, and 363 of the Bankruptcy Code.  The Debtors have requested that the Prepetition Lender consent to the Debtors' use of the Cash Collateral pursuant to the terms and conditions of this Interim Order during the Interim Period.  Subject to the entry of and continued effectiveness of this Interim Order, the Prepetition Lender has consented to the Debtors' use of the Cash Collateral during the Interim Period strictly on the terms and conditions set forth herein.

I.      **Use of Proceeds of the DIP Loan**.  Proceeds of the DIP Loan shall be used, in each case in a manner consistent with the terms and conditions of the DIP Loan Documents, and in strict compliance with the Budget (limited pursuant to this Interim Order to the Interim Period), subject to the Permitted Budget Variance, solely for the purposes (i) set forth in the Budget, including among other things, for (a) working capital and general corporate purposes, including the payroll and overhead associated with operating the Debtors' business, (b) payment of certain of the costs of administration of the Cases, to the extent set forth in the Budget, (d) payment of interest, fees and costs to the DIP Lender under the DIP Loan Documents, and (e) payment of the maintenance of and insurance on the Prepetition Collateral and the Postpetition Collateral.

J.       **Payment of Post-Petition Interest and Expenses**.  The Debtors are authorized to pay, and the DIP Lender is entitled to receive, (i) any and all interest due under the DIP Loan in accordance herewith, which interest shall be paid monthly in arrears commencing on May 1, 2015 and continuing monthly thereafter on the first day of each month, and (ii) the costs and expenses of the DIP Lender in connection with the Cases and in accordance herewith.

K.       **Extension of Financing**.  The DIP Lender has indicated a willingness to provide interim financing to the Debtors in accordance with this Interim Order and the DIP Loan Documents and subject to (i) the entry of this Interim Order, and (ii) findings by the Court that such financing is essential to the Debtors' estates, that the DIP Lender is a good faith financier, and that the DIP Lender's claims, super priority claims, senior security interests and priming liens and other protections granted pursuant to this Interim Order and the DIP Loan will not be affected by any subsequent reversal, modification, vacatur or amendment of this Interim Order, the Final Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

K.       **Business Judgment and Good Faith Pursuant to Section 364(e).**  (i) The terms and conditions of the DIP Loan and the DIP Loan Documents, and the fees and costs to be paid thereunder, are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration; (ii) the DIP Loan and this Interim Order were negotiated in good faith and at arms' length between the Debtors (through the Chief Restructuring Officer) and the DIP Lender; and (iii) use of the proceeds to be extended under the DIP Loan will be so extended in good faith, and for valid business purposes and uses, as a consequence of which the DIP Lender is entitled to the full protection and benefits of section 364(e) of the Bankruptcy Code.

L.      **Entry of Interim Order**.   For the reasons stated above, the Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

**NOW, THEREFORE**, on the Motion of the Debtors and the record before this Court with respect to the Motion, and with the consent of the Debtors, the Prepetition Lender and the DIP Lender to the form and entry of this Interim Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1.      The Motion is granted in accordance with and limited to the terms and conditions set forth in this Interim Order and the DIP Loan Documents.

2.      All objections to the Motion as it relates to the interim relief sought therein and to the entry of this Interim Order have been resolved by the provisions hereof or are overruled.

3.      Notwithstanding any provision of the Bankruptcy Code or the Bankruptcy Rules to the contrary, this Interim Order shall take effect immediately upon entry and shall remain in effect until 11:59 p.m. (Prevailing Eastern Time) on May 15, 2015 (such period being referred to as the "Interim Period").

4.      The Debtors, the Prepetition Lender, the DIP Lender, and their respective advisors and employees have acted in good faith in negotiating, consenting, and agreeing to the DIP Loan and the Debtors' use of the Cash Collateral as contemplated and provided by this Interim Order. The negotiation of the terms and provisions of this Interim Order has been conducted at arms' length, and such terms and provisions are fair and reasonable under the circumstances and reflect the Debtors' exercise of reasonable business judgment consistent with the Debtors' fiduciary duties.

5.      Nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon the Prepetition Lender, the DIP Lender or any of its

14

respective advisors or employees, any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts.

6.    Based on the findings set forth in this Interim Order and the reliance of the Prepetition Lender and the DIP Lender in good faith on the terms thereof, if any of the provisions of this Interim Order are hereafter modified, vacated or stayed by an Order of this Court or another court, such stay, modification or vacation shall not affect the validity and enforceability of any lien, security interest or priority authorized for the benefit of the Prepetition Lender or the DIP Lender hereunder that is granted or attaches prior to the effective date of such stay, modification or vacation, and any use of DIP Loan or Cash Collateral by the Debtors pursuant to this Interim Order prior to the effective date of such modification, stay or vacation shall be governed in all respects by the original provisions of this Interim Order.

7.    This Interim Order is without prejudice to the rights of the Prepetition Lender or the DIP Lender to seek a modification of this Interim Order, including a request for additional adequate protection or the termination of the DIP Loan or the Debtors' right to use Cash Collateral, after notice and hearing, including a hearing noticed on an emergency basis.  The Prepetition Lender and the DIP Lender have each expressly reserved, and this Interim Order is without prejudice to, any and all rights and remedies of the Prepetition Lender or the DIP Lender, including the appropriateness of any adequate protection that may be proposed in connection with the DIP Loan or any authorization to use Cash Collateral after the Interim Period.

8.    The DIP Lender shall receive such protections and be entitled to such rights as are set forth in this Interim Order.  The Debtors and all other relevant parties are expressly and immediately authorized, empowered and directed (i) to execute and deliver to DIP Lender the

15

DIP Loan Documents in a form consistent with the terms of this Interim Order, (ii) to consummate the transactions described herein and therein and incur and perform on an interim basis the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Loan Documents, and (iii) to execute and deliver all instruments and documents which reasonably may be required or necessary for the performance by the Debtors under the DIP Loan and the creation and perfection of the Postpetition Liens described in and provided for by this Interim Order and the DIP Loan Documents.  The Debtors are hereby authorized to perform all acts, and subject to the provisions of this Interim Order, pay the principal, interest, fees, expenses and other amounts described in this Interim Order and the DIP Loan Documents as such become due, including, without limitation, attorneys' and financial advisors' fees and disbursements pursuant to the terms hereof.

9.      In order to enable them to continue to operate their business during the Interim Period, subject to the terms and conditions of this Interim Order, the DIP Loan Documents and the Budget (which Budget may not be materially amended or modified during the Interim Period), the Debtors are hereby authorized under the DIP Loan to borrow up to the amounts set forth in the Budget during the Interim Period.  Notwithstanding any provision of its certificate or articles of incorporation, bylaws, operating agreement, partnership agreement, membership agreement, certificate of formation, certificate of limited partnership, regulations, or comparable governing documents to the contrary, each Debtor is authorized to, and each officer, member, manager, partner, or other comparable authorized signatory of each Debtor is hereby authorized to cause such Debtor to, jointly and severally guarantee and pay the DIP Obligations of each other Debtor obligated under this Interim Order and the DIP Loan Documents, and pledge, mortgage and grant security interests in its assets to secure such DIP Obligations, and to execute and enter into any and all of the DIP Loan Documents and all other documents and transactions

necessary to implement and effectuate the terms of the DIP Loan, this Interim Order and the DIP Loan Documents.

10.     The proceeds of the DIP Loan (net of any amounts used to pay fees, costs and expenses under this Interim Order or the DIP Loan Documents) and the Cash Collateral shall be used, in each case in a manner consistent with the terms and conditions of this Interim Order and the DIP Loan Documents, and in accordance with the Budget limited pursuant to this Interim Order to the Interim Period, subject to the Permitted Budget Variance.

11.     Effective immediately upon the entry of the Interim Order, the DIP Lender is hereby granted, pursuant to subsections 364(c)(2), (c)(3) and 364(d) of the Bankruptcy Code, perfected and enforceable liens and security interests (collectively, the "Postpetition Liens") comprised of (a) a first priority valid, binding, enforceable priming lien and security interest, pursuant to section 364(d) of the Bankruptcy Code, on and against all of the Postpetition Collateral, senior in priority to any prior perfected and/or duly enforceable lien of any person or entity existing as of the Petition Date, including the Prepetition Lender, but subject only to the Iberiabank Lien, (b) a first priority valid, binding, enforceable priority lien and security interest, pursuant to section 364(c)(2) of the Bankruptcy Code, on and against the Postpetition Collateral that is not otherwise subject of a prior perfected and duly enforceable lien or security interest as of the Petition Date, and (c) a junior priority valid, binding, enforceable lien and security interest, pursuant to section 364(c)(3) of the Bankruptcy Code, on and against the Postpetition Collateral that is otherwise subject of a prior perfected and duly enforceable lien or security interest as of the Petition Date; provided however, that the Postpetition Liens shall not encumber the Debtors' avoidance claims or causes of action arising under chapter 5 of the Bankruptcy Code and the proceeds thereof (the "Avoidance Actions").  The Postpetition Liens shall be cross-collateralized

17

and cross-defaulted as to all of the Postpetition Collateral.  Notwithstanding anything herein to the contrary, the Postpetition Liens shall at all times be subject to the Carve Out.

12.    Except as set forth in this Interim Order and except for the Iberiabank Lien and the Carve Out, the Postpetition Liens granted pursuant to this Interim Order shall be priming and senior in priority and shall not be made subject to, or pari passu with any prepetition lien or security interest by any court order heretofore or hereafter entered in the Cases and shall be valid and enforceable against any trustee or examiner appointed in the Cases, upon the conversion of the Cases to cases under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (any "Successor Cases"), and/or upon the dismissal of the Cases, provided however, that this provision shall not apply to any bankruptcy case filed by one or more of the Debtors in the future after the closing of these Cases or any related chapter 7 case.   The Postpetition Liens shall not be subject to sections 506(c), 510, 549, 550 or 551 of the Bankruptcy Code or challenge on any basis.

13.    Except with respect to the Carve-Out during the Interim Period pending the entry of a Final Order, all DIP Obligations shall be an allowed super priority administrative expense claim (the "DIP Super priority Claim" and, together with the Postpetition Liens, the "DIP Protections") with priority in the Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code.  Except in respect of the administrative expense claims provided for in the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under

18

sections 328, 330, and 331 of the Bankruptcy Code or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or *pari passu* with the DIP Protections or the DIP Obligations, or with any other claims of the DIP Lender arising hereunder.

14.    The Debtors may use the Cash Collateral during the Interim Period solely to pay the ordinary, necessary and reasonable expenses of operating their business exclusively in accordance with and subject to the Budget. The Debtors' actual disbursements for any given week during the Interim Period shall not exceed the sum of (x) 120% of the disbursements projected for such week in the Budget, plus (y) (except for the first week) any unused portion of the disbursements projected for any prior week in the Budget (but excluding, for avoidance of doubt, any amounts in excess of 100% of the projected disbursements for any week). The Budget and any modification to, or extension, amendment or update of the Budget, shall be in a form and substance acceptable to the Lender in its sole discretion.

15.    The Postpetition Liens, DIP Super-Priority Claim, Adequate Protection Liens (as defined below) and the Super-priority Claim (as defined below) to the extent granted hereunder to and for the benefit of the Prepetition Lender and the DIP Lender, respectively, shall be subject and subordinate to the following expenses (collectively, the "Carve Out"):

> a.  the claims of the respective retained professionals of the Debtors in these Cases, as well as the Chief Restructuring Officer and his professional firm (collectively, the "Retained Professionals") for fees and expenses incurred at any time on and after the Petition Date and prior to the delivery of a Carve-Out Trigger Notice[3]; provided that, in each case, such fees and expenses of the Retained Professionals

---

3    As used herein, "Carve-Out Trigger Notice" means, upon the occurrence of an Event of Default, a written notice delivered by the DIP Lender or Prepetition Lender to respective counsel for the Debtors expressly stating that the Carve-Out has been invoked and terminating the right of the Debtors to pay professional fees incurred after such date outside of the Carve-Out. Upon receipt of the Carve-Out Trigger Notice, the Debtors shall provide immediate notice by facsimile (or other electronic means) to the professionals retained in the Cases informing them that a Carve-Out Trigger Notice has been received and further advising them that the Debtors' ability to pay professional fees incurred subsequent to the date thereof is subject to the Carve-Out.

are ultimately allowed, if and as applicable, on a final basis by this Court under sections 330 or 331 or allowed pursuant to the Court-approved terms applicable to the retention of the Debtors' Chief Restructuring Officer and his professional firm (such fees and expenses described in this clause (i), the "Pre-Termination Date Expenses" and the permitted amount thereof, the "Pre-Termination Date Amount");

b.  the claims of the Retained Professionals for fees and expenses which were incurred on and after the delivery of a Carve-Out Trigger Notice; provided that, in each case, such fees and expenses of the Retained Professionals are ultimately allowed, if and as applicable, on a final basis by this Court under sections 330 or 331 of the Bankruptcy Code, or allowed pursuant to the Court-approved terms applicable to the retention of the Debtors' Chief Restructuring Officer and his professional firm, and do not exceed $300,000 in the aggregate for all of the Retained Professionals, plus the fees and expenses incurred by any professionals engaged by any successor to the Debtors, including, without limitation, any trustee appointed under chapter 11 or 7 of the Bankruptcy Code or any examiner with expanded powers, in an aggregate amount not to exceed $5,000 (such fees and expenses described in this clause "(ii)" the "Post-Termination Date Expenses" and the permitted amount thereof, the "Post-Termination Amount" and, together with the Pre-Termination Date Amount, the "Professional Fees");

c.  the reasonable and documented expenses payable to the members of any Statutory Committee, subject to the approval of the Court upon motion and a hearing;

d.  the unpaid fees and expenses of the United States Trustee and the Clerk of the Court (or any agent thereof) pursuant to 28 U.S.C. § 1930(a)(6) or otherwise; and

e.  unpaid operating expenses (including the Chief Restructuring Officer and his professional firm) in accordance with the Budget that were incurred prior to the delivery of a Carve-Out Trigger Notice, solely to the extent that such claims would have been authorized to be paid by the Debtors prior to such date, pursuant to the Budget, if the Carve-Out Trigger Notice had not been delivered.

16.    The following events shall each constitute an event of default hereunder, (collectively, the "Events of Default"):

a.  the violation of or failure by the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order (including the Budget);

b.  the obtaining of credit or the incurring of indebtedness that is (i) secured by a security interest, mortgage or other lien on all or any portion of the Postpetition Collateral

which is equal or senior to any security interest, mortgage or other lien of the DIP Lender or Prepetition Lender, or (ii) entitled to priority administrative status which is equal or senior to that granted to the DIP Lender or Prepetition Lender herein;

 c. the institution of a Challenge (as defined below) after a party in interest has been granted standing by order of the Court;

 d. any lien or security interest purported to be created under the Prepetition Loan Documents shall cease to be, or shall be asserted by the Debtors not to be, a valid and perfected lien on or security interest in any Prepetition Collateral, with the priority required by the Prepetition Loan Documents or herein;

 e. the entry of an order by the Court granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor to execute upon or enforce a lien on or security interest in any Postpetition Collateral, or (ii) with respect to any lien of or the granting of any lien on any Postpetition Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a material adverse effect on the business, operations, property, assets, or condition, financial or otherwise, of the Debtors;

 f. the reversal, vacatur, or modification (without the express prior written consent of the DIP Lender, in its sole discretion) of this Interim Order;

 g. dismissal of the Cases or conversion of the Cases to  chapter 7 cases, or appointment of a chapter 11 trustee or examiner with enlarged powers or other responsible person;

 h. the sale of any portion of the Debtors' assets outside the ordinary course of business without the prior written consent of the DIP Lender, in its sole discretion;

 i. the Debtors' failure to obtain entry of a Final Order by May 30, 2015;

 j. the granting of any motion providing for reconsideration, stay, or vacatur of this Interim Order; or (1) the Debtors shall assert in any pleading filed in any court that any material provision of this Interim Order is not valid and binding for any reason, or (2) any material provision of this Interim Order shall, for any reason, cease to be valid and binding without the prior written consent of the DIP Lender.

17. Immediately upon the occurrence and during the continuation of an Event of Default, the DIP Lender or the Prepetition Lender may declare a termination, reduction or restriction of the ability of the Debtors to use any Cash Collateral and may declare a termination of the obligations to advance any additional amounts under the DIP Loan (any such declaration shall be referred to herein as a "<u>Termination Declaration</u>"). The Termination Declaration shall

be given by e-mail or facsimile (or other electronic means) contemporaneously to counsel to the Debtors, counsel to any Statutory Committee, and the U.S. Trustee (the earliest date any such Termination Declaration is made shall be referred to herein as the "Termination Declaration Date"). On the Termination Declaration Date, the Debtors' right to use Cash Collateral shall automatically cease, except as provided herein, and notwithstanding anything herein to the contrary, the DIP Lender shall not be obligated to advance any additional funds under the DIP Loan.    Within seven (7) business days after the Termination Declaration Date (the "Remedies Notice Period"), the Debtors and/or the Statutory Committee shall be entitled to seek an emergency hearing with the Court seeking an emergency determination of whether an Event of Default has occurred and/or any other appropriate relief related to the Debtors' continued use of Cash Collateral on a non-consensual basis, with the rights and objections of all parties reserved with respect thereto.  Unless the Court determines otherwise during the Remedies Notice Period (which shall be extended, if necessary, to accommodate the Court's calendar for an emergency hearing), the automatic stay shall automatically be terminated at the end of the Remedies Notice Period without further notice to or order of the Court, and the Debtors shall no longer have the right to use or seek to use Cash Collateral and the Prepetition Lender shall be permitted to exercise any and all remedies set forth herein, in the Prepetition Loan Documents or the DIP Loan Documents, as applicable, and as otherwise available at law against the Postpetition Collateral, without further order of or notice, application or motion to the Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the liens and security interest in the Postpetition Collateral or any other rights and remedies granted to the Prepetition Lender and the DIP Lender with respect thereto pursuant to the Prepetition Loan Documents, this Interim Order or the DIP Loan Documents, as applicable.  In addition, the Prepetition Lender and/or the DIP Lender shall have

the right to file an emergency motion with the Court during the Remedies Notice Period seeking, among other things, relief from the automatic stay otherwise applicable to the Prepetition Lender and/or the DIP Lender so as to be able to exercise its rights and remedies at law or in equity to satisfy the Prepetition Obligations, the DIP Obligations, the Superpriority Claims, the Adequate Protection Liens, and the Prepetition Loan Documents and any other obligation under this Interim Order.

18.    This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Postpetition Liens and the Adequate Protection Liens (as defined below) without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect the Postpetition Liens or the Adequate Protection Liens, or to entitle the DIP Lender or the Prepetition Lender to the priorities granted herein.  Notwithstanding the foregoing, the Debtors, the Prepetition Lender and the DIP Lender are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the Prepetition Lender or DIP Lender shall, in its sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge or dispute or subordination, at the time and on the date of entry of this Interim Order.  Upon the

23

request of the Prepetition Lender or the DIP Lender, without any further consent of any party, each Debtor is authorized to take, execute, deliver and file such instruments (in each case without representation or warranty of any kind) to enable the Prepetition Lender or the DIP Lender to further validate, perfect, preserve and enforce the Adequate Protection Liens, Postpetition Liens and claims.  The Debtors shall execute and deliver to the Prepetition Lender and the DIP Lender all such agreements, financing statements, instruments and other documents as the Prepetition Lender or the DIP Lender may reasonably request to more fully evidence, confirm, validate, perfect, preserve and enforce the Adequate Protection Liens, Postpetition Liens and claims.  All such documents will be deemed to have been recorded and filed as of the Petition Date.  A certified copy of this Interim Order may, in the discretion of the Prepetition Lender or the DIP Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording. The Prepetition Lender or the DIP Lender, in its discretion, may also file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtors have real or personal property, and in such event, the subject filing or recording officer shall be authorized and is directed to file or record such copy of this Interim Order.

19.     Nothing herein shall be construed as consent to the allowance of, or obligate an obligation of the Prepetition Lender or the DIP Lender to pay, any professional fees or expenses of the Debtors, any Statutory Committee or of any person or shall affect the right of the Prepetition Lender or the DIP Lender to object to the allowance and payment of such fees and expenses or to permit the Debtors to pay any such amounts not set forth in the Budget.  The

Prepetition Lender or the DIP Lender each reserve the right to object to any request or application for the payment of professional fees that may be submitted or filed in the Cases.

20.     No costs or expenses of administration that have been or may be incurred in the Chapter 11 Cases at any time shall be charged against the Prepetition Lender or the DIP Lender, provided however, that this provision shall not apply to a chapter 7 trustee in respect solely of the Postpetition Collateral pursuant to and in accordance with section 105 or 506(c) of the Bankruptcy Code.  Nothing contained in this Interim Order shall be deemed a consent by the DIP Lender or the Prepetition Lender to any charge, lien, assessment or claim against the Postpetition Collateral under section 506(c) of the Bankruptcy Code or otherwise, and the Prepetition Lender and DIP Lender each reserve all rights in connection therewith.

21.     On account of the Debtors' use of the Cash Collateral during the Interim Period, the Prepetition Lender is granted the following adequate protection:

(a)     Pursuant to section 361 and 363(e) of the Bankruptcy Code, the Prepetition Lender is granted additional and replacement continuing valid, binding, enforceable, non-avoidable, and automatically perfected postpetition security interests in and liens on (the "Adequate Protection Liens") the Postpetition Collateral to the extent of any Diminution in Value; provided however, that the Adequate Protection Liens shall not encumber the Avoidance Actions.  The Adequate Protection Liens shall be shall be subject and subordinate in priority to (i) the Carve Out, (ii) the Postpetition Liens, and (ii) any liens, security interests and other encumbrances, existing as of the Petition Date, that are valid, perfected, enforceable and unavoidable and that are (as of the Petition Date) senior to the Prepetition Senior Liens in favor of the Prepetition Lender in accordance with applicable non-bankruptcy law.

(b)     The Adequate Protection Liens and the Postpetition Liens granted under this Interim Order shall be valid, perfected, and enforceable against the Postpetition Collateral from

and after the Petition Date and shall not be subject to dispute, avoidance, recharacterization or subordination.  Notwithstanding the automatic perfection of the Adequate Protection Liens and the Postpetition Liens granted pursuant to this Interim Order, the Prepetition Lender and the DIP Lender are each   hereby authorized, but not required, to file or record financing statements, trademark filings, mortgages, notices of lien and other similar instruments in any jurisdiction, or to take any other action it deems necessary or appropriate in order to validate or perfect such Adequate Protection Liens and the Postpetition Liens.  A certified copy of this Interim Order may, in the discretion of the Lender, be filed with or recorded in any filing or recording offices in addition to, or in lieu of, such financing statements, mortgages, notices of lien or other similar instruments, and all filing or recording offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.  The Debtors are authorized and directed to execute and deliver all instruments and documents prepared by the Prepetition Lender, and to pay all reasonable fees and expenses, that are reasonably required or necessary to facilitate any such filings or recordings elected to be made by the Prepetition Lender.

(c)      The Adequate Protection Liens granted hereunder shall be valid and enforceable against any trustee appointed in these Cases, or in any prior or subsequent proceeding affecting the Debtors, including any conversion of these Cases to cases under chapter 7 of the Bankruptcy Code. The Adequate Protection Liens shall not be subject to sections 506(c), 510, 549, or 550 of the Bankruptcy Code or challenge on any basis.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the Adequate Protection Liens.

(d)      As additional adequate protection hereunder, to the extent of the Diminution in Value of the Prepetition Collateral, including the Cash Collateral, from and after the Petition

Date in excess of the value of the Adequate Protection Liens granted herein, the Prepetition Lender shall have an administrative expense claim under sections 361, 363, 503(b) and 507(b) of the Bankruptcy Code with priority over all other administrative expense claims against the Debtors or the Debtors' estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code (the "Super-Priority Claim"), subject only to the Carve-out and the DIP Super Priority Claim. Such Super-Priority Claim (without the need to file any further, notice or pleading, or to make any demand), shall be deemed an allowed claim pursuant to section 507(b) of the Bankruptcy Code.

(e)     As additional adequate protection to the Prepetition Lender hereunder, the Debtors are authorized and directed to make payments to the Prepetition Lender (i) in an amount equal to the interest accrued on the Prepetition Obligations from and after the Petition Date, which payments shall be made in arrears and shall commence on May 1, 2015 and continue on the first day of each month thereafter, and (ii) in an amount equal to the reasonable fees and expenses of the Prepetition Lender's attorneys and financial advisors incurred in connection with the Cases from and after the Petition Date, which payments shall be made in accordance herewith.

(f)     The Debtors shall provide the Prepetition Lender with the following information during the Interim Period:

(i)     a weekly report, in form and with supporting information in detail reasonably acceptable to the Lender, reconciling the Debtors' sources, uses and disbursements of cash for the week most recently ended with the sources, uses and disbursements projected for such week in the Budget, along with a

27

certification of the Debtors' Chief Restructuring Officer certifying that the Debtors are in compliance with the disbursements limitations set forth in this Interim Order as of the end of the week most recently ended; and

(ii)    all of the financial information, operational information and related reports, documents and analysis required under the terms of the Prepetition Loan Agreement or as reasonably requested by the Prepetition Lender.

22.    Neither the Cash Collateral, nor the proceeds from DIP Loan nor the Carve Out funds may be used: (a) in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type (i) adverse to the interests of the DIP Lender, the Prepetition Lender or their respective rights and remedies under the Prepetition Loan Documents or this Interim Order, (ii) invalidating, setting aside, avoiding, recharacterizing or subordinating, in whole or in part, the obligations under the DIP Lien, this Interim Order or the Prepetition Loan Documents, (iii) for monetary, injunctive or other affirmative relief against the DIP Lender and the Prepetition Lender , or (iv) preventing, hindering or otherwise delaying the exercise by the DIP Lender and the Prepetition Lender of any rights and/or remedies under this Interim Order, the Prepetition Loan Documents, or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court or otherwise) by the DIP Lender and the Prepetition Lender upon any of the Collateral or Postpetition Collateral; (b) for objecting to, contesting, or interfering with in any way the DIP Lender and the Prepetition Lender's enforcement or realization upon any of the Postpetition Collateral once an Event of Default has occurred; (c) for using or seeking to use Cash Collateral or selling or otherwise disposing of the Postpetition Collateral without the consent of the DIP Lender or Prepetition Lender; (d) for objecting to or challenging in any way the claims, liens, or interests (including interests in the Collateral and Postpetition Collateral) held by or on behalf of the DIP Lender or

28

Prepetition Lender; (e) for asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions, against DIP Lender or Prepetition Lender or the Lender Parties; (f) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Prepetition Obligations under the Prepetition Loan Documents or Prepetition Senior Liens or any other rights or interests of DIP Lender or Prepetition Lender; or (g) for preventing, hindering or otherwise delaying the exercise by the DIP Lender and Prepetition Lender of any rights and remedies granted under this Interim Order.

23.     Nothing in this Interim Order shall prejudice the rights of a Statutory Committee, if granted standing by the Court, and, solely if no Statutory Committee is appointed, any other party in interest granted standing by the Court (other than the Debtors and/or their successors) to seek, solely in accordance with the provisions of this paragraph 23, to assert claims against any of the Prepetition Lender or the Lender Parties behalf of the Debtors, their estates, or their creditors, or to otherwise object to or to challenge the findings, Debtors' Stipulations, or any other stipulations or findings herein, including, but not limited to those in relation to: (a) the validity, extent, priority, or perfection of the mortgage, security interests, and liens of Prepetition Lender; (b) the validity, allowability, priority, fully secured status or amount of the Prepetition Obligations under the Prepetition Loan Documents; (c) any liability of the Prepetition Lender with respect to  anything arising from the Prepetition Loan Documents or the Debtors; and (d) any claims against the Prepetititon Lender  and Lender Parties under Chapter 5 of the Bankruptcy Code.  A party in interest, including any Statutory Committee (if appointed), that has been granted standing must commence, as appropriate, an adversary proceeding raising such claim, objection or challenge, including, without limitation, any claim or cause of action against the Lender (each, a "Challenge") within the earlier of (i) sixty (60) calendar days

following the formation of a Statutory Committee (if appointed), and (ii) if no Statutory Committee is appointed, seventh-five (75) days from the Petition Date (together, the "Challenge Period"). The Challenge Period may only be extended for cause shown on motion and hearing brought prior to its expiration, or by written consent of the Prepetition Lender, in its sole discretion.   Only those parties in interest (including, without limitation, the Statutory Committee, if appointed), that have properly initiated a Challenge challenging the Prepetition Obligations under the Prepetition Loan Documents, the Prepetition Senior Liens, or any liability of the Prepetition Lender prior to the expiration of the Challenge Period shall be permitted to participate in the prosecution of such Challenge. As to (i) any parties in interest, including the Statutory Committee (if appointed), who fail to file a Challenge prior to the expiration of the Challenge Period, or if any such Challenge is filed and overruled or dismissed and (ii) any and all matters that are not expressly the subject of a timely Challenge: (A) any and all such Challenges by any party (including, without limitation, any Statutory Committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed in these Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed in any Successor Cases), shall be deemed to be forever waived, released and barred, (B) all unchallenged matters, Debtors' Stipulations, findings, waivers, releases, waivers, releases, affirmations and other stipulations, including as to the validity, perfection, priority, allowability, enforceability or non-avoidability as to the Prepetition Lender's claims, liens, and interests, shall be of full force and effect and forever binding upon the Debtors, the Debtors' bankruptcy estate and all creditors, interest holders, and other parties in interest in these Cases and any Successor Cases, and (C) any and all claims or causes of action against the Prepetition Lender and the Lender Parties relating in any way to the Debtors shall be forever waived and released by the Debtors' estate, all creditors, interest holders and other parties in interest in these Cases and any Successor Cases

30

24.    All net proceeds of the sale or other disposition of any Postpetition Collateral outside the ordinary course of business, prior to the occurrence of an Event of Default, shall be paid to the DIP Lender pending the application thereof to the DIP Obligations according to the provisions of this Interim Order and subject, in all respects, to the Carve Out.

25.    The Prepetition Lender and the DIP Lender have acted in good faith in connection with this Interim Order and their respective reliance on this Interim Order is in good faith.  Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Loan and use of Cash Collateral contemplated by this Interim Order, in the event any or all of the provisions of this Interim Order are hereafter modified, stayed, amended or vacated by a subsequent order of this or any other Court, the Prepetition Lender and the DIP Lender are each entitled to the protections provided in section 364(e) of the Bankruptcy Code and no such modification, stay, amendment or vacation shall affect the validity and enforceability of any advances made hereunder or the liens or priority authorized or created hereby.  Notwithstanding any such modification, amendment or vacation, any claim or lien granted to the Prepetition Lender or the DIP Lender hereunder arising prior to the effective date of such modification, amendment or vacation of any Adequate Protection Liens or DIP Protections granted to the Prepetition Lender or the DIP Lender shall be governed in all respects by the original provisions of this Interim Order, and the Prepetition Lender and the DIP Lender shall be entitled to all of the rights, remedies, privileges and benefits, including the Adequate Protection Lenders and DIP Protections granted herein, with respect to any such claim or lien.  Since the loans made pursuant to the DIP Loan Documents and the consent to use of Cash Collateral are made in reliance on this Interim Order, the Prepetition Obligations owed to the Prepetition Lender and the DIP Lender prior to the effective date of any stay, modification or vacation of this Interim Order cannot, as a result of

31

any subsequent order in the Chapter 11 Cases or in any Successor Cases, be subordinated, lose their lien priority or super priority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the Prepetition Lender DIP Lender under this Interim Order and/or the DIP Loan Documents.

26.     All costs and expenses of the DIP Lender and the Prepetition Lender in connection with the Cases, including, without limitation, legal, accounting, financial advisory fees, will be paid by the Debtors.  The DIP Lender and Prepetition Lender shall provide to the U.S. Trustee, counsel to the Debtors and counsel to the Statutory Committee (the "Fee Notice Parties"), on a monthly basis, the total amount of professional fees and expenses described in this subsection that are incurred per calendar month in the Cases, upon request, along with summary invoices relating to such fees and expenses.   Under no circumstances shall professionals for the DIP Lender and the Prepetition Lender be required to comply with the U.S. Trustee fee guidelines.   In the event any of the Fee Notice Parties object to such fees or expenses, or any portion thereof, such objecting Fee Notice Party shall send written notice of such objection to the DIP Lender and Prepetition Lender within five (5) days of receipt of the invoice.   Any unresolved objection shall be resolved by the Court after notice and hearing. Absent any objections, the Debtors shall pay such requested fees and expenses within five (5) days of receipt of the invoices.

27.     The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to the extent necessary to implement this Interim Order, including, without limitation to (1) permit the Debtors to grant the Postpetition Liens and to incur all liabilities and DIP Obligations to the DIP Lender hereunder, and (2) authorize the DIP Lender to retain and apply payments hereunder in accordance with the provisions of this Interim Order.

28.     The DIP Lender and the Prepetition Lender may, but are not required to file proofs of claim in the Cases or any Successor Cases.  Any order entered by the Court in relation to the establishment of a bar date for any claim (including without limitation administrative claims) in the Cases or any Successor Cases shall not apply to the DIP Lender or the Prepetition Lender.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date in the Cases or Successor Cases to the contrary, the DIP Lender and the Prepetition Lender are hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim in the Cases or any Successor Cases.

29.     The DIP Lender and the Prepetition Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender with respect to proceeds, products, offspring or profits of any of the Collateral.

30.     The Final Hearing to consider entry of the Final Order and final approval of the DIP Loan and use of Cash Collateral, shall be held on _____ at _____, at the United States Bankruptcy Court for the Southern District of Florida, Miami Division, C. Clyde Atkins United States Courthouse, 301 North Miami Avenue, Room _____, Miami, FL 33128 before the Honorable Laurel M. Isicoff, United States Bankruptcy Judge.

This Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

# # #

**SUBMITTED BY:**

Paul J. Battista, Esq
Genovese Joblove & Battista, P.A.
100 S.E. Second Street, 44th Floor


Miami, FL 33131
(305) 349-2300
(305) 349- 2310 (fax)
pbattista@gjb-law.com

_____

# EXHIBIT A
# BUDGET

**SIMPLY FASHION STORES, LTD.**
Case No.

**United States Bankruptcy Court - _____ District of Florida - ____ Division**

**Chief Restructuring Officer**
**Weekly Operating Cash Budget - Adjusted for GOB Agent Effect**

PRELIMINARY DRAFT as of April 16, 2015:
This is a preliminary draft. It has been prepared based on preliminary information and assumptions. No one may rely on this draft. It is subject to change as additional information becomes available or is clarified.

Source: Sales projections and historical sales reports provided by client, Great Plains general ledger account and disbursements reports for various expense accounts and sales taxes, P&L statements provided by client, and supporting invoices and checks.

| | Notes | Budget for the Week Ending Saturday, | | | |
|---|---|---|---|---|---|
| | | 4/18/2015 | 4/25/2015 | 5/2/2015 | Total |
| *Proceeds:* | | | | | |
| Store Sales | 1 | $ 140,000 | $ 1,069,088 | $ 1,069,088 | $ 2,278,175 |
| Less Sales tax | 2 | | (550,000) | | (550,000) |
| **Net Sales** | | **140,000** | **519,088** | **1,069,088** | **1,728,175** |
| | | | | | |
| *Operating Cash Outflows:* | | | | | |
| Store expenses | | | | | |
| Payroll and related taxes | 3 | 645,920 | 176,554 | 895,920 | 1,718,393 |
| Temp labor | 4 | | 3,000 | 3,000 | 6,000 |
| Rent | 5 | | 400,000 | | 400,000 |
| Shipping/ freight | 6 | | 66,000 | 15,000 | 81,000 |
| Credit card fees | 7 | 1,400 | 10,691 | 10,691 | 22,782 |
| Utilities, waste & telephone | 8 | | 58,000 | 48,000 | 106,000 |
| Iberia - POS | 9 | | 40,000 | | 40,000 |
| Repairs & maintenance | 10 | | 19,000 | 19,000 | 38,000 |
| Licenses | 10 | | 1,600 | 1,600 | 3,200 |
| Security | 10 | | | | - |
| Supplies | 10 | | 10,000 | 10,000 | 20,000 |
| Bank service charge | 10 | | | 7,100 | 7,100 |
| Auto expense | 10 | | 10000 | 10,000 | 20,000 |
| Travel & lodging | 10 | | 1,500 | 1,500 | 3,000 |
| Other | 11 | | 2,000 | 2,000 | 4,000 |
| **Total Store Expenses** | | **647,320** | **798,345** | **1,023,810** | **2,469,475** |
| | | | | | |
| Home Office & DC expenses | | | | | |
| Payroll and related taxes | 3 | 106,284 | 41,920 | 106,284 | 254,488 |
| Health insurance | 12 | 24,000 | 24,000 | 24,000 | 72,000 |
| Temp labor | 4 | | 2,000 | 2,000 | 4,000 |
| Rent | 13 | | | | - |
| Utilities, waste & telephone | 8 | | | 13,000 | 13,000 |
| Supplies | 11 | | 1,000 | 5,000 | 6,000 |
| Repairs, maintenance & janitorial | 10 | | 5,000 | 5,000 | 10,000 |
| Insurance - business | 14 | | | | - |
| IT - support and services | 15 | | 35,000 | | 35,000 |
| Copy machines \ printers | 16 | | 4,000 | | 4,000 |
| Security | 10 | | 1,000 | 1,000 | 2,000 |
| Bank svc charge | 10 | | | 1,000 | 1,000 |
| Advertising \ promotion | 17 | | | | - |
| Ordinary course professionals | 22 | | | | - |
| Inventory counter | | | | | - |
| Travel & lodging | 10 | | 1,500 | 1,500 | 3,000 |
| Other | 11 | | 3,000 | 3,000 | 6,000 |
| Document storage/ moving | 11 | | | | - |
| **Total Home Office expenses** | | **130,284** | **118,420** | **161,784** | **410,488** |
| | | | | | |
| ***Total Operating Cash Outflows*** | | **777,604** | **916,765** | **1,185,594** | **2,879,963** |
| | | | | | |
| *Bankruptcy related expenses:* | | | | | |
| Professional fees | | | | | - |
| Adequate protection -utilities | 18 | | 10,000 | 10,000 | 20,000 |
| Cash collateral - interest | 19 | | | | - |
| DIP facility interest | 20 | | | 3,125 | 3,125 |
| US Trustee Fees | 21 | | | | - |
| ***Total Bankruptcy expenses*** | | **-** | **10,000** | **13,125** | **23,125** |
| | | | | | |
| **Net cash flow (deficit) after Expenses** | | **$ (637,604)** | **$ (407,678)** | **$ (129,632)** | **$ (1,174,913)** |
| | | | | | |
| Beginning cash balance | 23 | $ 23,544 | $ 635,940 | $ 228,262 | $ 23,544 |
| Net cash flow | | (637,604) | (407,678) | (129,632) | (1,174,913) |
| DIP facility advances (paydowns) | | 1,250,000 | | | 1,250,000 |
| **Ending cash balance** | | **$ 635,940** | **$ 228,262** | **$ 98,631** | **$ 98,631** |
| | | | | | |
| Beginning DIP Facility balance | | $ - | $ 1,250,000 | $ 1,250,000 | $ - |
| DIP facility advances (paydowns) | | 1,250,000 | - | - | 1,250,000 |
| **Ending DIP Facility balance** | | **$ 1,250,000** | **$ 1,250,000** | **$ 1,250,000** | **$ 1,250,000** |

**SEE ACCOMPANYING NOTES**

The  CRO from time to time makes written or oral forward-looking statements concerning expectations, beliefs, plans, objectives, future events or performance and underlying assumptions and other statements that are not historical facts.  These statements are "forward-looking statements."  Generally, the inclusion of the words "believe", "could", "should", "estimate", "expect", "intend", "anticipate", "will", "plan", "target", "forecast" and similar expressions identify statements that constitute "forward-looking statements."  All statements addressing developments that the CRO expects or anticipates will occur in the future, including statements relating to values, future financial condition, assets, real property and timing of their disposition, as well as statements expressing optimism or pessimism about future results, are forward-looking statements.

The forward-looking statements are based upon the CRO's  then-current views and assumptions regarding future developments and are applicable only as of the dates of such statements.  By their nature, all forward-looking statements involve risks and uncertainties.  The CRO assumes no obligation to update or review any forward-looking information to reflect actual results, changes in assumptions or changes in other factors affecting forward-looking information, whether as a result of new information, future events or otherwise.  There can be no assurance that the CRO has correctly identified and appropriately assessed all factors affecting the Company and its assets.  For these reasons, you are cautioned not to place undue reliance on any forward-looking statements.

**SIMPLY FASHION STORES, LTD.**
Case No:
United States Bankruptcy Court
_____ District of Florida
_____ Division

**Chief Restructuring Officer**
**13 Week Operating Cash Budget**
**Significant Notes and Assumptions**

The assumptions provided in the operating budget are based on an wind down of the company's stores
with the retention of a going out of business agent.

**Note 1)** Stores sales for the week ending 4/18/2015 were based on the actual sales and estimated cash transferred from the store bank accounts and credit card accounts effective Friday 4/17/2015. The subsequent weeks store sales estimates (inclusive of sales taxes) were based on data provided by Management.

**Note 2)** The sales tax was estimated by applying a 7.5% sales tax rate based on historical averages.

**Note 3)** The payroll estimate is based on actual payroll for the week ending 4/11/2015 and paid 4/17/2015. Store payroll estimates for subsequent weeks are based on anticipated reductions in the workforce. Home Office and DC subsequent payroll estimates are based on anticipated reductions provided by Management. The bi-weekly net payroll disbursement is made on Friday beginning 4/17/2015 and the tax and other liabilities are made the following week.

**Note 4)** Temporary labor is an estimate based on the potential use of short term labor as a result of the reduction in the workforce of full time employees.

**Note 5)** The stores rent for the week ending 4/18/2015 was calculated based on rent due from the April rent roll and prorated for the post petition period. The rent expense does not include any estimate for stores that base their rent payments as a percentage of sales.

**Note 6)** Shipping costs are based on estimates provided by Management, and assuming no new inventory purchases.

**Note 7)** Credit card fees are estimated based on historical credit cards fees as compared to sales.

**Note 8)** Utility payments were based on 3 month average paid from January through March 2015.

**Note 9)** The Iberia Bank payments are for debt service related to the Point of Sale system.

**Note 10)** Expenses were estimated based on a monthly or weekly average derived from the P&L statements for the period January 2014 through January 2015.

**Note 11)** Estimate for supplies, storage, moving and other expenses.

**Note 12)** The health insurance estimate is an average of weekly payments made to the third party administrator for the period January through March 2015. The company's health insurance is a self funded policy, actual claims incurred but not reported could be substantially higher and it is not practical to estimate unreported claims.

**Note 13)** Rent for the Birmingham, AL corporate office and warehouse was pre-paid in January 2015 for the period January through June 2015 for at total payment of $160,000.

**Note 14)** Insurance expenses were calculated based on the installment schedule and invoice provided by the insurance agent.

**Note 15)** IT support and services were estimated based on an average of historical expenses and information provided by management.

**Note 16)** Estimates for leased copiers and printers for the home office were provided by Management, based on monthly payments made by credit cards to the leasing companies.

**Note 17)** Advertising and promotional expenses are incorporated in the Agent's Agreement.

**Note 18)** The inventory cost counter expense was allocated and split 50/50 between the Merchant and Agent.

**Note 18)** Utility deposits for adequate protection were based on 50% of the monthly average payment from January through March 2015 and reduced by deposits currently held by the utility providers.

**Note19)** Cash collateral interest payments are pursuant to ¶9(e) of the Cash Collateral Order.

**Note 20)** The DIP facility interest was calculated based on $1,250,000 at an annual interest rate of 6%.

**Note 21)** The US Trustee fee was estimated based on disbursements for the second calendar quarter between $5,000,000 and $14,999,999.99 and due no later than one month following the end of each calendar quarter.

**Note 22)** Ordinary course professionals were estimated to provide services including, but not limited to, tax, legal, and managerial professional during the liquidation process.

**Note 23)** The beginning cash balance as of 4/16/2015.

**<u>EXHIBIT B</u>**
**OPERATING BUDGET**

**SIMPLY FASHION STORES, LTD.**
Case No.

**United States Bankruptcy Court - _____ District of Florida - ____ Division**

**Chief Restructuring Officer**
**Weekly Operating Cash Budget - Adjusted for GOB Agent Effect**

PRELIMINARY DRAFT as of April 16, 2015:
This is a preliminary draft.  It has been prepared based on preliminary information and assumptions.  No one may rely on this draft.  It is subject to change as additional information becomes available or is clarified.

Source: Sales projections and historical sales reports provided by client, Great Plains general ledger account and disbursements reports for various expense accounts and sales taxes, P&L statements provided by client, and supporting invoices and checks.

| | Notes | Budget for the Week Ending Saturday, | | | |
| --- | --- | --- | --- | --- | --- |
| | | 4/18/2015 | 4/25/2015 | 5/2/2015 | Total |
| *Proceeds:* | | | | | |
| Store Sales | 1 | $ 140,000 | $ 1,069,088 | $ 1,069,088 | $ 2,278,175 |
| Less Sales tax | 2 | | (550,000) | | (550,000) |
| **Net Sales** | | **140,000** | **519,088** | **1,069,088** | **1,728,175** |
| | | | | | |
| *Operating Cash Outflows:* | | | | | |
| **Store expenses** | | | | | |
| Payroll and related taxes | 3 | 645,920 | 176,554 | 895,920 | 1,718,393 |
| Temp labor | 4 | | 3,000 | 3,000 | 6,000 |
| Rent | 5 | | 400,000 | | 400,000 |
| Shipping/ freight | 6 | | 66,000 | 15,000 | 81,000 |
| Credit card fees | 7 | 1,400 | 10,691 | 10,691 | 22,782 |
| Utilities, waste & telephone | 8 | | 58,000 | 48,000 | 106,000 |
| Iberia - POS | 9 | | 40,000 | | 40,000 |
| Repairs & maintenance | 10 | | 19,000 | 19,000 | 38,000 |
| Licenses | 10 | | 1,600 | 1,600 | 3,200 |
| Security | 10 | | | | - |
| Supplies | 10 | | 10,000 | 10,000 | 20,000 |
| Bank service charge | 10 | | | 7,100 | 7,100 |
| Auto expense | 10 | | 10000 | 10,000 | 20,000 |
| Travel & lodging | 10 | | 1,500 | 1,500 | 3,000 |
| Other | 11 | | 2,000 | 2,000 | 4,000 |
| **Total Store Expenses** | | **647,320** | **798,345** | **1,023,810** | **2,469,475** |
| | | | | | |
| **Home Office & DC expenses** | | | | | |
| Payroll and related taxes | 3 | 106,284 | 41,920 | 106,284 | 254,488 |
| Health insurance | 12 | 24,000 | 24,000 | 24,000 | 72,000 |
| Temp labor | 4 | | 2,000 | 2,000 | 4,000 |
| Rent | 13 | | | | - |
| Utilities, waste & telephone | 8 | | | 13,000 | 13,000 |
| Supplies | 11 | | 1,000 | 5,000 | 6,000 |
| Repairs, maintenance & janitorial | 10 | | 5,000 | 5,000 | 10,000 |
| Insurance - business | 14 | | | | - |
| IT - support and services | 15 | | 35,000 | | 35,000 |
| Copy machines \ printers | 16 | | 4,000 | | 4,000 |
| Security | 10 | | 1,000 | 1,000 | 2,000 |
| Bank svc charge | 10 | | | 1,000 | 1,000 |
| Advertising \ promotion | 17 | | | | - |
| Ordinary course professionals | 22 | | | | - |
| Inventory counter | | | | | - |
| Travel & lodging | 10 | | 1,500 | 1,500 | 3,000 |
| Other | 11 | | 3,000 | 3,000 | 6,000 |
| Document storage/ moving | 11 | | | | - |
| **Total Home Office expenses** | | **130,284** | **118,420** | **161,784** | **410,488** |
| | | | | | |
| **Total Operating Cash Outflows** | | **777,604** | **916,765** | **1,185,594** | **2,879,963** |
| | | | | | |
| *Bankruptcy related expenses:* | | | | | |
| Professional fees | | | | | - |
| Adequate protection -utilities | 18 | | 10,000 | 10,000 | 20,000 |
| Cash collateral - interest | 19 | | | | - |
| DIP facility interest | 20 | | | 3,125 | 3,125 |
| US Trustee Fees | 21 | | | | - |
| **Total Bankruptcy expenses** | | **-** | **10,000** | **13,125** | **23,125** |
| | | | | | |
| **Net cash flow (deficit) after Expenses** | | **$ (637,604)** | **$ (407,678)** | **$ (129,632)** | **$ (1,174,913)** |
| | | | | | |
| Beginning cash balance | 23 | $ 23,544 | $ 635,940 | $ 228,262 | $ 23,544 |
| Net cash flow | | (637,604) | (407,678) | (129,632) | (1,174,913) |
| DIP facility advances (paydowns) | | 1,250,000 | | | 1,250,000 |
| **Ending cash balance** | | **$ 635,940** | **$ 228,262** | **$ 98,631** | **$ 98,631** |
| | | | | | |
| Beginning DIP Facility balance | | $ - | $ 1,250,000 | $ 1,250,000 | $ - |
| DIP facility advances (paydowns) | | 1,250,000 | - | - | 1,250,000 |
| **Ending DIP Facility balance** | | **$ 1,250,000** | **$ 1,250,000** | **$ 1,250,000** | **$ 1,250,000** |

**SEE ACCOMPANYING NOTES**

The CRO from time to time makes written or oral forward-looking statements concerning expectations, beliefs, plans, objectives, future events or performance and underlying assumptions and other statements that are not historical facts. These statements are "forward-looking statements." Generally, the inclusion of the words "believe", "could", "should", "estimate", "expect", "intend", "anticipate", "will", "plan", "target", "forecast" and similar expressions identify statements that constitute "forward-looking statements." All statements addressing developments that the CRO expects or anticipates will occur in the future, including statements relating to values, future financial condition, assets, real property and timing of their disposition, as well as statements expressing optimism or pessimism about future results, are forward-looking statements.

The forward-looking statements are based upon the CRO's then-current views and assumptions regarding future developments and are applicable only as of the dates of such statements. By their nature, all forward-looking statements involve risks and uncertainties. The CRO assumes no obligation to update or review any forward-looking information to reflect actual results, changes in assumptions or changes in other factors affecting forward-looking information, whether as a result of new information, future events or otherwise. There can be no assurance that the CRO has correctly identified and appropriately assessed all factors affecting the Company and its assets. For these reasons, you are cautioned not to place undue reliance on any forward-looking statements.

**SIMPLY FASHION STORES, LTD.**
**Case No:**
**United States Bankruptcy Court**
**_____ District of Florida**
**_____ Division**

**Chief Restructuring Officer**
**13 Week Operating Cash Budget**
**Significant Notes and Assumptions**

**The assumptions provided in the operating budget are based on an wind down of the company's stores
with the retention of a going out of business agent.**

**Note 1)** Stores sales for the week ending 4/18/2015 were based on the actual sales and estimated cash transferred from the store bank accounts and credit card accounts effective Friday 4/17/2015. The subsequent weeks store sales estimates (inclusive of sales taxes) were based on data provided by Management.

**Note 2)** The sales tax was estimated by applying a 7.5% sales tax rate based on historical averages.

**Note 3)** The payroll estimate is based on actual payroll for the week ending  4/11/2015 and paid 4/17/2015.  Store payroll estimates for subsequent weeks are based on anticipated reductions in the workforce. Home Office and DC subsequent payroll estimates are based on anticipated reductions provided by Management. The bi-weekly net payroll disbursement is made on Friday beginning 4/17/2015 and the tax and other liabilities are made the following week.

**Note 4)** Temporary labor is an estimate based on the potential use of short term labor as a result of the reduction in the workforce of full time employees.

**Note 5)** The stores rent for the week ending 4/18/2015 was calculated based on rent due from the April rent roll and prorated for the post petition period. The rent expense does not include any estimate for stores that base their rent payments as a percentage of sales.

**Note 6)** Shipping costs are based on estimates provided by Management, and assuming no new inventory purchases.

**Note 7)** Credit card fees are estimated based on historical credit cards fees as compared to sales.

**Note 8)** Utility payments were based on 3 month average paid from January through March 2015.

**Note 9)** The Iberia Bank payments are for debt service related to the Point of Sale system.

**Note 10)** Expenses were estimated based on a monthly or weekly average derived from the P&L statements for the period January 2014 through January 2015.

**Note 11)** Estimate for supplies, storage, moving and other expenses.

**Note 12)** The health insurance estimate is an average of weekly payments made to the third party administrator for the period January through March 2015. The company's health insurance is a self funded policy, actual claims incurred but not reported could be substantially higher and it is not practical to estimate unreported claims.

**Note 13)** Rent for the Birmingham, AL corporate office and warehouse was pre-paid in January 2015 for the period January through June 2015 for at total payment of $160,000.

**Note 14)** Insurance expenses were calculated based on the installment schedule and invoice provided by the insurance agent.

**Note 15)** IT support and services were estimated based on an average of historical expenses and information provided by management.

**Note 16)** Estimates for leased copiers and printers for the home office were provided by Management, based on monthly payments made by credit cards to the leasing companies.

**Note 17)** Advertising and promotional expenses are incorporated in the Agent's Agreement.

**Note 18)** The inventory cost counter expense was allocated and split 50/50 between the Merchant and Agent.

**Note 18)** Utility deposits for adequate protection were based on 50% of the monthly average payment from January through March 2015 and reduced by deposits currently held by the utility providers.

**Note19)** Cash collateral interest payments are pursuant to ¶9(e) of the Cash Collateral Order.

**Note 20)** The DIP facility interest was calculated based on $1,250,000 at an annual interest rate of 6%.

**Note 21)** The US Trustee fee was estimated based on disbursements for the second calendar quarter between $5,000,000 and $14,999,999.99 and due no later than one month following the end of each calendar quarter.

**Note 22)** Ordinary course professionals were estimated to provide services including, but not limited to, tax, legal, and managerial professional during the liquidation process.

**Note 23)** The beginning cash balance as of 4/16/2015.