

**ORDERED in the Southern District of Florida on April 23, 2015.**

Laurel M. Isicoff, Judge
United States Bankruptcy Court

_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:                                          Chapter 11 Cases

ADINATH CORP. and SIMPLY                         Case No. 15-16885-LMI
FASHION STORES, LTD., [1]                        Jointly Administered

    Debtors.

_____/

**ORDER PURSUANT TO SECTIONS 105(a), 363 AND 365
OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6004 AND
6006, AND LOCAL RULE 6004-1 (I) APPROVING PROCEDURES IN CONNECTION
WITH THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS;
(II) AUTHORIZING THE DEBTOR TO ENTER INTO STALKING
HORSE AGREEMENT IN CONNECTION THEREWITH;
(III) APPROVING THE PAYMENT OF STALKING HORSE PROTECTIONS;
AND (IV) SETTING RELATED AUCTION AND SALE HEARING DATES**

    **THIS MATTER** came before the Court on the 20th day of April, 2015 at 3:00 p.m. in

Miami, Florida, upon the motion dated April 17, 2015 [ECF No. 39] (the "Motion"), of the

---

[1] The Debtors in these cases, along with the addresses and last four digits of each Debtor's federal tax
identification number are: (i) Adinath Corp., 2110 N.W.95th Avenue, Miami FL 33172 (4843); and (ii)
Simply Fashion Stores, Ltd., 2500 Crestwood Boulevard, Birmingham, AL 35210 (6230).

debtor and debtor in possession, Simply Fashion Stores, Ltd. ("Simply Fashion", "Debtor"), pursuant to sections 105, 363 and 365 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 6004-1 seeking (A) entry of an order (the "Bidding Procedures Order") (i) approving procedures (the "Bidding Procedures") in connection with the disposition of substantially all of the Debtor's assets (the "Assets"), subject to higher and better offers received at an auction (the "Auction"), (ii) authorizing the Debtor to enter into an Agency Agreement (the "Stalking Horse Agreement")[2] attached hereto as **Exhibit "1"** with Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (the "Stalking Horse Bidder") in connection therewith, (iii) approving the payment of the Break-Up Fee (as defined below), (iv) approving procedures (the "Assignment Procedures") for the assumption and assignment of contracts (the "Contracts") and leases (the "Leases") to any purchaser(s) of the Debtor's assets who requests assumption and assignment of such Contracts and/or Leases, and/or to resolve any objections thereto, and (v) setting related auction and sale hearing dates, all as more fully described in the Motion, and (B) entry of an order (the "Sale Approval Order") pursuant to sections 105(a) and 363(b), (f), and (m) and 365 of the Bankruptcy Code and Bankruptcy Rules 6004, 6006 and 9014, and Local Rule 6004-1, approving the consummation of the transactions contemplated by the Stalking Horse Agreement or any other sale or liquidation of the Merchandise pursuant to a purchase agreement or agency agreement with a party other than the Stalking Horse Bidder who submitted the highest or otherwise best bid(s) at the Auction; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Motion or in the Stalking Horse Agreement, as applicable.

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion and the Bidding Procedures having been provided to (i) the Office of the United States Trustee for the Southern District of Florida, (ii) the attorneys for  the Lender, (iii) those creditors holding the 20 largest unsecured claims against the Debtor's estate, (iv) all Interested Parties, (v) all attorney general's offices in the states in which the Debtor conduct business, (vi) all county attorney's offices in the counties in which the Debtor conduct business; and (vii) all other and all affected federal and local regulatory and taxing authorities, including the Internal Revenue Service (collectively, the "Bidding Procedures Notice Parties"), and it appearing that no other or further notice need be provided; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtor, its estate and creditors, and all parties in interest; the objections raised at the hearing, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

**FOUND AND DETERMINED THAT:**

A.      The Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.      Good and sufficient notice of the relief sought in the Motion has been given under the circumstances, and no other or further notice is required. A reasonable opportunity to object or be heard regarding the relief requested in the Motion (including, without limitation, with respect to the Bidding Procedures, and the Break-Up Fee (as defined below)) has been afforded

to all interested persons and entities including, but not limited to, the Bidding Procedures Notice Parties.

C.      The Debtor's proposed notice of the Bidding Procedures, the Auction and the hearing to approve any sale of the Assets to a purchaser or liquidation of the Assets by a liquidator acting through an agency agreement (the "Sale Approval Hearing") is appropriate and reasonably calculated to provide all interested parties with timely and proper notice, and no other or further notice is required.

D.      The Bidding Procedures substantially in the form attached hereto as **Exhibit "2"** are fair, reasonable, and appropriate and are designed to maximize the recovery from any sale of the Assets.

E.      The Debtor has demonstrated a compelling and sound business justification for authorization to (i) enter into the Stalking Horse Agreement to establish a minimum bidding price for the Assets and (ii) to pay the combined break-up fee and expense reimbursement (the "Bid Protection") under the terms and conditions set forth in the Stalking Horse Agreement.  The Break-Up Fee is fair and reasonable and provides a benefit to the Debtor's estate and creditors.

F.      The Debtor's payment of the Bid Protection is (a) an actual and necessary cost of preserving the Debtor's estate, within the meaning of section 503(b) of the Bankruptcy Code, (b) of substantial benefit to the Debtor's estate and creditors and all parties in interest herein, (c) reasonable and appropriate, and (d) a material inducement and condition necessary to ensure that the Stalking Horse Bidder will continue to pursue its proposed agreement to undertake any sale.

G.      No later than Monday, April 27, 2015, the Debtor will serve notice of the Auction and the Sale Approval Hearing (the "Sale Notice") by first class mail on: (i) the U.S. Trustee;

4

(ii) counsel for the Lender; (iii) all known creditors of the Debtor; (iv) all attorney general's offices in the states in which the Debtor conduct business, (v) all county attorney's offices in the counties in which the Debtor conducts business; and (vi) all other and all affected federal and local regulatory and taxing authorities, including the Internal Revenue Service (collectively, the "Sale Notice Parties").

H.      Entry of this Order is in the best interests of the Debtor and its estate, creditors, and interest holders and all other parties in interest herein.

I.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014,

J.      To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such,

**ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Bidding Procedures attached hereto as **Exhibit "2"** are **APPROVED**, fully incorporated into this Order and the Debtor is authorized and directed to act in accordance therewith.  The failure to specifically include a reference to any particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness of such provision.

2.      All objections to the Motion or the relief requested therein that have not been withdrawn, waived, settled, or specifically addressed in this Order, and all reservations of rights included in such objections, are overruled in all respects on the merits.

3.      The form of Sale Notice attached hereto as **Exhibit "3"** is approved.

4.      Service of the Sale Notice on the Sale Notice Parties in the manner described herein and in the Motion constituted good and sufficient notice of the Auction and the Sale Approval Hearing.  No other or further notice is required.

5.      The Debtor is authorized to accept bids for any asset or combination of assets, to combine Qualified Bidders or Qualified Bids, and to implement such other arrangements at the Auction so as to maximize the value received by the estate from the Auction.

6.      To constitute a "Qualified Bid," a bid (other than a bid submitted by a Stalking Horse Bidder, who shall be deemed to be a Qualified Bidder and the Stalking Horse Bid a Qualified Bid) must be received by the Bid Deadline (as defined in the Bidding Procedures) and comply with the applicable provisions of the Bidding Procedures.

7.      All Qualified Bids must be received by the Bid Deadline (as defined in the Bidding Procedures) and comply with the applicable provisions of the Bidding Procedures.

8.      The Auction shall be conducted at the offices of Berger Singerman LLP, **1450 Brickell Avenue, Suite 1900, Miami, FL 33131, on May 5, 2015 at 2:00 p.m. (prevailing Eastern Time).**

9.      Objection Deadline to Sale Order(s).  Objections to the sale of the Assets shall be in writing, filed, and served so as to be actually received by **May 5, 2015 at  4:00 p.m. (prevailing Eastern Time)** by: (i) the Debtor, c/o KapilaMukamal LLP,1000 South Federal Highway, Suite 200, Fort Lauderdale, FL 33316, Attn.:  Soneet R. Kapila, CRO; (ii) the Debtor, 2110 N.W. 95th Avenue, Miami, FL 33172, Attn: Swapnil Shah; (iii) counsel to the Debtor, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131, Attn: Paul Steven Singerman, Esq. and Christopher A. Jarvinen, Esq.; (iv) the Stalking Horse Bidder, (i) Hilco Merchant Resources, LLC, 5 Revere Drive, Suite 206, Northbrook, IL 60062, Attention Ian S.

Fredericks, and (ii) Gordon Brothers Retail Partners, LLC, Prudential Tower, 800 Boylston Street, Boston, MA  02119, Attention Michael Chartock; (iii) counsel to the Stalking Horse Bidder, Bilzin Sumberg Baena Price & Axelrod LLP, 1450 Brickell Avenue, 23rd Floor, Miami, FL  33131, Attn: Scott L. Baena, Esq., and Jay Sakalo, Esq., (iv) counsel to the Official Committee of Unsecured Creditors, if one is appointed; and (v) the U.S. Trustee, 51 S.W. First Avenue, Room 1204, Miami, FL 33130 (collectively, the "Objection Notice Parties").

10.    The Sale Approval Hearing shall be held in **United States Bankruptcy Court for the Southern District of Florida, C. Clyde Atkins United States Courthouse, 301 North Miami Avenue, Courtroom 8, Miami, FL 33128, on May 6, 2015 at 8:00 a.m. (prevailing Eastern Time)** or such other date and time that the Court may later direct; *provided, however,* that the Sale Approval Hearing may be adjourned, from time to time, without further notice to creditors or parties in interest other than by announcement of the adjournment in open Court or on the Court's docket.

11.    The Debtor will file and serve the proposed form of sale order and the store closing procedures no later than **Monday, April 27, 2015**. As soon as practicable after the conclusion of the Auction, but no later than before the Sale Approval Hearing, the Debtor shall file a final form of order approving the sale(s) as agreed upon between the Debtor and the Successful Bidder(s).   Notwithstanding the authorization to enter into the Stalking Horse Agreement, the Court is not approving the provisions thereof and such approval shall be addressed at the Sale Hearing.

12.    The Debtor is authorized, but not directed, to enter into the Stalking Horse Agreement.

13.     The Stalking Horse Bidder shall be entitled to receive the Bid Protection in accordance with the terms and conditions of the Stalking Horse Agreement. The Bid Protection, once earned in accordance with the terms of the Stalking Horse Agreement, shall (i) be an administrative expense in the Debtor's chapter 11 cases pursuant to sections 503(b), 507(a)(1) and 507(b) of the Bankruptcy Code until paid to the Stalking Horse Bidder, *provided, however,* that all such amounts shall have the priority and be paid solely in the manner set forth in the Stalking Horse Agreement.

14.     Notwithstanding any confidentiality agreement that may be contained in any agreement, contract, or other document to which the Debtor is a party, the Debtor is authorized to disclose the contents of such agreement, contract, or document to prospective bidders in connection with the Bidding Procedures and proposed sale, and such disclosure shall not be a breach of any such contract, agreement or document.

15.     Notwithstanding Bankruptcy Rules 6004, 6006 or otherwise, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self- executing.

16.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

17.     To the extent this Order is inconsistent with any prior order or pleading with respect to the Motion in these cases, the terms of this Order shall govern.

18.     This Court shall retain jurisdiction over any matters related to or arising from the implementation or interpretation of this Order. To the extent any provisions of this Order shall be inconsistent with the Motion, the terms of this Order shall control.

# # #

Submitted by:
Paul Steven Singerman, Esq.
BERGER SINGERMAN LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL  33131
Telephone: (305) 755-9500
Facsimile:  (305) 714-4340
Email:  singerman@bergersingerman.com

Copies furnished to:
Paul Steven Singerman, Esq.
*(Attorney Singerman is directed to serve a signed copy of this Order upon all interested parties and to file a Certificate of Service with the Court.)*

# EXHIBIT "1"

# AGENCY AGREEMENT

This Agency Agreement ("Agreement") is made as of April 17  2015, by and between SIMPLY FASHION STORES, LTD. ("Merchant") and a contractual joint venture composed of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, "Agent"), it being understood and agreed that each entity comprising Agent shall be jointly and severally liable for all obligations of Agent hereunder.

Section 1.  Recitals.

WHEREAS, Merchant operates retail stores and desires that the Agent act as Merchant's exclusive agent for the limited purposes of: (a) selling all of the Merchandise (as hereinafter defined) from Merchant's two hundred forty-seven (247) retail store locations identified on Exhibit 1 attached hereto (each individually a "Store," and collectively the "Stores") by means of a "store closing", "sale on everything", "going out of business", "everything must go", or similar sale (as further described below, the "Sale"); and (b) disposing of the Owned FF&E in the Stores and Distribution Centers.

WHEREAS, Merchant intends to file voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, et seq. (the "Bankruptcy Code")  in the United States Bankruptcy Court for the Southern District of Florida (such case, the "Bankruptcy Case" and such court, or other court of competent jurisdiction in which the Bankruptcy Case is filed, the "Bankruptcy Court").

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Agent and Merchant hereby agrees as follows:

Section 2.  Appointment of Agent/Approval Order.

(a)  Subject to entry of an order authorizing Merchant to enter into this Agreement and authorizing Merchant to conduct the Sale in accordance with the terms of this Agreement (the "Approval Order"), Merchant hereby appoints the Agent, and the Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale in accordance with the terms and conditions of this Agreement.

(b)  The Approval Order shall provide, in a form reasonably satisfactory to Merchant and Agent, *inter alia,* that (i) this Agreement is in the best interest of the Merchant, Merchant's estates, creditors, and other parties in interest, (ii) this Agreement (and each of the transactions contemplated hereby) is approved in its entirety; (iii) Merchant and Agent shall be authorized to continue to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby; (iv) upon payment of the Initial Guaranty Payments (as defined below) and delivery of the Letter of Credit (as defined below), Agent shall be entitled to sell all Merchandise and Owned FF&E hereunder free and clear of all liens, claims or encumbrances thereon, with any presently existing liens encumbering all or any portion of the Merchandise or Owned FF&E or the Proceeds (as defined below) thereof attaching only to the Guaranteed Amounts and other amounts to be received by Merchant under this Agreement; (v) Agent shall have the right to use the Stores and all related Store services, furniture, fixtures, equipment and other assets of the Merchant as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person, subject to compliance with the Sale Guidelines (as defined below) and Approval Order; (vi) Agent, as agent for Merchant, is authorized

to conduct, advertise, post signs, utilize signwalkers, and otherwise promote the Sale as a "store closing", "sale on everything", "going out of business", "everything must go", or similar themed sale, in accordance with the Sale Guidelines (as the same may be modified and approved by the Bankruptcy Court) and without further compliance with the Liquidation Sale Laws (as defined below), subject to compliance with the Sale Guidelines and Approval Order; (vii) Agent shall be granted a limited license and right to use until the Sale Termination Date the trade names, logos, e-mail lists, customer lists, e-commerce sites (including (without limitation) websites and social media sites such as Facebook, and Twitter) relating to and used in connection with the operation of the Stores, solely for the purpose of advertising the Sale in accordance with the terms of the Agreement; provided, however, Agent is prohibited from using the websites, social media sites, e-mail lists, customer lists and e-commerce sites owned by or related to New Dots, LLC or the "Dots" brand (collectively, the "Dots Carveout"); (viii) all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Approval Order as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including, without limitation, the conducting and advertising of the Sale in the manner contemplated by this Agreement; (ix) all utilities, landlords, creditors and other interested parties and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, or institute any action in any court (other than in the Bankruptcy Court) with respect to Merchandise or the Owned FF&E or before any administrative body which in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale; (x) the Bankruptcy Court shall retain jurisdiction over the parties to enforce this Agreement; (xi) Agent shall not be liable for any claims against Merchant other than as expressly provided for in this Agreement; (xii) Agent shall be granted a valid, binding, enforceable and perfected security interest as provided for in Section 16 hereof (without the necessity of filing financing statements to perfect the security interests); (xiii) the Bankruptcy Court finds that time is of the essence in effectuating this Agreement and proceeding with the Sale at the Stores uninterrupted; (xiv) the Bankruptcy Court finds that the Merchant's decisions to (a) enter into this Agreement and (b) perform under and make payments required by this Agreement is a reasonable exercise of the Merchant's sound business judgment consistent with its fiduciary duties and is in the best interests of the Merchant, its estate, its creditors, and other parties in interest; (xv) the Bankruptcy Court finds that this Agreement was negotiated in good faith and at arms' length between the Merchant and Agent and that Agent is entitled to the protection of section 363(m) of the Bankruptcy Code; (xvi) the Bankruptcy Court finds that Agent's performance under this Agreement will be, and payment of the Guaranteed Amounts under this Agreement will be made, in good faith and for valid business purposes and uses, as a consequence of which Agent is entitled to the protection and benefits of sections 363(m) and 364(e) of the Bankruptcy Code; (xvii) this Agreement is approved pursuant to Bankruptcy Code section 363; and (xviii) in the event any of the provisions of the Approval Order are modified, amended or vacated by a subsequent order of the Bankruptcy Court or any other court, Agent shall be entitled to the protections provided in Bankruptcy Code sections 363(m) and 364(e) and, no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of the sale or the liens or priority authorized or created under this Agreement or the Approval Order.

(c)    Subject to entry of the Approval Order, Agent shall be authorized to advertise the Sale as a "store closing," "sale on everything", "going out of business", "everything must go", or similar-themed sale, and the Approval Order shall provide that Agent shall be required to comply with applicable federal, state and local laws, regulations and ordinances, including, without limitation, all laws and regulations relating to advertising, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities (collectively, the "Applicable General Laws"), other than all applicable laws, rules and regulations in respect of "going out of business", "store closing" or similar-themed sales and permitting (collectively, the "Liquidation Sale Laws"), provided that such Sale is

2

conducted in accordance with the terms of this Agreement, the Sale Guidelines and Approval Order; and provided further that the Approval Order shall provide that so long as the Sale is conducted in accordance with the Sale Guidelines and the Approval Order and in a safe and professional manner, Agent shall be deemed to be in compliance with any Applicable General Laws.

Section 3.    Consideration to Merchant and Agent.

3.1    Payments to Merchant.

(a)    Subject to Merchant's compliance with all representations, warranties, covenants, terms and conditions set forth in this Agreement, as a guaranty of Agent's performance hereunder, Agent guarantees that Merchant shall receive twenty-seven and one-half percent (27.5%) (the "Guaranty Percentage") of the aggregate Retail Price of the Merchandise (the "Guaranteed Amount"), which Guaranteed Amount shall be paid at such times and in such manner as shall hereinafter be provided. The Agent shall pay to Merchant the Guaranteed Amount and the Sharing Amount due to Merchant (if any) in the manner and at the times specified in Section 3.3. The Guaranteed Amount will be calculated based upon the aggregate Retail Price of the Merchandise as determined by multiplying (x) the Guaranty Percentage by (y)(A) the final certified report of the Inventory Taking Service after verification and reconciliation thereof by Agent and Merchant showing the aggregate Retail Price of the Merchandise as of the Sale Commencement Date, in consultation with Lender, (B) the aggregate Retail Price of the Merchandise subject to Gross Rings (as adjusted for shrinkage per this Agreement), (C) the aggregate Retail Price of Returned Merchandise not otherwise included in the Inventory Taking, and (D) any other adjustments to Retail Price as expressly contemplated by this Agreement. Agent shall pay to Merchant (or its designee) the Guaranteed Amount in the manner and at the times specified in Section 3.3 below.

(b)    The Guaranty Percentage has been fixed based upon the aggregate Retail Price of the Merchandise included in the Sale being not less than $16,000,000 (the "Merchandise Threshold") as of the Sale Commencement Date. To the extent that the aggregate Retail Price of the Merchandise included in the Sale is less than the Merchandise Threshold, then such deviation shall not constitute a breach of any representation or warranty, or an Event of Default; provided, however, that, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(b) annexed hereto, which adjustment in the Guaranty Percentage shall result in an dollar adjustment to the Guaranteed Amount the actual amount of which will be determined in connection with the Final Inventory Report; provided that, solely for purposes of determining whether the aggregate Retail Price of the Merchandise included in the Sale is less than the Merchandise Threshold, no adjustment shall be made to the applicable Retail Price to account for the effect of any prevailing discount adjustment or the following discounts or price adjustments offered by the Merchant: (i) employee discounts; (ii) member or customer appreciation points or coupons; (iii) coupons (Merchant's or competitors'); (iv) customer savings pass discounts or "bounce back" coupons, or discounts for future purchases based on dollar value of past purchases; (v) obvious ticketing or marking errors; (vi) instant (in-store) or mail in rebates.

(c)    To ensure accurate sales audit functions, as well as accurate calculations of the Sharing Amount, if any, Agent shall use Merchant's existing point-of-sale system for recording all sales (including any sales of Additional Agent Goods) in the Stores.

3.2    Compensation to Agent, Sharing:

(a)    After Proceeds are used to repay Agent for amounts paid on account of the Guaranteed Amount and to pay Expenses, all remaining Proceeds shall be allocated in the following order

3

of priority: FIRST: to Agent in an amount equal to two percent (2.0%) of the aggregate Retail Price of the Merchandise ("Agent's Fee"); and THEREAFTER: fifty percent (50%) to Agent and fifty percent (50%) to Merchant ("Sharing Amounts").  Agent shall pay the Sharing Amount, if any, to Merchant (or its designee), on the first business day after the completion of the Final Reconciliation conducted pursuant to Section 8.7 and shall remit such payment to the Merchant's Designated Account.

(b)    To the extent that there is Merchandise remaining at the Sale Termination Date (the "Remaining Merchandise"), subject to Merchant's right to participate in the Proceeds from the disposition thereof, such Remaining Merchandise shall be deemed transferred to Agent free and clear of all liens, claims, and encumbrances to the extent provided in the Approval Order, and Agent shall use diligent and commercially reasonable efforts to dispose of all such Remaining Merchandise by means of bulk sale/wholesale or otherwise.  Agent and its affiliates shall be authorized to sell or otherwise dispose of the Remaining Merchandise with all logos, brand names, and other intellectual property on the Merchandise intact (subject to the Dots Carveout), and shall be authorized to advertise the sale of the Remaining Merchandise using Merchant's name and logo.  The proceeds received by Agent from such disposition shall constitute Proceeds hereunder.

3.3    Proceeds; Time of Payments; Control of Proceeds.

(a)    For purposes of this Agreement, "Proceeds" shall mean the aggregate of (a) the total amount (in dollars) of all sales of Merchandise made under this Agreement and all service revenue, in each case during the Sale Term and exclusive of Sales Taxes; (b) all proceeds of Merchant's insurance for loss or damage to Merchandise arising from events occurring during the Sale Term; and (c) any and all proceeds received by Agent from the disposition of Remaining Merchandise.  For the avoidance of doubt: (1) proceeds from the sales at Merchant's Stores or through the e-commerce platform for periods prior to the Sale Commencement Date; (2) the proceeds from the sale of Merchant Consignment Goods pursuant to Section 5.4 hereof (subject to Agent's right to receive the commission under Section 5.4 below); (3) all proceeds of Merchant's insurance for loss or damage to goods arising from events occurring prior to the Sale Commencement Date; (4) proceeds from the sale or other disposition of Owned FF&E (subject to Agent's right to receive the FF&E Commission under Section 7.1 below); (5) proceeds from the sale of Additional Agent Goods; and (6) payments made by Agent on account of the Guaranteed Amount, the Sharing Amounts (if any), Expenses, or the Letter of Credit, shall, in each case, not constitute "Proceeds" hereunder.

(b)    On the first business day following the entry of the Approval Order (the "Payment Date"), Agent shall pay to Merchant an amount equal to eighty-five percent (85%) of the estimated Guaranteed Amount of the Retail Price of Merchandise in the Stores as of the Sale Commencement Date (based upon Merchant's books and records maintained in the ordinary course as of the date immediately preceding the Payment Date, but in no event shall such estimate of the Retail Price of Merchandise be less than the Merchandise Threshold) (the "Initial Guaranty Payment") by wire transfer of immediately available funds to an account designated in writing by Merchant on Exhibit 3.3(b) attached hereto ("Merchant's Account").  The balance of the Guaranteed Amount, if any, shall be paid by Agent by wire transfer of immediately available funds to the Merchant's Account on the earlier of (i) the date that is thirty (30) days after the Sale Commencement Date and (ii) the second business day following the issuance of the final report of the aggregate Retail Price of the Merchandise included in the Sale by the Inventory Taking Service, after review, reconciliation and mutual written verification thereof by Agent and Merchant, in consultation with the Lender  (the "Final Inventory Report" with the date of completion of such reconciliation and issuance of such Final Inventory Report to be referred to as the "Inventory Reconciliation Date") (and in the case of "(i)" herein, Agent shall tender payment of only the

4

undisputed portion on account of any remaining portion of the Guaranteed Amount). To the extent that Merchant is entitled to receive any funds on account of the Sharing Amount due to Merchant, Agent shall pay such Sharing Amount as part of the Final Reconciliation under Section 8.7. To the extent that the Guaranteed Amount has not been paid in full by the date of the Final Reconciliation, Agent shall pay the unpaid portion of the Guaranteed Amount to Merchant as part of the Final Reconciliation. In the event of a dispute as to the calculation of the portion of the Guaranteed Amount, any such dispute shall be resolved in the manner and at the times set forth in Section 8.7 hereof. To the extent the Agent fails to pay when due the balance or an undisputed portion, if any, of any remaining portion of the Guaranteed Amount in accordance with this section 3.3(b), Merchant and/or Lender shall have the rights granted under Section 3.4 hereof to the extent of such balance or undisputed portion. Merchant and Agent shall exercise commercially reasonable best efforts to reconcile the Inventory Taking within ten (10) days after its completion by the Inventory Taking Service.

(c)     All Proceeds shall be controlled by Agent in the manner provided for below.

(i)     Agent may (but shall not be required to) establish its own accounts (including without limitation credit card accounts and systems) with five (5) business days advance notice to Merchant, dedicated solely for the deposit of the Proceeds and the disbursement of amounts payable to Agent hereunder (the "Agency Accounts"), and Merchant shall use commercially reasonable procedures, upon Agent's reasonable request, execute and deliver all necessary documents to open and maintain the Agency Accounts; provided, however, Agent shall have the right, in its sole and absolute discretion, to continue to use Merchant's Designated Deposit Accounts (as defined below) as the Agency Accounts in which case Merchant's Designated Deposit Accounts shall be deemed to be Agency Accounts. Agent shall exercise sole signatory authority and control with respect to the Agency Accounts. The Agency Accounts shall be dedicated solely to the deposit of Proceeds and other amounts contemplated by this Agreement and the distribution of amounts payable hereunder. Agent shall deliver to Merchant, not later than three (3) business days following receipt thereof, copies of all bank statements and other information relating to such accounts. The Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the Sale and the Agency Accounts, whether received during or after the Sale Term. Upon Agent's notice to Merchant of Agent's designation of the Agency Accounts (other than Merchant's Designated Deposit Accounts), all Proceeds of the Sale (including credit card Proceeds) shall be deposited into the Agency Accounts.

(ii)     Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, Merchant's identification number(s) and existing bank accounts for credit card transactions relating solely to the Sale. In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures. Without limiting the foregoing, Merchant shall cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s). At Agent's request, Merchant shall cooperate with Agent to establish Merchant's identification numbers under Agent's name to enable Agent to process all such credit card Proceeds for Agent's account. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to the Sale, whether received during or after the Sale Term. Agent shall not be responsible for, as an Expense or otherwise, any credit card fees, charges, or chargebacks that do not relate to the Sale, whether received prior to, during or after the Sale Term.

5

(iii)    Unless and until Agent establishes its own Agency Accounts (other than Merchant's Designated Deposit Accounts), all Proceeds and other amounts contemplated by this Agreement (including credit card Proceeds), shall be collected by Merchant and deposited on a daily basis into depository accounts designated by, and owned and in the name of, Merchant for the Stores, which accounts shall be designated solely for the deposit of Proceeds and other amounts contemplated by this Agreement (including credit card Proceeds), and the disbursement of amounts payable to or by Agent hereunder (the "Designated Deposit Accounts").  The Designated Deposit Accounts shall be cash collateral accounts, with all cash, credit card payments, checks and similar items of payment, deposits and any other amounts in such accounts being Proceeds or other amounts contemplated hereunder, and Merchant hereby grants to Agent a first priority senior security interest in each Designated Deposit Account and all proceeds (including Proceeds) in such accounts from and after the Sale Commencement Date.  If requested by Agent, each account shall be subject to an agreement between and among the Agent, the Merchant and the subject bank (in form and content reasonably satisfactory to each party), providing for, among other things, that such bank will comply with instructions originated by Agent directing the disposition of funds in such account without further consent of the Merchant (a "Control Agreement").  If, notwithstanding the provisions of this Section 3.3(c), Merchant or Lender receives or otherwise has dominion over or control of any Proceeds or other amounts due to Agent, Merchant and Lender shall be deemed to hold such Proceeds and other amounts "in trust" for Agent and shall not commingle Proceeds or other amounts due to Agent with any of Merchant's or Lender's other funds or deposit such Proceeds or other amounts in any account except a Designated Deposit Account or as otherwise instructed by Agent.

(iv)    On each business day, Merchant shall promptly pay to Agent by wire funds transfer all funds in the Designated Deposit Accounts (including, without limitation, Proceeds, Proceeds from credit card sales, and all other amounts) deposited into the Designated Deposit Accounts for the prior day(s) without any offset or netting of Expenses or other amounts that may be due to Merchant.  Agent shall notify Merchant and JNS INVT, LLC ("Lender") of any shortfall in such payment, in which case, Merchant (or Lender, as the case may be) shall promptly pay to Agent funds in the amount of such shortfall.

(d)    In the event that the Agent funds or pays all or any portion of Merchant's obligations under this Agreement, such funding or payment cannot be recovered by the Agent under section 3.3(e) by means of an offset, and, as a result of such funding or payment, Merchant (or Lender) received more value than Merchant (or Lender) would have otherwise received under this Agreement had Agent not funded or paid such obligations, Lender shall pay all such funded or paid amounts to Agent within two (2) business days of Agent's request.  If and to the extent the Agent over-funds any amounts in respect of the Guaranteed Amount hereunder and Merchant for any reason fails to refund Agent such overfunded amount after two (2) business days written demand by Agent, Lender shall, within two (2) business days of written demand by Agent, pay to the Agent the over-funded amount.  Notwithstanding anything to the contrary in this Agreement, the Lender shall be required to pay to Agent any amount. in excess of the amounts actually received by such Lender pursuant to this Agreement, unless the Lender is the proximate cause of an Event of Default such as the filing of a motion for appointment of a chapter 11 trustee or conversion of the Debtors' cases to cases under chapter 7 of the Bankruptcy Code or declares or an "event of default" under any debtor-in-possession financing or use of cash collateral in which case the foregoing limitation shall not be applicable.

(e)    Merchant and Agent further agree that if at any time during the Sale Term, (i) Agent holds any amounts due to Merchant under this Agreement, Agent may, in its discretion, after five (5) business days' notice to Merchant, offset such amounts being held by Agent against any undisputed

6

amounts due and owing by, or required to be paid by, Merchant hereunder, and (ii) Merchant holds any amounts due to Agent under this Agreement, Merchant may, in its discretion, after five (5) business days' notice to Agent, offset such amounts being held by Merchant against any undisputed amounts due and owing by, or required to be paid by, Agent hereunder.

        (f)    In addition to the Guaranteed Amount, in connection with the first Weekly Sale Reconciliation, Agent shall purchase and pay Merchant by wire transfer to the account designated in writing by Merchant all cash in the Stores on and as of the start of business on the Sale Commencement Date on a dollar for dollar basis.

        3.4    <u>Security</u>.  In order to secure Agent's obligations under this Agreement to pay the balance of any unpaid portion of the Guaranteed Amount, Sharing Amount (if any),  Expenses and other amounts due Merchant hereunder, no later than the Payment Date, Agent shall deliver to JNS INVT, LLC (as defined herein, the Lender), as Merchant's designee, an irrevocable standby Letter of Credit, substantially in the form of <u>Exhibit 3.4</u> attached hereto, naming Lender and Merchant as co-beneficiaries (each, a "<u>Beneficiary</u>") in the aggregate original face amount equal to the sum of: (a) fifteen percent (15%) of the estimated Guaranteed Amount (based upon Merchant's books and records maintained in the ordinary course as of the date immediately preceding the Payment Date), plus (b) the parties' mutually agreed upon estimate of three weeks of Expenses, which shall be substantially in the form of <u>Exhibit 3.4</u> hereof (the "<u>Letter of Credit</u>").   The Letter of Credit shall be delivered to JNS INVT, LLC (as defined herein, the Lender), as Merchant's designee, no later than the second business day following the Payment Date, and shall be issued by a U.S. national bank selected by Agent and reasonable acceptable to Merchant and the Lender, which shall include Bank of America, N.A. and its affiliates.  In the event that Agent fails to timely pay any undisputed amount hereunder in respect of the Guaranteed Amount, Sharing Amount (if any), Additional Agent Goods Fee (if any) and/or Expenses as required under this Agreement, Merchant and the Lender shall be entitled to draw on the Letter of Credit to fund such undisputed amount or obligation after five (5) business days' written notice to Agent, provided Agent does not pay such undisputed amount within such five-day period.  The Letter of Credit shall have an expiry date of no earlier than sixty (60) days after the Sale Termination Date.  Upon Lender's receipt of payment in full of its claims against the Merchant, Lender shall promptly deliver the Letter of Credit to Merchant and take all steps necessary to remove itself as a named beneficiary thereunder.  Unless the parties shall have mutually agreed that they have completed the Final Reconciliation under this Agreement, then, at least ten (10) business days prior to the initial or any subsequent expiry date, Agent shall cause the Beneficiaries to receive an amendment to the Letter of Credit solely extending (or further extending, as the case may be) the expiry date by at least thirty (30) days.  If Agent fails to provide the Beneficiaries such amendment to the Letter of Credit no later than ten (10) business days before the expiry date, then the Beneficiaries shall be permitted to draw the full amount under the Letter of Credit to hold as security for amounts that may become due and payable to Merchant.  In the event that Agent, after receipt of five (5) business days' written notice, fails to pay any undisputed portion of the Guaranteed Amount or Expenses, the Beneficiaries may draw on the Letter of Credit in an amount equal to the unpaid, past due, amount of the Guaranteed Amount or Expenses that is not the subject of a reasonable dispute.  Lender, Merchant and Agent agree that, from time to time upon Agent's request, the face amount of the Letter of Credit shall be reduced by the aggregate amount of payments made by Agent on account of the Guaranteed Amount to the time of each such request (and Merchant and Lender shall cooperate with respect to each such request); <u>provided</u>, <u>however</u>, in no event shall the face amount of the Letter of Credit be reduced to an amount less than the parties' mutually agreed upon estimate of three weeks of estimated Expenses until the Final Reconciliation.

7

Section 4.  <u>Expenses of the Sale</u>.

        4.1    <u>Expenses</u>.  Agent shall be unconditionally responsible for all "Expenses," which expenses shall be paid by Agent in accordance with Section 4.2 below.  Agent and/or Merchant and/or Lender may review or audit the Expenses at any reasonable time.  As used herein, "Expenses" shall mean the Store-level operating expenses of the Sale which arise during the Sale Term and are attributable to the Sale, limited to the following:

        (a)    actual payroll (including wages and commissions (if applicable)) with respect to all Retained Employees used in connection with conducting the Sale for actual days/hours worked at a Store during the Sale Term (excluding hours worked during the Inventory Taking), as well as payroll for any temporary labor engaged for the Sale provided, that Agent shall only be obligated to pay 50% of the payroll wages for Store-level Retained Employees used during the Inventory Taking, and Merchant shall pay the remaining 50% of the payroll wages for Store-level Retained Employees used during the Inventory Taking;

        (b)    any amounts payable by Merchant for benefits for Retained Employees (including FICA, unemployment taxes, workers' compensation and healthcare insurance, but excluding Excluded Payroll Benefits) for Retained Employees used in the Sale, in an amount not to exceed 18.0% of the base payroll in the aggregate for the Retained Employees in the Stores (the "<u>Payroll Benefits Cap</u>");

        (c)    the actual Occupancy Expenses for the Stores on a per location and per diem basis in an amount up to the aggregate per diem per location amount set forth on <u>Exhibit 4.1(c)</u>, including but not limited to, (i) the portion of any percentage rent obligations attributable to the sale of Merchandise during the Sale Term, plus (ii) the portion of any percentage rent obligations attributable to the sale of Additional Agent Goods during the Sale Term (in the case of 4.1(c)(i) and (ii), as determined in the manner described in the definition of "Occupancy Expenses" below in this Section 4.1); <u>provided</u>, <u>however</u>, that in respect of section 4.1(c)(i) and (ii), percentage rent shall only be an "Expense" if and to the extent such percentage rent obligation for a Store is reflected on Exhibit 4.1(c) (through the designation of a specific percentage (e.g., 5%)), and, if no percentage rent obligation is reflected on Exhibit 4.1(c) for each a Store, Agent shall not be liable for any percentage rent associated with each such Store and percentage rent shall not be an "Expense" for each such Store; in all cases Occupancy Expenses shall be limited on a per Store, per category, and per diem basis not to exceed the respective categories and amounts shown on <u>Exhibit 4.1(c)</u>;

        (d)    Retention Bonuses for Retained Employees, as provided for in Section 9.4 below;

        (e)    advertising and direct mailings relating to the Sale, Store interior and exterior signage and banners, and signwalkers, in each case relating to the Sale;

        (f)    credit card fees, bank card fees, and chargebacks and credit/bank card discounts with respect to Merchandise sold in the Sale;

        (g)    bank service charges (for Store, corporate accounts, and Agency Accounts), check guarantee fees, and bad check expenses to the extent attributable to the Sale;

        (h)    costs for additional Supplies at the Stores necessary to conduct the Sale as requested by Agent;

8

(i)      all fees and charges required to comply with applicable laws in connection with the Sale as agreed to by Agent;

(j)      Store cash theft and other store cash shortfalls in the registers;

(k)      all costs and expenses associated with Agent's on-site supervision of the Stores and Distribution Centers, including (but not limited to) any and all fees, wages, taxes, third party payroll costs and expenses, and deferred compensation of Agent's field personnel, travel to, from or between the Stores and Distribution Centers, and out-of-pocket and commercially reasonable expenses relating thereto (including reasonable and documented corporate travel to monitor and manage the Sale);

(l)      postage, courier and overnight mail charges requested by Agent to the extent relating to the Sale;

(m)      fifty percent (50%) of cost of the Inventory Taking Service; provided, however, if the cost of the Inventory Taking Service exceeds $180,000, Agent shall pay 100% of the cost of the Inventory Taking Service in excess of $180,000 and such cost shall be considered Expenses;

(n)      Agent's actual cost of capital (including Letter of Credit fees) and insurance attributable to the Sale, and Merchant's insurance under Section 12 prorated to include amounts attributable to the Sale Term;

(o)      Agent's reasonable out-of-pocket costs and expenses associated with this Agreement, the Sale, or the transactions contemplated by this Agreement, including, but not limited to, legal fees and expenses incurred in connection with the review of data, preparation, negotiation, and execution of this Agreement and any ancillary documents, and the Sale;

(p)      third party payroll processing expenses associated with the Sale;

(q)      costs of transfers initiated by Agent of Merchandise between and among the Stores during the Sale Term, including delivery and freight costs, it being understood that Agent shall be responsible for coordinating such transfer of Merchandise, subject, however, to the provisions of section 8.1(e); and

(r)      $7,500 per week, pro rated for partial weeks, on account of Central Service Expenses;

(s)      Subject to Merchant's written consent, which shall not be unreasonably withheld or delayed, the documented actual costs and expenses of Agent providing such additional services as the Agent reasonably deems appropriate for the Sale.

Notwithstanding anything herein to the contrary, to the extent that any Expense category listed in section 4.1 is also included on Exhibit 4.1(c), Exhibit 4.1(c) shall control and such Expenses shall not be double counted.  There will be no double counting or payment of Expenses to the extent that Expenses appear or are contained in more than one Expense category.

As used herein, the following terms have the following respective meanings:

9

(i)      "Central Service Expenses" means costs and expenses for Merchant's central administrative services necessary for the Sale, including, but not limited to, internal payroll processing, MIS services, cash and inventory reconciliation, data processing and reporting, email preparation and distribution, information technology and e-commerce site updates and maintenance, and accounting (collectively, "Central Services").

(ii)      "Excluded Payroll Benefits" means (i) the following benefits arising, accruing or attributable to the period prior to, during, or after the Sale Term:  (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence and (z) ERISA coverage and similar contributions and/or (ii) any other benefits in excess of the Payroll Benefits Cap, including, without limitation, any payments due under the WARN Act.

(iii)      "Occupancy Expenses" means, with respect to the Stores, base rent, percentage rent, HVAC, utilities, CAM (common area maintenance), landlord promotional fees, storage costs, real estate and use taxes, Merchant's association dues and expenses, utilities expenses, cash register maintenance (including point-of-sale systems maintenance), routine repairs and maintenance, building maintenance, trash and snow removal, housekeeping and cleaning expenses, pest control services, telecom/telephone charges (including local and long-distance telephone) and internet/wifi expenses (including broadband internet), satellite broadband connections, T-1 lines, security (including, without limitation, security systems, courier and guard service, building alarm service and alarm service maintenance), taxes and licenses, rental for furniture, fixtures and equipment, and all other categories of expenses at the Stores as set forth on Exhibit 4.1(c) attached hereto and in an amount up to the specific amounts set forth on Exhibit 4.1(c) attached hereto and calculated in accordance with Section 4.1(c), plus any percentage rent obligations incurred by Merchant under applicable leases or occupancy agreements that are allocable to the sales as part of the Sale during the Sale Term of: (x) Merchandise and (y) Additional Agent Goods included in the Sale.

(iv)      "Third Party" means, with reference to any Expenses to be paid to a Third Party, a party which is not affiliated with or related to the Merchant.

(v)      Notwithstanding any other provision of this Agreement to the contrary, "Expenses" shall not include: (i) Excluded Payroll Benefits; (ii) Central Service Expenses, (iii) Occupancy Expenses or any occupancy-related expenses of any kind or nature in excess of the respective per Store, per diem occupancy-related categories and amounts expressly provided for as an Expense under Section 4.1(c) above to the extent actually incurred; (iv) any expenses of any kind relating to or arising from Merchant's home office or Distribution Centers, including (without limitation) the Distribution Center Expenses (except as set forth in Section 4.3), and/or (v) any other costs, expenses or liabilities payable by Merchant not provided for herein, all of which shall be paid solely by Merchant promptly when due, subject to the provisions of the Bankruptcy Code and the Approval Order.

4.2      Payment of Expenses.

Agent shall be responsible for the payment of all Expenses out of Proceeds (or from Agent's own accounts if and to the extent there are insufficient Proceeds) after the payment of the Guaranteed Amount.  All Expenses incurred during each week of the Sale (*i.e.* Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or paid by Merchant and thereafter reimbursed by Agent as provided for herein, immediately following the Weekly Sale Reconciliation; provided, however, in the event that the actual amount of an Expense is unavailable on the date of the reconciliation (such as

10

payroll), Merchant and Agent shall agree to an estimate of such amounts, which amounts will be reconciled once the actual amount of such Expense becomes available.  Agent and/or Merchant may review or audit the Expenses at any time.

        4.3      Distribution Center Expenses

        From and after the Sale Commencement Date, Agent shall be responsible for allocating and designating the shipment of Merchandise, including Agent's Additional Agent Goods, from the Merchant's Distribution Centers to the Stores.  From and after the date on which this Agreement is executed and pending Bankruptcy Court approval hereof, Merchant and Agent shall cooperate with each other and shall mutually agree upon a schedule and allocation to the Stores of the Merchandise located at the Distribution Centers. In any event, Agent shall provide Merchant with the schedule and allocation of Merchandise to the Stores no later than the Sale Commencement Date.  Notwithstanding the foregoing and except as otherwise provided herein, all costs and expenses of operating the Distribution Centers, including, but not limited to, use and occupancy expenses, Distribution Center employee payroll and other obligations,  and/or processing, transferring, consolidating, shipping, and/or delivering goods within or from the Distribution Centers (the "Distribution Center Expenses"), shall remain the sole obligation of the Merchant. Agent shall have no right to use the Distribution Center for Additional Agent Goods unless otherwise agreed to by Merchant and Agent.  Notwithstanding anything contained in this Section 4.3 to the contrary, from and after the date on which there is no Merchandise remaining in the Distribution Center, the Merchant may terminate and discontinue use of the Distribution Centers in its discretion and without penalty hereunder.

    Section 5.   Gross Rings; Merchandise.

        5.1      Inventory Taking.

        (a)      Commencing on the Sale Commencement Date, Merchant and Agent shall cause to be taken a STYLE level and Retail Price physical inventory of the Merchandise located in the Stores (collectively, the "Inventory Taking"), which Inventory Taking shall be completed in each of the Stores as soon as practicable (the date of the Inventory Taking at each Store being the "Inventory Date" for each such Store), but in any event no later than twenty-one (21) days after the Sale Commencement Date (subject to the availability of the Inventory Taking Service), and, with respect to Merchandise located in Merchant's Distribution Centers, upon transfer to the Stores.  Merchant and Agent shall jointly employ RGIS or other mutually agreed upon national inventory taking service (the "Inventory Taking Service") to conduct the Inventory Taking. The Inventory Taking shall be conducted in accordance with the procedures and instructions set forth on Exhibit 5.1(a) (the "Inventory Taking Instructions").  As an Expense, Agent shall be responsible for fifty percent (50%) of cost of the Inventory Taking Service. Merchant shall be responsible for fifty percent (50%) of cost of the Inventory Taking Service (capped at $90,000).  Except as provided in the immediately preceding two sentences, Merchant and Agent shall each bear their respective costs and expenses relative to the Inventory Taking.  Merchant, Lender, and Agent may each have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service.  Merchant agrees that during the conduct of the Inventory Taking (which the Merchant and Agent anticipate should not reasonably take more than one (1) day at any Store), the applicable Store shall be closed to the public, and no sales or other transactions shall be conducted within the applicable Store.  Merchant and Agent further agree that until the Inventory Taking in a particular Store is completed, neither the Merchant nor Agent shall: (i) move Merchandise within or about the Store so as to make any such items unavailable for counting as part of the Inventory Taking, provided, that, for the avoidance of doubt, the foregoing shall not restrict the

11

Agent's ability to transfer Merchandise between Stores subject to the restriction set forth in section 8.1(e); or (ii) remove or add any hang tags, price tickets, inventory control tags affixed to any Merchandise or any other kind of in-store pricing signage within the Store.  Merchant agrees to cooperate with Agent to conduct the Inventory Taking (including without limitation by making available to Agent information relating to sales, units, costs and Retail Price, and making available to Agent Merchant's books, records, work papers and personnel to the extent reasonably necessary to calculate the Retail Price of the Merchandise).  Each Store will be closed during the Inventory Taking; provided, however, that the parties agree that the Inventory Taking will commence at a time that will minimize the number of hours that the Stores will be closed for business.  The Inventory Taking, including, but not limited to the Final Inventory Report, shall be reviewed, reconciled, and mutually verified by the Merchant and Agent in writing as soon as practicable following the Inventory Taking.

(b)	At each Store, for the period from the Sale Commencement Date until the Inventory Date for such Store, Agent and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable Sales Taxes but excluding any prevailing discounts ("Gross Rings"), and (ii) cash reports of sales within such Store.  Register receipts shall show for each item sold the Retail Price for such item and the markdown or discount, if any, specifically granted by Agent in connection with such Sale.  Agent shall pay that portion of the Guaranteed Amount calculated on the Gross Rings basis, to account for shrinkage, on the basis of 101.0% of the aggregate Retail Price of Merchandise sold during the Gross Rings Period.  All such records and reports shall be made available to Agent and Merchant during regular business hours upon reasonable notice.  Any Merchandise included in the Sale using the Gross Rings method shall be included as Merchandise.

5.2	Merchandise Subject to This Agreement.

(a)	For purposes of this Agreement, "Merchandise" shall mean all (i) new, finished, first-quality saleable goods in the ordinary course of business located at the Stores as of the Sale Commencement Date (including Merchandise subject to Gross Rings), (ii) Defective Merchandise, and (iii) Distribution Center Merchandise received at the Stores no later than seven (7) days after the Sale Commencement Date, provided that if such goods are received at the Stores after such seven-day period, but on or before fourteen (14) days after the Sale Commencement Date (the "Receipt Deadline"), such goods shall be included in the Sale as Merchandise at the Retail Price of each good multiplied by the inverse of the then prevailing Sale discount for each such good.   "Merchandise" shall not include:  (1) goods which belong to sublessees, licensees, department lessees, or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) Excluded Defective Merchandise; (4) Merchant's Consignment Goods; (5) Additional Agent Goods; (6) furniture, furnishings, trade fixtures, machinery, equipment, office supplies, Supplies, conveyor systems, racking, rolling stock, and other personal property (but expressly excluding cash registers and point-of-sale system) (collectively without such exclusions, "FF&E") or improvements to real property; provided that Agent shall be permitted to sell Owned FF&E as set forth in Section 7 below; or (7) Distribution Center Merchandise received at the Stores after the Receipt Deadline or in-transit or on order goods.

(b)	As used in this Agreement, the following terms have the respective meanings set forth below:

"Defective Merchandise" means any item of Merchandise which is not new, finished, first-quality, saleable goods sold in the normal or ordinary course.  Examples of Defective Merchandise include but are not limited to goods that are used, damaged, defective, scratched, soiled, dented, shopworn, out of box (if normally sold as new in-the-box), out of season, missing pieces, mismatched,

12

mismated, parts, items typically sold as a set which are incomplete, or gift with purchase items; provided, however, that display items and other clothing and accessories that can be sold individually shall not *per se* constitute "Defective Merchandise".

"Excluded Defective Merchandise" means any item of (i) Defective Merchandise that is not saleable in the ordinary course because it is so damaged or defective that it cannot reasonably be used for its intended purpose or for which the parties cannot mutually agree upon a Retail Price or (ii) obsolete or discontinued goods or goods that have been marked out of stock or have received a similar designation. Excluded Defective Merchandise shall be identified as such during the Inventory Taking.

"Distribution Center Merchandise" means all new, finished, first-quality saleable goods in the ordinary course of business located at Merchant's warehouse/distribution centers on the Sale Commencement Date (collectively, the "Distribution Centers") and reflected on Exhibit 5.2(b).

"Merchandise File" shall mean the following files, together with all updates and additional files received by Agent from Merchant through the Sale Commencement Date: "Dots Accessory Dept 4-5 (Item Level).xlsx", "Dots Junior Dept 4-5 (Item Level).xlsx", "Dots Plus Dept 4-5 (Item Level).xlsx", "Simply Fashions Accessory Dept 4-5 (Item Level).xlsx", "Simply Fashions Closeouts 4-5 (Item Report).xlsx", "Simply Fashions Junior Dept 4-5 (Item Level).xlsx", "Simply Fashions Plus Dept 4-5 (Item Level).xlsx", "Simply Fashions Super Plus Dept 4-5 (Item Level).xlsx".

5.3    Valuation.

(a)    For purposes of this Agreement, "Retail Price" shall be determined as of the Sale Commencement Date and shall mean with respect to each item of Merchandise, the lower of the lowest (i) ticketed price, (ii) marked price, (iii) shelf price, (iv) Merchandise File price, (iv) other file price as reflected in Merchant's books and records for such items, and (v) "buy one get one", "BOGO", "two for", or similar promotion price (which price shall be determined after taking into account such "buy one get one", "BOGO", "two for", or similar promotional pricing) of such item of Merchandise.

(b)    Notwithstanding the provisions of Section 5.3(a), with respect to each item of Defective Merchandise, the parties shall mutually agree upon the "Retail Price" (and if Agent and Merchant are unable to mutually agree on the Retail Price of any one or more items of Defective Merchandise, such items shall be deemed Excluded Defective Merchandise).

5.4    Excluded Goods.  Merchant shall retain all responsibility for any goods not included as "Merchandise" hereunder.  If the Merchant elects at the beginning of the Sale Term, Agent shall accept goods not included as "Merchandise" hereunder for sale at prices mutually agreed upon by Agent and Merchant (such goods, "Merchant's Consignment Goods").  The Agent shall retain 20% of the receipts (net of Sales Taxes) for all sales of Merchant's Consignment Goods, and Merchant shall receive 80% of the receipts (net of Sales Taxes) in respect of such sales.  Merchant shall receive its share of the receipts of sales of Merchant's Consignment Goods on a weekly basis, immediately following the Weekly Sale Reconciliation.  If Merchant does not elect to have Agent sell goods not included as Merchandise or Merchant and Agent are unable to agree upon prices, then all such items will be removed by Merchant from the Closing Stores at Merchant's expense as soon as practicable and shall not be shipped to the Closing Stores from the Distribution Centers absent Agent's express written consent.  Agent shall have no cost, expense or responsibility in connection with any goods not included in Merchandise.

13

Section 6.  Sale Term.

6.1    Term.  Subject to satisfaction of the conditions precedent set forth in Section 10 hereof, the Sale shall commence at each Store on the date that is one (1) day after the Bankruptcy Court enters the Approval Order, but in no event later than May 7, 2015 (such date, the "Sale Commencement Date").  Agent shall complete the Sale at each Store no later than June 30, 2015 (the "Sale Termination Date", and the period from the Sale Commencement Date to the Sale Termination Date as to each Store being the "Sale Term").  Notwithstanding the foregoing, Agent may, in its discretion, earlier terminate the Sale on a Store-by-Store basis upon not less than seven  (7) days' prior written notice (a "Vacate Notice") to Merchant (the "Vacate Date"), provided, that it being understood that the Agent's obligations to pay all Expenses, including Occupancy Expenses, for each Store subject to a Vacate Notice shall continue until the applicable Vacate Date for such Store.

6.2    Vacating the Store.  At the conclusion of the Sale, Agent agrees to leave each Store in "broom clean" condition and otherwise in at least as good condition as on the Sale Commencement Date, ordinary wear and tear excepted, except for unsold items of Owned FF&E which may be abandoned by Agent in place in a neat and orderly manner pursuant to Section 7 below.  Agent shall vacate each Store on or before the Sale Termination Date as provided for herein, at which time Agent shall surrender and deliver the Store premises, and Store keys, to Merchant.  Agent's obligations to pay all Expenses for the Stores shall continue until the applicable Vacate Date for each Store.

Section 7.  FF&E.

7.1    Owned FF&E.  Agent shall sell all FF&E owned by Merchant located at the Stores, whether or not reflected on Exhibit 7.1 but including (without limitation) all items set forth on Exhibit 7.1 (the "Owned FF&E").   Merchant shall have the option, which option shall be exercised no later than one business day before the Sale Commencement Date, to have Agent sell the Owned FF&E on a commission or guaranteed basis.  Merchant hereby represents, warrants, covenants, and agrees in favor of Agent that: (i) all Owned FF&E may be sold by Agent on Merchant's behalf, free and clear of all liens, claims, and encumbrances; (ii) Merchant owns all Owned FF&E and has good and marketable title to and all right, power, and authority to sell the Owned FF&E, and (iii) all Owned FF&E is devoid of hazardous materials and substances. As used herein, unless otherwise and later agreed to by the Merchant and the Agent in writing, the term Owned FF&E shall not include (i) any  FF&E located in any premise other than the Stores (including the Corporate Office or any Distribution Center) and (ii) the point of sale system equipment, wheresoever located.

7.2    FF&E Guaranteed Option.  If Merchant elects to have Agent sell the Owned FF&E on a guaranteed basis, Agent shall pay Merchant an amount equal to $728,650 (i.e., $2,950 per Store for 247 Stores) for the sole and exclusive right to sell or otherwise dispose of the Owned FF&E in the Stores (with no exclusions other than Merchant's cash registers and point-of-sale system, which are excluded from the definition of FF&E) (the "Additional Guaranteed Amount"), shall be reduced by $2,950 per Store for any Store that is closed prior to the Sale Commencement Date and which Additional Guaranteed Amount shall be paid by Agent on the Payment Date; provided, further, that, if Merchant elects to have Agent sell the Owned FF&E on a guaranteed basis at the Distribution Center and/or Corporate Office, Merchant and Agent shall mutually agree upon the guaranteed amount for the Distribution Center and/or Corporate Office (the "Additional DC/CO Guaranteed Amount"), which Additional DC/CO Guaranteed Amount shall be paid at time(s) mutually acceptable to the Parties.  In consideration for the payment of the Additional Guaranteed Amount and, if applicable the Additional DC/CO Guaranteed Amount, Agent shall be authorized to sell the Owned FF&E and retain all proceeds

14

(net of Sales Taxes, which shall be handled in accordance with section 8.3) from the sale of all Owned FF&E at the Stores and, if applicable, the Distribution Center and/or Corporate Office (the "FF&E Proceeds") for Agent's sole and exclusive benefit, which FF&E Proceeds shall not constitute Proceeds, and, in such circumstances, Agent shall be responsible for the payment of all costs and expenses associated with the disposition of the applicable Owned FF&E, other than Distribution Centers Expenses or any costs or expenses associated with the Corporate Offices, all of which shall be paid when due by Merchant.

7.3    FF&E Fee Option.  If Merchant elects to have Agent sell the Owned FF&E on a fee basis, Agent shall be entitled to receive a commission equal to twenty percent (20%) of the gross proceeds from the sale of the Owned FF&E (net only of Sales Taxes), and Merchant shall reimburse Agent for Agent's documented costs and expenses associated with selling the Owned FF&E pursuant to a mutually agreed upon budget.  Merchant shall be solely responsible for all costs and expenses associated with the sale of the FF&E, including (without limitation) Agent's costs and expenses.

7.4    Abandonment of FF&E.    Anything in this Agreement to the contrary notwithstanding, Agent shall be authorized to abandon any and all FF&E, whether owned or not by Merchant, in place without any cost or liability to any party.  For the avoidance of doubt, Agent shall have no responsibility whatsoever with respect to FF&E that is not owned by Merchant.

Section 8.  Conduct of the Sale.

8.1    Rights of Agent.  In addition to any other rights granted to Agent elsewhere in this Agreement, Agent shall be permitted to conduct the Sale as a "store closing", "sale on everything", "going out of business", "everything must go", or similar themed sale throughout the Sale Term without compliance with any Liquidation Sale Laws.  The Agent shall conduct the Sale in the name of and on behalf of the Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement and subject to the Approval Order.  Agent shall conduct the Sale in accordance with the sale guidelines attached hereto as Exhibit 8.1(the "Sale Guidelines").  Subject to the Approval Order and Sale Guidelines, in addition to any other rights granted to Agent hereunder in conducting the Sale, the Agent, in the exercise of its reasonable discretion shall have the right:

(a)    to establish Sale prices and discounts and Store hours;

(b)    except as otherwise expressly included as an Expense, to use without charge during the Sale Term all FF&E, computer hardware and software, existing Supplies, intangible assets (including Merchant's name, logo and tax identification numbers), Store keys, case keys, security codes and safe and lock combinations required to gain access to and operate the Stores, and any other assets of the Merchant located at the Stores or the Distribution Centers (whether owned, leased, or licensed);

(c)    (i) to be provided by Merchant (at no additional cost to Agent) with central office facilities, central administrative services and personnel to process and perform Central Services and provide other central office services reasonably necessary for the Sale; but in no event shall Merchant be required to (x) provide any such services or facilities at a level in excess of the levels of such services and facilities customarily provided in connection with Merchant's operation of the Stores or (y) hire or retain personnel not presently employed or engaged by Merchant; (ii) to use not to exceed three reasonably sized offices located at Merchant's office facility located in Birmingham, Alabama to effect the Sale; and (iii) to use, subject to the Dots Carveout, all customer lists, mailing lists, email lists, and web and social networking sites utilized by Merchant in connection with its business (but solely in connection with the

15

Sale and pursuant to such reasonable restrictions requested by Merchant in order for Merchant to comply with its privacy policy and applicable laws governing the use and dissemination of confidential consumer personal data).

(d)     to establish and implement advertising, signage and promotion programs consistent with the "store closing", "sale on everything", "going out of business", "everything must go", or similar themed including without limitation by means of media advertising, and similar interior and exterior signs and banners, and the use of sign walkers;

(e)     to transfer Merchandise between and among the Stores at Agent's expense; provided, however, the Agent shall not transfer Merchandise between and among Stores so as to make the Merchandise unavailable for purposes of the Inventory Taking; and

(f)     subject to the provisions of Section 8.10 below, to include Additional Agent Goods as part of the Sale.

8.2     Terms of Sales to Customers; Final/As Is Sales.  All sales of Merchandise will be "final sales" and "as is," and appropriate signage and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash or nationally recognized bank credit cards.  Agent shall accept and honor coupons during the Sale Term, including but not limited to, Merchant's membership program as well as Merchant's employee discount terms as are in effect immediately prior to the commencement of the Sale Term.  The Agent shall clearly mark all receipts for the Merchandise sold at the Stores during the Sale Term so as to distinguish such Merchandise from the goods sold prior to the Sale Commencement Date.  Merchant shall reimburse Agent in cash for all amounts related to coupons, including, but not limited to, Merchant's membership programs as well as Merchant's employee discount terms, during each Weekly Sale Reconciliation provided for in Section 8.7.

8.3     Sales Taxes.

(a)     During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise and Additional Agent Goods, as indicated on Merchant's point of sale equipment (other than taxes on income, but specifically including, without limitation, gross receipts taxes) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise and Additional Agent Goods and collected by Agent, on Merchant's behalf and in trust for Merchant and for the benefit of the taxing authorities, at the time of sale and paid over to Merchant.  All Sales Taxes shall be deposited into a segregated account designated by Merchant and Agent solely for the deposit of such Sales Taxes (the "Sales Taxes Account").  If Agent does not timely remit Sales Taxes to Merchant, Merchant shall be permitted to immediately draw on the Letter of Credit in unremitted amount of Sales Taxes collected by Agent in the preceding week.  Merchant shall prepare and file all applicable reports and documents required by the applicable taxing authorities, and Merchant shall promptly pay all Sales Taxes collected by Merchant or turned by Agent to Merchant from the Sales Taxes Account.  Merchant will be given access to the computation of gross receipts for verification of all such Sales Tax collections.  If Agent calculates Sales Taxes using systems other than Mercahnt's systems, Agent shall reimburse Merchant for any additional Sales Taxes, interest, fines, penalties, and similar amounts payable to any taxing authority as the result of a Sales Tax audit conducted by or on behalf of such authority which discloses that the Sales Takes collected by Agent and paid over to Merchant for any period during the Sale Term were less than those mandated by applicable law for the sale of Merchandise, Additional

16

Agent Goods and/or Owned FF&E, if any, that is sold by Agent under this Agreement (any such additional Sales Taxes and other amounts are collectively referred to herein as "Additional Taxes and Penalties").  Provided that Agent performs its responsibilities in accordance with this Section 8.3, Agent shall have no further obligation to the Merchant, the Lender, any taxing authority, or any other party, and Merchant (and Lender to the extent it has received any funds on account of Sales Taxes) shall indemnify and hold harmless Agent and its officers, directors, employees, agents and independent contractors (collectively, "Agent Indemnified Parties") from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Agent sustains or incurs as a result or consequence of the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required by applicable law to be filed with or delivered to such taxing authorities.  If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with its obligations hereunder, Agent shall indemnify and hold harmless Merchant and its officers, directors, employees, agents and independent contractors (collectively, "Merchant Indemnified Parties") from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties (including but not limited to all Additional Taxes and Penalties) which Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.

(b)      Without limiting the generality of Section 8.3(a) hereof, it is hereby agreed that, as Agent is conducting the Sale solely as agent for the Merchant, various payments that this Agreement contemplates that one party may make to the other party (including the payment by Agent of the Guaranteed Amount) do not represent the sale of tangible personal property and, accordingly, are not subject to Sales Taxes.

8.4      Supplies.  Agent shall have the right to use, without charge, all existing supplies located at the Stores, Distribution Centers and corporate office(s), including, without limitation, boxes, bags, paper, twine and similar sales materials (collectively, "Supplies").  In the event that additional Supplies are required in any of the Stores during the Sale, Merchant agrees to reasonably cooperate with Agent to obtain the same, if reasonably available, for which Agent shall reimburse the Merchant at Merchant's cost therefor in connection with each Weekly Sale Reconciliation.

8.5      Returns of Merchandise.  Agent shall accept returns of goods sold by Merchant prior to the Sale Commencement Date ("Returned Merchandise"), provided that such return is in compliance with Merchant's return policy in effect immediately prior to the Sale Commencement Date.  If such Returned Merchandise is otherwise "Merchandise" it shall be included in the Sale at its Retail Price, multiplied by the inverse of the then prevailing Sale discount on the date of the return.  To the extent Returned Merchandise is salable as first quality merchandise, it shall be included in Merchandise and for purposes of the calculation of the Guaranteed Amount and (i) if returned during the first seven (7) days of the Sale, shall be valued at the Retail Price applicable to such item or (ii) if returned after such seven-day period, shall be valued at the Retail Price applicable to such item multiplied by the inverse of the then prevailing Sale discount.  Subject to Merchant's reimbursement to Agent of the amount of any store credit or refund granted for any such Returned Merchandise, the aggregate Retail Price of the Merchandise shall be increased by the applicable Retail Price of any Returned Merchandise, and the Guaranteed Amount shall be adjusted accordingly.  If the Returned Merchandise is not first. quality goods, Merchant and Agent shall negotiate in good faith to determine an appropriate Retail Price applicable to such merchandise for purposes of determining the Retail Price attributable thereto; provided that, in the event Merchant and Agent cannot agree on the Retail Price to be attributed to any particular

17

items) of Returned Merchandise, than such items) shall be segregated form Merchandise and excluded from the Sale and treated as Excluded Defective Merchandise for all purposes hereunder. Any reimbursements due to Agent as a result of Returned Merchandise shall be accounted for and paid by Merchant immediately following the Weekly Sale Reconciliation pursuant to Section 8.7 hereof. Any increases in payment on account of the Guaranteed Amount as a result of Returned Merchandise shall be paid by Agent as part of the Final Reconciliation provided for under Section 8.7 hereof. In brief, the aggregate Retail Price of the Merchandise shall be increased by the adjusted Retail Price of any Returned Merchandise included in Merchandise (determined in accordance with this Section 8.5). In addition, Merchant shall promptly reimburse Agent in cash or credit for any refunds Agent is required to issue to customers in respect of any Returned Merchandise during each Weekly Sale Reconciliation provided for in Section 8.7. Except to the extent that Merchant and Agent agree that Merchant's POS or other applicable systems can account for returns of goods, all returns must be noted and described in a mutually agreeable Returned Merchandise log on a weekly basis during the Sale.

8.6     Gift Certificates; Membership Program.

(a)     During the Sale Term, Agent shall accept Merchant's gift certificates, gift cards, return credits, and similar merchandise credits issued by Merchant in accordance with Merchant's polities and the terms and conditions applicable to such items (collectively, the "Gift Certificates"), which terms and conditions will be made available by Merchant to Agent prior to the Sale Commencement Date; and Merchant shall reimburse Agent in cash for such amounts during the Weekly Sale Reconciliation provided for in Section 8.7. Agent shall not sell any Gift Certificates.

(b)     During the Sale Term, customers may elect to take advantage of (i) discounts afforded customers in connection with Merchant's membership program benefits and/or Merchant's then valid coupons (collectively, "Merchant Discounts"); or (ii) the then-prevailing Sale discounts being offered by Agent, but not both on a cumulative basis. To the extent the customer elects an applicable Merchant Discount, then Merchant shall reimburse Agent in cash during the Weekly Sale Reconciliation for the value/differential between the applicable Merchant Discount and the then-prevailing Sale discounts being offered by Agent.

8.7     Sale Reconciliation. On each Wednesday during the Sale Term, Agent and Merchant shall cooperate to reconcile Expenses of the Sale, make payments/setoffs on account of the Guaranteed Amount, Agent's Fee, Sharing Amounts, sales of Additional Agent Goods, and Owned FF&E, and reconcile such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e. Sunday through Saturday), all pursuant to procedures agreed upon by Merchant and Agent (the "Weekly Sale Reconciliation"). On a weekly basis, Agent shall also provide Merchant (and a copy to the Lender) with a report (in electronic format reasonably acceptable to Merchant) of all sales of Additional Agent Goods, which report shall detail by Store gross sales (net of Sales Taxes) and, if available with Merchant's systems, items sold. Within thirty (30) days after the end of the Sale Term, or as soon as practicable thereafter, Agent and Merchant shall jointly prepare a final reconciliation of the Sale, including, without limitation, a summary of Proceeds, Sales Taxes, Expenses, and any other accountings required hereunder (the "Final Reconciliation"), the written results of which shall be certified by representatives of each of the Merchant and Agent as a final settlement of accounts between the Merchant and Agent. Within five (5) days after the completion of the Final Reconciliation and execution of a settlement letter including an appropriate mutual release, Agent shall pay to Merchant, or Merchant shall pay to Agent, as the case may be, any and all amounts due the other pursuant to the Final Reconciliation. Once executed by Merchant and Agent, such settlement and Final Reconciliation shall be deemed approved without further order of the Bankruptcy Court (other than the Approval Order).

18

During the Sale Term, and thereafter until all of Merchant's and Agent's obligations under this Agreement have been satisfied, Merchant and Agent shall have reasonable access to Merchant's and Agent's records with respect to the Sale (including, but not limited to, Retail Price, Merchandise, Expenses, and Proceeds) to review and audit such records.  In the event that there is any dispute with respect to either (x) the determination of the aggregate Retail Price of the Merchandise as reflected in the Final Inventory Report and/or (y) the Final Reconciliation, such dispute shall be promptly (and in no event later than the fifth (5th) business day following a request by either Merchant or Agent) submitted to the Bankruptcy Court for resolution.  In the event of a dispute as to (x) or (y) above, Agent shall extend the Letter of Credit in accordance with the provisions of Sections 3.4 hereof, as applicable. If Agent has for any reason not so extended the expiration date of the Letter of Credit by the date that is ten (10) business days prior to the applicable expiration date (as may have been extended previously), Merchant and/or Lender shall have the right to make a drawing under the Letter of Credit in an amount or amounts equal to the undisputed amounts Merchant asserts are then owing to Merchant.

       8.8     Force Majeure.  If any casualty, act or threatened act of terrorism, or act of God prevents or substantially inhibits the conduct of business in the ordinary course at any of the Stores for a period of five (5) consecutive days, the Merchandise located at such Store shall, in Agent's reasonable discretion (after consultation with the Merchant), be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Sale which is not the subject of insurance proceeds, and Merchant (or Lender to the extent it has received any funds on account of the Guaranteed Amount) shall within five (5) business days following written demand by Agent reimburse Agent for the amount the Guaranteed Amount is so reduced.

       8.9     Right to Monitor.  Merchant shall have the right to monitor the Sale and activities attendant thereto and to be present in the Stores during the hours when the Stores are open for business; provided that Merchant's presence does not unreasonably disrupt the conduct of the Sale.  Merchant shall also have a right of access to the Stores at any time in the event of an emergency situation and shall promptly notify Agent of such emergency.

       8.10   Additional Agent Goods.

       (a)     Agent shall have the right to supplement the Merchandise in the Sale with additional goods procured by Agent which are of like kind, and no lesser quality to the Merchandise in the Sale ("Additional Agent Goods").  The Additional Agent Goods shall be purchased by Agent as part the Sale at Agent's sole expense (and such purchase price shall not constitute an Expense).  Agent shall have no right to use the Distribution Center for Additional Agent Goods unless otherwise agreed to by Merchant and Agent.  Sales of Additional Agent Goods shall be run through Merchant's point of sale systems, provided however, Agent shall mark the Additional Agent Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Agent Goods from the sale of Merchandise.  Agent and Merchant shall also cooperate so as to ensure that the Additional Agent Goods are marked in such a way that a reasonable consumer could identify the Additional Agent Goods as non-Merchant goods.  Additionally, Agent shall provide, at Agent's sole expense (and as an Expense), signage in the Stores notifying customers that the Additional Agent Goods have been included in the Sale.

19

(b)    In addition to all other compensation due to Merchant under this Agreement, Agent shall pay to Merchant an amount equal to five percent (5.0%) percent of the gross proceeds (excluding Sale Taxes) from the sale of the Additional Agent Goods (the "Additional Agent Goods Fee") and Agent shall retain all remaining amounts from the sale of the Additional Agent Goods.  Agent shall pay Merchant its Additional Agent Goods Fee in connection with each Weekly Sale Reconciliation with respect to sales of Additional Agent Goods sold by Agent during each then prior week (or at such other mutually agreed upon time in the case of Additional Agent Goods sold pursuant to Section 3.2(b) above).

(c)    Agent and Merchant intend that the transactions relating to the Additional Agent Goods are, and shall be construed as, a true consignment from Agent to Merchant in all respects and not a consignment for security purposes.  Subject solely to Agent's obligations to pay to Merchant the Additional Agent Goods Fee, at all times and for all purposes the Additional Agent Goods and their proceeds shall be the exclusive property of Agent, and no other person or entity shall have any claim against any of the Additional Agent Goods or their proceeds.  The Additional Agent Goods shall at all times remain subject to the exclusive control of Agent.

(d)    Merchant shall, at Agent's sole expense (and not as an Expense), insure the Additional Agent Goods and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers.  Agent shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Agent Goods, which amount shall be deemed an Additional Agent Goods expense.

(e)    Merchant acknowledges, and the Approval Order shall provide, that the Additional Agent Goods shall be consigned to Merchant as a true consignment under Article 9 of the Code.  Agent is hereby granted a first priority security interest in and lien upon (i) the Additional Agent Goods and (ii) the Additional Agent Goods proceeds, which security interest shall be deemed perfected pursuant to the Approval Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Agent is hereby authorized to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Goods as consigned goods thereunder and the Merchant as the consignee therefor, and Agent's security interest in and lien upon such Additional Agent Goods and Additional Agent Goods proceeds).

(f)    Lender hereby acknowledges receipt of notice of the consignment of the Additional Agent Goods and consents to the payments to Agent of Additional Agent Goods proceeds.

8.11    Collective Bargaining Agreements; Leases.  Agent shall not be obligated to comply with any of Merchant's collective bargaining agreements or leases/occupancy agreements; except as provided for in sections 4.1(a) and 4.1(c) herein.

Section 9.    Employee Matters.

9.1    Merchant's Employees.  Agent may use Merchant's employees in the conduct of the Sale to the extent Agent deems necessary for the Sale, and Agent may select and schedule the number and type of Merchant's employees required for the Sale.  Agent shall identify any such employees to be used in connection with the Sale (each such employee, a "Retained Employee").  Notwithstanding the foregoing, Merchant's employees shall at all times remain employees of the Merchant.  Agent's selection and scheduling of Merchant's employees shall at all times comply with all applicable laws and regulations.  Merchant and Agent agree that, except to the extent that wages and benefits of Retained

20

Employees constitute Expenses hereunder, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Payroll Benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any employment agreement, collective bargaining agreement, or be deemed a joint or successor employer with respect to such employees. Merchant shall not, without the prior consent of Agent, raise the salary or wages or increase the benefits for, or pay any bonuses or other extraordinary payments to, any Store employees prior to the Sale Termination Date. Merchant shall not transfer any employee in anticipation of the Sale nor any Retained Employee during the Sale Term, in each case without Agent's prior consent.

        9.2     <u>Termination of Employees</u>. Agent may in its discretion stop using any Retained Employee at any time during the Sale, subject to the conditions provided for herein. In the event that Agent desires to cease using any Retained Employee, Agent shall notify Merchant at least seven (7) days prior thereto; <u>provided</u>, <u>however</u>, that, in the event that Agent determines to cease using an employee "for cause" (such as dishonesty, fraud or breach of employee duties), the seven (7) day notice period shall not apply; <u>provided</u>, <u>further</u>, <u>however</u>, that Agent shall immediately notify Merchant of the basis for such "cause." From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent. Notwithstanding the foregoing, Agent shall not have the right to terminate the actual employment of any employee, but rather may only cease using such employee in the Sale and paying any Expenses with respect to such employee (and all decisions relating to the termination or non-termination of such employees shall at all times rest solely with Merchant).

        9.3     <u>Payroll Matters</u>. During the Sale Term, Merchant shall process the payroll for all Retained Employees and any former employees and temporary labor engaged for the Sale. Each Wednesday (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Agent shall transfer to Merchant's payroll accounts an amount equal to the base payroll for Retained Employees plus related payroll taxes, workers' compensation and benefits for such week, to the extent such amount constitutes Expenses hereunder.

        9.4     <u>Employee Retention Bonuses</u>. Subject to approval by the Bankruptcy Court, Agent may pay, as an Expense, retention bonuses ("<u>Retention Bonuses</u>") (which bonuses shall be inclusive of payroll taxes, but as to which no benefits shall be payable), up to a maximum of ten percent (10%) of base payroll for all Retained Employees, to such Retained Employees who do not voluntarily leave employment and are not terminated "for cause," as Agent may determine in its discretion. Subject to approval by the Bankruptcy Court, the amount of such Retention Bonuses shall be in an amount to be determined by Agent, in its discretion, and shall be payable within thirty (30) days after the Sale Termination Date, and shall be processed through Merchant's payroll system.

    Section 10.  <u>Conditions Precedent and Subsequent</u>.

        (a)     The willingness of Agent to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Agent:

21

(i) All representations and warranties of the Merchant hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the Sale Commencement Date.

(ii) Lender has executed this Agreement (with all Exhibits attached hereto) solely to bind itself to the provisions specifically relating to Lender herein.

(iii) The Bankruptcy Court shall have entered the Approval Order by May 6, 2015, or such later date as mutually agreed upon by the Merchant and the Agent (the "Approval Order Deadline").

(b) The willingness of Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by the Merchant:

(i) All representations and warranties of Agent hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the Sale Commencement Date.

(ii) Lender has executed this Agreement (with all Exhibits attached hereto), subject to the Approval Order, solely to bind itself to the provisions specifically relating to such Lender herein, subject to the Approval Order.

Section 11.  Representations, Warranties and Covenants.

11.1  Merchant's Representations, Warranties and Covenants.  Merchant hereby represents, warrants and covenants in favor of Agent as follows:

(a) Merchant (i) are entities  duly organized, validly existing and in good standing under the laws of the State of Florida and the State of Alabama; (ii) subject to the applicable provisions of the Bankruptcy Code, has all requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of the Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b) Subject to entry of the Approval Order, the Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "Agency Documents") and to perform fully its obligations thereunder.  Subject to entry of the Approval Order, Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.  Subject to entry of the Approval Order, each of the Agency Documents has been duly executed and delivered by the Merchant

22

and constitutes the legal, valid and binding obligation of the Merchant enforceable in accordance with its terms.

(c)     Merchant owns, and will own at all times during the Sale Term, good and marketable title to all of the Merchandise and Owned FF&E to be included in the Sale, free and clear of all security interests, liens, claims and encumbrances of any nature (other than the security interests and liens of the Agent hereunder and Lender).  Merchant shall not create, incur, assume or suffer to exist any security interest, lien or other charge or encumbrance upon or with respect to any of the Merchandise or the Proceeds (or the Owned FF&E and its proceeds), in each case other than the liens and security interests of Agent hereunder and of the Lender and any other liens and security interests granted pursuant to Merchant's debtor-in-possession financing (if any) and cash collateral usage.

(d)     Merchant has maintained its pricing files (including (without limitation) the Merchandise File) in the ordinary course of business, and prices charged to the public for goods are the same in all material respects as set forth in such pricing files for the periods indicated therein, and all pricing files and records are true and accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods without consideration of any point of sale discounts, as of the dates and for the periods indicated therein.  Merchant represents that (i) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes and (ii) all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law, as such calculations have been identified to Merchant by its retained service provider.

(e)     Through the Sale Commencement Date, Merchant has ticketed or marked, and shall continue to ticket or mark, all items of inventory received at the Stores in a manner consistent with similar Merchandise located at the Stores, and in accordance with Merchant's ordinary course past practices and policies relative to pricing and marking inventory.  Since April 1, 2015, Merchant has not removed any POS promotions, sale stickers, or other markings indicating items are on sale or on clearance from the Merchandise prior to the Sale Commencement Date, and have not raised, and will not raise, prices of any Merchandise in contemplation of the Sale.

(f)     Since April 1, 2015, Merchant has not, and through the Sale Commencement Date Merchant shall not, purchase for or transfer to or from the Stores any merchandise or goods outside the ordinary course; provided, however, that in no event shall Merchant transfer any goods into the Stores without Agent's consent from and after the date hereof.

(g)     To Merchant's knowledge after reasonable inquiry, all Merchandise is in compliance with all applicable federal, state and local product safety laws, rules and standards.  Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls prior to the Sale Commencement Date.

(h)     Subject to the provisions of the Approval Order, Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, the Stores, the assets currently located at the Stores, and the utilities and other services provided at the Stores.  Merchant shall, throughout the Sale Term, maintain in good working order, condition and repair all cash registers, heating systems, air conditioning systems, elevators, escalators and all other mechanical devices necessary or appropriate for the conduct of the Sale at the Stores.  Except as otherwise restricted by the Bankruptcy Code or as provided herein and absent a bona fide dispute, throughout the Sale Term Merchant shall remain current on all expenses and payables necessary or appropriate for the conduct of the Sale.

23

(i)     Subject to approval by the Bankruptcy Court, Merchant has paid, and will continue to pay throughout the Sale Term, all self-insured or Merchant-funded employee benefit programs for Store employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(j)     Since April 1, 2015, Merchant has not taken, and shall not throughout the Sale Term take, any actions with the intent of increasing the Expenses of the Sale, including without limitation increasing salaries or other amounts payable to employees; except to the extent an employee was due an annual raise in the ordinary course.

(k)     Since April 1, 2015, Merchant has operated, and, except as otherwise restricted by the Bankruptcy Code or as provided herein and absent a bona fide dispute, through the Sale Commencement Date Merchant covenants to continue to operate, the Stores in all material respects in the ordinary course of business including without limitation by: (i) selling inventory during such period at customary prices consistent with the ordinary course of business; (ii) not promoting or advertising any sales or in-store promotions (including POS promotions) to the public outside of the Merchant's ordinary course of business; (iii) except as may occur in the ordinary course of business, not returning inventory to vendors and not transferring inventory or supplies out of or to the Stores; (iv) except as may occur in the ordinary course of business, not making any management personnel moves or changes at the Stores; and (v) replenishing the Stores in the ordinary course of business.

(l)     Prior to the execution of this Agreement, Merchant has provided Agent reasonable access to all pricing and cost files, computer hardware, software and data files, inter-Stores transfer logs, markdown schedules, invoices, style runs and all other documents relative to the price, mix and quantities of inventory located at the Stores and the Distribution Centers or on order or in transit.

(m)     Merchant has provided representatives of Agent with access to (and the opportunity to copy) all collective bargaining agreements, and all amendments, modifications, and supplements thereto.

(n)     To Merchant's knowledge after reasonable inquiry, all documents, information and supplements provided by Merchant to Agent in connection with Agent's due diligence and the negotiation of this Agreement were true and accurate in all material respects at the time provided.

(o)     On and as of the Sale Commencement Date, the level of goods (as to quantity) and the mix of goods (as to type, category, style, brand and description) at the Stores shall be in all material respects, subject to ordinary course of business changes and adjustments, consistent with the level and mix set forth on Exhibit 11.1(o).

(p)     Merchant has not and shall not purchase or transfer to or from the Stores any merchandise or goods outside the ordinary course in anticipation of the Sale or of the Inventory Taking.

(q)     Merchant has not since April 1, 2015 shipped any Excluded Defective Merchandise from the Distribution Centers to the Stores.  Merchant will not ship any Excluded Defective Merchandise from the date of this Agreement from the Distribution Centers to the Stores.

(r)     Other than filing the Bankruptcy Case, no action, arbitration, suit, notice, or legal, administrative or other proceeding before any court or governmental body has been instituted by or against the Merchant, or has been settled or resolved, or to Merchant's knowledge, is threatened against or

24

affects Merchant, relative to Merchant's business or properties, or which questions the validity of this Agreement, or that if adversely determined, would adversely affect the conduct of the Sale.

(s)     Merchant shall not, prior to the Sale Termination Date, offer any promotions or discounts at the Stores, any other retail store location, or any other retail sales channel, except as detailed on Exhibit 11.1(s).

(t)     Merchant hereby acknowledges that, as of and after the date of this Agreement, Agent intends to begin to make arrangements for the purchase of Additional Agent Goods from Agent's suppliers of goods as well as Merchant's existing suppliers of goods, all at no cost or expense whatsoever to Merchant and at Agent's sole risk.  To assist Agent in that regard, from and after the date of this Agreement, Merchant shall use Merchant's commercially reasonable efforts to assist and cause Merchant's employees to assist Agent with Agent's efforts to negotiate orders with Merchant's suppliers for goods that Agent is interested in purchasing as Additional Agent Goods, provided that (i) such assistance does not unreasonably interfere with or disrupt Merchant's business operations, (ii) the appropriate employees to perform such activities then remain employees of Merchant, it being agreed that Merchant shall in no event be required to retain any such employee for the purpose of rendering such assistance, (iii) Merchant shall have no liability whatsoever in connection with any orders placed for such Additional Agent Goods or otherwise in connection with the activities contemplated by this subpart (t).

11.2     Agent's Representations, Warranties and Covenants.  Agent hereby represents, warrants and covenants in favor of Merchant as follows:

(a)     Each entity composing Agent: (i) is a limited liability company duly and validly existing and in good standing under the laws of the State of Delaware; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Agent to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)     Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Agent has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale.  Each of the Agency Documents has been duly executed and delivered by the Agent and constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms.  No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for, Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor, other than as provided herein.  No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)     No action, arbitration, suit, notice or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved or, to Agent's knowledge, has been threatened against or affects Agent, which questions the

25

validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement or which, if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

(d)     The Sale shall be conducted in compliance with all applicable state and local laws, rules and regulations and Merchant's leases and other agreements, except as otherwise provided for in the Sale Guidelines and Approval Order.

(e)     Absent prior consent by the Merchant, Agent will not cause any non-emergency repairs or maintenance (emergency repairs are repairs necessary to preserve the security of a Store premise or to ensure customer safety) to be conducted at the Stores.

(f)     To the best of Agent's knowledge, all Additional Agent Goods are in compliance with all applicable federal, state or local product safety laws, rules and standards.  All Additional Agent Goods shall be of like kind and no lesser quality to the Merchandise located in the Stores.

Section 12.  Insurance.

12.1    Merchant's Liability Insurance.  Subject to approval by the Bankruptcy Court, Merchant shall continue at its cost and expense until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies, including, but not limited to, commercial general liability, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with, Merchant's operation of the Stores; and Merchant shall cause Agent to be named as an additional named insured (as its interest may appear) with respect to all such policies.  Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days' prior notice to Agent of cancellation, non-renewal or material change during the Sale Term.  In the event of a claim under any such policies, Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Agent, or Agent's employees, independent contractors or agents.  Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

12.2    Merchant's Casualty Insurance.  Subject to approval by the Bankruptcy Court, Merchant shall provide, as an Occupancy Expense, throughout the Sale Term fire, flood, theft and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the retail value thereof.  From and after the date of this Agreement until the Sale Termination Date, all such policies will also name Agent as an additional named insured or loss payee, as applicable (as its interest may appear).  In the event of a loss to the Merchandise on or after the date of this Agreement, the Proceeds of such insurance attributable to the Merchandise, shall constitute Proceeds hereunder.  Merchant shall deliver to Agent certificates evidencing such insurance, setting forth the duration thereof and naming the Agent as an additional insured or loss payee, as applicable, in form and substance reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days' prior notice to the Agent of cancellation, non-renewal or material change during the Sale Term.  Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

26

12.3    <u>Agent's Insurance</u>.    Agent shall maintain at Agent's cost as an Expense hereunder throughout the Sale Term, in such amounts as it currently has in effect, commercial general liability policies covering injuries to persons and property in or in connection with Agent's agency at the Store, and shall cause Merchant to be named as an additional insured with respect to such policies.  Agent shall deliver to Merchant certificates evidencing such insurance policies setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonably satisfactory to Merchant.  In the event of a claim under any such policies, Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Merchant or Merchant's employees, independent contractors or agents (other than Agent or Agent's employees, agents or independent contractors).  Agent shall not make any change in the amount of any deductibles or self insurance amounts prior to the Sale Termination Date without Merchant's prior written consent.

12.4    <u>Worker's Compensation Insurance</u>.    Subject to approval by the Bankruptcy Court, Merchant shall at all times during the Sale Term maintain in full force and effect workers' compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements.

Section 13.  <u>Indemnification</u>.

13.1    <u>Merchant's Indemnification</u>.    Merchant shall indemnify and hold Agent and its officers, directors, employees, agents, representatives, and independent contractors (collectively, "<u>Agent Indemnified Parties</u>") harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to: (i) Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof; (iii) any failure of Merchant to pay to its  employees any wages, salaries or benefits due to such employees during the Sale Term; (iv) any consumer warranty or products liability claims or other claims of any type or kind and by any party whatsoever relating to Merchandise; (v) any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN Act); (vi) any harassment or any other unlawful, tortious, or otherwise actionable treatment of any customers, employees or agents of Agent by Merchant or any of its representatives; (vi) any failure of Merchant to pay to any Occupancy Expenses or Central Service Expenses during the Sale Term; and (vii) the gross negligence (including omissions) or willful misconduct of the Merchant, its officers, directors, employees, agents (other than Agent) or representatives.

13.2    <u>Agent Indemnification</u>.    Agent shall indemnify and hold the Merchant and its officers, directors, employees, agents and representatives harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: (i) Agent's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment; (iii) any harassment or any other unlawful, tortious or otherwise actionable treatment of any customers, employees or agents

27

of the Merchant by Agent or any of its representatives; (iv) any consumer warranty, products liability claims  or other claims of any type or kind and by any party whatsoever  relating to Additional Agent Goods; (v) as set forth in section 8.3 above; (vi) any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Merchant Indemnified Party by reason of acts or omissions of Agent or Agent's representatives in connection with the Sale, and (vii) the gross negligence (including omissions) or willful misconduct of Agent, its officers, directors, employees, agents or representatives.

Section 14.  Defaults.  The following shall constitute "Events of Default" hereunder:

(a)      The Merchant or Agent shall fail to perform any material obligation hereunder if such failure remains uncured five (5) days after receipt of written notice thereof;

(b)      Any representation or warranty made by the Merchant or Agent proves untrue in any material respect as of the date made and, to the extent curable, continues uncured five (5) days after written notice to the defaulting party, save for and representations regarding Retail Price of the Merchandise or the representations in Section 11.1(o) hereof, in which case Agent's sole remedy shall be such adjustment to the Guaranteed Amount mutually acceptable to the Merchant and Agent;

(c)      The filing of a motion by any party to covert the Merchant's bankruptcy case to a case under another chapter of the Bankruptcy Code (other than chapter 11) or the filing of a motion by any party to appoint a chapter 11 trustee; or

(d)      The Sale is terminated prior to the Sale Termination Date or materially interrupted or impaired at any Store for any reason other than (i) an Event of Default by Agent, or (ii) any other material breach or action by Agent not authorized hereunder.

Upon an Event of Default, the non-defaulting party (in the case of (a) or (b) above), or Agent (in the case of (c) above) may in its discretion elect to terminate this Agreement, and any party's damages or entitlement to equitable relief on account of an Event of Default shall (in addition to the right to terminate as provided above) be determined by a court of competent jurisdiction.

Section 15.  Agent's Security Interest.  In consideration of and effective upon payment by Agent of the Initial Guaranty Payment on the Payment Date and the delivery of the Letter of Credit to the Lender, as Merchant's designee, Merchant hereby grants to Agent first priority, senior security interests in and liens upon: (i) the Merchandise; (ii) to the extent of Merchant's ownership therein, the Additional Agent Goods; (iii) all Proceeds (including, without limitation, credit card Proceeds); (iv) the commission regarding the sale or other disposition of Merchant's Consignment Goods under Section 5.4 hereof; (v) the commission regarding the sale or other disposition of Owned FF&E under Section 7 hereof; (vi) any Sharing Amount, but only up to the amount of Agent's percentage share of such Sharing Amount under Section 3.2(a) hereof, and (vii) all "proceeds" (within the meaning of Section 9-102(a)(64) of the Code) of each of the foregoing (all of which are collectively referred to herein as the "Agent Collateral"), to secure the full payment and performance of all obligations of Merchant to Agent hereunder.  Upon entry of the Approval Order, payment of the Initial Guaranty Payment, and delivery of the Letter of Credit to the Lender, the security interests and liens granted to the Agent hereunder shall be deemed properly perfected without the necessity of filing UCC-1 financing statements or any other documentation.

(a)      Without any further act by or on behalf of the Agent or any other party (including (without limitation) the Lender and Merchant), the Agent's security interests and liens in the Agent

28

Collateral created hereunder are (i) validly created, (ii) effective upon entry of the Approval Order, perfected, and (iii) senior to all other liens and security interests, provided, however, that (i) until the Merchant receives payment in full of the Guaranteed Amount, the Additional Agent Goods Fee, the Sharing Amount (if any), Expenses, the proceeds realized upon the sale of Owned FF&E (less the FF&E Commission) or Additional Guaranteed Amount, and such others amountsdue to Merchant hereunder, the security interest granted to Agent hereunder shall remain junior and subordinate in all respects to the security interests of Lender in the Agent Collateral (other than the Additional Agent Goods and proceeds thereof in which Merchant has not property or other interest and Lender has no security interest or other lien), but solely to the extent and amount of the unpaid portion of the Guaranteed Amount, the Additional Agent Goods Fee, the Sharing Amount (if any), Expenses, the proceeds realized upon the sale of Owned FF&E (less the FF&E Commission) or the Additional Guaranteed Amount, and such others amountsdue to Merchant hereunder, and (ii) upon payment in full of the Guaranteed Amount, the Additional Agent Goods Fee, the Sharing Amount (if any), Expenses, the proceeds realized upon the sale of Owned FF&E (less the FF&E Commission) or the Additional Guaranteed Amount, and such others amountsdue to Merchant hereunder, any security interest or lien of the Lender in the Agent Collateral shall be junior and subordinate in all respects to the security interest and liens of Agent.  Merchant shall cooperate with Agent with respect to all filings (including (without limitation) UUC-1 financing statements) and other actions to the extent reasonably requested by Agent in connection with the security interests and liens granted under this Agreement.

(b)    Merchant will not sell, grant, assign or transfer any security interest in, or permit to exist any encumbrance on, any of the Agent Collateral other than in favor of the Agent and Lender.

(c)    In the event of an occurrence of an Event of Default by the Merchant hereunder, in any jurisdiction where the enforcement of its rights hereunder is sought, the Agent shall have, in addition to all other rights and remedies, the rights and remedies of a secured party under the Code.

(d)    "Code" shall mean the Uniform Commercial Code as the same may be in effect from time to time in the State of Florida.

Section 16.  Bidding and Auction.  The bidding procedures order shall provide that, in consideration of Agent conducting its due diligence and entering into this Agreement (which may serve as a base by which other offers may be measured and is subject to higher and better offers by way of an auction process) ("Auction"); then in the event that this Agreement shall not be consummated with Agent because Merchant elects as a consequence of the Auction to accept or pursue an alternate bid or sale mechanism through the Bankruptcy Court (including, without limitation, one or more transactions for the purchase or any portion of Merchant's assets and business as a going concern or otherwise) (the "Alternate Transaction"), and provided that there is no Event of Default by Agent then pending hereunder and that each of the Break-Up Fee Conditions (hereinafter defined) are satisfied as determined by the Bankruptcy Court, Merchant shall pay Agent (on the first business day following (i) receipt of the initial guaranty payment in the case of a liquidation Alternate Transaction from the initial guaranty payment received from such Alternate Transaction and available for expenditure by the Merchant, (ii) entry of an order approving an Alternative Transaction other than a liquidation transaction from the Deposit (as defined below) received  from such bidder and available for expenditure by the Merchant, or (iii) such later date as Agent may agree) an amount equal to the sum of (i) $75,000 as a combined break-up fee and expense reimbursement to cover Agent's reasonable out-of-pocket costs and expenses associated with due diligence and professionals' fees and expenses associated with, among other things, negotiating, drafting, and obtaining approval of this Agreement and the bid procedures (the "Bid Protection"), and (ii) Agent's documented, actual out-of-pocket costs of signage and freight in an amount not to exceed  $350,000 (the

29

"Signage Costs"); provided, however, that (x) to participate in the Auction, a potential bidder shall be required to (1) post a deposit in an amount not less than the sum of the Bid Protection and the Signage Costs, and such other amount as the Merchant shall require (the "Deposit") and (2) irrevocably affirm in writing, if such potential bidder is the successful bidder, upon entry of the order approving the transaction with such successful bidder, the Merchant is authorized to, and the Merchant shall, use the Deposit to pay the Agent the Bid Protection and the Signage Costs from the Deposit, (y) if the Agent is not the "successful bidder" at the Auction and the successful bidder is the liquidating agent, the Agent agrees to make the signage available to the successful bidder upon receipt of the Bid Protections and Signage Costs from the Merchant.  At the Auction: (i) the Bid Protections shall not be eligible to be "credit bid" by Agent; (ii) the first overbid by a competing bidder shall be an amount equal a Guaranty Percentage of not less than 28.5% (as quantified by the Merchant, acting reasonably, in the case of a going concern bid), with successive overbids in increments of not more than 0.1% absent Agent's consent; and (iii) all competing liquidation bids shall be on the same terms and conditions as this Agreement other than as to the increased Guaranty Percentage as determined by Merchant in its sole discretion.  For the avoidance of all doubt, the requirements of clause (iii) of the immediately preceding sentence shall not apply to any going concern bids received by Merchant.  For avoidance of doubt, Agent's right to receive payment of the Bid Protections and reimbursement of the Signage Costs as provided herein shall be the sole and exclusive remedy of Agent in the event of termination of the Agency Agreement to accept an Alternate Transaction.  In the event Agent not the "successful bidder" at the auction, but is the "next highest bidder, Agent agrees to serve as the "back up" bidder and close the transaction contemplated by this Agreememt, as may modified by the Agent's bidding at the Auction; provided the Sale Commencement Date occurs no later than May 7, 2015 (absent the Agent's express written consent, which may be withheld or granted in the Agent's sole and absolute discretion or modified at the Auction).

Section 17.  Miscellaneous.

17.1    Notices.    All notices and communications provided for pursuant to this Agreement shall be in writing and sent by email, by hand, by facsimile or by Federal Express or other recognized overnight delivery service, as follows:

If    to    the    Agent:    HILCO MERCHANT RESOURCES, LLC
5 Revere Drive, Suite 206
Northbrook, IL 60062
Attention: Ian S. Fredericks
Tel: (847) 418-2075
Fax: (847) 897-0859
Email: ifredericks@hilcotrading.com

GORDON BROTHERS RETAIL PARTNERS, LLC
Prudential Tower
800 Boylston Street
Boston, MA 02119
Attn:    Michael Chartock
Tel:    617.210.7116
Email: mchartock@gordonbrothers.com

If to the Merchant:    Simply Fashion Stores, Ltd.
2110 NW 95th Avenue
Miami, Florida 33172

30

Attn:  Swapnil Shah
Tel:  305.592.2712
Email: sjs@mahudi.com

With a copy to (which shall not constitute notice)

KapilaMukamal
1000 South Federal Highway, Suite 200
Fort Lauderdale, Florida 33316
Attn: Soneet R. Kapila, CRO
Tel:  954.761.1011
Email:  skapila@kapilamukamal.com

With a copy to (which shall not constitute notice)

Berger Singerman LLP
1450 Brickell Avenue
Miami, Florida 33131
Attn:  Paul Steven Singerman
Tel:  305.714.4343
Email: Singerman@bergersingerman.com
Attn:  Christopher Andrew Jarvinen
Tel:  305.714.4363
Email: cjarvinen@bergersingerman.com

If to the Lender:        JNS INVT, LLC
                         c/o Genovese Joblove & Battista, P.A.
                         100 Southeast Second Street, 44th Floor
                         Miami, Florida 33131
                         Attn:  Paul J. Battista
                         Tel: 305.349.2300
                         Email: pbattista@gjb-law.com

17.2    Governing Law/Exclusive Jurisdiction.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of Florida, without reference to any conflict of laws provisions thereof, except where governed by the Bankruptcy Code.  Each of the parties hereto irrevocably and unconditionally submits, for itself and its properties, to the exclusive jurisdiction of the Bankruptcy Court, in any action or proceeding arising out of or relating to this Agreement.

17.3    Amendments.  This Agreement, the Exhibits hereto, and the Agency Documents may not be modified except in a written instrument executed by each of the parties hereto and consented to in writing by the Lender (unless the obligations to the Lender are paid in full), which consent shall not be unreasonably withheld, conditioned or delayed.

17.4    No Waiver.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of

31

any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

17.5    <u>Currency</u>.  All reference to dollars in this Agreement and all schedules, exhibits, and ancillary documents related to this Agreement shall refer to US dollars.

17.6    <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and be binding upon Agent and Merchant and their respective successors and assigns, including, but not limited to, any chapter 11 or chapter 7 trustee; provided, however, that this Agreement may not be assigned by Merchant or Agent to any party without the prior written consent of the other (which consent may be granted or withheld in the applicable party's sole discretion).

17.7    <u>Execution in Counterparts</u>.  This Agreement may be executed in one or more counterparts.  Each such counterpart shall be deemed an original but all such counterparts together shall constitute one and the same agreement.  This Agreement, to the extent signed and delivered by means of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto, each other party hereto or thereto shall re-execute original forms hereof and deliver them to all other parties.  No party hereto shall raise the use of a facsimile machine, electronic mail, or other electronic transmission in which the actual signature is evident to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident as a defense to the formation of a contract and each party forever waives such defense.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against which enforcement is sought.

17.8    <u>Section Headings</u>.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

17.9    <u>Wiring of Funds</u>.  All amounts required to be paid by Agent or the Merchant under any provision of this Agreement shall be made by wire transfer of immediately available funds which shall be wired by Agent or Merchant, as applicable, no later as 2:00 p.m. (Eastern Time) on the date that such payment is due; provided, however, that all of the information necessary to complete the wire transfer has been received by Agent or Merchant, as applicable, by 10:00 a.m. (Eastern Time) on the date that such payment is due.  In the event that the date on which any such payment is due is not a business day, then such payment shall be made by wire transfer on the next business day.

17.10    <u>Nature of Remedies</u>.  Except to the extent expressly set forth herein, all rights, remedies, powers, privilege and adjustments under sections 3.1(b), 3.4 and 11.1(o) shall be in addition to and not in limitation of those provided elsewhere in this Agreement or by applicable law.  No failure to exercise and no delay in exercising, on the part of the Agent, any right, remedy, power, privilege or adjustment hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, privilege, or adjustment hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, privilege, or adjustment.  For the avoidance of doubt and notwithstanding anything to the contrary in this Agreement, the rights granted to Agent pursuant to Section 16 shall be the Agent's sole and exclusive rights and remedies in the event of a termination of this Agreement by Merchant under Section 16.

32

17.11    <u>Entire Agreement</u>.    This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

33

IN WITNESS WHEREOF, the Agent and the Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**HILCO MERCHANT RESOURCES, LLC**

By: _____

Print         Name         and         Title:

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By: _____

Print         Name         and         Title:

**SIMPLY FASHION STORES, LTD.**

By: _____

Print Name and Title: _SONEET R. KAPILA_
_C.R.O._

Agreed and Accepted as to Sections
3.3, 3.4, 8.3, 8.8, 8.10, 15, 16, and 17:
JNS INVT, LLC

By: _____

Print Name and Title:
_Swapnil J. Shah, Lender_

### List of Exhibits

Exhibit 1 – Store List.
Exhibit 3.1(b) – Merchandise Level Adjustment Schedule.
Exhibit 3.3(b) – Merchant's Designated Account.
Exhibit 3.4 – Form of Letter of Credit.
Exhibit 4.1(c) – Per Store, Per Diem Occupancy Expenses.
Exhibit 5.1(a) – Inventory Taking Instructions.
Exhibit 5.2(b) – Distribution Center
Exhibit 7.1 – Owned FF&E
Exhibit 11.1(o) – Inventory Mix
Exhibit 11.1(s) – Promotional Calendar
Exhibit 11.1(u) – Locations to be Closed
Exhibit 8.1 – Sale Guidelines

34

IN WITNESS WHEREOF, the Agent and the Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

HILCO MERCHANT RESOURCES, LLC

By:_____
Print Name and Title: Ian Fredericks
                    VP & Assistant General Counsel, Managing Member

GORDON BROTHERS RETAIL PARTNERS, LLC

By:_____
Print Name and Title:

SIMPLY FASHION STORES, LTD.

By:_____
Print Name and Title:

**Agreed and Accepted as to Sections
3.3, 3.4, 8.3, 8.8, 8.10, 15, 16, and 17:**
JNS INVT, LLC

By: _____
Print Name and Title:

### List of Exhibits

Exhibit 1 – Store List.
Exhibit 3.1(b) – Merchandise Level Adjustment Schedule.
Exhibit 3.3(b) – Merchant's Designated Account.
Exhibit 3.4 – Form of Letter of Credit.
Exhibit 4.1(c) – Per Store, Per Diem Occupancy Expenses.
Exhibit 5.1(a) – Inventory Taking Instructions.
Exhibit 5.2(b) – Distribution Center
Exhibit 7.1 – Owned FF&E
Exhibit 11.1(o) – Inventory Mix
Exhibit 11.1(s) – Promotional Calendar
Exhibit 11.1(u) – Locations to be Closed
Exhibit 8.1 – Sale Guidelines

IN WITNESS WHEREOF, the Agent and the Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**HILCO MERCHANT RESOURCES, LLC**

By:_____
Print Name and Title:

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By:_____
Print Name and Title:
Richard Edwards
co-President - Retail

**SIMPLY FASHION STORES, LTD.**

By:_____
Print Name and Title:

**Agreed and Accepted as to Sections
3.3, 3.4, 8.3, 8.8, 8.10, 15, 16, and 17:
JNS INVT, LLC**

By: _____
Print Name and Title:

## List of Exhibits

Exhibit 1 – Store List.
Exhibit 3.1(b) – Merchandise Level Adjustment Schedule.
Exhibit 3.3(b) – Merchant's Designated Account.
Exhibit 3.4 – Form of Letter of Credit.
Exhibit 4.1(c) – Per Store, Per Diem Occupancy Expenses.
Exhibit 5.1(a) – Inventory Taking Instructions.
Exhibit 5.2(b) – Distribution Center
Exhibit 7.1 – Owned FF&E
Exhibit 11.1(o) – Inventory Mix
Exhibit 11.1(s) – Promotional Calendar
Exhibit 11.1(u) – Locations to be Closed
Exhibit 8.1 – Sale Guidelines

**Simply Fashions**
Exhibit 1

| | | | Store List | | | | | | |
|---|---|---|---|---|---|---|---|---|---|

| Store # | Location Type | Name | Address | City | State | Zip | Phone | Open Date | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|
| 12 | SIMPLY FASHIONS | CHURCH SQUARE S/C | 917 N. CAROLINE STREET | BALTIMORE | MD | 21205 | 410/844-1426 | 7/18/14 | 2,910 |
| 14 | SIMPLY FASHIONS | LEE STREET SHOPPING CTR | 4523 LEE STREET | ALEXANDRIA | LA | 71302 | 318/619-9940 | 05/29/98 | 3000 |
| 15 | SIMPLY FASHIONS | INWOOD CENTRAL | 8161 ANTOINE | HOUSTON | TX | 77088 | 281/931-5450 | 03/15/02 | 3,272 |
| 16 | SIMPLY FASHIONS | PEMBERTON SQUARE | 3505 PEMBERTON SQUARE BLVD #43 | VICKSBURG | MS | 39180 | 601/629-9562 | 08/28/98 | 4,573 |
| 18 | SIMPLY FASHIONS | GATEWAY SHOPPING CENTER | 5238-14 NORWOOD AVENUE | JACKSONVILLE | FL | 32208 | 904/768-1488 | 02/20/93 | 4532 |
| 19 | SIMPLY FASHIONS | AMERICAN WAY PLAZA | 4667 AMERICAN WAY | MEMPHIS | TN | 38118 | 901/362-2545 | 03/19/93 | 4800 |
| 20 | SIMPLY FASHIONS | JEFFERSON SQUARE S/C | 2801 OLIVE ST STE. 8 | PINE BLUFF | AR | 71603 | 870/534-1432 | 05/28/93 | 4,672 |
| 21 | DOTS | EISENHOWER CROSSING | 4673 PRESIDENTIAL PKWY, SUITE M | MACON | GA | 31206 | 478/960-3928 | 7/3/14 | 4,368 |
| 22 | SIMPLY FASHIONS | FREESTANDING | 69-73 W. CHELTEN AVENUE | PHILADELPHIA | PA | 19144 | 215/435-1317 | 3/21/14 | 4,858 |
| 24 | SIMPLY FASHIONS | CENTER CITY | 1629 POPLAR AVE | MEMPHIS | TN | 38104 | 901/274-9551 | 7/16/05 | 3,800 |
| 26 | SIMPLY FASHIONS | TAMPA FESTIVAL CENTRE | 2525 E. HILLSBOROUGH AVE. STE.101 | TAMPA | FL | 33610 | 813/237-5150 | 10/28/93 | 3,900 |
| 27 | SIMPLY FASHIONS | GENTILLY S/C | 3155 GENTILLY BLVD | NEW ORLEANS | LA | 70122 | 504/286-0793 | 10/01/93 | 3,018 |
| 30 | SIMPLY FASHIONS | MERIDIAN MARKETPLACE | 2526 67TH AVE LOOP, #106 | MERIDIAN | MS | 39307 | 601/553-2990 | 5/2/08 | 3,067 |
| 31 | DOTS | EASTGATE S/C | 26200 EASTGATE BLVD | ROSEVILLE | MI | 48066 | 586/675-0852 | 6/7/14 | 7,450 |
| 32 | SIMPLY FASHIONS | FOWLERS PLAZA | 1433 S. EISENHOWER PKWY | MACON | GA | 31206 | 478/781-9672 | 5/11/07 | 4,300 |
| 33 | SIMPLY FASHIONS | CHATHAM VILLAGE SQUARE | 8658 S. COTTAGE GROVE AVE, UNIT #402 | CHICAGO | IL | 60619 | 312/485-4518 | 1/31/15 | 3,060 |
| 36 | SIMPLY FASHIONS | LINDELL MARKETPLACE | 4167 LINDELL BLVD | ST. LOUIS | MO | 63108 | 314/296-2106 | 01/30/15 | 3,850 |
| 37 | SIMPLY FASHIONS | GENTILLY S/C | 4800 CHEF MENTEUR HWY SUITE F | NEW ORLEANS | LA | 70126 | 504/940-2255 | 10/05/10 | 3,000 |
| 39 | SIMPLY FASHIONS | FREESTANDING | 456 MEETING STREET | CHARLESTON | SC | 29403 | 843/722-2526 | 06/30/00 | 3880 |
| 40 | DOTS | BRICKTOWN SQUARE | 6560 WEST FULLERTON AVE | CHICAGO | IL | 60707 | 224/213-0590 | 1/31/15 | 6,000 |
| 41 | DOTS | EAST FOREST DRIVE | 5424 FOREST DRIVE | COLUMBIA | SC | 29206 | 803/239-6545 | 1/30/15 | 4,723 |
| 43 | SIMPLY FASHIONS | LINCOLN S/C | 26150 GREENFIELD RD | OAK PARK | MI | 48237 | 248/514-1483 | 7/25/14 | 7,800 |
| 44 | SIMPLY FASHIONS | N/A | 2111 HWY 82 EAST, SUITE C | GREENVILLE | MS | 38710 | 662/334-3138 | 02/08/02 | 3,000 |
| 45 | SIMPLY FASHIONS | NORTH EASTWOOD PLAZA | 8939 EAST 38TH STREET | INDIANAPOLIS | IN | 46226 | 317/897-8935 | 02/08/02 | 3,300 |
| 46 | SIMPLY FASHIONS | REDFORD PLAZA | 9189 TELEGRAPH RD, SPACE #260 | REDFORD | MI | 48239 | 313/255-2376 | 4/10/09 | 3,660 |
| 47 | DOTS | SALEM CONSUMER SQUARE | 5477 SALEM AVE | DAYTON | OH | 45426 | 937/823-4770 | 1/30/15 | 3,500 |
| 48 | SIMPLY FASHIONS | SOUTHGATE SHOPPING CENTER | 1631 GORDON HWY., SPACE 11 | AUGUSTA | GA | 30906 | 706/790-0669 | 05/27/94 | 6,570 |
| 49 | SIMPLY FASHIONS | OVERBROOK PLAZA | 5610 LANCASTER AVE UNIT #900 A&B | PHILADELPHIA | PA | 19131 | 267/317-0453 | 11/26/14 | 4,370 |
| 52 | DOTS | VICTORY CROSSING S/C | 4010 A VICTORY BLVD | PORTSMOUTH | VA | 23701 | 757/532-6617 | 1/30/15 | 5,250 |
| 53 | SIMPLY FASHIONS | 95TH & JEFFREY | 2023 E. 95TH STREET | CHICAGO | IL | 60617 | 773/933-8660 | 10/3/08 | 2,717 |
| 54 | SIMPLY FASHIONS | SUPER 1 FOODS S/C | 2600 WAGGONER AVE., STE. 208 | SHREVEPORT | LA | 71108 | 318/636-1354 | 03/27/04 | 12,006 |
| 55 | SIMPLY FASHIONS | NORTHWOOD S/C | 4445 NORTH STATE ST. | JACKSON | MS | 39206 | 601/362-0420 | 04/28/04 | 7,135 |
| 57 | SIMPLY FASHIONS | AMERICANA PLAZA | 2141 AMERICANA BLVD, SUITE 110 & 111 | ORLANDO | FL | 32839 | 407/854-8336 | 2/20/09 | 2,800 |
| 58 | SIMPLY FASHIONS | FAMILY DOLLAR BUILDING | 1024 NORTH STATE STREET | CLARKSDALE | MS | 38614 | 662/627-1040 | 8/27/03 | 3,000 |
| 59 | SIMPLY FASHIONS | LINWOOD SQUARE S/C | 3135 PROSPECT | KANSAS CITY | MO | 64128 | 816/861-1015 | 7/15/94 | 8000 |
| 62 | SIMPLY FASHIONS | MT. CLARE JUNCTION | 1229 W. PRATT STREET, SUITE B | BALTIMORE | MD | 21233 | 410/244-8440 | 10/04/06 | 3,000 |
| 63 | SIMPLY FASHIONS | THE LANDINGS | 16743 TORRENCE AVE | LANSING | IL | 60438 | 708/418-3830 | 5/4/09 | 6,000 |
| 66 | SIMPLY FASHIONS | N.W. JUNCTION S/C | 3188 W. NORTHSIDE DR. | JACKSON | MS | 39213 | 601/366-7365 | 9/25/89 | 2847 |
| 68 | SIMPLY FASHIONS | WYANDOTTE PLAZA | 7722 STATE AVE | KANSAS CITY | KS | 66112 | 913/302-7118 | 4/4/14 | 4,490 |
| 70 | DOTS | OAKLAND POINTE PLAZA | 332 N. TELEGRAPH RD | PONTIAC | MI | 48341 | 248/309-0487 | 1/30/15 | 8,600 |
| 72 | SIMPLY FASHIONS | NORTHSIDE PLAZA | 3018 MEMORIAL PKWY NW | HUNTSVILLE | AL | 35810 | 256/859-8004 | 2/14/09 | 4,000 |
| 75 | DOTS | MARCUS PLAZA | 624 WEST MAIN STREET | NORWICH | CT | 06360 | 860/222-4126 | 11/14/14 | 3,850 |
| 76 | DOTS | WATERTOWER PLAZA | 40 WATERTOWER PLAZA | LEOMINSTER | MA | 01453 | 774/364-2450 | 1/30/15 | 3,600 |
| 77 | DOTS | GATEWAY MARKETPLACE | 1355 W. 8 MILE RD | HIGHLAND PARK | MI | 48203 | 248/228-7987 | 6/7/14 | 4,000 |
| 79 | DOTS | WHITEHALL S/C | 2180 MACARTHUR RD SPACE 6-A | WHITEHALL | PA | 18052 | 484/523-0298 | 1/30/15 | 4,250 |
| 80 | DOTS | ROUNDTREE PLACE | 2477 ELLSWORTH RD | YPSILANTI | MI | 48197 | 734/740-2991 | 1/30/15 | 4,000 |
| 82 | SIMPLY FASHIONS | SOUTHLAND MALL | 20505 S. DIXIE HWY, SUITE #829 | CUTLER BAY | FL | 33189 | 305/234-6131 | 5/1/14 | 5,373 |
| 85 | SIMPLY FASHIONS | K-MART PLAZA | 2107 SOUTH US HWY 1 | FT PIERCE | FL | 34950 | 561/489-8068 | 03/31/00 | 2500 |

**Simply Fashions**
Exhibit 1

Store List

| Store # | Location Type | Name | Address | City | State | Zip | Phone | Open Date | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|
| 86 | SIMPLY FASHIONS | BURLINGTON PLAZA | 3753 AUSTELL RD, SUITE 160 & 170 | AUSTELL | GA | 30106 | 770/819-8150 | 6/26/10 | 3,200 |
| 91 | SIMPLY FASHIONS | CHICAGO HEIGHTS HILLTOP PLAZA | 1333 HILLTOP AVE, UNIT D | CHICAGO HEIGHTS | IL | 60411 | 708/481-8730 | 12/12/13 | 3,708 |
| 92 | DOTS | NEWPORT S/C | 1765 MONMOUTH STREET | NEWPORT | KY | 41071 | 859/414-4068 | 10/25/14 | 4,000 |
| 94 | SIMPLY FASHIONS | PINE HILLS MARKETPLACE | 5311 WEST COLONIAL DRIVE | ORLANDO | FL | 32808 | 407/578-6079 | 02/12/03 | 3,600 |
| 95 | SIMPLY FASHIONS | CAHOKIA VILLAGE S/C | 1024 CAMP JACKSON ROAD | CAHOKIA | IL | 62206 | 618/337-6106 | 11/11/94 | 2908 |
| 97 | SIMPLY FASHIONS | THE SHOPS AT WHITE OAK VILLAGE | 4501 SOUTH LABURNUM AVE SPACE 145 | RICHMOND | VA | 23231 | 804/222-2117 | 9/17/10 | 3,965 |
| 99 | SIMPLY FASHIONS | GREENWOOD WEST | 2304 HWY. 82 W. | GREENWOOD | MS | 38930 | 662/453-7437 | 8/01/90 | 2880 |
| 100 | DOTS | CHERRYDALE POINT S/C | 1510 POINSETT HWY | GREENVILLE | SC | 29609 | 864/270-3583 | 1/30/15 | 3,900 |
| 101 | SIMPLY FASHIONS | NEWMARKET SOUTH S/C | 105 NEW MARKET SQUARE EAST | NEWPORT NEWS | VA | 23605 | 757/244-5041 | 2/10/95 | 4538 |
| 102 | DOTS | FOOD 4 LESS S/C | 6930 S. ASHLAND AVE, SUITE 3 | CHICAGO | IL | 60636 | 312/550-0866 | 6/10/14 | 3,900 |
| 104 | SIMPLY FASHIONS | SOUTHLAKE MALL | 1000 SOUTHLAKE CIRCLE, SUITE 2409 | MORROW | GA | 30260 | 404/615-5158 | 5/31/14 | 3,824 |
| 106 | DOTS | RACEWAY PARK S/C | 13053 ASHLAND AVE | CALUMET PARK | IL | 60827 | 312/848-7624 | 5/31/14 | 4,000 |
| 107 | SIMPLY FASHIONS | POINCIANA PLAZA | 1225 W. 45TH STREET, SUITE #303 & #304 | MAGNOLIA PARK | FL | 33407 | 561/494-0705 | 2/25/2011 | 2,400 |
| 109 | DOTS | HERITAGE PLACE S/C | 12551 OLIVE BLVD | CREVE COEUR | MO | 63141 | 314/304-4598 | 1/30/15 | 4,800 |
| 110 | SIMPLY FASHIONS | POPLAR PLAZA S/C | 4930 POPLAR LEVEL ROAD | LOUISVILLE | KY | 40219 | 502/968-7435 | 2/28/95 | 5000 |
| 111 | SIMPLY FASHIONS | LANGLEY SQUARE | 39 WEST MERCURY BLVD | HAMPTON | VA | 23669 | 757/723-1536 | 11/12/99 | 3440 |
| 114 | SIMPLY FASHIONS | NORTH POINTE S/C | 5430G NORTH TRYON STREET | CHARLOTTE | NC | 28213 | 704/599-9777 | 05/17/96 | 3200 |
| 116 | DOTS | SPENCER SQUARE | 3552 SPENCER HWY | PASADENA | TX | 77504 | 713/205-2976 | 1/30/15 | 4,000 |
| 118 | DOTS | VILLAGE S/C | 3604 VILLAGE COURT | GARY | IN | 46408 | 219/742-8550 | 6/27/14 | 6,500 |
| 122 | DOTS | LYNNHAVEN NORTH S/C | 2720 N. MALL DR SUITE 200 | VIRGINIA BEACH | VA | 23452 | 757/266-1324 | 1/30/15 | 5,000 |
| 123 | DOTS | CEDAR HILLS S/C | 3606 BLANDING BLVD | JACKSONVILLE | FL | 32210 | 904/404-6926 | 11/8/14 | 6,000 |
| 124 | SIMPLY FASHIONS | ROEBUCK MARKETPLACE | 9164 PARKWAY EAST | BIRMINGHAM | AL | 35206 | 205/815-1173 | 8/15/08 | 3,000 |
| 126 | SIMPLY FASHIONS | FREESTANDING | 9 N 52ND ST | PHILADELPHIA | PA | 19139 | 267/449-4409 | 1/30/15 | 6,336 |
| 127 | SIMPLY FASHIONS | RIVER COMMONS | 4021 BEHRMAN PLACE, SPACE 1-2 | NEW ORLEANS | LA | 70114 | 504/366-3967 | 05/01/04 | 3000 |
| 128 | SIMPLY FASHIONS | EASTLAND HILL CENTER | 605 GALLATIN ROAD | NASHVILLE | TN | 37206 | 615/226-1066 | 06/30/00 | 4200 |
| 129 | SIMPLY FASHIONS | WEST TOWN PLAZA | 4263 WEST THIRD STREET | DAYTON | OH | 45417 | 937/263-6167 | 03/20/04 | 4,350 |
| 130 | SIMPLY FASHIONS | GRAND BOULEVARD PLAZA | 5401 S. WENTWORTH AVE., UNIT #7 | CHICAGO | IL | 60609 | 773/924-3379 | 5/01/95 | 3500 |
| 133 | SIMPLY FASHIONS | CAPITOL PLAZA | 2288 EAST SOUTH BLVD | MONTGOMERY | AL | 36116 | 334/284-3433 | 2/28/93 | 3421 |
| 137 | SIMPLY FASHIONS | PARKWAY PLAZA | 2001 NW EVANGELIN THRUWAY, SUITE 400 | LAFAYETTE | LA | 70501 | 337/235-8980 | 04/04/03 | 3,247 |
| 138 | SIMPLY FASHIONS | N/A | 5963 PLANK ROAD, SUITE B | BATON ROUGE | LA | 70805 | 225/355-1336 | 10/06/06 | 10,140 |
| 139 | SIMPLY FASHIONS | DODGE PLAZA | 7748 LANDOVER ROAD | LANDOVER | MD | 20785 | 301/773-3691 | 11/10/95 | 2400 |
| 141 | SIMPLY FASHIONS | FOOD WORLD PLAZA SOUTH | 4200 MCFARLAND BOULEVARD | TUSCALOOSA | AL | 35405 | 205/349-4360 | 01/01/92 | 2600 |
| 144 | SIMPLY FASHIONS | FRAYSER PLAZA | 2146 FRAYSER BOULEVARD | MEMPHIS | TN | 38127 | 901/354-8886 | 04/10/98 | 3000 |
| 145 | SIMPLY FASHIONS | IVES DAIRY CROSSING S/C | 19925 NW 2ND AVE, BAY 1 | MIAMI GARDENS | FL | 33169 | 785/510-2707 | 10/3/14 | 3,000 |
| 148 | SIMPLY FASHIONS | SHOPS AT NORTHEAST VILLAGE | 14477 GRATIOT AVENUE | DETROIT | MI | 48205 | 313/527-0282 | 03/01/01 | 6012 |
| 151 | SIMPLY FASHIONS | TOWN & COUNTRY PLAZA | 3300 N. PACE BLVD. #35 | PENSACOLA | FL | 32505 | 850/432-5711 | 01/01/92 | 4312 |
| 153 | DOTS | SHOPPES AT GARNER | 4446 FAYETTEVILLE RD | RALEIGH | NC | 27603 | 919/368-1387 | 1/30/15 | 4,200 |
| 154 | DOTS | NORTHLINE CROSSING S/C | 4400 NORTH FREEWAY E 1000 | HOUSTON | TX | 77022 | 281/507-8484 | 1/31/15 | 4,200 |
| 155 | SIMPLY FASHIONS | CANE RUN | 3230 CRUMS LANE | LOUISVILLE | KY | 40216 | 502/449-0883 | 02/23/96 | 3000 |
| 157 | SIMPLY FASHIONS | EASTOVER S/C | 5037 Indian Head Hwy | Oxon Hill | MD | 20745 | 301/749-1435 | 4/26/96 | 3200 |
| 158 | DOTS | STEELYARD COMMONS S/C | 3495 STEELYARD DRIVE | CLEVELAND | OH | 44109 | 216/212-2560 | 6/21/14 | 6,500 |
| 159 | SIMPLY FASHIONS | WESTERN HILLS MALL | 7201 AARON ARONOV DRIVE, STE. 36A | FAIRFIELD | AL | 35064 | 205/925-6004 | 9/29/06 | 3,850 |
| 160 | SIMPLY FASHIONS | THE SHOPPES OF LIBERTY CITY | 1156 NW 54TH STREET | MIAMI | FL | 33127 | 305/757-0797 | 08/24/00 | 3000 |
| 161 | SIMPLY FASHIONS | BLUE PARKWAY TOWN CENTER | 4307 EAST 50TH TERRACE, SPACE A & B | KANSAS CITY | MO | 64130 | 816/921-2810 | 2/3/06 | 3,176 |
| 162 | SIMPLY FASHIONS | GRIGGS ROAD S/C | 4421 GRIGGS ROAD | HOUSTON | TX | 77021 | 713/741-4604 | 2/15/03 | 5,000 |
| 163 | SIMPLY FASHIONS | MADISON SQUARE | 2585 MADISON AVENUE | MONTGOMERY | AL | 36107 | 334/241-8995 | 10/24/08 | 4,000 |
| 164 | SIMPLY FASHIONS | SELMA MALL | 1391 HIGHLAND AVE., SUITE 113 | SELMA | AL | 36703 | 334/418-8884 | 03/13/96 | 3000 |
| 165 | SIMPLY FASHIONS | FAMILY DOLLAR CENTER | 3111 W. CAPITOL STREET | JACKSON | MS | 39209 | 601/354-5564 | 02/27/04 | 3,297 |

**Simply Fashions**
Exhibit 1

| | Store List | |
|---|---|---|

| Store # | Location Type | Name | Address | City | State | Zip | Phone | Open Date | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|
| 166 | SIMPLY FASHIONS | LANTANA VILLAGE SQUARE | 1301 S. DIXIE HWY | LANTANA | FL | 33462 | 561/586-1959 | 2/13/09 | 3,500 |
| 167 | SIMPLY FASHIONS | AZALEA SHOPPING CENTER | 2121 BEMISS ROAD | VALDOSTA | GA | 31602 | 912/245-8040 | 3/15/96 | 2920 |
| 170 | DOTS | TAYLOR COMMONS | 1341 S. MAIN AVE SUITE 210 | SCRANTON | PA | 18504 | 570/209-0637 | 1/30/15 | 7,040 |
| 173 | SIMPLY FASHIONS | EUTAW VILLAGE | 2710 BRAGG BLVD | FAYETTEVILLE | NC | 28303 | 910/321-9483 | 07/21/2000 | 6,500 |
| 174 | SIMPLY FASHIONS | NORTHSIDE SHOPPING CENTRE | 7900 NORTHWEST 27TH AVE., STE. 11B | MIAMI | FL | 33147 | 305/691-1604 | 07/24/96 | 4,000 |
| 175 | SIMPLY FASHIONS | LAMAR AIRWAYS S/C | 2236 LAMAR AVENUE | MEMPHIS | TN | 38114 | 901/454-9377 | 05/25/96 | 4033 |
| 176 | DOTS | STONY ISLAND PLAZA | 1627 E. 95TH ST | CHICAGO | IL | 60617 | 312/914-1902 | 1/30/15 | 3,500 |
| 178 | DOTS | WEST ALLIS | 6822 W. GREENFIELD AVE. #A-114 | WEST ALLIS | WI | 53214 | 414-207-2971 | 03/13/15 | - |
| 180 | SIMPLY FASHIONS | WEST RIDGE | 3050 MARTIN LUTHER KING JR DR. SPACE F1 | ATLANTA | GA | 30311 | 404/699-7395 | 4/14/04 | 2,886 |
| 182 | SIMPLY FASHIONS | LAUDERHILL MALL | 1341 N.W. 40TH AVENUE | LAUDERHILL | FL | 33313 | 954/587-2859 | 09/01/1989 | 3600 |
| 183 | SIMPLY FASHIONS | SAVE A LOT CTR | 1181 E MAIN STREET | COLUMBUS | OH | 43205 | 614/253-3779 | 5/21/08 | 3,000 |
| 184 | DOTS | MODEL T PLAZA | 14110 WOODWARD AVENUE | HIGHLAND PARK | MI | 48203 | 248/915-8625 | 8/29/14 | 3,840 |
| 185 | DOTS | KING SHOPPING CENTER | 7057 MARTIN LUTHER KING DR | LANDOVER | MD | 20785 | 301/773-5117 | 6/21/99 | 4,360 |
| 186 | DOTS | SOUTHGATE USA S/C | 21640 LIBBY ROAD | MAPLE HEIGHTS | OH | 44137 | 216/347-3418 | 1/31/15 | 4,400 |
| 187 | DOTS | THRUWAY PLAZA | 150 THRUWAY PLAZA DR | CHEEKTOWAGA | NY | 14225 | 716/462-2133 | 1/30/15 | 4,978 |
| 188 | DOTS | MIRACLE MILE S/C | 4128 WILLIAM PENN HIGHWAY | MONROEVILLE | PA | 15146 | 412/552-9383 | 11/17/14 | 4,700 |
| 189 | SIMPLY FASHIONS | MARSHFIELD PLAZA | 11612 S. MARSHFIELD AVE | CHICAGO | IL | 60643 | 773/660-8840 | 9/18/09 | 3,000 |
| 190 | DOTS | SOUTHERN PLAZA | 4200 SOUTH EAST ST #31 | INDIANAPOLIS | IN | 46227 | 317/650-5238 | 1/30/15 | 5,003 |
| 191 | DOTS | FONDREN SOUTHWEST VILLAGE | 11168 FONDREN ROAD | HOUSTON | TX | 77096 | 832/544-0371 | 8/29/14 | 5,500 |
| 192 | SIMPLY FASHIONS | VILLAGE GREEN | 1126 280 BYPASS | PHENIX CITY | AL | 36867 | 334/298-1897 | 2/25/11 | 4,200 |
| 193 | SIMPLY FASHIONS | N/A | 3163 CLEVELAND AVENUE | COLUMBUS | OH | 43224 | 614/268-9112 | 08/15/96 | 4464 |
| 196 | SIMPLY FASHIONS | DUNCAN PLAZA | 17235 NW 27TH AVENUE | MIAMI GARDENS | FL | 33056 | 954/540-4395 | 9/12/14 | 3,022 |
| 197 | SIMPLY FASHIONS | BOSSIER TOWN CENTER | 3143 EAST TEXAS STREET | BOSSIER CITY | LA | 71111 | 318/747-5568 | 10/01/89 | 3,568 |
| 198 | SIMPLY FASHIONS | GATEWAY | 3250 JACKSON AVE | MEMPHIS | TN | 38122 | 901/458-7111 | 10/22/03 | 4,979 |
| 199 | SIMPLY FASHIONS | BEL AIR S/C | 8780 E. 8 MILE ROAD | DETROIT | MI | 48234 | 313/892-1683 | 08/30/96 | 3300 |
| 200 | DOTS | MARKETPLACE AT SMYRNA | 801 INDUSTRIAL BLVD SUITE 140 | SMYRNA | TN | 37167 | 615/427-8693 | 1/31/15 | 5,000 |
| 201 | SIMPLY FASHIONS | GALLERY AT WARREN CONNER | 4905 CONNER AVE | DETROIT | MI | 48215 | 313/824-6314 | 2/11/05 | 4,290 |
| 203 | SIMPLY FASHIONS | ELLIS AVENUE PLAZA | 1335 ELLIS AVENUE, #15 | JACKSON | MS | 39204 | 601/949-8448 | 8/1/97 | 3071 |
| 204 | SIMPLY FASHIONS | RIVERVIEW PLAZA | 264 WEST GENESSEE STREET | SAGINAW | MI | 48602 | 989/753-1260 | 11/05/04 | 3,000 |
| 205 | SIMPLY FASHIONS | CULLEN PLAZA | 9426 CULLEN BLVD | HOUSTON | TX | 77051-3321 | 713/738-8552 | 03/08/02 | 3000 |
| 207 | SIMPLY FASHIONS | THE COMMONS ROUTE 20 | 4417 WEST 5TH AVENUE | GARY | IN | 46406 | 219/949-6428 | 09/25/04 | 4,032 |
| 208 | DOTS | JEFFERSON VILLAGE | 11226 JEFFERSON AVENU | DETROIT | MI | 48214 | 313/815-0246 | 11/7/14 | 3,600 |
| 212 | SIMPLY FASHIONS | ROYAL TOWN CENTER | 8900 B WEST EIGHT MILE ROAD | FERNDALE | MI | 48220 | 248/546-6565 | 03/07/03 | 3,612 |
| 213 | SIMPLY FASHIONS | COLLEGE PARK COMMONS | 7940 WEST OUTER DRIVE | DETROIT | MI | 48235 | 313/533-7030 | 6/5/09 | 3,602 |
| 215 | SIMPLY FASHIONS | SOUTH SLAPPEY VILLAGE | 1030 WEST GORDON AVENUE, SUITE F | ALBANY | GA | 31701 | 229/446-9956 | 9/12/97 | 5840 |
| 216 | SIMPLY FASHIONS | WALNUT HILLS PLAZA | 2047 CRATER RD #104 | PETERSBURG | VA | 23805 | 804/862-8529 | 09/24/99 | 4680 |
| 218 | DOTS | SHOPS AT WHITE OAK VILLAGE | 4501 SOUTH LABURNUM AVE SUITE 560 | RICHMOND | VA | 23231 | 757/603-7020 | 1/30/15 | 4,552 |
| 219 | SIMPLY FASHIONS | COUNTRY CLUB PLAZA | 490 LINCOLN ST | WORCESTER | MA | 01613 | 508/735-9290 | 1/31/15 | 5,355 |
| 221 | SIMPLY FASHIONS | THE CROSSINGS AT HALLS FERRY | 10835 OLD HALLS FERRY RD, STE.A | ST. LOUIS | MO | 63136 | 314/867-7885 | 03/02/99 | 3000 |
| 223 | DOTS | CHICAGO | 741 & 743 EAST 47TH STREET | CHICAGO | IL | 60653 | 773-717-0299 | 02/27/15 | - |
| 224 | SIMPLY FASHIONS | SQUARE 67 | 2550 RED BIRD LANE, SUITE 207 | DALLAS | TX | 75237 | 214/330-9354 | 08/26/98 | 3720 |
| 225 | SIMPLY FASHIONS | GREENS CROSSROADS | 221 WEST GREENS ROAD | HOUSTON | TX | 77067 | 281/872-4744 | 9/25/09 | 3,915 |
| 227 | SIMPLY FASHIONS | PLAZA ON THE BLV | 8035 WEST FLORISSANT AVE, SUITE F & G | JENNINGS | MO | 63136 | 314/385-9597 | 11/3/06 | 3,200 |
| 228 | DOTS | NORTHGATE S/C | 339 SQUIRE ROAD | REVERE | MA | 02151 | 617/716-9973 | 11/22/14 | 4,200 |
| 229 | SIMPLY FASHIONS | JOYLAND S/C | 15550 JOY ROAD | DETROIT | MI | 48228 | 313/838-3836 | 2/27/98 | 3025 |
| 230 | SIMPLY FASHIONS | SILVER MILL COURT S/C | 6115 NORTH TEUTONIA AVE | MILWAUKEE | WI | 53209 | 414/527-6222 | 01/31/03 | 4,300 |
| 231 | SIMPLY FASHIONS | MARLOW HEIGHTS S/C | 3923 BRANCH AVENUE | TEMPLE HILLS | MD | 20748 | 301/316-2020 | 6/25/98 | 2979 |
| 233 | SIMPLY FASHIONS | WESTPORT COMMONS S/C | 3264 W. 87TH STREET | CHICAGO | IL | 60652 | 708/710-9119 | 9/19/14 | 3,500 |

Hilco Merchant Resources, LLC

4/10/2015

**Simply Fashions**
Exhibit 1

**Store List**

| Store # | Location Type | Name | Address | City | State | Zip | Phone | Open Date | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|
| 234 | SIMPLY FASHIONS | TOWNE SOUTH | 2525 SOUTH MONROE ST. STE. 20 & 21 | TALLAHASSEE | FL | 32301 | 850/656-7602 | 02/13/03 | 3,500 |
| 236 | SIMPLY FASHIONS | LAWNDALE PLAZA | 3230 WEST ROOSEVELT ROAD | CHICAGO | IL | 60624 | 773/638-1565 | 11/04/98 | 3200 |
| 237 | SIMPLY FASHIONS | BALTIMORE | 2331 CLEANLEIGH DR. | BALTIMORE | MD | 21234 | 443.826.8891 | 03/27/15 | - |
| 239 | SIMPLY FASHIONS | SOUTH WIND PLAZA | 5335 N. MILITARY TRAIL SPACE 31&32 | WEST PALM BEACH | FL | 33407 | 561/684-5399 | 04/10/98 | 3600 |
| 240 | SIMPLY FASHIONS | BUCKNER COMMONS | 9208 EAST RL THORNTON FREEWAY, STE.110 | DALLAS | TX | 75228 | 214/321-3733 | 02/27/04 | 4,500 |
| 241 | DOTS | TINLEY PARK PLAZA | 15967 SOUTH HARLEM AVE | TINLEY PARK | IL | 60477 | 312/718-1235 | 1/30/15 | 5,000 |
| 242 | SIMPLY FASHIONS | SOUTH PHILADELPHIA S/C | 2426 SOUTH 23RD STREET | PHILADELPHIA | PA | 19145 | 215/764-0260 | 3/1/14 | 2,380 |
| 246 | SIMPLY FASHIONS | CITY PLAZA | 3447 UNION BLVD | ST. LOUIS | MO | 63115 | 314/381-9088 | 11/09/98 | 3000 |
| 247 | SIMPLY FASHIONS | SPEEDWAY SUPERCENTER | 5824 CRAWFORDSVILLE RD | INDIANAPOLIS | IN | 46224 | 314/240-0334 | 11/17/06 | 3,600 |
| 248 | SIMPLY FASHIONS | FREESTANDING | 2000 E. 71ST STREET | CHICAGO | IL | 60649 | 773/324-9770 | 4/16/10 | 4,320 |
| 249 | DOTS | CROSSROADS CENTER | 6777 SPENCER HWY | PASADENA | TX | 77505 | 832/392-5687 | 1/30/15 | 3,000 |
| 252 | SIMPLY FASHIONS | JEWEL OSCO S/C | 117 WEST 87TH STREET | CHICAGO | IL | 60620 | 773/874-6063 | 05/12/98 | 6562 |
| 254 | DOTS | 30TH STREET S/C | 3034 CROMER AVE | CANTON | OH | 44709 | 234/804-2546 | 1/30/15 | 3,279 |
| 255 | DOTS | MANCHESTER PARKADE | 370 WEST MIDDLE TURNPIKE | MANCHESTER | CT | 06040 | 860/306-5958 | 2/11/15 | 4,691 |
| 256 | DOTS | SOUTHFIELD | 20176 W. 8 MILE ROAD | SOUTHFIELD | MI | 48075 | 248-945-0282 | 02/27/15 | - |
| 257 | SIMPLY FASHIONS | Baseline Plaza | 20212 W EIGHT MILE RD | SOUTHFIELD | MI | 48075 | 248/945-0282 | 09/25/98 | 2800 |
| 258 | SIMPLY FASHIONS | SHOPPES ON MAIN | 3662 EAST MAIN STREET, UNIT D | COLUMBUS | OH | 43213 | 614/231-2324 | 4/22/11 | 3,000 |
| 259 | SIMPLY FASHIONS | SOUTH DEKALB PLAZA | 2774 CANDLER RD | DECATUR | GA | 30034 | 404/212-3880 | 6/23/99 | 3000 |
| 262 | SIMPLY FASHIONS | MEADOWBROOK EAST | 6707 MEADOWBROOK DRIVE | FT. WORTH | TX | 76112 | 817/457-0580 | 9/19/03 | 4,875 |
| 263 | SIMPLY FASHIONS | CHARITON SQUARE | 4236 SOUTH BROADWAY | ST. LOUIS | MO | 63111 | 314/832-9969 | 09/19/03 | 2,160 |
| 264 | SIMPLY FASHIONS | LAMAR CROSSING | 2938 LAMAR AVE, SUITE 116 | MEMPHIS | TN | 38114 | 901/743-8466 | 5/19/06 | 4,264 |
| 265 | SIMPLY FASHIONS | WYOMING VILLAGE | 1242 28TH STREET SW | WYOMING | MI | 49509 | 616/531-6051 | 6/20/08 | 4,650 |
| 266 | SIMPLY FASHIONS | STATE STREET | 2524 STATE STREET | EAST ST. LOUIS | IL | 62205 | 618/875-5461 | 03/31/00 | 3000 |
| 268 | SIMPLY FASHIONS | EASTLAND CENTER | 18000 VERNIER RD SPACE #741 | HARPER WOODS | MI | 48225 | 313/527-1949 | 12/10/10 | 4,154 |
| 269 | SIMPLY FASHIONS | ST. STEPHENS SQUARE | 2312 ST. STEPHENS RD. SUITE 6 | MOBILE | AL | 36617 | 334/452-9331 | 06/23/00 | 2,977 |
| 270 | SIMPLY FASHIONS | HIGHLAND LAKES CENTER | 7459 WEST COLONIAL DRIVE | ORLANDO | FL | 32818 | 407/298-5200 | 6/3/11 | 3,032 |
| 271 | DOTS | CARRIAGE CROSSING MARKETPLACE | 10233 EAST SHELBY DR | COLLIERVILLE | TN | 38017 | 901/229-7596 | 1/30/15 | 4,080 |
| 272 | SIMPLY FASHIONS | ERDMAN PLAZA | 3933 ERMAN AVE | BALTIMORE | MD | 21213 | 410/276-1441 | 3/28/97 | 4,000 |
| 273 | DOTS | NORTHWEST CROSSING | 5762 HOLLISTER STREET | HOUSTON | TX | 77040 | 281/543-9144 | 1/30/15 | 4,000 |
| 274 | SIMPLY FASHIONS | WOODLAND VILLAGE | 6046-6048 WOODLAND AVENUE | PHILADELPHIA | PA | 19142 | 215/990-8309 | 11/20/14 | 2,964 |
| 275 | SIMPLY FASHIONS | CROSS COUNTRY PLAZA | 3201 MACON ROAD | COLUMBUS | GA | 31906 | 706/569-5800 | 05/04/02 | 3,906 |
| 278 | SIMPLY FASHIONS | EDENS PLAZA | 4105 WEST BELTLINE BLVD #50 | COLUMBIA | SC | 29204 | 803/251-2445 | 1/29/10 | 3,000 |
| 281 | SIMPLY FASHIONS | WHITEHAVEN PLAZA | 4275 ELVIS PRESLEY BLVD | MEMPHIS | TN | 38116 | 901/332-2273 | 05/04/02 | 3,410 |
| 282 | SIMPLY FASHIONS | RACEWAY PARK S/C | 13065 S. ASHLAND AVENUE | CALUMET PARK | IL | 60827 | 312/502-5380 | 10/03/14 | 4,000 |
| 283 | SIMPLY FASHIONS | ALBANY CROSSING | 244 CORDELE RD, SUITE 125 | ALBANY | GA | 31705 | 229/883-7722 | 5/13/11 | 2,800 |
| 284 | SIMPLY FASHIONS | OAKLAND POINTE | 362 TELEGRAPH ROAD | PONTIAC | MI | 48341 | 248/333-3131 | 9/15/06 | 5,340 |
| 285 | SIMPLY FASHIONS | ONE & OLNEY SQUARE | 5675 NORTH FRONT ST #100 | PHILADELPHIA | PA | 19120 | 267/353-3188 | 4/18/14 | 4,042 |
| 287 | DOTS | NORTHWEST CROSSING | 130 BLACKHORSE PIKE | AUDUBON | NJ | 08106 | 609/314-5040 | 1/30/15 | 4,037 |
| 288 | SIMPLY FASHIONS | CLEVELAND AVENUE CROSSING | 854 CLEVELAND AVENUE, SUITE 108 | EAST POINT | GA | 30344 | 404/780-4596 | 10/22/14 | 3,000 |
| 301 | SIMPLY FASHIONS | CLOVERLEAF S/C | 1814-A N. FRONTAGE ROAD | MERIDIAN | MS | 39301 | 601/693-6801 | 01/01/92 | 7380 |
| 302 | SIMPLY FASHIONS | BATESVILLE S/C | 103 KEATING ROAD | BATESVILLE | MS | 38606 | 662/563-0217 | 01/01/92 | 3000 |
| 303 | SIMPLY FASHIONS | NORTHTOWN PLAZA | 5510 NORTH FREEWAY | HOUSTON | TX | 77076 | 713/697-3451 | 7/05/90 | 3835 |
| 317 | SIMPLY FASHIONS | HAMMOND AIRE PLAZA | 9626 AIRLINE HIGHWAY, STE. C-3 | BATON ROUGE | LA | 70827 | 225/927-6216 | 03/30/93 | 6000 |
| 327 | SIMPLY FASHIONS | WALZEM PLAZA | 5334 WALZEM ROAD | SAN ANTONIO | TX | 78218 | 210/656-7141 | 01/01/92 | 4400 |
| 337 | DOTS | TOWN & COUNTRY | 3816 E. BROAD STREET | COLUMBUS | OH | 43213 | 740/919-1112 | 8/29/14 | 5,887 |
| 338 | DOTS | SOUTH PHILADELPHIA S/C | 2300 W. PASSYUNK AVE | PHILADELPHIA | PA | 19145 | 267/670-1143 | 8/1/14 | 4,428 |
| 343 | DOTS | EASTOWN S/C | 3954 LINDEN AVE | DAYTON | OH | 45432 | 937/307-9240 | 8/29/14 | 4,045 |
| 344 | DOTS | NORTHERN LIGHTS | 3487 CLEVELAND AVE | COLUMBUS | OH | 43224 | 614/802-7240 | 8/29/14 | 4,500 |

**Simply Fashions**
Exhibit 1

| | | | | | | | | | Store List |
|---|---|---|---|---|---|---|---|---|---|

| Store # | Location Type | Name | Address | City | State | Zip | Phone | Open Date | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|
| 348 | DOTS | CENTURY CENTER | 373 MEMORIAL AVENUE | W. SPRINGFIELD | MA | 01089 | 413/313-4745 | 11/8/14 | 3,550 |
| 360 | SIMPLY FASHIONS | FIVE POINTS WEST S/C | 2209 BESSEMER ROAD | BIRMINGHAM | AL | 35208 | 205/780-4206 | 08/30/90 | 4000 |
| 365 | SIMPLY FASHIONS | CROSS CREEK | 5648 GEORGETOWN ROAD | INDIANAPOLIS | IN | 46254 | 317/388-0444 | 09/19/03 | 2,400 |
| 369 | SIMPLY FASHIONS | FREESTANDING | 2419 MURPHY MILL RD | DOTHAN | AL | 36303 | 334/792-7332 | 10/15/2010 | 4,030 |
| 375 | SIMPLY FASHIONS | ROSE PLAZA | 4025 S. BROADWAY AVENUE | TYLER | TX | 75701 | 903/581-2778 | 4/30/92 | 2700 |
| 377 | DOTS | LINCOLN S/C | 26130 GREENFIELD ROAD | OAK PARK | MI | 48237 | 313/410-4264 | 8/29/14 | 4,800 |
| 500 | SIMPLY FASHIONS | ANDERSON ROAD PLAZA | 2604 ANDERSON ROAD | GREENVILLE | SC | 29611 | 864/269-1204 | 01/01/92 | 5,900 |
| 501 | SIMPLY FASHIONS | METRO PLAZA | 1634 EAST 63RD STREET | KANSAS CITY | MO | 64110 | 816/363-0780 | 12/15/12 | 3,000 |
| 504 | SIMPLY FASHIONS | HIGHLAND PARK PLACE | 14515 SOUTH WOODWARD AVENUE | DETROIT | MI | 48203 | 313/865-6550 | 08/04/05 | 5111 |
| 506 | DOTS | LIVONIA MARKETPLACE | 29508 SEVEN MILE ROAD | LIVONIA | MI | 48152 | 248/412-3564 | 10/24/14 | 4,000 |
| 507 | SIMPLY FASHIONS | EDISTO VILLAGE SHOPPING CENTER | 403 RIVERSIDE DRIVE S.W. | ORANGEBURG | SC | 29115 | 803/533-0700 | 07/09/05 | 3328 |
| 508 | DOTS | WESTSHORE PLAZA | 1795 E. SHERMAN BLVD | MUSKEGON | MI | 49444 | 231/215-6635 | 02/13/15 | 6,400 |
| 509 | DOTS | KLINE PLAZA | 130 B KLINE VILLAGE | HARRISBURG | PA | 17104 | 717/317-3256 | 11/19/14 | 5,200 |
| 510 | DOTS | CLINTON POINTE | 33816 GRATIOT AVENUE | CLINTON TOWNSHIP | MI | 48035 | 586/348-2803 | 10/24/14 | 3,250 |
| 511 | SIMPLY FASHIONS | OAK STREET SHOPPING CENTER | 845 OAK STREET | ATLANTA | GA | 30310 | 404/753-0408 | 3/9/1995 | 3420 |
| 512 | DOTS | NORGATE PLAZA | 7235 N. KEYSTONE AVE. SUITE H | INDIANAPOLIS | IN | 46240 | 317/448-3811 | 11/8/14 | 4,500 |
| 513 | SIMPLY FASHIONS | MLK PLAZA | 1300 NORTH GRAND AVE | SAINT LOUIS | MO | 63113 | 314-535-5758 | 6/13/2003 | 3000 |
| 514 | SIMPLY FASHIONS | NORTH CHARLESTON CENTER | 5900 RIVERS AVE-SUITE H | NORTH CHARLESTON | SC | 29406 | 843-554-0730 | 4/1/1998 | 3200 |
| 515 | SIMPLY FASHIONS | SUMTER SQUARE SHOPPING CENTER | 1009 BROAD STREET | SUMTER | SC | 29150 | 803/773-0972 | 5/28/1992 | 2875 |
| 516 | DOTS | COTTMAN & BUSELTON S/C | 2121 COTTMAN AVE | PHILADELPHIA | PA | 19149 | 267/572-0157 | 1/31/15 | 4,426 |
| 520 | SIMPLY FASHIONS | BORDEAUX SHOPPING CENTER | 3200 CLARKSVILLE HIGHWAY | NASHVILLE | TN | 37208 | 615/726-1184 | 5/13/1992 | 3000 |
| 523 | SIMPLY FASHIONS | WESTLAND SHOPPING CENTER | 31284 MICHIGAN AVENUE | WESTLAND | MI | 48185 | 734/728-3634 | 3/29/2000 | 3000 |
| 524 | DOTS | THE SHOPS AT STERLING PONDS | 33329 VAN DYKE AVE | STERLING HEIGHTS | MI | 48312 | 586/212-3674 | 10/24/14 | 4,803 |
| 525 | SIMPLY FASHIONS | NORTHWEST PLAZA | 3269 W. SIEBENTHALER AVE., UNIT 5 | DAYTON | OH | 45406 | 937/274-0096 | 1/28/1996 | 2864 |
| 526 | SIMPLY FASHIONS | DORCHESTER SQUARE | 4391 DORCHESTER ROAD | NORTH CHARLESTON | SC | 29405 | 843-566-0028 | 08/01/05 | 2970 |
| 527 | DOTS | CANTON CENTRE | 4060 TUSCARAWAS STREET W. | CANTON | OH | 44708 | 234/850-4204 | 10/3/14 | 5,086 |
| 528 | SIMPLY FASHIONS | GEORGETOWN PLAZA SHOPPING CENTER | 4941 WEST 38TH STREET | INDIANAPOLIS | IN | 46254 | 317/328-8958 | 4/1/1998 | 4200 |
| 529 | SIMPLY FASHIONS | EASTGATE SHOPPING CENTER | 3134 LOUISVILLE AVENUE | MONROE | LA | 71201 | 318/362-1206 | 7/31/2003 | 4500 |
| 531 | DOTS | MIDDLESEX S/C | 1310 EASTERN BLVD | BALTIMORE | MD | 21221 | 410/999-5097 | 10/25/14 | 3,000 |
| 535 | SIMPLY FASHIONS | CRICHTON PLAZA | 3038 A  SPRINGHILL AVE. | MOBILE | AL | 36607 | 251/479-5811 | 8/24/1995 | 3300 |
| 537 | SIMPLY FASHIONS | CHESAPEAKE CROSSING  SHOPPING CENTER | 1949 S. MILITARY HWY. | CHESAPEAKE | VA | 23320 | 757/545-1863 | 6/27/1999 | 3000 |
| 538 | SIMPLY FASHIONS | CROSSROADS PLAZA | 1958 STONE ROSE DRIVE | ROCKY MOUNT | NC | 27802 | 252/446-6001 | 5/26/1993 | 4000 |
| 539 | SIMPLY FASHIONS | HATTIESBURG SHOPPING CENTER | 5891 U.S. HIGHWAY 49 | HATTIESBURG | MS | 39402 | 601/268-3725 | 10/23/2000 | 2700 |
| 541 | DOTS | LIBERTY CENTER | 3728 LIBERTY STREET | ERIE | PA | 16508 | 814/450-9296 | 11/25/14 | 5,796 |
| 543 | SIMPLY FASHIONS | LEHMBERG CROSSING | 993 EAST ALABAMA STREET | EAST COLUMBUS | MS | 39702 | 662/329-3237 | 4/26/2001 | 3200 |
| 544 | DOTS | SHOP CITY PLAZA | 179 SHOP CITY PLAZA | SYRACUSE | NY | 13206 | 315/412-5800 | 10/10/14 | 4,959 |
| 545 | DOTS | GREAT SOUTHERN S/C | 3831 SOUTH HIGH STREET | COLUMBUS | OH | 43207 | 614/867-2491 | 10/3/14 | 4,500 |
| 549 | SIMPLY FASHIONS | FREEDOM SQUARE SHOPPING CENTER | 1615 SOUTH IRBY STREET | FLORENCE | SC | 29505 | 843-661-7847 | 10/26/1995 | 3440 |
| 554 | DOTS | TOWN CENTER MARKET | 2821 CHASTAIN MEADOWS PKWY NW #120 | MARIETTA | GA | 30066 | 404/858-2805 | 10/6/14 | 4,800 |
| 555 | SIMPLY FASHIONS | IROQUOIS MANOR | 5326 SOUTH THIRD STREET | LOUISVILLE | KY | 40214 | 502/368-7228 | 9/27/1990 | 3360 |
| 556 | SIMPLY FASHIONS | WESLEY CHAPEL SQUARE SHOPPING CENTER | 2389 WESLEY CHAPEL ROAD | DECATUR | GA | 30035 | 770/593-0905 | 8/02/2005 | 2800 |
| 558 | SIMPLY FASHIONS | SHELBY PLAZA | 4673 ELVIS PRESLEY BLVD. | MEMPHIS | TN | 38116 | 901/396-7433 | 7/28/1993 | 2800 |
| 559 | DOTS | AUSTINTOWN PLAZA | 6000 MAHONING AVENUE #252 | YOUNGSTOWN | OH | 44515 | 330/369-6989 | 10/29/14 | 4,500 |
| 562 | SIMPLY FASHIONS | NORTH POINT CENTER | 3409 DICKERSON PIKE, STE 106 | NASHVILLE | TN | 37207 | 615/227-8765 | 5/13/2004 | 4000 |
| 563 | DOTS | CONSUMER SQUARE WEST | 3650 SOLDANO BLVD | COLUMBUS | OH | 43228 | 516/507-0202 | 2/13/15 | 3,685 |
| 565 | SIMPLY FASHIONS | BROADWAY  CENTER | 2043-A  BROADWAY | KNOXVILLE | TN | 37917 | 865/637-7025 | 8/4/1994 | 3000 |
| 571 | SIMPLY FASHIONS | WESTWOOD SHOPPING CENTER | 3709 JEWELLA AVE | SHREVEPORT | LA | 71109 | 318/631-0970 | 4/19/2000 | 4055 |
| 575 | SIMPLY FASHIONS | VILLAGE SHOPPING CENTER | 3552 VILLAGE COURT | GARY | IN | 46408 | 219/884-5180 | 6/14/2000 | 4550 |

**Simply Fashions**
**Exhibit 1**

| | | | | | | | | | Store List |
|---|---|---|---|---|---|---|---|---|---|

| Store # | Location Type | Name | Address | City | State | Zip | Phone | Open Date | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|
| 576 | SIMPLY FASHIONS | SOUTHGATE SHOPPING CENTER | 4439 WEST FUQUA ROAD | HOUSTON | TX | 77045 | 713/413-3397 | 9/26/2000 | 3300 |
| 577 | SIMPLY FASHIONS | HICKORY RIDGE CROSSING | 3641 HICKORY HILL | MEMPHIS | TN | 38115 | 901/566-9443 | 8/05/00 | 4000 |
| 581 | SIMPLY FASHIONS | GAINSVILLE SHOPPING CENTER | 1208 NORTH MAIN STREET, UNIT 1208 | GAINESVILLE | FL | 32608 | 352/264-7990 | 7/9/05 | 3000 |
| 584 | SIMPLY FASHIONS | SOUTHGATE PLAZA | 303-B SOUTH SLAPPEY DRIVE | ALBANY | GA | 31701 | 229/446-2340 | 4/25/2002 | 3456 |
| 595 | SIMPLY FASHIONS | PARKWAY PLAZA | 1223 SILAS CREEK PARKWAY | WINSTON-SALEM | NC | 27127 | 336/724-3676 | 6/24/06 | 5,630 |
| 599 | SIMPLY FASHIONS | COURTHOUST SQUARE | 100 WEST ARIZONA AVE | RUSTON | LA | 71270 | 318/255-5955 | 6/17/05 | 3,315 |
| 617 | SIMPLY FASHIONS | ASHER | 6420 COLONEL GLENN ROAD, SUITE 5 | LITTLE ROCK | AR | 72204 | 501/568-7334 | 7/1/05 | 2,400 |
| **247** | | | | | | | | | **5,125** |

**Simply Fashions**
**Exhibit 3.1(b)**

| Merchandise Threshold Schedule | | |
|---|---|---|
| Retail Value | Adjustment Points | Adjusted Guaranty |
| 16,000,000 | | 27.50% |
| 15,900,000 | 0.16% | 27.34% |
| 15,800,000 | 0.16% | 27.18% |
| 15,700,000 | 0.16% | 27.02% |
| 15,600,000 | 0.17% | 26.85% |
| 15,500,000 | 0.17% | 26.68% |
| 15,400,000 | 0.18% | 26.50% |
| 15,300,000 | 0.18% | 26.32% |
| 15,200,000 | 0.19% | 26.13% |
| 15,100,000 | 0.19% | 25.94% |
| 15,000,000 | 0.20% | 25.74% |

*Note(s):*
*1. Adjustments between the increments shall be on a prorata basis.*
*3. In the event that the Retail value of the Merchandise is less than $15,000,000, each*
*$100,000 (or pro rata portion thereof) increment shall decrease the Guaranty by 0.23%.*

Hilco Merchant Resources, LLC                                                          4/22/2015

Simply Fashions
Exhibit 4.1(c)

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Occupancy Per Diem | | | | | | | |

| Store # | Store Name | RENT | AD VALOREM TAX | FILTER SERVICE | INSURANCE - BUSINESS | LICENSE - CITY | LICENSE- STATE & COUNTY | MAINTENANCE | SECURITY | TELEPHONE | UTILITIES | WASTE PICK UP | Total Occupancy | % Rent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12 | CHURCH SQUARE S/C | 129 | - | - | 3 | 1 | 1 | 2 | - | - | 21 | - | 157 | |
| 14 | LEE STREET SHOPPING CTR | 49 | 2 | - | 4 | - | 2 | 3 | 1 | 2 | 23 | 3 | 89 | |
| 15 | INWOOD CENTRAL | - | 3 | - | 4 | - | 0 | 4 | 1 | 2 | 17 | 2 | 32 | 5% |
| 16 | PEMBERTON SQUARE | 55 | 2 | - | 4 | 0 | - | 4 | - | 2 | 16 | - | 83 | |
| 18 | GATEWAY SHOPPING CENTER | 82 | 6 | - | 4 | 0 | 1 | 2 | 1 | 2 | 42 | - | 140 | |
| 19 | AMERICAN WAY PLAZA | 115 | 1 | - | 4 | 1 | 1 | 42 | 1 | 2 | 28 | 3 | 198 | |
| 20 | JEFFERSON SQUARE S/C | 66 | 2 | - | 4 | 0 | - | 1 | 1 | 2 | 17 | 7 | 99 | |
| 21 | EISENHOWER CROSSING | 166 | 17 | - | 8 | 2 | - | 26 | - | 1 | 27 | 1 | 249 | |
| 22 | FREESTANDING | 86 | - | - | 3 | 0 | - | 4 | 1 | 2 | 44 | 8 | 148 | |
| 24 | CENTER CITY | 136 | 16 | - | 4 | 1 | 1 | 13 | 1 | 2 | 18 | 3 | 195 | |
| 26 | TAMPA FESTIVAL CENTRE | 115 | 21 | - | 10 | 1 | 0 | 24 | 1 | 2 | 25 | 8 | 208 | |
| 27 | GENTILLY S/C | 167 | 16 | - | 4 | 3 | 0 | 34 | 1 | 2 | 18 | 6 | 251 | |
| 28 | MERIDIAN MARKETPLACE | 66 | 23 | - | 7 | 0 | - | 6 | 1 | 2 | 23 | 3 | 130 | |
| 31 | EASTGATE S/C | 85 | - | - | 4 | - | - | 4 | 1 | 1 | 50 | 2 | 146 | |
| 32 | FOWLERS PLAZA | - | 2 | - | 4 | 1 | - | 8 | 1 | 2 | 24 | 3 | 43 | 3% |
| 33 | CHATHAM VILLAGE SQUARE | 275 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 331 | |
| 36 | LINDELL MARKETPLACE | 122 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 178 | |
| 37 | GENTILLY S/C | 115 | 14 | - | 12 | 2 | 0 | 17 | 1 | 2 | 19 | - | 181 | |
| 39 | FREESTANDING | 79 | 28 | - | 4 | 2 | - | 8 | 1 | 2 | 41 | 4 | 168 | |
| 40 | BRICKTOWN SQUARE | 304 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 360 | |
| 42 | EAST FOREST PLAZA | 193 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 250 | |
| 43 | LINCOLN S/C | - | 29 | - | 30 | 1 | - | 32 | - | 1 | 36 | 2 | 131 | 4% |
| 44 | N/A | 73 | 10 | - | 5 | 0 | - | 7 | 1 | 2 | 22 | 3 | 122 | |
| 45 | NORTH EASTWOOD PLAZA | - | 1 | - | 4 | 0 | - | 3 | 1 | 2 | 21 | 2 | 34 | 5% |
| 46 | REDFORD PLAZA | 121 | 13 | - | 8 | - | - | 30 | 1 | 2 | 34 | 2 | 212 | |
| 47 | SALEM CONSUMER SQUARE | - | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 56 | 5% |
| 48 | SOUTHGATE SHOPPING CENTER | 104 | 1 | - | 4 | 0 | - | 4 | 1 | 2 | 39 | 2 | 157 | |
| 49 | OVERBROOK PLAZA | 122 | 5 | - | 1 | 1 | - | 3 | - | - | 31 | - | 163 | |
| 52 | VICTORY CROSSING S/C | 184 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 240 | |
| 53 | 95TH & JEFFREY | 75 | 23 | - | 4 | 0 | - | 24 | 1 | 2 | 15 | 4 | 148 | |
| 55 | SUPER 1 FOODS S/C | 115 | 7 | - | 4 | 3 | 0 | 5 | 1 | 2 | 32 | 4 | 173 | |
| 56 | NORTHWOOD S/C | 137 | 4 | - | 4 | 0 | - | 4 | 1 | 2 | 38 | - | 190 | |
| 57 | AMERICANA PLAZA | - | 6 | - | 9 | - | 0 | 14 | 1 | 2 | 19 | 2 | 53 | 4% |
| 58 | FAMILY DOLLAR BUILDING | 46 | 3 | - | 4 | 0 | - | 3 | 1 | 4 | 26 | 3 | 89 | |
| 59 | LINWOOD SQUARE S/C | 187 | 1 | - | 4 | 1 | - | 9 | 1 | 2 | 68 | - | 272 | |
| 62 | MT. CLARE JUNCTION | - | 5 | - | 4 | 0 | 1 | 5 | 1 | 2 | 19 | - | 37 | 7% |
| 63 | THE LANDINGS | 190 | - | - | 4 | - | - | - | 1 | 2 | 17 | 3 | 216 | |
| 65 | N.W. JUNCTION S/C | 83 | 8 | - | 6 | 0 | - | 17 | 1 | 2 | 17 | 2 | 136 | |
| 68 | WYANDOTTE PLAZA | 98 | - | - | 3 | 0 | - | 4 | 1 | 2 | 27 | 3 | 138 | |
| 70 | OAKLAND POINTE PLAZA | 204 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 260 | |
| 72 | NORTHSIDE PLAZA | 93 | 1 | - | 4 | - | 0 | 4 | 1 | 2 | 33 | 3 | 141 | |
| 75 | MARCUS PLAZA | 36 | - | - | 4 | - | - | 12 | - | - | 9 | 0 | 61 | |
| 76 | WATERTOWER PLAZA | 203 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 260 | |
| 77 | GATEWAY MARKETPLACE | 203 | 49 | - | 5 | 1 | - | - | 1 | 1 | 22 | - | 282 | |
| 79 | WHITEHALL S/C | 220 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 276 | |
| 80 | ROUNDTREE PLACE | 178 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 234 | |
| 82 | SOUTHLAND MALL | 121 | 8 | - | 4 | 1 | 1 | 8 | - | 1 | 27 | - | 170 | |
| 85 | K-MART PLAZA | 49 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 106 | |
| 86 | BURLINGTON PLAZA | 82 | 7 | - | 5 | - | 1 | 10 | 1 | 2 | 27 | 2 | 136 | |
| 91 | CHICAGO HEIGHTS HILLTOP PLAZA | 137 | - | - | 4 | 0 | - | 10 | 1 | 2 | 8 | 3 | 166 | |
| 92 | NEWPORT S/C | 56 | - | - | 3 | 1 | - | 3 | - | 1 | 8 | - | 71 | |
| 94 | PINE HILLS MARKETPLACE | 58 | 4 | - | 4 | 0 | - | 3 | 1 | 2 | 29 | 2 | 102 | |
| 95 | CAHOKIA VILLAGE S/C | 66 | - | - | 4 | 1 | - | 4 | 1 | 2 | 19 | 2 | 99 | |
| 97 | THE SHOPS AT WHITE OAK VILLAGE | 82 | 2 | - | 4 | - | 1 | 3 | 1 | 2 | 16 | 4 | 114 | |
| 99 | GREENWOOD WEST | 49 | 3 | - | 4 | 0 | - | 7 | 1 | 2 | 11 | - | 77 | |
| 100 | CHERRYDALE POINT S/C | 203 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 260 | |
| 101 | NEWMARKET SOUTH S/C | 77 | 6 | - | 4 | 2 | - | 13 | 1 | 2 | 15 | 2 | 122 | |

1 of 5

Simply Fashions
Exhibit 4.1(c)

**Occupancy Per Diem**

| Store # | Store Name | RENT | AD VALOREM TAX | FILTER SERVICE | INSURANCE - BUSINESS | LICENSE - CITY | LICENSE-STATE & COUNTY | MAINTENANCE | SECURITY | TELEPHONE | UTILITIES | WASTE PICK UP | Total Occupancy | % Rent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 102 | FOOD 4 LESS S/C | 253 | - | - | 4 | - | - | 4 | - | 1 | 16 | - | 278 | |
| 104 | SOUTHLAKE MALL | 113 | - | - | 4 | 4 | - | 7 | - | 2 | 20 | 3 | 151 | |
| 106 | RACEWAY PARK S/C | 148 | 49 | - | 3 | 1 | - | 20 | 1 | 1 | 21 | 3 | 247 | |
| 107 | POINCIANA PLAZA | - | 17 | - | 7 | 1 | 0 | 13 | 1 | 2 | 26 | 4 | 70 | 3% |
| 109 | HERITAGE PLACE S/C | 206 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 262 | |
| 110 | POPLAR PLAZA S/C | 79 | 3 | - | 4 | - | - | 13 | 1 | 2 | 26 | 2 | 130 | |
| 111 | LANGLEY SQUARE | 100 | 1 | - | 4 | 1 | - | 3 | 1 | 2 | 16 | - | 128 | |
| 114 | NORTH POINTE S/C | 90 | 4 | - | 4 | 1 | - | 12 | 1 | 2 | 17 | 2 | 132 | |
| 116 | SPENCER SQUARE | 220 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 276 | |
| 118 | VILLAGE S/C | - | - | - | 3 | 1 | 0 | 5 | - | 1 | 40 | 3 | 54 | 8% |
| 122 | LYNNHAVEN NORTH S/C | 166 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 222 | |
| 123 | CEDAR HILLS S/C | 93 | - | - | 4 | 5 | - | 4 | - | - | 33 | 0 | 139 | |
| 124 | ROEBUCK MARKETPLACE | 96 | 1 | - | 4 | 1 | 0 | 3 | 1 | 2 | 23 | - | 130 | |
| 126 | FREESTANDING | 165 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 222 | |
| 127 | RIVER COMMONS | 56 | 10 | - | 7 | 2 | 0 | 5 | 1 | 2 | 18 | 4 | 104 | |
| 128 | EASTLAND HILL CENTER | 99 | 19 | - | 4 | 2 | 1 | 23 | 1 | 2 | 22 | 4 | 176 | |
| 129 | WEST TOWN PLAZA | 47 | 2 | - | 4 | - | - | 35 | 1 | 2 | 25 | 2 | 119 | |
| 130 | GRAND BOULEVARD PLAZA | 149 | 34 | - | 4 | 0 | - | 28 | 1 | 2 | 23 | 4 | 244 | |
| 133 | CAPITOL PLAZA | 47 | 0 | - | 4 | 2 | 0 | 18 | 1 | 2 | 33 | 3 | 111 | |
| 137 | PARKWAY PLAZA | 38 | 1 | - | 4 | 1 | 0 | 5 | 1 | 2 | 21 | 3 | 75 | |
| 142 | N/A | 168 | 3 | - | 4 | 1 | 0 | 3 | 1 | 2 | 28 | 4 | 213 | |
| 139 | DODGE PLAZA | 104 | 3 | - | 4 | 0 | 0 | 2 | 1 | 2 | 15 | 3 | 135 | |
| 141 | FOOD WORLD PLAZA SOUTH | 70 | 4 | - | 4 | 2 | 0 | 10 | 1 | 2 | 23 | 3 | 118 | |
| 144 | FRAYSER PLAZA | 74 | 7 | - | 5 | 1 | 1 | 16 | 1 | 2 | 24 | 3 | 133 | |
| 146 | IVES DAIRY CROSSING S/C | 104 | 7 | - | 3 | 7 | - | 9 | - | 0 | 15 | 2 | 147 | |
| 148 | SHOPS AT NORTHEAST VILLAGE | 110 | 1 | - | 4 | 3 | - | 4 | 1 | 2 | 32 | - | 157 | |
| 151 | TOWN & COUNTRY PLAZA | 66 | 10 | - | 9 | - | 0 | 9 | 1 | 2 | 26 | 4 | 127 | |
| 153 | SHOPPES AT GARNER | 188 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 244 | |
| 154 | NORTHLINE CROSSING S/C | 267 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 324 | |
| 155 | CANE RUN | 90 | 2 | - | 4 | - | - | 2 | 1 | 2 | 30 | 2 | 133 | |
| 157 | EASTOVER S/C | 192 | 17 | - | 5 | 2 | 0 | 20 | 1 | 2 | 25 | 5 | 269 | |
| 162 | STEELYARD COMMONS S/C | 339 | 81 | - | 3 | - | - | 54 | - | 1 | 40 | 9 | 529 | |
| 159 | WESTERN HILLS MALL | 98 | 0 | - | 4 | 1 | 0 | 3 | - | 2 | 38 | 1 | 148 | |
| 160 | THE SHOPPES OF LIBERTY CITY | 152 | 35 | - | 16 | 4 | 0 | 18 | 1 | 2 | 23 | - | 252 | |
| 161 | BLUE PARKWAY TOWN CENTER | 104 | 14 | - | 5 | 1 | - | 26 | 1 | 2 | 18 | - | 170 | |
| 162 | GRIGGS ROAD S/C | 181 | 17 | - | 13 | 2 | - | 27 | 1 | 2 | 24 | 4 | 272 | |
| 163 | MADISON SQUARE | 69 | 7 | - | 7 | 2 | 0 | 10 | 1 | 2 | 34 | 4 | 135 | |
| 164 | SELMA MALL | 54 | 0 | - | 4 | 1 | 0 | 15 | 1 | 2 | 22 | 4 | 104 | |
| 165 | FAMILY DOLLAR CENTER | 42 | 4 | - | 4 | 0 | - | 3 | 1 | 2 | 28 | 2 | 86 | |
| 166 | LANTANA VILLAGE SQUARE | - | 1 | - | 4 | 1 | 0 | 3 | 1 | 2 | 26 | 5 | 42 | 3% |
| 167 | AZALEA SHOPPING CENTER | - | 4 | - | 5 | 1 | - | 13 | 1 | 2 | 19 | 4 | 48 | 3% |
| 170 | TAYLOR COMMONS | 192 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 248 | |
| 173 | EUTAW VILLAGE | 119 | 1 | - | 4 | 0 | - | 7 | 1 | 2 | 21 | 3 | 157 | |
| 174 | NORTHSIDE SHOPPING CENTRE | 176 | 20 | - | 13 | 0 | 0 | 30 | 1 | 2 | 29 | - | 271 | |
| 175 | LAMAR AIRWAYS S/C | 103 | 13 | - | 6 | 1 | 1 | 23 | 1 | 2 | 22 | 3 | 174 | |
| 177 | STONY ISLAND PLAZA | 219 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 276 | |
| 178 | WEST ALLIS | 216 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 272 | |
| 180 | WEST RIDGE | 99 | 12 | - | 6 | - | - | 19 | 1 | 2 | 25 | 2 | 164 | |
| 182 | LAUDERHILL MALL | 151 | 9 | - | 4 | 2 | 0 | 4 | 1 | 2 | 30 | 6 | 208 | |
| 183 | SAVE A LOT CTR | 88 | - | - | 4 | 0 | - | - | 1 | 2 | 22 | - | 117 | |
| 184 | MODEL T PLAZA | 179 | - | - | 3 | 2 | - | 26 | - | 1 | 16 | 2 | 230 | |
| 185 | KING SHOPPING CENTER | 95 | 25 | - | 4 | - | 0 | 32 | 1 | 2 | 39 | 1 | 199 | |
| 186 | SOUTHGATE USA S/C | 121 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 177 | |
| 187 | THRUWAY PLAZA | 227 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 283 | |
| 188 | MIRACLE MILE S/C | 237 | - | - | 2 | 0 | - | 5 | - | - | 15 | 4 | 264 | |
| 189 | MARSHFIELD PLAZA | 165 | 38 | - | 7 | 1 | - | 37 | 1 | 2 | 21 | 4 | 275 | |
| 190 | SOUTHERN PLAZA | 196 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 252 | |

**Simply Fashions**
**Exhibit 4.1(c)**

| Occupancy Per Diem |
|---|

| Store # | Store Name | RENT | AD VALOREM TAX | FILTER SERVICE | INSURANCE - BUSINESS | LICENSE - CITY | LICENSE- STATE & COUNTY | MAINTENANCE | SECURITY | TELEPHONE | UTILITIES | WASTE PICK UP | Total Occupancy | % Rent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 191 | FONDREN SOUTHWEST VILLAGE | 188 | 14 | - | 5 | 2 | - | 16 | - | 1 | 15 | 4 | 245 | |
| 192 | VILLAGE GREEN | 69 | 1 | - | 4 | 1 | 0 | 4 | 1 | 2 | 34 | 2 | 119 | |
| 193 | N/A | 86 | - | - | 4 | - | - | 22 | 1 | 2 | 29 | 3 | 147 | |
| 196 | DOLPHIN PLAZA | 51 | 10 | - | 6 | 7 | 1 | 13 | - | 1 | 22 | 5 | 117 | |
| 197 | BOSSIER TOWN CENTER | 127 | 4 | - | 4 | 2 | 0 | 17 | 1 | 2 | 25 | 4 | 186 | |
| 198 | GATEWAY | 50 | 11 | - | 7 | 1 | 1 | 17 | 1 | 2 | 30 | 3 | 120 | |
| 199 | BEL AIR S/C | 71 | 0 | - | 4 | 4 | - | 4 | 1 | 2 | 23 | 2 | 111 | |
| 200 | MARKETPLACE AT SMYRNA | 275 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 331 | |
| 201 | GALLERY AT WARREN CONNER | 178 | 13 | - | 4 | 0 | - | 21 | 1 | 2 | 32 | 4 | 255 | |
| 203 | ELLIS AVENUE PLAZA | 77 | 5 | - | 4 | 0 | - | 3 | 1 | 2 | 24 | 3 | 119 | |
| 204 | RIVERVIEW PLAZA | 56 | 0 | - | 4 | 0 | - | 3 | 1 | 2 | 25 | 1 | 93 | |
| 205 | CULLEN PLAZA | 127 | 15 | - | 9 | 1 | - | 25 | 1 | 2 | 15 | 1 | 197 | |
| 207 | THE COMMONS ROUTE 20 | 43 | 1 | - | 4 | 1 | - | 4 | 1 | 2 | 34 | 2 | 91 | |
| 208 | JEFFERSON VILLAGE | 134 | - | - | 4 | - | - | 2 | - | - | 14 | - | 154 | |
| 212 | ROYAL TOWN CENTER | 137 | 1 | - | 4 | - | - | 3 | 1 | 2 | 22 | 3 | 172 | |
| 213 | COLLEGE PARK COMMONS | 95 | 2 | - | 4 | - | - | 3 | 1 | 2 | 20 | 3 | 129 | |
| 215 | SOUTH SLAPPEY VILLAGE | 78 | 10 | - | 7 | 0 | - | 9 | 1 | 2 | 29 | 2 | 138 | |
| 216 | WALNUT HILLS PLAZA | 107 | 2 | - | 4 | 2 | 3 | 6 | 1 | 2 | 22 | 2 | 150 | |
| 218 | SHOPS AT WHITE OAK VILLAGE | 244 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 300 | |
| 219 | COUNTRY CLUB PLAZA | 209 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 265 | |
| 221 | THE CROSSINGS AT HALLS FERRY | 133 | 23 | - | 5 | 1 | - | 21 | 1 | 2 | 14 | 2 | 201 | |
| 223 | CHICAGO | 258 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 314 | |
| 224 | SQUARE 67 | 68 | 10 | - | 7 | 0 | - | 18 | 1 | 0 | 17 | 2 | 124 | |
| 225 | GREENS CROSSROADS | 93 | 3 | - | 4 | 1 | - | 4 | 1 | 2 | 19 | 2 | 130 | |
| 227 | PLAZA ON THE BLV | 155 | 20 | - | 4 | 1 | - | 32 | 1 | 2 | 15 | - | 229 | |
| 228 | NORTHGATE S/C | 289 | 35 | - | 2 | 5 | - | 25 | - | - | 5 | 0 | 360 | |
| 229 | JOYLAND S/C | 130 | 1 | - | 4 | 2 | - | 3 | 1 | 2 | 27 | 3 | 173 | |
| 230 | SILVER MILL COURT S/C | 80 | 0 | - | 4 | 0 | - | 24 | 1 | 2 | 41 | 4 | 157 | |
| 231 | MARLOW HEIGHTS S/C | 118 | 2 | - | 4 | - | 0 | 3 | 1 | 2 | 18 | 5 | 153 | |
| 233 | WESTPORT COMMONS S/C | 112 | - | - | 3 | 1 | - | 6 | - | 1 | 18 | - | 141 | |
| 234 | TOWNE SOUTH | - | 2 | - | 4 | 0 | - | 4 | 1 | 2 | 27 | 1 | 42 | 3% |
| 235 | LAWNDALE PLAZA | 211 | 31 | - | 4 | 0 | - | 54 | 1 | 2 | 19 | - | 322 | |
| 236 | BALTIMORE | 187 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 243 | |
| 239 | SOUTH WIND PLAZA | 78 | 5 | - | 4 | 1 | 0 | 3 | 1 | 2 | 16 | - | 109 | |
| 240 | BUCKNER COMMONS | - | 15 | - | 5 | 0 | - | 17 | 1 | 2 | 22 | - | 63 | 3% |
| 241 | TINLEY PARK PLAZA | 187 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 243 | |
| 242 | SOUTH PHILADELPHIA S/C | 78 | 6 | - | 3 | 2 | - | 8 | 1 | 2 | 24 | 6 | 129 | |
| 246 | CITY PLAZA | 151 | 22 | - | 6 | 1 | 1 | 53 | 1 | 2 | 17 | 2 | 255 | |
| 247 | SPEEDWAY SUPERCENTER | 48 | 1 | - | 4 | 0 | - | 3 | 1 | 2 | 22 | 2 | 81 | |
| 248 | FREESTANDING | 66 | - | - | 4 | 0 | - | 2 | 1 | 2 | 28 | 4 | 108 | |
| 249 | CROSSROADS CENTER | 132 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 188 | |
| 253 | JEWEL OSCO S/C | 165 | 43 | - | 4 | 0 | - | 102 | 1 | 2 | 39 | 7 | 363 | |
| 254 | 30TH STREET S/C | 110 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 166 | |
| 255 | MANCHESTER PARKADE | 184 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 240 | |
| 256 | SOUTHFIELD | - | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 56 | 4% |
| 257 | Baseline Plaza | 102 | 7 | - | 4 | 0 | - | 24 | 1 | 2 | 16 | - | 155 | |
| 258 | SHOPPES ON MAIN | 88 | - | - | 4 | - | - | 5 | 1 | 2 | 19 | - | 118 | |
| 259 | SOUTH DEKALB PLAZA | 88 | 9 | - | 4 | - | 1 | 21 | 1 | 2 | 24 | 3 | 152 | |
| 262 | MEADOWBROOK EAST | 41 | 15 | - | 8 | 0 | - | 21 | 1 | 2 | 23 | 3 | 113 | |
| 263 | CHARITON SQUARE | - | 1 | - | 4 | 1 | 1 | 8 | 1 | 2 | 13 | 2 | 32 | 3% |
| 264 | LAMAR CROSSING | 102 | 27 | - | 6 | 1 | 1 | 21 | 1 | 2 | 30 | 3 | 195 | |
| 265 | WYOMING VILLAGE | - | 0 | - | 4 | 0 | - | - | 1 | 2 | 28 | - | 35 | 3% |
| 266 | STATE STREET | 116 | 7 | - | 5 | 0 | - | 10 | 1 | 2 | 15 | 2 | 159 | |
| 267 | EASTLAND CENTER | 82 | 1 | - | 4 | 1 | - | 3 | 1 | 2 | 40 | - | 132 | |
| 269 | ST. STEPHENS SQUARE | 82 | 5 | - | 6 | 2 | 0 | 11 | 1 | 2 | 25 | 3 | 136 | |
| 270 | HIGHLAND LAKES CENTER | 62 | 14 | - | 4 | - | 0 | 14 | 1 | 2 | 17 | - | 114 | |
| 271 | CARRIAGE CROSSING MARKETPLACE | - | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 56 | 5% |

Simply Fashions
Exhibit 4.1(c)

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Occupancy Per Diem | | | | | | | |

| Store # | Store Name | RENT | AD VALOREM TAX | FILTER SERVICE | INSURANCE - BUSINESS | LICENSE - CITY | LICENSE-STATE & COUNTY | MAINTENANCE | SECURITY | TELEPHONE | UTILITIES | WASTE PICK UP | Total Occupancy | % Rent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 272 | ERDMAN PLAZA | 110 | 13 | - | 6 | - | 1 | 19 | 1 | 2 | 23 | 2 | 176 | |
| 273 | NORTHWEST CROSSING | 267 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 323 | |
| 274 | WOODLAND VILLAGE | 147 | 14 | - | 2 | 2 | - | 30 | - | - | 21 | 3 | 219 | |
| 275 | CROSS COUNTRY PLAZA | 118 | 13 | - | 7 | 2 | - | 3 | 1 | 2 | 29 | - | 175 | |
| 278 | EDENS PLAZA | 47 | 3 | - | 4 | 1 | - | 3 | 1 | 2 | 30 | 2 | 92 | |
| 281 | WHITEHAVEN PLAZA | 77 | 1 | - | 4 | 1 | 1 | 3 | 1 | 1 | 25 | 3 | 117 | |
| 282 | RACEWAY PARK S/C | 204 | 60 | - | 3 | 1 | - | 23 | - | 0 | 13 | 2 | 306 | |
| 283 | ALBANY CROSSING | 101 | 5 | - | 15 | 0 | - | 15 | 1 | 2 | 18 | 2 | 159 | |
| 284 | OAKLAND POINTE | 99 | 0 | - | 4 | 1 | - | 4 | 1 | 2 | 23 | - | 134 | |
| 285 | ONE & OLNEY SQUARE | 185 | 38 | - | 7 | 0 | - | 18 | 1 | 1 | 32 | 7 | 290 | |
| 287 | NORTHWEST CROSSING | 232 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 289 | |
| 288 | CLEVELAND AVENUE CROSSING | 110 | - | - | 3 | 5 | - | 2 | - | 1 | 29 | - | 150 | |
| 301 | CLOVERLEAF S/C | 108 | 4 | - | 4 | 0 | - | 4 | 1 | 2 | 32 | 3 | 157 | |
| 302 | BATESVILLE S/C | 66 | 8 | - | 5 | 0 | - | 9 | 1 | 2 | 16 | 4 | 110 | |
| 303 | NORTHTOWN PLAZA | 136 | 24 | - | 6 | 0 | - | 21 | 1 | 2 | 17 | 4 | 211 | |
| 317 | HAMMOND AIRE PLAZA | 132 | 9 | - | 11 | 1 | 0 | 31 | 1 | 2 | 32 | 4 | 223 | |
| 327 | WALZEM PLAZA | 57 | 5 | - | 4 | 0 | - | 13 | 1 | 2 | 23 | 3 | 108 | |
| 337 | TOWN & COUNTRY | 173 | 12 | - | 5 | 1 | 0 | 16 | - | 1 | 19 | 4 | 231 | |
| 338 | SOUTH PHILADELPHIA S/C | 147 | 10 | - | 3 | 0 | - | 2 | - | 1 | 24 | 5 | 192 | |
| 343 | EASTOWN S/C | 38 | - | - | 2 | - | 0 | 7 | - | 1 | 23 | 2 | 73 | |
| 344 | NORTHERN LIGHTS | 151 | - | - | 2 | - | 0 | 8 | - | 1 | 24 | - | 186 | |
| 348 | CENTURY CENTER | 185 | 8 | - | 5 | 1 | - | 6 | - | - | 14 | 4 | 224 | |
| 360 | FIVE POINTS WEST S/C | 159 | 1 | - | 4 | 2 | 0 | 3 | 1 | 2 | 27 | 2 | 202 | |
| 365 | CROSS CREEK | 69 | 1 | - | 4 | - | - | 13 | 1 | 2 | 17 | - | 107 | |
| 369 | FREESTANDING | 111 | 1 | - | 4 | 2 | 0 | 6 | 1 | 2 | 26 | 4 | 156 | |
| 375 | ROSE PLAZA | 86 | 9 | - | 6 | - | - | 10 | 1 | 2 | 17 | 3 | 134 | |
| 377 | LINCOLN S/C | 147 | 8 | - | 10 | - | - | 10 | - | 1 | 20 | 2 | 198 | |
| 500 | ANDERSON ROAD PLAZA | - | 4 | - | 4 | - | - | 31 | 1 | 2 | 25 | 3 | 69 | 5% |
| 501 | METRO PLAZA | 227 | 5 | - | 4 | 2 | - | 2 | 1 | 2 | 32 | 2 | 154 | |
| 504 | HIGHLAND PARK PLACE | 110 | 1 | - | 4 | 0 | - | 2 | 1 | 2 | 32 | 2 | 210 | |
| 506 | LIVONIA MARKETPLACE | 104 | - | - | 3 | 1 | - | 5 | - | 1 | 16 | - | 130 | |
| 507 | EDISTO VILLAGE SHOPPING CENTER | 41 | 13 | - | 5 | 1 | - | 6 | 1 | 2 | 20 | - | 89 | |
| 508 | WESTSHORE PLAZA | 214 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 270 | |
| 509 | KLINE PLAZA | 172 | 43 | - | 7 | 3 | - | 34 | - | - | 19 | 5 | 282 | |
| 510 | CLINTON POINTE | 69 | - | - | 3 | - | - | 3 | - | 1 | 3 | 2 | 80 | |
| 511 | OAK STREET SHOPPING CENTER | 88 | 2 | - | 4 | 1 | - | 3 | 1 | 2 | 34 | 2 | 137 | |
| 512 | NORGATE PLAZA | 136 | - | - | 4 | - | 0 | 0 | - | - | 13 | 0 | 153 | |
| 513 | MLK PLAZA | 123 | 25 | - | 9 | 2 | 1 | 28 | 1 | 2 | 18 | - | 209 | |
| 514 | NORTH CHARLESTON CENTER | 103 | 9 | - | 7 | - | 2 | 10 | 1 | 2 | 24 | 5 | 163 | |
| 515 | SUMTER SQUARE SHOPPING CENTER | 85 | 11 | - | 5 | 1 | - | 11 | 1 | 2 | 17 | 2 | 135 | |
| 516 | COTTMAN & BUSELTON S/C | 236 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 292 | |
| 521 | BORDEAUX SHOPPING CENTER | 87 | 8 | - | 6 | 1 | 1 | 19 | 1 | 2 | 26 | 3 | 154 | |
| 523 | WESTLAND SHOPPING CENTER | 74 | 17 | - | 5 | - | - | 11 | 1 | 2 | 18 | 3 | 130 | |
| 524 | THE SHOPS AT STERLING PONDS | 146 | 2 | - | 3 | 6 | - | 9 | - | 1 | 11 | 1 | 179 | |
| 525 | NORTHWEST PLAZA | 55 | - | - | 8 | 0 | - | 3 | 1 | 2 | 20 | 2 | 90 | |
| 526 | DORCHESTER SQUARE | 73 | 11 | - | 7 | - | 2 | 18 | 1 | 2 | 28 | 4 | 145 | |
| 527 | CANTON CENTRE | 227 | 5 | - | 3 | - | 0 | 14 | - | 0 | 19 | - | 267 | |
| 528 | GEORGETOWN PLAZA SHOPPING CENTER | 61 | 11 | - | 5 | - | - | 16 | 1 | 2 | 29 | 2 | 127 | |
| 529 | EASTGATE SHOPPING CENTER | 105 | 8 | - | 4 | 1 | 0 | 13 | 1 | 2 | 21 | 2 | 158 | |
| 531 | MIDDLESEX S/C | 196 | 10 | - | 3 | 2 | 2 | 23 | - | 1 | 9 | 5 | 250 | |
| 532 | CRICHTON PLAZA | 73 | 1 | - | 4 | 2 | 0 | 20 | 1 | 2 | 32 | 3 | 137 | |
| 537 | CHESAPEAKE CROSSING  SHOPPING CENTER | 90 | 7 | - | 4 | 2 | - | 10 | 1 | 2 | 23 | 2 | 140 | |
| 538 | CROSSROADS PLAZA | - | 1 | - | 4 | 0 | - | 5 | 1 | 2 | 31 | 3 | 47 | 4% |
| 539 | HATTIESBURG SHOPPING CENTER | 104 | 4 | - | 4 | 0 | - | 28 | 1 | 2 | 19 | 2 | 164 | |
| 541 | LIBERTY CENTER | 100 | - | - | 2 | - | - | 4 | - | - | 5 | 0 | 112 | |
| 543 | LEHMBERG CROSSING | - | 3 | - | 4 | - | 0 | 3 | 1 | 2 | 15 | 2 | 29 | 4% |
| 544 | SHOP CITY PLAZA | 104 | 15 | - | 4 | 1 | - | 23 | - | 1 | 12 | - | 160 | |

**Simply Fashions**
**Exhibit 4.1(c)**

| Occupancy Per Diem |
|---|

| Store # | Store Name | RENT | AD VALOREM TAX | FILTER SERVICE | INSURANCE - BUSINESS | LICENSE - CITY | LICENSE-STATE & COUNTY | MAINTENANCE | SECURITY | TELEPHONE | UTILITIES | WASTE PICK UP | Total Occupancy | % Rent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 545 | GREAT SOUTHERN S/C | 104 | - | - | 3 | - | 0 | 29 | - | 0 | 12 | - | 149 | |
| 549 | FREEDOM SQUARE SHOPPING CENTER | 103 | 4 | - | 4 | 2 | - | 4 | 1 | 2 | 20 | 2 | 141 | |
| 554 | TOWN CENTER MARKET | 169 | 5 | - | 5 | - | 1 | 11 | - | 1 | 18 | 2 | 213 | |
| 555 | IROQUOIS MANOR | 62 | 9 | - | 5 | - | - | 11 | 1 | 2 | 27 | 2 | 118 | |
| 556 | WESLEY CHAPEL SQUARE SHOPPING CENTER | 108 | 2 | - | 4 | - | 1 | 39 | 1 | 2 | 26 | 3 | 186 | |
| 558 | SHELBY PLAZA | 88 | 1 | - | 4 | 1 | 1 | 15 | 1 | 2 | 13 | 3 | 128 | |
| 559 | AUSTINTOWN PLAZA | 128 | - | - | 3 | 2 | 1 | 2 | - | 1 | 10 | 3 | 148 | |
| 562 | NORTH POINT CENTER | 132 | 1 | - | 4 | 1 | 1 | 4 | 1 | 2 | 28 | 3 | 176 | |
| 563 | CONSUMER SQUARE WEST | 160 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 216 | |
| 565 | BROADWAY CENTER | 89 | 1 | - | 4 | 1 | 1 | - | 1 | 2 | 16 | 2 | 115 | |
| 571 | WESTWOOD SHOPPING CENTER | 113 | 19 | - | 8 | 2 | 0 | 18 | 1 | 2 | 36 | 3 | 202 | |
| 575 | VILLAGE SHOPPING CENTER | - | 7 | - | 5 | 1 | - | 17 | 1 | 2 | 35 | 2 | 69 | 8% |
| 576 | SOUTHGATE SHOPPING CENTER | 129 | 14 | - | 10 | 1 | - | 29 | 1 | 2 | 21 | - | 207 | |
| 577 | HICKORY RIDGE CROSSING | 58 | 1 | - | 4 | 1 | 1 | 3 | 1 | 2 | 22 | 2 | 94 | |
| 581 | GAINSVILLE SHOPPING CENTER | 84 | 13 | - | 4 | 1 | - | 20 | 1 | 2 | 22 | 3 | 150 | |
| 584 | SOUTHGATE PLAZA | 121 | 7 | - | 7 | 0 | - | 10 | 1 | 2 | 26 | 2 | 174 | |
| 595 | PARKWAY PLAZA | 91 | 17 | - | 10 | 0 | - | 17 | 1 | 2 | 24 | 2 | 164 | |
| 599 | COURTHOUST SQUARE | 86 | 2 | - | 4 | - | 0 | 2 | 1 | 2 | 12 | 3 | 111 | |
| 617 | ASHER | 59 | 3 | - | 4 | 1 | - | 11 | 1 | 2 | 18 | 2 | 100 | |
| **247** | **Total** | **27,968** | **2,098** | **-** | **1,217** | **211** | **51** | **3,150** | **198** | **382** | **5,803** | **578** | **41,655** | |

Note:
For stores indicating percentage rent amounts, these are straight percentage rent locations; there is no base rent associated with these stores and the percentage rent amount is a straight percentage of sales with no minimum threshold or breakpoint.

# Simply Fashions

Exhibit 5.2(b)

| Distribution Center Merchandise |
| --- |

As reflected in **Simply Fashions Stores Inventory Including Cost and Retail 4-7-15.xlsx** , locations:

| Location # | Description |
| --- | --- |
| 751 | Dots DOTCOM |
| 752 | SF DOTCOM |
| 0 | Simply Warehouse |
| 2 | Pallet Simply Fashions |
| 3 | Dots Warehouse |
| 6 | SIMPLY FASHION TIERING WAREHOUSE |

**Simply Fashions**
Exhibit 11.1(o)

| Level and Mix |
| --- |

| Dept # | Dept Name | Class | Class Name | Sub Class | SubClass Name | Current Retail | % of Total Retail |
|--------|-----------|-------|------------|-----------|---------------|---------------|-------------------|
| 01-51 | JUNIOR | 01-51-10 | JUNIOR TOPS | 01-51-10-10 | JR WOV S/L | 365,562 | 2.3% |
| 01-51 | JUNIOR | 01-51-10 | JUNIOR TOPS | 01-51-10-20 | JR WOV S/S | 212,525 | 1.3% |
| 01-51 | JUNIOR | 01-51-10 | JUNIOR TOPS | 01-51-10-30 | JR WOV L/S | 287,484 | 1.8% |
| 01-51 | JUNIOR | 01-51-10 | JUNIOR TOPS | 01-51-10-50 | JR KNI S/L | 402,431 | 2.5% |
| 01-51 | JUNIOR | 01-51-10 | JUNIOR TOPS | 01-51-10-60 | JR KNI S/S | 597,669 | 3.7% |
| 01-51 | JUNIOR | 01-51-10 | JUNIOR TOPS | 01-51-10-70 | JR KNI L/S | 159,444 | 1.0% |
| 01-51 | JUNIOR | 01-51-10 | JUNIOR TOPS | 01-51-10-80 | JR 2-FOR CAMI'S | 205,825 | 1.3% |
| 01-51 | JUNIOR | 01-51-10 | JUNIOR TOPS | 01-51-10-82 | JR 2-FOR S/S | 266,602 | 1.7% |
| 01-51 | JUNIOR | 01-51-10 | JUNIOR TOPS | 01-51-10-84 | JR 2-FOR L/S | 56,432 | 0.4% |
| 01-51 | JUNIOR | 01-51-20 | JUNIOR BOTTOMS | 01-51-20-10 | JR SKIRTS | 154,237 | 1.0% |
| 01-51 | JUNIOR | 01-51-20 | JUNIOR BOTTOMS | 01-51-20-15 | JR DEN SKIRTS | 45,467 | 0.3% |
| 01-51 | JUNIOR | 01-51-20 | JUNIOR BOTTOMS | 01-51-20-25 | JR JEANS | 495,408 | 3.1% |
| 01-51 | JUNIOR | 01-51-20 | JUNIOR BOTTOMS | 01-51-20-30 | JR PANTS | 439,848 | 2.7% |
| 01-51 | JUNIOR | 01-51-20 | JUNIOR BOTTOMS | 01-51-20-40 | JR CAPRIS | 70,313 | 0.4% |
| 01-51 | JUNIOR | 01-51-20 | JUNIOR BOTTOMS | 01-51-20-45 | JR DEN CAPRIS | 15,610 | 0.1% |
| 01-51 | JUNIOR | 01-51-20 | JUNIOR BOTTOMS | 01-51-20-60 | JR ROMPERS | 65,339 | 0.4% |
| 01-51 | JUNIOR | 01-51-20 | JUNIOR BOTTOMS | 01-51-20-70 | JR SHORTS | 196,081 | 1.2% |
| 01-51 | JUNIOR | 01-51-20 | JUNIOR BOTTOMS | 01-51-20-75 | JR DEN SHORTS | 89,385 | 0.6% |
| 01-51 | JUNIOR | 01-51-20 | JUNIOR BOTTOMS | 01-51-20-80 | JR LEGGING | 146,850 | 0.9% |
| 01-51 | JUNIOR | 01-51-30 | JUNIOR COORDINATES | 01-51-30-10 | JR WOV COOR | 3,894 | 0.0% |
| 01-51 | JUNIOR | 01-51-30 | JUNIOR COORDINATES | 01-51-30-35 | JR DEN COOR | 3,034 | 0.0% |
| 01-51 | JUNIOR | 01-51-30 | JUNIOR COORDINATES | 01-51-30-50 | JR KNI COOR | 125,096 | 0.8% |
| 01-51 | JUNIOR | 01-51-30 | JUNIOR COORDINATES | 01-51-30-55 | JR ACT WEAR | 174,086 | 1.1% |
| 01-51 | JUNIOR | 01-51-40 | JUNIOR OUTERWEAR | 01-51-40-10 | JR SWEATERS | 66,019 | 0.4% |
| 01-51 | JUNIOR | 01-51-40 | JUNIOR OUTERWEAR | 01-51-40-20 | JR JKT | 67,534 | 0.4% |
| 01-51 | JUNIOR | 01-51-50 | JUNIOR DRESSES | 01-51-50-10 | JR DRESSES | 840,702 | 5.3% |
| 01-51 | JUNIOR | 01-51-50 | JUNIOR DRESSES | 01-51-50-20 | JR JUMPSUITS | 44,724 | 0.3% |
| 02-52 | PLUS TOPS | 02-52-10 | PLUS TOPS | 02-52-10-10 | PL WOV S/L | 227,074 | 1.4% |
| 02-52 | PLUS TOPS | 02-52-10 | PLUS TOPS | 02-52-10-20 | PL WOV S/S | 238,095 | 1.5% |
| 02-52 | PLUS TOPS | 02-52-10 | PLUS TOPS | 02-52-10-30 | PL WOV L/S | 184,972 | 1.2% |
| 02-52 | PLUS TOPS | 02-52-10 | PLUS TOPS | 02-52-10-50 | PL KNI S/L | 333,008 | 2.1% |
| 02-52 | PLUS TOPS | 02-52-10 | PLUS TOPS | 02-52-10-60 | PL KNI S/S | 626,283 | 3.9% |
| 02-52 | PLUS TOPS | 02-52-10 | PLUS TOPS | 02-52-10-70 | PL KNI L/S | 126,577 | 0.8% |
| 02-52 | PLUS TOPS | 02-52-10 | PLUS TOPS | 02-52-10-80 | PL 2-FOR CAMI'S | 199,656 | 1.2% |
| 02-52 | PLUS TOPS | 02-52-10 | PLUS TOPS | 02-52-10-82 | PL 2-FOR S/S | 249,928 | 1.6% |
| 02-52 | PLUS TOPS | 02-52-10 | PLUS TOPS | 02-52-10-84 | PL 2-FOR L/S | 23,408 | 0.1% |
| 02-52 | PLUS TOPS | 02-52-30 | PLUS KNIT COORDINATES | 02-52-30-50 | PL KNI COOR | 120,831 | 0.8% |
| 02-52 | PLUS TOPS | 02-52-30 | PLUS KNIT COORDINATES | 02-52-30-55 | PLUS ACT WEAR | 151,667 | 0.9% |
| 02-52 | PLUS TOPS | 02-52-40 | PLUS OUTERWEAR | 02-52-40-10 | PL SWEATERS | 24,530 | 0.2% |
| 02-52 | PLUS TOPS | 02-52-40 | PLUS OUTERWEAR | 02-52-40-20 | PL JKTS | 67,848 | 0.4% |
| 02-52 | PLUS TOPS | 02-52-50 | PLUS DRESSES | 02-52-50-10 | PLUS DRESSES | 651,277 | 4.1% |
| 02-52 | PLUS TOPS | 02-52-50 | PLUS DRESSES | 02-52-50-20 | PLUS JUMPSUITS | 49,374 | 0.3% |
| 02-53 | SUPER TOPS | 02-53-10 | SUPER PLUS TOPS | 02-53-10-10 | SP WOV S/L | 48,298 | 0.3% |
| 02-53 | SUPER TOPS | 02-53-10 | SUPER PLUS TOPS | 02-53-10-20 | SP WOV S/S | 69,083 | 0.4% |
| 02-53 | SUPER TOPS | 02-53-10 | SUPER PLUS TOPS | 02-53-10-30 | SP WOV L/S | 61,847 | 0.4% |
| 02-53 | SUPER TOPS | 02-53-10 | SUPER PLUS TOPS | 02-53-10-50 | SP KNI S/L | 39,373 | 0.2% |
| 02-53 | SUPER TOPS | 02-53-10 | SUPER PLUS TOPS | 02-53-10-60 | SP KNI S/S | 199,100 | 1.2% |
| 02-53 | SUPER TOPS | 02-53-10 | SUPER PLUS TOPS | 02-53-10-70 | SP KNI L/S | 13,976 | 0.1% |
| 02-53 | SUPER TOPS | 02-53-10 | SUPER PLUS TOPS | 02-53-10-80 | SP 2-FOR CAMI'S | 52,483 | 0.3% |
| 02-53 | SUPER TOPS | 02-53-10 | SUPER PLUS TOPS | 02-53-10-82 | SP 2-FOR S/S | 64,081 | 0.4% |
| 02-53 | SUPER TOPS | 02-53-30 | SUPER KNIT COORDINATES | 02-53-30-50 | SP KNI COOR | 9,674 | 0.1% |
| 02-53 | SUPER TOPS | 02-53-30 | SUPER KNIT COORDINATES | 02-53-30-55 | SUPER ACT WEAR | 67,490 | 0.4% |
| 02-53 | SUPER TOPS | 02-53-40 | SUPER PLUS OUTERWEAR | 02-53-40-10 | SP SWEATERS | 4,395 | 0.0% |
| 02-53 | SUPER TOPS | 02-53-40 | SUPER PLUS OUTERWEAR | 02-53-40-20 | SP JKT | 683 | 0.0% |
| 02-53 | SUPER TOPS | 02-53-50 | SUPER PLUS DRESSES | 02-53-50-10 | SP DRESS/JSUITS/RMPR | 94,210 | 0.6% |
| 03-52 | PLUS BOTTOMS | 03-52-20 | PLUS BOTTOMS | 03-52-20-10 | PL SKIRTS | 163,242 | 1.0% |
| 03-52 | PLUS BOTTOMS | 03-52-20 | PLUS BOTTOMS | 03-52-20-15 | PL DEN SKIRT | 34,321 | 0.2% |
| 03-52 | PLUS BOTTOMS | 03-52-20 | PLUS BOTTOMS | 03-52-20-25 | PL JEANS | 262,407 | 1.6% |
| 03-52 | PLUS BOTTOMS | 03-52-20 | PLUS BOTTOMS | 03-52-20-30 | PL PANTS | 332,219 | 2.1% |
| 03-52 | PLUS BOTTOMS | 03-52-20 | PLUS BOTTOMS | 03-52-20-40 | PL CAPRIS | 93,552 | 0.6% |
| 03-52 | PLUS BOTTOMS | 03-52-20 | PLUS BOTTOMS | 03-52-20-45 | PL DEN CAPRI | 17,856 | 0.1% |
| 03-52 | PLUS BOTTOMS | 03-52-20 | PLUS BOTTOMS | 03-52-20-60 | PL ROMPERS | 32,800 | 0.2% |
| 03-52 | PLUS BOTTOMS | 03-52-20 | PLUS BOTTOMS | 03-52-20-70 | PL SHORTS | 225,859 | 1.4% |
| 03-52 | PLUS BOTTOMS | 03-52-20 | PLUS BOTTOMS | 03-52-20-75 | PL DEN SHORTS | 68,151 | 0.4% |
| 03-52 | PLUS BOTTOMS | 03-52-20 | PLUS BOTTOMS | 03-52-20-80 | PL  LEGGING | 152,883 | 1.0% |

| Dept # | Dept Name | Class | Class Name | Sub Class | SubClass Name | Current Retail | % of Total Retail |
|---|---|---|---|---|---|---|---|
| 03-52 | PLUS BOTTOMS | 03-52-30 | PLUS WOVEN COORDINATES | 03-52-30-10 | PL WOV COOR | 11,334 | 0.1% |
| 03-52 | PLUS BOTTOMS | 03-52-30 | PLUS WOVEN COORDINATES | 03-52-30-35 | PL DEN COOR | 8,475 | 0.1% |
| 03-53 | SUPER BOTTOMS | 03-53-20 | SUPER PLUS BOTTOMS | 03-53-20-10 | SP SKIRTS | 55,061 | 0.3% |
| 03-53 | SUPER BOTTOMS | 03-53-20 | SUPER PLUS BOTTOMS | 03-53-20-15 | SP DEN SKIRT | 7,338 | 0.0% |
| 03-53 | SUPER BOTTOMS | 03-53-20 | SUPER PLUS BOTTOMS | 03-53-20-25 | SP JEANS | 63,450 | 0.4% |
| 03-53 | SUPER BOTTOMS | 03-53-20 | SUPER PLUS BOTTOMS | 03-53-20-30 | SP PANTS | 150,750 | 0.9% |
| 03-53 | SUPER BOTTOMS | 03-53-20 | SUPER PLUS BOTTOMS | 03-53-20-40 | SP CAPRIS | 56,316 | 0.4% |
| 03-53 | SUPER BOTTOMS | 03-53-20 | SUPER PLUS BOTTOMS | 03-53-20-45 | SP DEN CAPRI | 21,660 | 0.1% |
| 03-53 | SUPER BOTTOMS | 03-53-20 | SUPER PLUS BOTTOMS | 03-53-20-70 | SP SHORTS | 31,815 | 0.2% |
| 03-53 | SUPER BOTTOMS | 03-53-20 | SUPER PLUS BOTTOMS | 03-53-20-75 | SP DEN SHORTS | 13,683 | 0.1% |
| 03-53 | SUPER BOTTOMS | 03-53-20 | SUPER PLUS BOTTOMS | 03-53-20-80 | SP LEGGINGS | 41,406 | 0.3% |
| 03-53 | SUPER BOTTOMS | 03-53-30 | SUPER WOVEN COORDINATES | 03-53-30-10 | SP WOV COOR | 4,444 | 0.0% |
| 03-53 | SUPER BOTTOMS | 03-53-30 | SUPER WOVEN COORDINATES | 03-53-30-35 | SP DEN COOR | 1,712 | 0.0% |
| 08-59 | CLOSEOUTS | 08-59-10 | CLOSEOUTS JUNIOR | 08-59-10-99 | JR CLOSEOUTS | 369,150 | 2.3% |
| 08-59 | CLOSEOUTS | 08-59-20 | CLOSEOUTS PLUS | 08-59-20-99 | PLUS CLOSEOUTS | 330,962 | 2.1% |
| 07-60 | ACCESSORIES | 07-60-10 | ACCESSORIES EARRINGS | 07-60-10-01 | GOLD/SILVER | 211,973 | 1.3% |
| 07-60 | ACCESSORIES | 07-60-10 | ACCESSORIES EARRINGS | 07-60-10-02 | COLOR | 235,875 | 1.5% |
| 07-60 | ACCESSORIES | 07-60-10 | ACCESSORIES EARRINGS | 07-60-10-03 | CLIPS | 25,867 | 0.2% |
| 07-60 | ACCESSORIES | 07-60-10 | ACCESSORIES EARRINGS | 07-60-10-05 | TRIOS | 79,081 | 0.5% |
| 07-60 | ACCESSORIES | 07-60-12 | ACCESSORIES SETS | 07-60-12-01 | NECK & EAR | 579,970 | 3.6% |
| 07-60 | ACCESSORIES | 07-60-12 | ACCESSORIES SETS | 07-60-12-03 | BRACELETS SETS | - | 0.0% |
| 07-60 | ACCESSORIES | 07-60-13 | ACCESSORIES BRACELETS | 07-60-13-01 | BRACELETS | 210,762 | 1.3% |
| 07-60 | ACCESSORIES | 07-60-19 | NOVELTY / GIFTS | 07-60-19-01 | NOVELTY JEWELRY | 41,368 | 0.3% |
| 07-60 | ACCESSORIES | 07-60-19 | NOVELTY / GIFTS | 07-60-19-02 | RINGS | 41,956 | 0.3% |
| 07-60 | ACCESSORIES | 07-60-19 | NOVELTY / GIFTS | 07-60-19-10 | BEAUTY PRODUCTS | 72,705 | 0.5% |
| 07-60 | ACCESSORIES | 07-60-19 | NOVELTY / GIFTS | 07-60-19-20 | ELECTRONICS | 16,493 | 0.1% |
| 07-60 | ACCESSORIES | 07-60-20 | ACCESSORIES WATCHES | 07-60-20-01 | WATCHES | 65,416 | 0.4% |
| 07-60 | ACCESSORIES | 07-60-30 | ACCESSORIES HATS | 07-60-30-01 | HATS | 29,821 | 0.2% |
| 07-60 | ACCESSORIES | 07-60-35 | ACCESSORIES SCARVES | 07-60-35-99 | SCARVES | 102,959 | 0.6% |
| 07-60 | ACCESSORIES | 07-60-40 | ACCESSORIES BELTS | 07-60-40-02 | BELTS | 67,969 | 0.4% |
| 07-60 | ACCESSORIES | 07-60-50 | ACCESSORIES HANDBAGS | 07-60-50-01 | HANDBAGS | 211,394 | 1.3% |
| 07-60 | ACCESSORIES | 07-60-60 | ACCESSORIES SUNGLASSES | 07-60-60-01 | SUNGLASSES | 50,153 | 0.3% |
| 07-60 | ACCESSORIES | 07-60-80 | ACCESSORIES COLD WEATHER | 07-60-80-01 | COLD WEATHER | 4,833 | 0.0% |
| 07-60 | ACCESSORIES | 07-60-90 | ACCESS SOCKS | 07-60-90-01 | SOCKS | 72,337 | 0.5% |
| 07-60 | ACCESSORIES | 07-60-95 | ACCESSORIES MISCELLANOUS | 07-60-95-01 | FRAGRANCES | 52,774 | 0.3% |
| 07-60 | ACCESSORIES | 07-60-95 | ACCESSORIES MISCELLANOUS | 07-60-95-10 | MISCELLANEOUS | 14,910 | 0.1% |
| 07-61 | LINGERIE | 07-61-01 | LINGERIE JUNIOR | 07-61-01-01 | BRAS | 131,791 | 0.8% |
| 07-61 | LINGERIE | 07-61-01 | LINGERIE JUNIOR | 07-61-01-02 | PANTIES | 308,752 | 1.9% |
| 07-61 | LINGERIE | 07-61-01 | LINGERIE JUNIOR | 07-61-01-03 | 1.49 PANTIES | 7,727 | 0.0% |
| 07-61 | LINGERIE | 07-61-01 | LINGERIE JUNIOR | 07-61-01-04 | DAYWEAR | 7,917 | 0.0% |
| 07-61 | LINGERIE | 07-61-01 | LINGERIE JUNIOR | 07-61-01-05 | SLEEPWEAR | 197,349 | 1.2% |
| 07-61 | LINGERIE | 07-61-02 | LINGERIE PLUS | 07-61-02-01 | BRAS | - | 0.0% |
| 07-61 | LINGERIE | 07-61-02 | LINGERIE PLUS | 07-61-02-02 | PANTIES | - | 0.0% |
| 07-61 | LINGERIE | 07-61-02 | LINGERIE PLUS | 07-61-02-03 | 2.49 PANTIES | 6,867 | 0.0% |
| 07-61 | LINGERIE | 07-61-02 | LINGERIE PLUS | 07-61-02-04 | DAYWEAR | - | 0.0% |
| 07-61 | LINGERIE | 07-61-02 | LINGERIE PLUS | 07-61-02-05 | SLEEPWEAR | - | 0.0% |
| 07-61 | LINGERIE | 07-61-03 | LINGERIE SUPER | 07-61-03-01 | BRAS | - | 0.0% |
| 07-61 | LINGERIE | 07-61-03 | LINGERIE SUPER | 07-61-03-02 | PANTIES | - | 0.0% |
| 07-61 | LINGERIE | 07-61-03 | LINGERIE SUPER | 07-61-03-05 | SLEEPWEAR | - | 0.0% |
| 07-62 | SHOES | 07-62-10 | SHOES | 07-62-10-01 | SHOES | 602,004 | 3.8% |
| 07-62 | SHOES | 07-62-10 | SHOES | 07-62-10-20 | BOOTS | 29,786 | 0.2% |
| 07-62 | SHOES | 07-62-10 | SHOES | 07-62-10-25 | W W BOOTS | 3,368 | 0.0% |
| 07-62 | SHOES | 07-62-10 | SHOES | 07-62-10-50 | 2 OR MORE | 366,185 | 2.3% |
| 07-63 | ACC/CLOSEOUTS | 07-63-01 | ACC/CLOSEOUTS | 07-63-01-10 | ACCESSORY CLOSEOUTS | 692 | 0.0% |
| 07-63 | ACC/CLOSEOUTS | 07-63-01 | ACC/CLOSEOUTS | 07-63-01-20 | LINGERIE CLOSEOUTS | 296 | 0.0% |
| 07-63 | ACC/CLOSEOUTS | 07-63-01 | ACC/CLOSEOUTS | 07-63-01-30 | SHOE CLOSEOUTS | 981 | 0.0% |
| | | | | | **Total** | **16,000,000** | **100.0%** |

# EXHIBIT "2"

## BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed in connection with an auction (the "Auction") for the sale of substantially all of the Debtor's assets, either to a purchaser or purchasers or through entry into one or more agency agreements for the liquidation of some or all of the Debtor's assets.  At a hearing following the Auction (the "Sale Approval Hearing"), the Debtor will seek entry of an order (the "Sale Order") of the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") authorizing and approving the Sales (as defined below) to the Qualified Bidder(s) (as defined below) that the Debtor determines to have made the highest or otherwise best bid(s) (the "Successful Bidder(s)").

### Assets to be Sold

The Debtor is soliciting bids for any and all of its assets.  The Debtor will consider bids for all of its assets, distinct lots of assets and individual assets, and will consider bids to enter into one or more agency agreements for the liquidation of some or all of its assets.  The Debtor, in its business judgment, and after review of all bids submitted, will determine the proposed transaction or transactions that generate the maximum value for its estate.

### The Stalking Horse Agreement

In order to maximize the value received pursuant to the Auction, the Debtor has entered into an Agency Agreement substantially in the form attached hereto as **Exhibit "1"** (the "Stalking Horse Agreement") with a joint venture comprised of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC ("Agent" or the "Stalking Horse Bidder") for the sale (the "Sale") of all of the Merchandise (as defined in the Stalking Horse Agreement) located in the Debtor's retail store locations identified in Exhibit 1 of the Stalking Horse Agreement (the "Stores"), and all of the Merchandise located at the Debtor's distribution center identified in Exhibit 5.2(b) of the Stalking Horse Agreement (the "Distribution Center"), as well as the potential disposition of the Debtor's owned furniture, fixtures and equipment located at the Stores.

### The Bidding Process

The Debtor shall (i) determine whether any person is a Qualified Bidder (as defined below), (ii) provide reasonable assistance to Qualified Bidders in conducting their due diligence investigations, (iii) receive offers from Qualified Bidders and (iv) negotiate any offers made to purchase the Merchandise.  Any person who wishes to participate in this bidding process must be a Qualified Bidder.  Neither the Debtor nor its representatives shall be obligated to furnish any information of any kind to any person who is not determined to be a Qualified Bidder.

### Bid Deadline

Any person or entity wanting to participate in the Auction must submit a Qualified Bid (as defined below) on or before **May 4, 2015 at 4:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline") in writing to (i) the Debtor, c/o KapilaMukamal LLP, 1000 South Federal Highway, Suite 200, Fort Lauderdale, FL 33316, Attn: Soneet R. Kapila, CRO; (ii) the Debtor, 2110 N.W.

95th Avenue, Miami, FL 33172, Attn: Swapnil Shah; (iii) counsel to the Debtor, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131, Attn: Paul Steven Singerman, Esq. and Christopher A. Jarvinen, Esq.; (iv) the Stalking Horse Bidder, (i) Hilco Merchant Resources, LLC, 5 Revere Drive, Suite 206, Northbrook, IL 60062, Attention Ian S. Fredericks, and (ii) Gordon Brothers Retail Partners, LLC, Prudential Tower, 800 Boylston Street, Boston, MA 02119, Attention Michael Chartock; (v) counsel to the Stalking Horse Bidder, Bilzin Sumberg Baena Price & Axelrod LLP, 1450 Brickell Avenue, 23rd Floor, Miami, FL 33131, Attn: Scott L. Baena, Esq.,and Jay Sakalo, Esq.; (vi) counsel to the Official Committee of Unsecured Creditors, if one is appointed ("Creditors' Committee"); and (vii) the U.S. Trustee, 51 S.W. First Avenue, Room 1204, Miami, FL 33130 (collectively, the "Bid Notification Parties").

**Qualified Bids**

The Debtor's determination as to which bidders and bids are qualified shall be made after consultation with its Lender and the Creditors' Committee. To qualify as a "Qualified Bidder," a bidder must submit a "Qualified Bid" by the Bid Deadline.

To constitute a Qualified Bid to participate in the Auction, a potential bidder shall be required to (1) to post a deposit in an amount not less than the sum of the Bid Protection and the Signage Costs, and such other amount as the Debtor shall require (the "Deposit") and (2) irrevocably affirm in writing, if such potential bidder is the successful bidder, upon entry of the order approving the transaction with such successful bidder, the Merchant is authorized to, and the Merchant shall, use the Deposit to pay the Agent the Bid Protection and the Signage Costs from the Deposit, (3) provide a mark-up of the Stalking Horse Agreement that reflects the bidder's proposed changes thereto, including any proposed minimum initial or guaranteed payment; (4) identify the potential bidder and the officer(s) or authorized agent(s) who will appear on behalf of such bidder; (5) provide evidence, satisfactory to the Debtors in their reasonable discretion, of the bidder's financial wherewithal and operational ability to consummate the proposed transaction; (6) provide that the bid shall not be conditioned on the outcome of unperformed due diligence by the bidder, board approval, or any financing contingency; (7) provide that the bidder's offer is irrevocable until consummation of a transaction involving any other bidder for the same assets and (8) provide for a Guaranty Percentage that is not less than 28.5%. Subsequent increments of overbids at the Auction shall be in increments of not more than 0.1%.

If the Agent is not the "successful bidder" at the Auction and the successful bidder is the liquidating agent, the Agent agrees to make the signage available to the successful bidder upon receipt of the Bid Protections and Signage Costs from the Debtor. At the Auction the Bid Protections shall not be eligible to be "credit bid" by Agent.

All Qualified Bids will be considered, but the Debtor reserves its right to reject any or all bids. Bids will be evaluated on numerous grounds, however, bids that are unconditional and contemplate sales that may be consummated on or soon after the Sale Approval Hearing, which will be conducted on **May 6, 2015, at 8:00 a.m.** will be preferred.

**Good Faith Deposits**

Bidders will be required to submit good faith deposits (the "Deposit") with the Debtor on or before the Bid Deadline. Such Deposit shall be equal to $425,000. Deposits of all Qualified Bidders shall be held in a separate interest-bearing account for the Debtor's benefit until consummation of a transaction involving any other bidder for the Merchandise. If a Successful Bidder fails to consummate a transaction because of a breach or failure to perform on the part of such Successful Bidder, the Debtor will not have any obligation to return the Deposit deposited by such Successful Bidder, and such Deposit shall irrevocably become property of the Debtor without affecting or reducing any of the Debtor's other rights or claims against such party.

**Due Diligence**

The Debtor may afford any potential bidder the opportunity to conduct a reasonable due diligence review in the manner determined by the Debtor in its discretion. The Debtor shall not be obligated to furnish any due diligence information after the Bid Deadline.

The Debtor either has provided or will provide to all parties that have either expressed an interest in liquidating the Debtor's assets or who the Debtor believes may have an interest in liquidating the Debtor's assets (each an "Interested Party" and, collectively, the "Interested Parties"), certain information, including, among other things, these Bidding Procedures. Should any Interested Party desire additional or further information, such Interested Party will be required to enter into a confidentiality agreement satisfactory to the Debtor in it business judgment. Upon execution of the confidentiality agreement, the Interested Party will be given access (through a virtual data room or otherwise) to various financial data and other relevant and confidential information, subject to the Debtor's right to exclude such access for competitive concerns.

Each bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Debtor's assets prior to making any such bids; that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the assets in making its bid; and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Debtor's assets, or the completeness of any information provided in connection therewith.

**The Auction**

The Auction will be conducted at the offices of Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131 on **May 5, 2015, commencing at 2:00 p.m. (prevailing Eastern Time)** to determine the highest or otherwise best bid with respect to the Merchandise. Any bidder submitting a Qualified Bid may appear and submit its highest or best bid at the Auction. The Auction may be adjourned without further notice by announcement at the Auction.

**Auction Procedures**

Prior to the start of the Auction, the Debtor will advise all Qualified Bidders of what the Debtor believes to be the highest or otherwise best Qualified Bid(s). Only Qualified Bidders are

eligible to participate in the Auction. The Lender and the Creditors' Committee and their respective counsel and advisors shall be permitted to attend the Auction. Bidding at the Auction shall begin initially with the highest or otherwise best bid and shall subsequently continue in such minimum increments as the Debtor determines.

Bidding will continue with respect to the Auction until the Debtor determines that it has received the highest or otherwise best bid(s) for its assets. After the Debtor so determines, it will close the Auction. The Debtor, after consultation with its Lender and the Creditors' Committee, will then determine and announce which sale or combination of sales has been determined to be the highest or otherwise best bid and, therefore, declared the Successful Bid(s). In determining which bid is a Successful Bid(s), the Debtor will consider the net return to its estate after the payment of the Break-Up Fee, provided, however, that economic considerations shall not be the sole criteria upon which the Debtor may base its decision and the Debtor shall take into account all factors it believes to be relevant in an exercise of its business judgment.

## Reservation Of Rights

### a.    Determination of Highest and Best Bid

The Debtor reserves the right to (i) determine in their reasonable discretion (after consultation with the Lender and the Creditors' Committee) which bid is the highest or best bid and (ii) reject at any time prior to entry of a Court order approving an offer, without liability, any offer that the Debtors in their reasonable discretion (after consultation with the Lender and the Creditors' Committee) deem to be (x) inadequate or insufficient, (y) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or procedures set forth therein or herein, or (z) contrary to the best interests of the Debtor and its estate.

Given that bidders will be permitted to submit bids for any asset or combination of assets, the Debtor may combine Qualified Bidders and Qualified Bids or implement such other arrangements at the Auction so as to compare bids and determine the highest or best return for the estate.

The selection of a Successful Bidder shall be within the reasonable business judgment of the Debtors (after consultation with the Lender and the Creditors' Committee) and subject to the approval of the Bankruptcy Court. The presentation of a particular bid to the Bankruptcy Court for approval does not constitute the Debtor's acceptance of the bid. The Debtor will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Approval Hearing.

### b.    Modification of Bidding Procedures

The Debtor, after consultation with the Lender, the Stalking Horse Bidder, and the Creditors' Committee, may modify any existing terms or impose such other terms and conditions on the Qualified Bidders as the Debtor may determine to be in the best interests of the Debtor, its estate, its creditors, and other parties in interest.

The Debtor, in consultation with the Lender, the Stalking Horse Bidder, and the Creditors' Committee, reserve the right to (i) extend the deadlines set forth in the Bidding

Procedures and/or adjourn the Auction at the Auction and/or the Sale Approval Hearing in open court without further notice, (ii) withdraw any asset(s) (the "Withdrawn Assets") from the Sale, including, without limitation, any assets held by the Debtor in connection with a valid consignment agreement, at any time prior to or during the Auction to make subsequent attempts to market the same, and to request separate hearing(s) by this Court to approve the sale(s) of some or all of the Withdrawn Assets, and/or (iii) seek approval of any separate agreement to sell some or all of the Withdrawn Assets at the Sale Approval Hearing.

### c.    Closing with Backup Offeror(s)

If for any reason the entity or entities that submit(s) the highest or otherwise best bid(s) fails to consummate the transaction(s) contemplated thereby, or any part thereof, the offeror of the second highest or best bid will automatically be deemed to have submitted the highest or best bid and to the extent such offeror and the Debtor consent, the Debtor and such offeror are authorized to effect a transaction with such offeror(s) as soon as is commercially reasonable. If such failure to consummate the transaction is the result of a breach by the winning offeror, the Debtors reserve the right to seek all available damages from the defaulting offeror.

### Sale Approval Hearing

The Sale Approval Hearing will be held on **May 6, 2015 at 8:00 a.m.** at the United States Bankruptcy Court for the Southern District of Florida, C. Clyde Atkins United States Courthouse, 301 North Miami Avenue, Courtroom 8, Miami, FL 33128, before the Honorable Laurel M. Isicoff, United States Bankruptcy Judge. The Sale Approval Hearing may be adjourned, from time to time, without further notice to creditors or parties in interest other than by announcement of the adjournment in open Court or on the Court's docket.

Dated: April ____, 2015

## Exhibit 1

**The Stalking Horse Agreement**

# AGENCY AGREEMENT

This Agency Agreement ("Agreement") is made as of April 17  2015, by and between SIMPLY FASHION STORES, LTD. ("Merchant") and a contractual joint venture composed of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, "Agent"), it being understood and agreed that each entity comprising Agent shall be jointly and severally liable for all obligations of Agent hereunder.

Section 1.  Recitals.

WHEREAS, Merchant operates retail stores and desires that the Agent act as Merchant's exclusive agent for the limited purposes of: (a) selling all of the Merchandise (as hereinafter defined) from Merchant's two hundred forty-seven (247) retail store locations identified on Exhibit 1 attached hereto (each individually a "Store," and collectively the "Stores") by means of a "store closing", "sale on everything", "going out of business", "everything must go", or similar sale (as further described below, the "Sale"); and (b) disposing of the Owned FF&E in the Stores and Distribution Centers.

WHEREAS, Merchant intends to file voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, et seq. (the "Bankruptcy Code")  in the United States Bankruptcy Court for the Southern District of Florida (such case, the "Bankruptcy Case" and such court, or other court of competent jurisdiction in which the Bankruptcy Case is filed, the "Bankruptcy Court").

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Agent and Merchant hereby agrees as follows:

Section 2.  Appointment of Agent/Approval Order.

(a)    Subject to entry of an order authorizing Merchant to enter into this Agreement and authorizing Merchant to conduct the Sale in accordance with the terms of this Agreement (the "Approval Order"), Merchant hereby appoints the Agent, and the Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale in accordance with the terms and conditions of this Agreement.

(b)    The Approval Order shall provide, in a form reasonably satisfactory to Merchant and Agent, *inter alia,* that (i) this Agreement is in the best interest of the Merchant, Merchant's estates, creditors, and other parties in interest, (ii) this Agreement (and each of the transactions contemplated hereby) is approved in its entirety; (iii) Merchant and Agent shall be authorized to continue to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby; (iv) upon payment of the Initial Guaranty Payments (as defined below) and delivery of the Letter of Credit (as defined below), Agent shall be entitled to sell all Merchandise and Owned FF&E hereunder free and clear of all liens, claims or encumbrances thereon, with any presently existing liens encumbering all or any portion of the Merchandise or Owned FF&E or the Proceeds (as defined below) thereof attaching only to the Guaranteed Amounts and other amounts to be received by Merchant under this Agreement; (v) Agent shall have the right to use the Stores and all related Store services, furniture, fixtures, equipment and other assets of the Merchant as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person, subject to compliance with the Sale Guidelines (as defined below) and Approval Order; (vi) Agent, as agent for Merchant, is authorized

to conduct, advertise, post signs, utilize signwalkers, and otherwise promote the Sale as a "store closing", "sale on everything", "going out of business", "everything must go", or similar themed sale, in accordance with the Sale Guidelines (as the same may be modified and approved by the Bankruptcy Court) and without further compliance with the Liquidation Sale Laws (as defined below), subject to compliance with the Sale Guidelines and Approval Order; (vii) Agent shall be granted a limited license and right to use until the Sale Termination Date the trade names, logos, e-mail lists, customer lists, e-commerce sites (including (without limitation) websites and social media sites such as Facebook, and Twitter) relating to and used in connection with the operation of the Stores, solely for the purpose of advertising the Sale in accordance with the terms of the Agreement; provided, however, Agent is prohibited from using the websites, social media sites, e-mail lists, customer lists and e-commerce sites owned by or related to New Dots, LLC or the "Dots" brand (collectively, the "Dots Carveout"); (viii) all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Approval Order as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including, without limitation, the conducting and advertising of the Sale in the manner contemplated by this Agreement; (ix) all utilities, landlords, creditors and other interested parties and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, or institute any action in any court (other than in the Bankruptcy Court) with respect to Merchandise or the Owned FF&E or before any administrative body which in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale; (x) the Bankruptcy Court shall retain jurisdiction over the parties to enforce this Agreement; (xi) Agent shall not be liable for any claims against Merchant other than as expressly provided for in this Agreement; (xii) Agent shall be granted a valid, binding, enforceable and perfected security interest as provided for in Section 16 hereof (without the necessity of filing financing statements to perfect the security interests); (xiii) the Bankruptcy Court finds that time is of the essence in effectuating this Agreement and proceeding with the Sale at the Stores uninterrupted; (xiv) the Bankruptcy Court finds that the Merchant's decisions to (a) enter into this Agreement and (b) perform under and make payments required by this Agreement is a reasonable exercise of the Merchant's sound business judgment consistent with its fiduciary duties and is in the best interests of the Merchant, its estate, its creditors, and other parties in interest; (xv) the Bankruptcy Court finds that this Agreement was negotiated in good faith and at arms' length between the Merchant and Agent and that Agent is entitled to the protection of section 363(m) of the Bankruptcy Code; (xvi) the Bankruptcy Court finds that Agent's performance under this Agreement will be, and payment of the Guaranteed Amounts under this Agreement will be made, in good faith and for valid business purposes and uses, as a consequence of which Agent is entitled to the protection and benefits of sections 363(m) and 364(e) of the Bankruptcy Code; (xvii) this Agreement is approved pursuant to Bankruptcy Code section 363; and (xviii) in the event any of the provisions of the Approval Order are modified, amended or vacated by a subsequent order of the Bankruptcy Court or any other court, Agent shall be entitled to the protections provided in Bankruptcy Code sections 363(m) and 364(e) and, no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of the sale or the liens or priority authorized or created under this Agreement or the Approval Order.

(c)    Subject to entry of the Approval Order, Agent shall be authorized to advertise the Sale as a "store closing," "sale on everything", "going out of business", "everything must go", or similar-themed sale, and the Approval Order shall provide that Agent shall be required to comply with applicable federal, state and local laws, regulations and ordinances, including, without limitation, all laws and regulations relating to advertising, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities (collectively, the "Applicable General Laws"), other than all applicable laws, rules and regulations in respect of "going out of business", "store closing" or similar-themed sales and permitting (collectively, the "Liquidation Sale Laws"), provided that such Sale is

2

conducted in accordance with the terms of this Agreement, the Sale Guidelines and Approval Order; and provided further that the Approval Order shall provide that so long as the Sale is conducted in accordance with the Sale Guidelines and the Approval Order and in a safe and professional manner, Agent shall be deemed to be in compliance with any Applicable General Laws.

Section 3.    Consideration to Merchant and Agent.

3.1    Payments to Merchant.

(a)    Subject to Merchant's compliance with all representations, warranties, covenants, terms and conditions set forth in this Agreement, as a guaranty of Agent's performance hereunder, Agent guarantees that Merchant shall receive twenty-seven and one-half percent (27.5%) (the "Guaranty Percentage") of the aggregate Retail Price of the Merchandise (the "Guaranteed Amount"), which Guaranteed Amount shall be paid at such times and in such manner as shall hereinafter be provided. The Agent shall pay to Merchant the Guaranteed Amount and the Sharing Amount due to Merchant (if any) in the manner and at the times specified in Section 3.3.  The Guaranteed Amount will be calculated based upon the aggregate Retail Price of the Merchandise as determined by multiplying (x) the Guaranty Percentage by (y)(A) the final certified report of the Inventory Taking Service after verification and reconciliation thereof by Agent and Merchant showing the aggregate Retail Price of the Merchandise as of the Sale Commencement Date, in consultation with Lender, (B) the aggregate Retail Price of the Merchandise subject to Gross Rings (as adjusted for shrinkage per this Agreement), (C) the aggregate Retail Price of Returned Merchandise not otherwise included in the Inventory Taking, and (D) any other adjustments to Retail Price as expressly contemplated by this Agreement. Agent shall pay to Merchant (or its designee) the Guaranteed Amount in the manner and at the times specified in Section 3.3 below.

(b)    The Guaranty Percentage has been fixed based upon the aggregate Retail Price of the Merchandise included in the Sale being not less than $16,000,000 (the "Merchandise Threshold") as of the Sale Commencement Date.  To the extent that the aggregate Retail Price of the Merchandise included in the Sale is less than the Merchandise Threshold, then such deviation shall not constitute a breach of any representation or warranty, or an Event of Default; provided, however, that, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(b) annexed hereto, which adjustment in the Guaranty Percentage shall result in an dollar adjustment to the Guaranteed Amount the actual amount of which will be determined in connection with the Final Inventory Report; provided that, solely for purposes of determining whether the aggregate Retail Price of the Merchandise included in the Sale is less than the Merchandise Threshold, no adjustment shall be made to the applicable Retail Price to account for the effect of any prevailing discount adjustment or the following discounts or price adjustments offered by the Merchant: (i) employee discounts; (ii) member or customer appreciation points or coupons; (iii) coupons (Merchant's or competitors'); (iv) customer savings pass discounts or "bounce back" coupons, or discounts for future purchases based on dollar value of past purchases; (v) obvious ticketing or marking errors; (vi) instant (in-store) or mail in rebates.

(c)    To ensure accurate sales audit functions, as well as accurate calculations of the Sharing Amount, if any, Agent shall use Merchant's existing point-of-sale system for recording all sales (including any sales of Additional Agent Goods) in the Stores.

3.2    Compensation to Agent, Sharing:

(a)    After Proceeds are used to repay Agent for amounts paid on account of the Guaranteed Amount and to pay Expenses, all remaining Proceeds shall be allocated in the following order

3

of priority: FIRST: to Agent in an amount equal to two percent (2.0%) of the aggregate Retail Price of the Merchandise ("Agent's Fee"); and THEREAFTER: fifty percent (50%) to Agent and fifty percent (50%) to Merchant ("Sharing Amounts").  Agent shall pay the Sharing Amount, if any, to Merchant (or its designee), on the first business day after the completion of the Final Reconciliation conducted pursuant to Section 8.7 and shall remit such payment to the Merchant's Designated Account.

(b)    To the extent that there is Merchandise remaining at the Sale Termination Date (the "Remaining Merchandise"), subject to Merchant's right to participate in the Proceeds from the disposition thereof, such Remaining Merchandise shall be deemed transferred to Agent free and clear of all liens, claims, and encumbrances to the extent provided in the Approval Order, and Agent shall use diligent and commercially reasonable efforts to dispose of all such Remaining Merchandise by means of bulk sale/wholesale or otherwise.  Agent and its affiliates shall be authorized to sell or otherwise dispose of the Remaining Merchandise with all logos, brand names, and other intellectual property on the Merchandise intact (subject to the Dots Carveout), and shall be authorized to advertise the sale of the Remaining Merchandise using Merchant's name and logo.  The proceeds received by Agent from such disposition shall constitute Proceeds hereunder.

3.3    Proceeds; Time of Payments; Control of Proceeds.

(a)    For purposes of this Agreement, "Proceeds" shall mean the aggregate of (a) the total amount (in dollars) of all sales of Merchandise made under this Agreement and all service revenue, in each case during the Sale Term and exclusive of Sales Taxes; (b) all proceeds of Merchant's insurance for loss or damage to Merchandise arising from events occurring during the Sale Term; and (c) any and all proceeds received by Agent from the disposition of Remaining Merchandise.  For the avoidance of doubt: (1) proceeds from the sales at Merchant's Stores or through the e-commerce platform for periods prior to the Sale Commencement Date; (2) the proceeds from the sale of Merchant Consignment Goods pursuant to Section 5.4 hereof (subject to Agent's right to receive the commission under Section 5.4 below); (3) all proceeds of Merchant's insurance for loss or damage to goods arising from events occurring prior to the Sale Commencement Date; (4) proceeds from the sale or other disposition of Owned FF&E (subject to Agent's right to receive the FF&E Commission under Section 7.1 below); (5) proceeds from the sale of Additional Agent Goods; and (6) payments made by Agent on account of the Guaranteed Amount, the Sharing Amounts (if any), Expenses, or the Letter of Credit, shall, in each case, not constitute "Proceeds" hereunder.

(b)    On the first business day following the entry of the Approval Order (the "Payment Date"), Agent shall pay to Merchant an amount equal to eighty-five percent (85%) of the estimated Guaranteed Amount of the Retail Price of Merchandise in the Stores as of the Sale Commencement Date (based upon Merchant's books and records maintained in the ordinary course as of the date immediately preceding the Payment Date, but in no event shall such estimate of the Retail Price of Merchandise be less than the Merchandise Threshold) (the "Initial Guaranty Payment") by wire transfer of immediately available funds to an account designated in writing by Merchant on Exhibit 3.3(b) attached hereto ("Merchant's Account").  The balance of the Guaranteed Amount, if any, shall be paid by Agent by wire transfer of immediately available funds to the Merchant's Account on the earlier of (i) the date that is thirty (30) days after the Sale Commencement Date and (ii) the second business day following the issuance of the final report of the aggregate Retail Price of the Merchandise included in the Sale by the Inventory Taking Service, after review, reconciliation and mutual written verification thereof by Agent and Merchant, in consultation with the Lender  (the "Final Inventory Report" with the date of completion of such reconciliation and issuance of such Final Inventory Report to be referred to as the "Inventory Reconciliation Date") (and in the case of "(i)" herein, Agent shall tender payment of only the

4

undisputed portion on account of any remaining portion of the Guaranteed Amount). To the extent that Merchant is entitled to receive any funds on account of the Sharing Amount due to Merchant, Agent shall pay such Sharing Amount as part of the Final Reconciliation under Section 8.7. To the extent that the Guaranteed Amount has not been paid in full by the date of the Final Reconciliation, Agent shall pay the unpaid portion of the Guaranteed Amount to Merchant as part of the Final Reconciliation. In the event of a dispute as to the calculation of the portion of the Guaranteed Amount, any such dispute shall be resolved in the manner and at the times set forth in Section 8.7 hereof. To the extent the Agent fails to pay when due the balance or an undisputed portion, if any, of any remaining portion of the Guaranteed Amount in accordance with this section 3.3(b), Merchant and/or Lender shall have the rights granted under Section 3.4 hereof to the extent of such balance or undisputed portion. Merchant and Agent shall exercise commercially reasonable best efforts to reconcile the Inventory Taking within ten (10) days after its completion by the Inventory Taking Service.

    (c)  All Proceeds shall be controlled by Agent in the manner provided for below.

    (i)  Agent may (but shall not be required to) establish its own accounts (including without limitation credit card accounts and systems) with five (5) business days advance notice to Merchant, dedicated solely for the deposit of the Proceeds and the disbursement of amounts payable to Agent hereunder (the "Agency Accounts"), and Merchant shall use commercially reasonable procedures, upon Agent's reasonable request, execute and deliver all necessary documents to open and maintain the Agency Accounts; provided, however, Agent shall have the right, in its sole and absolute discretion, to continue to use Merchant's Designated Deposit Accounts (as defined below) as the Agency Accounts in which case Merchant's Designated Deposit Accounts shall be deemed to be Agency Accounts. Agent shall exercise sole signatory authority and control with respect to the Agency Accounts. The Agency Accounts shall be dedicated solely to the deposit of Proceeds and other amounts contemplated by this Agreement and the distribution of amounts payable hereunder. Agent shall deliver to Merchant, not later than three (3) business days following receipt thereof, copies of all bank statements and other information relating to such accounts. The Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the Sale and the Agency Accounts, whether received during or after the Sale Term. Upon Agent's notice to Merchant of Agent's designation of the Agency Accounts (other than Merchant's Designated Deposit Accounts), all Proceeds of the Sale (including credit card Proceeds) shall be deposited into the Agency Accounts.

    (ii)  Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, Merchant's identification number(s) and existing bank accounts for credit card transactions relating solely to the Sale. In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures. Without limiting the foregoing, Merchant shall cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s). At Agent's request, Merchant shall cooperate with Agent to establish Merchant's identification numbers under Agent's name to enable Agent to process all such credit card Proceeds for Agent's account. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to the Sale, whether received during or after the Sale Term. Agent shall not be responsible for, as an Expense or otherwise, any credit card fees, charges, or chargebacks that do not relate to the Sale, whether received prior to, during or after the Sale Term.

5

(iii)    Unless and until Agent establishes its own Agency Accounts (other than Merchant's Designated Deposit Accounts), all Proceeds and other amounts contemplated by this Agreement (including credit card Proceeds), shall be collected by Merchant and deposited on a daily basis into depository accounts designated by, and owned and in the name of, Merchant for the Stores, which accounts shall be designated solely for the deposit of Proceeds and other amounts contemplated by this Agreement (including credit card Proceeds), and the disbursement of amounts payable to or by Agent hereunder (the "Designated Deposit Accounts").  The Designated Deposit Accounts shall be cash collateral accounts, with all cash, credit card payments, checks and similar items of payment, deposits and any other amounts in such accounts being Proceeds or other amounts contemplated hereunder, and Merchant hereby grants to Agent a first priority senior security interest in each Designated Deposit Account and all proceeds (including Proceeds) in such accounts from and after the Sale Commencement Date.  If requested by Agent, each account shall be subject to an agreement between and among the Agent, the Merchant and the subject bank (in form and content reasonably satisfactory to each party), providing for, among other things, that such bank will comply with instructions originated by Agent directing the disposition of funds in such account without further consent of the Merchant (a "Control Agreement").  If, notwithstanding the provisions of this Section 3.3(c), Merchant or Lender receives or otherwise has dominion over or control of any Proceeds or other amounts due to Agent, Merchant and Lender shall be deemed to hold such Proceeds and other amounts "in trust" for Agent and shall not commingle Proceeds or other amounts due to Agent with any of Merchant's or Lender's other funds or deposit such Proceeds or other amounts in any account except a Designated Deposit Account or as otherwise instructed by Agent.

(iv)    On each business day, Merchant shall promptly pay to Agent by wire funds transfer all funds in the Designated Deposit Accounts (including, without limitation, Proceeds, Proceeds from credit card sales, and all other amounts) deposited into the Designated Deposit Accounts for the prior day(s) without any offset or netting of Expenses or other amounts that may be due to Merchant.  Agent shall notify Merchant and JNS INVT, LLC ("Lender") of any shortfall in such payment, in which case, Merchant (or Lender, as the case may be) shall promptly pay to Agent funds in the amount of such shortfall.

(d)    In the event that the Agent funds or pays all or any portion of Merchant's obligations under this Agreement, such funding or payment cannot be recovered by the Agent under section 3.3(e) by means of an offset, and, as a result of such funding or payment, Merchant (or Lender) received more value than Merchant (or Lender) would have otherwise received under this Agreement had Agent not funded or paid such obligations, Lender shall pay all such funded or paid amounts to Agent within two (2) business days of Agent's request.  If and to the extent the Agent over-funds any amounts in respect of the Guaranteed Amount hereunder and Merchant for any reason fails to refund Agent such overfunded amount after two (2) business days written demand by Agent, Lender shall, within two (2) business days of written demand by Agent, pay to the Agent the over-funded amount.  Notwithstanding anything to the contrary in this Agreement, the Lender shall be required to pay to Agent any amount. in excess of the amounts actually received by such Lender pursuant to this Agreement, unless the Lender is the proximate cause of an Event of Default such as the filing of a motion for appointment of a chapter 11 trustee or conversion of the Debtors' cases to cases under chapter 7 of the Bankruptcy Code or declares or an "event of default" under any debtor-in-possession financing or use of cash collateral in which case the foregoing limitation shall not be applicable.

(e)    Merchant and Agent further agree that if at any time during the Sale Term, (i) Agent holds any amounts due to Merchant under this Agreement, Agent may, in its discretion, after five (5) business days' notice to Merchant, offset such amounts being held by Agent against any undisputed

6

amounts due and owing by, or required to be paid by, Merchant hereunder, and (ii) Merchant holds any amounts due to Agent under this Agreement, Merchant may, in its discretion, after five (5) business days' notice to Agent, offset such amounts being held by Merchant against any undisputed amounts due and owing by, or required to be paid by, Agent hereunder.

(f)    In addition to the Guaranteed Amount, in connection with the first Weekly Sale Reconciliation, Agent shall purchase and pay Merchant by wire transfer to the account designated in writing by Merchant all cash in the Stores on and as of the start of business on the Sale Commencement Date on a dollar for dollar basis.

3.4    Security.  In order to secure Agent's obligations under this Agreement to pay the balance of any unpaid portion of the Guaranteed Amount, Sharing Amount (if any),  Expenses and other amounts due Merchant hereunder, no later than the Payment Date, Agent shall deliver to JNS INVT, LLC (as defined herein, the Lender), as Merchant's designee, an irrevocable standby Letter of Credit, substantially in the form of Exhibit 3.4 attached hereto, naming Lender and Merchant as co-beneficiaries (each, a "Beneficiary") in the aggregate original face amount equal to the sum of: (a) fifteen percent (15%) of the estimated Guaranteed Amount (based upon Merchant's books and records maintained in the ordinary course as of the date immediately preceding the Payment Date), plus (b) the parties' mutually agreed upon estimate of three weeks of Expenses, which shall be substantially in the form of Exhibit 3.4 hereof (the "Letter of Credit").   The Letter of Credit shall be delivered to JNS INVT, LLC (as defined herein, the Lender), as Merchant's designee, no later than the second business day following the Payment Date, and shall be issued by a U.S. national bank selected by Agent and reasonable acceptable to Merchant and the Lender, which shall include Bank of America, N.A. and its affiliates.  In the event that Agent fails to timely pay any undisputed amount hereunder in respect of the Guaranteed Amount, Sharing Amount (if any), Additional Agent Goods Fee (if any) and/or Expenses as required under this Agreement, Merchant and the Lender shall be entitled to draw on the Letter of Credit to fund such undisputed amount or obligation after five (5) business days' written notice to Agent, provided Agent does not pay such undisputed amount within such five-day period.  The Letter of Credit shall have an expiry date of no earlier than sixty (60) days after the Sale Termination Date.  Upon Lender's receipt of payment in full of its claims against the Merchant, Lender shall promptly deliver the Letter of Credit to Merchant and take all steps necessary to remove itself as a named beneficiary thereunder.  Unless the parties shall have mutually agreed that they have completed the Final Reconciliation under this Agreement, then, at least ten (10) business days prior to the initial or any subsequent expiry date, Agent shall cause the Beneficiaries to receive an amendment to the Letter of Credit solely extending (or further extending, as the case may be) the expiry date by at least thirty (30) days.  If Agent fails to provide the Beneficiaries such amendment to the Letter of Credit no later than ten (10) business days before the expiry date, then the Beneficiaries shall be permitted to draw the full amount under the Letter of Credit to hold as security for amounts that may become due and payable to Merchant.  In the event that Agent, after receipt of five (5) business days' written notice, fails to pay any undisputed portion of the Guaranteed Amount or Expenses, the Beneficiaries may draw on the Letter of Credit in an amount equal to the unpaid, past due, amount of the Guaranteed Amount or Expenses that is not the subject of a reasonable dispute.  Lender, Merchant and Agent agree that, from time to time upon Agent's request, the face amount of the Letter of Credit shall be reduced by the aggregate amount of payments made by Agent on account of the Guaranteed Amount to the time of each such request (and Merchant and Lender shall cooperate with respect to each such request); provided, however, in no event shall the face amount of the Letter of Credit be reduced to an amount less than the parties' mutually agreed upon estimate of three weeks of estimated Expenses until the Final Reconciliation.

7

Section 4.  Expenses of the Sale.

4.1    Expenses.  Agent shall be unconditionally responsible for all "Expenses," which expenses shall be paid by Agent in accordance with Section 4.2 below.  Agent and/or Merchant and/or Lender may review or audit the Expenses at any reasonable time.  As used herein, "Expenses" shall mean the Store-level operating expenses of the Sale which arise during the Sale Term and are attributable to the Sale, limited to the following:

(a)    actual payroll (including wages and commissions (if applicable)) with respect to all Retained Employees used in connection with conducting the Sale for actual days/hours worked at a Store during the Sale Term (excluding hours worked during the Inventory Taking), as well as payroll for any temporary labor engaged for the Sale provided, that Agent shall only be obligated to pay 50% of the payroll wages for Store-level Retained Employees used during the Inventory Taking, and Merchant shall pay the remaining 50% of the payroll wages for Store-level Retained Employees used during the Inventory Taking;

(b)    any amounts payable by Merchant for benefits for Retained Employees (including FICA, unemployment taxes, workers' compensation and healthcare insurance, but excluding Excluded Payroll Benefits) for Retained Employees used in the Sale, in an amount not to exceed 18.0% of the base payroll in the aggregate for the  Retained Employees in the Stores (the "Payroll Benefits Cap");

(c)    the actual Occupancy Expenses for the Stores on a per location and per diem basis in an amount up to the aggregate per diem per location amount set forth on Exhibit 4.1(c), including but not limited to, (i) the portion of any percentage rent obligations attributable to the sale of Merchandise during the Sale Term, plus (ii) the portion of any percentage rent obligations attributable to the sale of Additional Agent Goods during the Sale Term (in the case of 4.1(c)(i) and (ii), as determined in the manner described in the definition of "Occupancy Expenses" below in this Section 4.1); provided, however, that in respect of section 4.1(c)(i) and (ii), percentage rent shall only be an "Expense" if and to the extent such percentage rent obligation for a Store is reflected on Exhibit 4.1(c) (through the designation of a specific percentage (e.g., 5%)), and, if no percentage rent obligation is reflected on Exhibit 4.1(c) for each a Store, Agent shall not be liable for any percentage rent associated with each such Store and percentage rent shall not be an "Expense" for each such Store; in all cases Occupancy Expenses shall be limited on a per Store, per category, and per diem basis not to exceed the respective categories and amounts shown on Exhibit 4.1(c);

(d)    Retention Bonuses for Retained Employees, as provided for in Section 9.4 below;

(e)    advertising and direct mailings relating to the Sale, Store interior and exterior signage and banners, and signwalkers, in each case relating to the Sale;

(f)    credit card fees, bank card fees, and chargebacks and credit/bank card discounts with respect to Merchandise sold in the Sale;

(g)    bank service charges (for Store, corporate accounts, and Agency Accounts), check guarantee fees, and bad check expenses to the extent attributable to the Sale;

(h)    costs for additional Supplies at the Stores necessary to conduct the Sale as requested by Agent;

8

(i)    all fees and charges required to comply with applicable laws in connection with the Sale as agreed to by Agent;

(j)    Store cash theft and other store cash shortfalls in the registers;

(k)    all costs and expenses associated with Agent's on-site supervision of the Stores and Distribution Centers, including (but not limited to) any and all fees, wages, taxes, third party payroll costs and expenses, and deferred compensation of Agent's field personnel, travel to, from or between the Stores and Distribution Centers, and out-of-pocket and commercially reasonable expenses relating thereto (including reasonable and documented corporate travel to monitor and manage the Sale);

(l)    postage, courier and overnight mail charges requested by Agent to the extent relating to the Sale;

(m)    fifty percent (50%) of cost of the Inventory Taking Service; provided, however, if the cost of the Inventory Taking Service exceeds $180,000, Agent shall pay 100% of the cost of the Inventory Taking Service in excess of $180,000 and such cost shall be considered Expenses;

(n)    Agent's actual cost of capital (including Letter of Credit fees) and insurance attributable to the Sale, and Merchant's insurance under Section 12 prorated to include amounts attributable to the Sale Term;

(o)    Agent's reasonable out-of-pocket costs and expenses associated with this Agreement, the Sale, or the transactions contemplated by this Agreement, including, but not limited to, legal fees and expenses incurred in connection with the review of data, preparation, negotiation, and execution of this Agreement and any ancillary documents, and the Sale;

(p)    third party payroll processing expenses associated with the Sale;

(q)    costs of transfers initiated by Agent of Merchandise between and among the Stores during the Sale Term, including delivery and freight costs, it being understood that Agent shall be responsible for coordinating such transfer of Merchandise, subject, however, to the provisions of section 8.1(e); and

(r)    $7,500 per week, pro rated for partial weeks, on account of Central Service Expenses;

(s)    Subject to Merchant's written consent, which shall not be unreasonably withheld or delayed, the documented actual costs and expenses of Agent providing such additional services as the Agent reasonably deems appropriate for the Sale.

Notwithstanding anything herein to the contrary, to the extent that any Expense category listed in section 4.1 is also included on Exhibit 4.1(c), Exhibit 4.1(c) shall control and such Expenses shall not be double counted.  There will be no double counting or payment of Expenses to the extent that Expenses appear or are contained in more than one Expense category.

As used herein, the following terms have the following respective meanings:

9

(i)    "<u>Central Service Expenses</u>" means costs and expenses for Merchant's central administrative services necessary for the Sale, including, but not limited to, internal payroll processing, MIS services, cash and inventory reconciliation, data processing and reporting, email preparation and distribution, information technology and e-commerce site updates and maintenance, and accounting (collectively, "<u>Central Services</u>").

(ii)    "<u>Excluded Payroll Benefits</u>" means (i) the following benefits arising, accruing or attributable to the period prior to, during, or after the Sale Term:  (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence and (z) ERISA coverage and similar contributions and/or (ii) any other benefits in excess of the Payroll Benefits Cap, including, without limitation, any payments due under the WARN Act.

(iii)    "<u>Occupancy Expenses</u>" means, with respect to the Stores, base rent, percentage rent, HVAC, utilities, CAM (common area maintenance), landlord promotional fees, storage costs, real estate and use taxes, Merchant's association dues and expenses, utilities expenses, cash register maintenance (including point-of-sale systems maintenance), routine repairs and maintenance, building maintenance, trash and snow removal, housekeeping and cleaning expenses, pest control services, telecom/telephone charges (including local and long-distance telephone) and internet/wifi expenses (including broadband internet), satellite broadband connections, T-1 lines, security (including, without limitation, security systems, courier and guard service, building alarm service and alarm service maintenance), taxes and licenses, rental for furniture, fixtures and equipment, and all other categories of expenses at the Stores as set forth on Exhibit 4.1(c) attached hereto and in an amount up to the specific amounts set forth on Exhibit 4.1(c) attached hereto and calculated in accordance with Section 4.1(c), plus any percentage rent obligations incurred by Merchant under applicable leases or occupancy agreements that are allocable to the sales as part of the Sale during the Sale Term of: (x) Merchandise and (y) Additional Agent Goods included in the Sale.

(iv)    "<u>Third Party</u>" means, with reference to any Expenses to be paid to a Third Party, a party which is not affiliated with or related to the Merchant.

(v)    Notwithstanding any other provision of this Agreement to the contrary, "<u>Expenses</u>" shall not include: (i) Excluded Payroll Benefits; (ii) Central Service Expenses, (iii) Occupancy Expenses or any occupancy-related expenses of any kind or nature in excess of the respective per Store, per diem occupancy-related categories and amounts expressly provided for as an Expense under Section 4.1(c) above to the extent actually incurred; (iv) any expenses of any kind relating to or arising from Merchant's home office or Distribution Centers, including (without limitation) the Distribution Center Expenses (except as set forth in Section 4.3), and/or (v) any other costs, expenses or liabilities payable by Merchant not provided for herein, all of which shall be paid solely by Merchant promptly when due, subject to the provisions of the Bankruptcy Code and the Approval Order.

4.2    <u>Payment of Expenses.</u>

Agent shall be responsible for the payment of all Expenses out of Proceeds (or from Agent's own accounts if and to the extent there are insufficient Proceeds) after the payment of the Guaranteed Amount.  All Expenses incurred during each week of the Sale (*i.e.* Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or paid by Merchant and thereafter reimbursed by Agent as provided for herein, immediately following the Weekly Sale Reconciliation; <u>provided</u>, <u>however</u>, in the event that the actual amount of an Expense is unavailable on the date of the reconciliation (such as

10

payroll), Merchant and Agent shall agree to an estimate of such amounts, which amounts will be reconciled once the actual amount of such Expense becomes available.  Agent and/or Merchant may review or audit the Expenses at any time.

      4.3      Distribution Center Expenses

      From and after the Sale Commencement Date, Agent shall be responsible for allocating and designating the shipment of Merchandise, including Agent's Additional Agent Goods, from the Merchant's Distribution Centers to the Stores.  From and after the date on which this Agreement is executed and pending Bankruptcy Court approval hereof, Merchant and Agent shall cooperate with each other and shall mutually agree upon a schedule and allocation to the Stores of the Merchandise located at the Distribution Centers. In any event, Agent shall provide Merchant with the schedule and allocation of Merchandise to the Stores no later than the Sale Commencement Date.  Notwithstanding the foregoing and except as otherwise provided herein, all costs and expenses of operating the Distribution Centers, including, but not limited to, use and occupancy expenses, Distribution Center employee payroll and other obligations,  and/or processing, transferring, consolidating, shipping, and/or delivering goods within or from the Distribution Centers (the "Distribution Center Expenses"), shall remain the sole obligation of the Merchant. Agent shall have no right to use the Distribution Center for Additional Agent Goods unless otherwise agreed to by Merchant and Agent.  Notwithstanding anything contained in this Section 4.3 to the contrary, from and after the date on which there is no Merchandise remaining in the Distribution Center, the Merchant may terminate and discontinue use of the Distribution Centers in its discretion and without penalty hereunder.

    Section 5.    Gross Rings; Merchandise.

      5.1      Inventory Taking.

      (a)      Commencing on the Sale Commencement Date, Merchant and Agent shall cause to be taken a STYLE level and Retail Price physical inventory of the Merchandise located in the Stores (collectively, the "Inventory Taking"), which Inventory Taking shall be completed in each of the Stores as soon as practicable (the date of the Inventory Taking at each Store being the "Inventory Date" for each such Store), but in any event no later than twenty-one (21) days after the Sale Commencement Date (subject to the availability of the Inventory Taking Service), and, with respect to Merchandise located in Merchant's Distribution Centers, upon transfer to the Stores.  Merchant and Agent shall jointly employ RGIS or other mutually agreed upon national inventory taking service (the "Inventory Taking Service") to conduct the Inventory Taking. The Inventory Taking shall be conducted in accordance with the procedures and instructions set forth on Exhibit 5.1(a) (the "Inventory Taking Instructions").  As an Expense, Agent shall be responsible for fifty percent (50%) of cost of the Inventory Taking Service. Merchant shall be responsible for fifty percent (50%) of cost of the Inventory Taking Service (capped at $90,000).  Except as provided in the immediately preceding two sentences, Merchant and Agent shall each bear their respective costs and expenses relative to the Inventory Taking.  Merchant, Lender, and Agent may each have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service.  Merchant agrees that during the conduct of the Inventory Taking (which the Merchant and Agent anticipate should not reasonably take more than one (1) day at any Store), the applicable Store shall be closed to the public, and no sales or other transactions shall be conducted within the applicable Store.  Merchant and Agent further agree that until the Inventory Taking in a particular Store is completed, neither the Merchant nor Agent shall: (i) move Merchandise within or about the Store so as to make any such items unavailable for counting as part of the Inventory Taking, provided, that, for the avoidance of doubt, the foregoing shall not restrict the

11

Agent's ability to transfer Merchandise between Stores subject to the restriction set forth in section 8.1(e); or (ii) remove or add any hang tags, price tickets, inventory control tags affixed to any Merchandise or any other kind of in-store pricing signage within the Store.  Merchant agrees to cooperate with Agent to conduct the Inventory Taking (including without limitation by making available to Agent information relating to sales, units, costs and Retail Price, and making available to Agent Merchant's books, records, work papers and personnel to the extent reasonably necessary to calculate the Retail Price of the Merchandise).  Each Store will be closed during the Inventory Taking; provided, however, that the parties agree that the Inventory Taking will commence at a time that will minimize the number of hours that the Stores will be closed for business.  The Inventory Taking, including, but not limited to the Final Inventory Report, shall be reviewed, reconciled, and mutually verified by the Merchant and Agent in writing as soon as practicable following the Inventory Taking.

(b)     At each Store, for the period from the Sale Commencement Date until the Inventory Date for such Store, Agent and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable Sales Taxes but excluding any prevailing discounts ("Gross Rings"), and (ii) cash reports of sales within such Store.  Register receipts shall show for each item sold the Retail Price for such item and the markdown or discount, if any, specifically granted by Agent in connection with such Sale.  Agent shall pay that portion of the Guaranteed Amount calculated on the Gross Rings basis, to account for shrinkage, on the basis of 101.0% of the aggregate Retail Price of Merchandise sold during the Gross Rings Period.  All such records and reports shall be made available to Agent and Merchant during regular business hours upon reasonable notice.  Any Merchandise included in the Sale using the Gross Rings method shall be included as Merchandise.

5.2     Merchandise Subject to This Agreement.

(a)     For purposes of this Agreement, "Merchandise" shall mean all (i) new, finished, first-quality saleable goods in the ordinary course of business located at the Stores as of the Sale Commencement Date (including Merchandise subject to Gross Rings), (ii) Defective Merchandise, and (iii) Distribution Center Merchandise received at the Stores no later than seven (7) days after the Sale Commencement Date, provided that if such goods are received at the Stores after such seven-day period, but on or before fourteen (14) days after the Sale Commencement Date (the "Receipt Deadline"), such goods shall be included in the Sale as Merchandise at the Retail Price of each good multiplied by the inverse of the then prevailing Sale discount for each such good.   "Merchandise" shall not include:  (1) goods which belong to sublessees, licensees, department lessees, or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) Excluded Defective Merchandise; (4) Merchant's Consignment Goods; (5) Additional Agent Goods; (6) furniture, furnishings, trade fixtures, machinery, equipment, office supplies, Supplies, conveyor systems, racking, rolling stock, and other personal property (but expressly excluding cash registers and point-of-sale system) (collectively without such exclusions, "FF&E") or improvements to real property; provided that Agent shall be permitted to sell Owned FF&E as set forth in Section 7 below; or (7) Distribution Center Merchandise received at the Stores after the Receipt Deadline or in-transit or on order goods.

(b)     As used in this Agreement, the following terms have the respective meanings set forth below:

"Defective Merchandise" means any item of Merchandise which is not new, finished, first-quality, saleable goods sold in the normal or ordinary course.  Examples of Defective Merchandise include but are not limited to goods that are used, damaged, defective, scratched, soiled, dented, shopworn, out of box (if normally sold as new in-the-box), out of season, missing pieces, mismatched,

12

mismated, parts, items typically sold as a set which are incomplete, or gift with purchase items; provided, however, that display items and other clothing and accessories that can be sold individually shall not *per se* constitute "Defective Merchandise".

"Excluded Defective Merchandise" means any item of (i) Defective Merchandise that is not saleable in the ordinary course because it is so damaged or defective that it cannot reasonably be used for its intended purpose or for which the parties cannot mutually agree upon a Retail Price or (ii) obsolete or discontinued goods or goods that have been marked out of stock or have received a similar designation. Excluded Defective Merchandise shall be identified as such during the Inventory Taking.

"Distribution Center Merchandise" means all new, finished, first-quality saleable goods in the ordinary course of business located at Merchant's warehouse/distribution centers on the Sale Commencement Date (collectively, the "Distribution Centers") and reflected on Exhibit 5.2(b).

"Merchandise File" shall mean the following files, together with all updates and additional files received by Agent from Merchant through the Sale Commencement Date: "Dots Accessory Dept 4-5 (Item Level).xlsx", "Dots Junior Dept 4-5 (Item Level).xlsx", "Dots Plus Dept 4-5 (Item Level).xlsx", "Simply Fashions Accessory Dept 4-5 (Item Level).xlsx", "Simply Fashions Closeouts 4-5 (Item Report).xlsx", "Simply Fashions Junior Dept 4-5 (Item Level).xlsx", "Simply Fashions Plus Dept 4-5 (Item Level).xlsx", "Simply Fashions Super Plus Dept 4-5 (Item Level).xlsx".

5.3    Valuation.

(a)    For purposes of this Agreement, "Retail Price" shall be determined as of the Sale Commencement Date and shall mean with respect to each item of Merchandise, the lower of the lowest (i) ticketed price, (ii) marked price, (iii) shelf price, (iv) Merchandise File price, (iv) other file price as reflected in Merchant's books and records for such items, and (v) "buy one get one", "BOGO", "two for", or similar promotion price (which price shall be determined after taking into account such "buy one get one", "BOGO", "two for", or similar promotional pricing) of such item of Merchandise.

(b)    Notwithstanding the provisions of Section 5.3(a), with respect to each item of Defective Merchandise, the parties shall mutually agree upon the "Retail Price" (and if Agent and Merchant are unable to mutually agree on the Retail Price of any one or more items of Defective Merchandise, such items shall be deemed Excluded Defective Merchandise).

5.4    Excluded Goods.    Merchant shall retain all responsibility for any goods not included as "Merchandise" hereunder.  If the Merchant elects at the beginning of the Sale Term, Agent shall accept goods not included as "Merchandise" hereunder for sale at prices mutually agreed upon by Agent and Merchant (such goods, "Merchant's Consignment Goods").  The Agent shall retain 20% of the receipts (net of Sales Taxes) for all sales of Merchant's Consignment Goods, and Merchant shall receive 80% of the receipts (net of Sales Taxes) in respect of such sales.  Merchant shall receive its share of the receipts of sales of Merchant's Consignment Goods on a weekly basis, immediately following the Weekly Sale Reconciliation.  If Merchant does not elect to have Agent sell goods not included as Merchandise or Merchant and Agent are unable to agree upon prices, then all such items will be removed by Merchant from the Closing Stores at Merchant's expense as soon as practicable and shall not be shipped to the Closing Stores from the Distribution Centers absent Agent's express written consent.  Agent shall have no cost, expense or responsibility in connection with any goods not included in Merchandise.

13

Section 6.  <u>Sale Term</u>.

6.1    <u>Term</u>.  Subject to satisfaction of the conditions precedent set forth in Section 10 hereof, the Sale shall commence at each Store on the date that is one (1) day after the Bankruptcy Court enters the Approval Order, but in no event later than May 7, 2015 (such date, the "<u>Sale Commencement Date</u>").  Agent shall complete the Sale at each Store no later than June 30, 2015 (the "<u>Sale Termination Date</u>", and the period from the Sale Commencement Date to the Sale Termination Date as to each Store being the "<u>Sale Term</u>").  Notwithstanding the foregoing, Agent may, in its discretion, earlier terminate the Sale on a Store-by-Store basis upon not less than seven  (7) days' prior written notice (a "<u>Vacate Notice</u>") to Merchant (the "<u>Vacate Date</u>"), <u>provided</u>, that it being understood that the Agent's obligations to pay all Expenses, including Occupancy Expenses, for each Store subject to a Vacate Notice shall continue until the applicable Vacate Date for such Store.

6.2    <u>Vacating the Store</u>.  At the conclusion of the Sale, Agent agrees to leave each Store in "broom clean" condition and otherwise in at least as good condition as on the Sale Commencement Date, ordinary wear and tear excepted, except for unsold items of Owned FF&E which may be abandoned by Agent in place in a neat and orderly manner pursuant to Section 7 below.  Agent shall vacate each Store on or before the Sale Termination Date as provided for herein, at which time Agent shall surrender and deliver the Store premises, and Store keys, to Merchant.  Agent's obligations to pay all Expenses for the Stores shall continue until the applicable Vacate Date for each Store.

Section 7.  <u>FF&E</u>.

7.1    <u>Owned FF&E</u>.  Agent shall sell all FF&E owned by Merchant located at the Stores, whether or not reflected on Exhibit 7.1 but including (without limitation) all items set forth on Exhibit 7.1 (the "<u>Owned FF&E</u>").   Merchant shall have the option, which option shall be exercised no later than one business day before the Sale Commencement Date, to have Agent sell the Owned FF&E on a commission or guaranteed basis.  Merchant hereby represents, warrants, covenants, and agrees in favor of Agent that: (i) all Owned FF&E may be sold by Agent on Merchant's behalf, free and clear of all liens, claims, and encumbrances; (ii) Merchant owns all Owned FF&E and has good and marketable title to and all right, power, and authority to sell the Owned FF&E, and (iii) all Owned FF&E is devoid of hazardous materials and substances. As used herein, unless otherwise and later agreed to by the Merchant and the Agent in writing, the term Owned FF&E shall not include (i) any  FF&E located in any premise other than the Stores (including the Corporate Office or any Distribution Center) and (ii) the point of sale system equipment, wheresover located.

7.2    <u>FF&E Guaranteed Option</u>.  If Merchant elects to have Agent sell the Owned FF&E on a guaranteed basis, Agent shall pay Merchant an amount equal to $728,650 (i.e., $2,950 per Store for 247 Stores) for the sole and exclusive right to sell or otherwise dispose of the Owned FF&E in the Stores (with no exclusions other than Merchant's cash registers and point-of-sale system, which are excluded from the definition of FF&E) (the "<u>Additional Guaranteed Amount</u>"), shall be reduced by $2,950 per Store for any Store that is closed prior to the Sale Commencement Date and which Additional Guaranteed Amount shall be paid by Agent on the Payment Date; <u>provided</u>, <u>further</u>, that, if Merchant elects to have Agent sell the Owned FF&E on a guaranteed basis at the Distribution Center and/or Corporate Office, Merchant and Agent shall mutually agree upon the guaranteed amount for the Distribution Center and/or Corporate Office (the "<u>Additional DC/CO Guaranteed Amount</u>"), which Additional DC/CO Guaranteed Amount shall be paid at time(s) mutually acceptable to the Parties.  In consideration for the payment of the Additional Guaranteed Amount and, if applicable the Additional DC/CO Guaranteed Amount, Agent shall be authorized to sell the Owned FF&E and retain all proceeds

14

(net of Sales Taxes, which shall be handled in accordance with section 8.3) from the sale of all Owned FF&E at the Stores and, if applicable, the Distribution Center and/or Corporate Office (the "FF&E Proceeds") for Agent's sole and exclusive benefit, which FF&E Proceeds shall not constitute Proceeds, and, in such circumstances, Agent shall be responsible for the payment of all costs and expenses associated with the disposition of the applicable Owned FF&E, other than Distribution Centers Expenses or any costs or expenses associated with the Corporate Offices, all of which shall be paid when due by Merchant.

       7.3    FF&E Fee Option.  If Merchant elects to have Agent sell the Owned FF&E on a fee basis, Agent shall be entitled to receive a commission equal to twenty percent (20%) of the gross proceeds from the sale of the Owned FF&E (net only of Sales Taxes), and Merchant shall reimburse Agent for Agent's documented costs and expenses associated with selling the Owned FF&E pursuant to a mutually agreed upon budget.  Merchant shall be solely responsible for all costs and expenses associated with the sale of the FF&E, including (without limitation) Agent's costs and expenses.

       7.4    Abandonment of FF&E.    Anything in this Agreement to the contrary notwithstanding, Agent shall be authorized to abandon any and all FF&E, whether owned or not by Merchant, in place without any cost or liability to any party.  For the avoidance of doubt, Agent shall have no responsibility whatsoever with respect to FF&E that is not owned by Merchant.

    Section 8.  Conduct of the Sale.

       8.1    Rights of Agent.  In addition to any other rights granted to Agent elsewhere in this Agreement, Agent shall be permitted to conduct the Sale as a "store closing", "sale on everything", "going out of business", "everything must go", or similar themed sale throughout the Sale Term without compliance with any Liquidation Sale Laws.  The Agent shall conduct the Sale in the name of and on behalf of the Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement and subject to the Approval Order.  Agent shall conduct the Sale in accordance with the sale guidelines attached hereto as Exhibit 8.1(the "Sale Guidelines").  Subject to the Approval Order and Sale Guidelines, in addition to any other rights granted to Agent hereunder in conducting the Sale, the Agent, in the exercise of its reasonable discretion shall have the right:

       (a)    to establish Sale prices and discounts and Store hours;

       (b)    except as otherwise expressly included as an Expense, to use without charge during the Sale Term all FF&E, computer hardware and software, existing Supplies, intangible assets (including Merchant's name, logo and tax identification numbers), Store keys, case keys, security codes and safe and lock combinations required to gain access to and operate the Stores, and any other assets of the Merchant located at the Stores or the Distribution Centers (whether owned, leased, or licensed);

       (c)    (i) to be provided by Merchant (at no additional cost to Agent) with central office facilities, central administrative services and personnel to process and perform Central Services and provide other central office services reasonably necessary for the Sale; but in no event shall Merchant be required to (x) provide any such services or facilities at a level in excess of the levels of such services and facilities customarily provided in connection with Merchant's operation of the Stores or (y) hire or retain personnel not presently employed or engaged by Merchant; (ii) to use not to exceed three reasonably sized offices located at Merchant's office facility located in Birmingham, Alabama to effect the Sale; and (iii) to use, subject to the Dots Carveout, all customer lists, mailing lists, email lists, and web and social networking sites utilized by Merchant in connection with its business (but solely in connection with the

15

Sale and pursuant to such reasonable restrictions requested by Merchant in order for Merchant to comply with its privacy policy and applicable laws governing the use and dissemination of confidential consumer personal data).

         (d)    to establish and implement advertising, signage and promotion programs consistent with the "store closing", "sale on everything", "going out of business", "everything must go", or similar themed including without limitation by means of media advertising, and similar interior and exterior signs and banners, and the use of sign walkers;

         (e)    to transfer Merchandise between and among the Stores at Agent's expense; provided, however, the Agent shall not transfer Merchandise between and among Stores so as to make the Merchandise unavailable for purposes of the Inventory Taking; and

         (f)    subject to the provisions of Section 8.10 below, to include Additional Agent Goods as part of the Sale.

         8.2    <u>Terms of Sales to Customers; Final/As Is Sales</u>.  All sales of Merchandise will be "final sales" and "as is," and appropriate signage and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash or nationally recognized bank credit cards.  Agent shall accept and honor coupons during the Sale Term, including but not limited to, Merchant's membership program as well as Merchant's employee discount terms as are in effect immediately prior to the commencement of the Sale Term.  The Agent shall clearly mark all receipts for the Merchandise sold at the Stores during the Sale Term so as to distinguish such Merchandise from the goods sold prior to the Sale Commencement Date.  Merchant shall reimburse Agent in cash for all amounts related to coupons, including, but not limited to, Merchant's membership programs as well as Merchant's employee discount terms, during each Weekly Sale Reconciliation provided for in Section 8.7.

         8.3    <u>Sales Taxes</u>.

         (a)    During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise and Additional Agent Goods, as indicated on Merchant's point of sale equipment (other than taxes on income, but specifically including, without limitation, gross receipts taxes) payable to any taxing authority having jurisdiction (collectively, "<u>Sales Taxes</u>") shall be added to the sales price of Merchandise and Additional Agent Goods and collected by Agent, on Merchant's behalf and in trust for Merchant and for the benefit of the taxing authorities, at the time of sale and paid over to Merchant.  All Sales Taxes shall be deposited into a segregated account designated by Merchant and Agent solely for the deposit of such Sales Taxes (the "<u>Sales Taxes Account</u>").  If Agent does not timely remit Sales Taxes to Merchant, Merchant shall be permitted to immediately draw on the Letter of Credit in unremitted amount of Sales Taxes collected by Agent in the preceding week.  Merchant shall prepare and file all applicable reports and documents required by the applicable taxing authorities, and Merchant shall promptly pay all Sales Taxes collected by Merchant or turned by Agent to Merchant from the Sales Taxes Account.  Merchant will be given access to the computation of gross receipts for verification of all such Sales Tax collections.  If Agent calculates Sales Taxes using systems other than Mercahnt's systems, Agent shall reimburse Merchant for any additional Sales Taxes, interest, fines, penalties, and similar amounts payable to any taxing authority as the result of a Sales Tax audit conducted by or on behalf of such authority which discloses that the Sales Takes collected by Agent and paid over to Merchant for any period during the Sale Term were less than those mandated by applicable law for the sale of Merchandise, Additional

16

Agent Goods and/or Owned FF&E, if any, that is sold by Agent under this Agreement (any such additional Sales Taxes and other amounts are collectively referred to herein as "Additional Taxes and Penalties"). Provided that Agent performs its responsibilities in accordance with this Section 8.3, Agent shall have no further obligation to the Merchant, the Lender, any taxing authority, or any other party, and Merchant (and Lender to the extent it has received any funds on account of Sales Taxes) shall indemnify and hold harmless Agent and its officers, directors, employees, agents and independent contractors (collectively, "Agent Indemnified Parties") from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Agent sustains or incurs as a result or consequence of the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required by applicable law to be filed with or delivered to such taxing authorities. If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with its obligations hereunder, Agent shall indemnify and hold harmless Merchant and its officers, directors, employees, agents and independent contractors (collectively, "Merchant Indemnified Parties") from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties (including but not limited to all Additional Taxes and Penalties) which Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.

(b)     Without limiting the generality of Section 8.3(a) hereof, it is hereby agreed that, as Agent is conducting the Sale solely as agent for the Merchant, various payments that this Agreement contemplates that one party may make to the other party (including the payment by Agent of the Guaranteed Amount) do not represent the sale of tangible personal property and, accordingly, are not subject to Sales Taxes.

8.4     Supplies. Agent shall have the right to use, without charge, all existing supplies located at the Stores, Distribution Centers and corporate office(s), including, without limitation, boxes, bags, paper, twine and similar sales materials (collectively, "Supplies"). In the event that additional Supplies are required in any of the Stores during the Sale, Merchant agrees to reasonably cooperate with Agent to obtain the same, if reasonably available, for which Agent shall reimburse the Merchant at Merchant's cost therefor in connection with each Weekly Sale Reconciliation.

8.5     Returns of Merchandise. Agent shall accept returns of goods sold by Merchant prior to the Sale Commencement Date ("Returned Merchandise"), provided that such return is in compliance with Merchant's return policy in effect immediately prior to the Sale Commencement Date. If such Returned Merchandise is otherwise "Merchandise" it shall be included in the Sale at its Retail Price, multiplied by the inverse of the then prevailing Sale discount on the date of the return. To the extent Returned Merchandise is salable as first quality merchandise, it shall be included in Merchandise and for purposes of the calculation of the Guaranteed Amount and (i) if returned during the first seven (7) days of the Sale, shall be valued at the Retail Price applicable to such item or (ii) if returned after such seven-day period, shall be valued at the Retail Price applicable to such item multiplied by the inverse of the then prevailing Sale discount. Subject to Merchant's reimbursement to Agent of the amount of any store credit or refund granted for any such Returned Merchandise, the aggregate Retail Price of the Merchandise shall be increased by the applicable Retail Price of any Returned Merchandise, and the Guaranteed Amount shall be adjusted accordingly. If the Returned Merchandise is not first. quality goods, Merchant and Agent shall negotiate in good faith to determine an appropriate Retail Price applicable to such merchandise for purposes of determining the Retail Price attributable thereto; provided that, in the event Merchant and Agent cannot agree on the Retail Price to be attributed to any particular

items) of Returned Merchandise, than such items) shall be segregated form Merchandise and excluded from the Sale and treated as Excluded Defective Merchandise for all purposes hereunder. Any reimbursements due to Agent as a result of Returned Merchandise shall be accounted for and paid by Merchant immediately following the Weekly Sale Reconciliation pursuant to Section 8.7 hereof. Any increases in payment on account of the Guaranteed Amount as a result of Returned Merchandise shall be paid by Agent as part of the Final Reconciliation provided for under Section 8.7 hereof. In brief, the aggregate Retail Price of the Merchandise shall be increased by the adjusted Retail Price of any Returned Merchandise included in Merchandise (determined in accordance with this Section 8.5). In addition, Merchant shall promptly reimburse Agent in cash or credit for any refunds Agent is required to issue to customers in respect of any Returned Merchandise during each Weekly Sale Reconciliation provided for in Section 8.7. Except to the extent that Merchant and Agent agree that Merchant's POS or other applicable systems can account for returns of goods, all returns must be noted and described in a mutually agreeable Returned Merchandise log on a weekly basis during the Sale.

8.6     Gift Certificates; Membership Program.

(a)     During the Sale Term, Agent shall accept Merchant's gift certificates, gift cards, return credits, and similar merchandise credits issued by Merchant in accordance with Merchant's polities and the terms and conditions applicable to such items (collectively, the "Gift Certificates"), which terms and conditions will be made available by Merchant to Agent prior to the Sale Commencement Date; and Merchant shall reimburse Agent in cash for such amounts during the Weekly Sale Reconciliation provided for in Section 8.7. Agent shall not sell any Gift Certificates.

(b)     During the Sale Term, customers may elect to take advantage of (i) discounts afforded customers in connection with Merchant's membership program benefits and/or Merchant's then valid coupons (collectively, "Merchant Discounts"); or (ii) the then-prevailing Sale discounts being offered by Agent, but not both on a cumulative basis. To the extent the customer elects an applicable Merchant Discount, then Merchant shall reimburse Agent in cash during the Weekly Sale Reconciliation for the value/differential between the applicable Merchant Discount and the then-prevailing Sale discounts being offered by Agent.

8.7     Sale Reconciliation. On each Wednesday during the Sale Term, Agent and Merchant shall cooperate to reconcile Expenses of the Sale, make payments/setoffs on account of the Guaranteed Amount, Agent's Fee, Sharing Amounts, sales of Additional Agent Goods, and Owned FF&E, and reconcile such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e. Sunday through Saturday), all pursuant to procedures agreed upon by Merchant and Agent (the "Weekly Sale Reconciliation"). On a weekly basis, Agent shall also provide Merchant (and a copy to the Lender) with a report (in electronic format reasonably acceptable to Merchant) of all sales of Additional Agent Goods, which report shall detail by Store gross sales (net of Sales Taxes) and, if available with Merchant's systems, items sold. Within thirty (30) days after the end of the Sale Term, or as soon as practicable thereafter, Agent and Merchant shall jointly prepare a final reconciliation of the Sale, including, without limitation, a summary of Proceeds, Sales Taxes, Expenses, and any other accountings required hereunder (the "Final Reconciliation"), the written results of which shall be certified by representatives of each of the Merchant and Agent as a final settlement of accounts between the Merchant and Agent. Within five (5) days after the completion of the Final Reconciliation and execution of a settlement letter including an appropriate mutual release, Agent shall pay to Merchant, or Merchant shall pay to Agent, as the case may be, any and all amounts due the other pursuant to the Final Reconciliation. Once executed by Merchant and Agent, such settlement and Final Reconciliation shall be deemed approved without further order of the Bankruptcy Court (other than the Approval Order).

18

During the Sale Term, and thereafter until all of Merchant's and Agent's obligations under this Agreement have been satisfied, Merchant and Agent shall have reasonable access to Merchant's and Agent's records with respect to the Sale (including, but not limited to, Retail Price, Merchandise, Expenses, and Proceeds) to review and audit such records.  In the event that there is any dispute with respect to either (x) the determination of the aggregate Retail Price of the Merchandise as reflected in the Final Inventory Report and/or (y) the Final Reconciliation, such dispute shall be promptly (and in no event later than the fifth (5th) business day following a request by either Merchant or Agent) submitted to the Bankruptcy Court for resolution.  In the event of a dispute as to (x) or (y) above, Agent shall extend the Letter of Credit in accordance with the provisions of Sections 3.4 hereof, as applicable. If Agent has for any reason not so extended the expiration date of the Letter of Credit by the date that is ten (10) business days prior to the applicable expiration date (as may have been extended previously), Merchant and/or Lender shall have the right to make a drawing under the Letter of Credit in an amount or amounts equal to the undisputed amounts Merchant asserts are then owing to Merchant.

8.8     Force Majeure.  If any casualty, act or threatened act of terrorism, or act of God prevents or substantially inhibits the conduct of business in the ordinary course at any of the Stores for a period of five (5) consecutive days, the Merchandise located at such Store shall, in Agent's reasonable discretion (after consultation with the Merchant), be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Sale which is not the subject of insurance proceeds, and Merchant (or Lender to the extent it has received any funds on account of the Guaranteed Amount) shall within five (5) business days following written demand by Agent reimburse Agent for the amount the Guaranteed Amount is so reduced.

8.9     Right to Monitor.  Merchant shall have the right to monitor the Sale and activities attendant thereto and to be present in the Stores during the hours when the Stores are open for business; provided that Merchant's presence does not unreasonably disrupt the conduct of the Sale.  Merchant shall also have a right of access to the Stores at any time in the event of an emergency situation and shall promptly notify Agent of such emergency.

8.10    Additional Agent Goods.

(a)     Agent shall have the right to supplement the Merchandise in the Sale with additional goods procured by Agent which are of like kind, and no lesser quality to the Merchandise in the Sale ("Additional Agent Goods").  The Additional Agent Goods shall be purchased by Agent as part the Sale at Agent's sole expense (and such purchase price shall not constitute an Expense).  Agent shall have no right to use the Distribution Center for Additional Agent Goods unless otherwise agreed to by Merchant and Agent.  Sales of Additional Agent Goods shall be run through Merchant's point of sale systems, provided however, Agent shall mark the Additional Agent Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Agent Goods from the sale of Merchandise.  Agent and Merchant shall also cooperate so as to ensure that the Additional Agent Goods are marked in such a way that a reasonable consumer could identify the Additional Agent Goods as non-Merchant goods.  Additionally, Agent shall provide, at Agent's sole expense (and as an Expense), signage in the Stores notifying customers that the Additional Agent Goods have been included in the Sale.

19

(b)    In addition to all other compensation due to Merchant under this Agreement, Agent shall pay to Merchant an amount equal to five percent (5.0%) percent of the gross proceeds (excluding Sale Taxes) from the sale of the Additional Agent Goods (the "Additional Agent Goods Fee") and Agent shall retain all remaining amounts from the sale of the Additional Agent Goods.  Agent shall pay Merchant its Additional Agent Goods Fee in connection with each Weekly Sale Reconciliation with respect to sales of Additional Agent Goods sold by Agent during each then prior week (or at such other mutually agreed upon time in the case of Additional Agent Goods sold pursuant to Section 3.2(b) above).

(c)    Agent and Merchant intend that the transactions relating to the Additional Agent Goods are, and shall be construed as, a true consignment from Agent to Merchant in all respects and not a consignment for security purposes.  Subject solely to Agent's obligations to pay to Merchant the Additional Agent Goods Fee, at all times and for all purposes the Additional Agent Goods and their proceeds shall be the exclusive property of Agent, and no other person or entity shall have any claim against any of the Additional Agent Goods or their proceeds.  The Additional Agent Goods shall at all times remain subject to the exclusive control of Agent.

(d)    Merchant shall, at Agent's sole expense (and not as an Expense), insure the Additional Agent Goods and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers.  Agent shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Agent Goods, which amount shall be deemed an Additional Agent Goods expense.

(e)    Merchant acknowledges, and the Approval Order shall provide, that the Additional Agent Goods shall be consigned to Merchant as a true consignment under Article 9 of the Code.  Agent is hereby granted a first priority security interest in and lien upon (i) the Additional Agent Goods and (ii) the Additional Agent Goods proceeds, which security interest shall be deemed perfected pursuant to the Approval Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Agent is hereby authorized to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Goods as consigned goods thereunder and the Merchant as the consignee therefor, and Agent's security interest in and lien upon such Additional Agent Goods and Additional Agent Goods proceeds).

(f)    Lender hereby acknowledges receipt of notice of the consignment of the Additional Agent Goods and consents to the payments to Agent of Additional Agent Goods proceeds.

8.11    Collective Bargaining Agreements; Leases.  Agent shall not be obligated to comply with any of Merchant's collective bargaining agreements or leases/occupancy agreements; except as provided for in sections 4.1(a) and 4.1(c) herein.

Section 9.  Employee Matters.

9.1    Merchant's Employees.  Agent may use Merchant's employees in the conduct of the Sale to the extent Agent deems necessary for the Sale, and Agent may select and schedule the number and type of Merchant's employees required for the Sale.  Agent shall identify any such employees to be used in connection with the Sale (each such employee, a "Retained Employee").  Notwithstanding the foregoing, Merchant's employees shall at all times remain employees of the Merchant.  Agent's selection and scheduling of Merchant's employees shall at all times comply with all applicable laws and regulations.  Merchant and Agent agree that, except to the extent that wages and benefits of Retained

20

Employees constitute Expenses hereunder, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Payroll Benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any employment agreement, collective bargaining agreement, or be deemed a joint or successor employer with respect to such employees. Merchant shall not, without the prior consent of Agent, raise the salary or wages or increase the benefits for, or pay any bonuses or other extraordinary payments to, any Store employees prior to the Sale Termination Date. Merchant shall not transfer any employee in anticipation of the Sale nor any Retained Employee during the Sale Term, in each case without Agent's prior consent.

   9.2 <u>Termination of Employees</u>. Agent may in its discretion stop using any Retained Employee at any time during the Sale, subject to the conditions provided for herein. In the event that Agent desires to cease using any Retained Employee, Agent shall notify Merchant at least seven (7) days prior thereto; <u>provided</u>, <u>however</u>, that, in the event that Agent determines to cease using an employee "for cause" (such as dishonesty, fraud or breach of employee duties), the seven (7) day notice period shall not apply; <u>provided</u>, <u>further</u>, <u>however</u>, that Agent shall immediately notify Merchant of the basis for such "cause." From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent. Notwithstanding the foregoing, Agent shall not have the right to terminate the actual employment of any employee, but rather may only cease using such employee in the Sale and paying any Expenses with respect to such employee (and all decisions relating to the termination or non-termination of such employees shall at all times rest solely with Merchant).

   9.3 <u>Payroll Matters</u>. During the Sale Term, Merchant shall process the payroll for all Retained Employees and any former employees and temporary labor engaged for the Sale. Each Wednesday (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Agent shall transfer to Merchant's payroll accounts an amount equal to the base payroll for Retained Employees plus related payroll taxes, workers' compensation and benefits for such week, to the extent such amount constitutes Expenses hereunder.

   9.4 <u>Employee Retention Bonuses</u>. Subject to approval by the Bankruptcy Court, Agent may pay, as an Expense, retention bonuses ("<u>Retention Bonuses</u>") (which bonuses shall be inclusive of payroll taxes, but as to which no benefits shall be payable), up to a maximum of ten percent (10%) of base payroll for all Retained Employees, to such Retained Employees who do not voluntarily leave employment and are not terminated "for cause," as Agent may determine in its discretion. Subject to approval by the Bankruptcy Court, the amount of such Retention Bonuses shall be in an amount to be determined by Agent, in its discretion, and shall be payable within thirty (30) days after the Sale Termination Date, and shall be processed through Merchant's payroll system.

  Section 10. <u>Conditions Precedent and Subsequent</u>.

   (a) The willingness of Agent to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Agent:

21

(i)     All representations and warranties of the Merchant hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the Sale Commencement Date.

(ii)     Lender has executed this Agreement (with all Exhibits attached hereto) solely to bind itself to the provisions specifically relating to Lender herein.

(iii)     The Bankruptcy Court shall have entered the Approval Order by May 6, 2015, or such later date as mutually agreed upon by the Merchant and the Agent (the "Approval Order Deadline").

(b)     The willingness of Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by the Merchant:

(i)     All representations and warranties of Agent hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the Sale Commencement Date.

(ii)     Lender has executed this Agreement (with all Exhibits attached hereto), subject to the Approval Order, solely to bind itself to the provisions specifically relating to such Lender herein, subject to the Approval Order.

Section 11.   Representations, Warranties and Covenants.

11.1     Merchant's Representations, Warranties and Covenants.     Merchant hereby represents, warrants and covenants in favor of Agent as follows:

(a)     Merchant (i) are entities  duly organized, validly existing and in good standing under the laws of the State of Florida and the State of Alabama; (ii) subject to the applicable provisions of the Bankruptcy Code, has all requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of the Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)     Subject to entry of the Approval Order, the Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "Agency Documents") and to perform fully its obligations thereunder.  Subject to entry of the Approval Order, Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.  Subject to entry of the Approval Order, each of the Agency Documents has been duly executed and delivered by the Merchant

22

and constitutes the legal, valid and binding obligation of the Merchant enforceable in accordance with its terms.

(c)    Merchant owns, and will own at all times during the Sale Term, good and marketable title to all of the Merchandise and Owned FF&E to be included in the Sale, free and clear of all security interests, liens, claims and encumbrances of any nature (other than the security interests and liens of the Agent hereunder and Lender).  Merchant shall not create, incur, assume or suffer to exist any security interest, lien or other charge or encumbrance upon or with respect to any of the Merchandise or the Proceeds (or the Owned FF&E and its proceeds), in each case other than the liens and security interests of Agent hereunder and of the Lender and any other liens and security interests granted pursuant to Merchant's debtor-in-possession financing (if any) and cash collateral usage.

(d)    Merchant has maintained its pricing files (including (without limitation) the Merchandise File) in the ordinary course of business, and prices charged to the public for goods are the same in all material respects as set forth in such pricing files for the periods indicated therein, and all pricing files and records are true and accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods without consideration of any point of sale discounts, as of the dates and for the periods indicated therein. Merchant represents that (i) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes and (ii) all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law, as such calculations have been identified to Merchant by its retained service provider.

(e)    Through the Sale Commencement Date, Merchant has ticketed or marked, and shall continue to ticket or mark, all items of inventory received at the Stores in a manner consistent with similar Merchandise located at the Stores, and in accordance with Merchant's ordinary course past practices and policies relative to pricing and marking inventory.  Since April 1, 2015, Merchant has not removed any POS promotions, sale stickers, or other markings indicating items are on sale or on clearance from the Merchandise prior to the Sale Commencement Date, and have not raised, and will not raise, prices of any Merchandise in contemplation of the Sale.

(f)    Since April 1, 2015, Merchant has not, and through the Sale Commencement Date Merchant shall not, purchase for or transfer to or from the Stores any merchandise or goods outside the ordinary course; provided, however, that in no event shall Merchant transfer any goods into the Stores without Agent's consent from and after the date hereof.

(g)    To Merchant's knowledge after reasonable inquiry, all Merchandise is in compliance with all applicable federal, state and local product safety laws, rules and standards.  Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls prior to the Sale Commencement Date.

(h)    Subject to the provisions of the Approval Order, Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, the Stores, the assets currently located at the Stores, and the utilities and other services provided at the Stores.  Merchant shall, throughout the Sale Term, maintain in good working order, condition and repair all cash registers, heating systems, air conditioning systems, elevators, escalators and all other mechanical devices necessary or appropriate for the conduct of the Sale at the Stores.  Except as otherwise restricted by the Bankruptcy Code or as provided herein and absent a bona fide dispute, throughout the Sale Term Merchant shall remain current on all expenses and payables necessary or appropriate for the conduct of the Sale.

23

(i)     Subject to approval by the Bankruptcy Court, Merchant has paid, and will continue to pay throughout the Sale Term, all self-insured or Merchant-funded employee benefit programs for Store employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(j)     Since April 1, 2015, Merchant has not taken, and shall not throughout the Sale Term take, any actions with the intent of increasing the Expenses of the Sale, including without limitation increasing salaries or other amounts payable to employees; except to the extent an employee was due an annual raise in the ordinary course.

(k)     Since April 1, 2015, Merchant has operated, and, except as otherwise restricted by the Bankruptcy Code or as provided herein and absent a bona fide dispute, through the Sale Commencement Date Merchant covenants to continue to operate, the Stores in all material respects in the ordinary course of business including without limitation by: (i) selling inventory during such period at customary prices consistent with the ordinary course of business; (ii) not promoting or advertising any sales or in-store promotions (including POS promotions) to the public outside of the Merchant's ordinary course of business; (iii) except as may occur in the ordinary course of business, not returning inventory to vendors and not transferring inventory or supplies out of or to the Stores; (iv) except as may occur in the ordinary course of business, not making any management personnel moves or changes at the Stores; and (v) replenishing the Stores in the ordinary course of business.

(l)     Prior to the execution of this Agreement, Merchant has provided Agent reasonable access to all pricing and cost files, computer hardware, software and data files, inter-Stores transfer logs, markdown schedules, invoices, style runs and all other documents relative to the price, mix and quantities of inventory located at the Stores and the Distribution Centers or on order or in transit.

(m)     Merchant has provided representatives of Agent with access to (and the opportunity to copy) all collective bargaining agreements, and all amendments, modifications, and supplements thereto.

(n)     To Merchant's knowledge after reasonable inquiry, all documents, information and supplements provided by Merchant to Agent in connection with Agent's due diligence and the negotiation of this Agreement were true and accurate in all material respects at the time provided.

(o)     On and as of the Sale Commencement Date, the level of goods (as to quantity) and the mix of goods (as to type, category, style, brand and description) at the Stores shall be in all material respects, subject to ordinary course of business changes and adjustments, consistent with the level and mix set forth on Exhibit 11.1(o).

(p)     Merchant has not and shall not purchase or transfer to or from the Stores any merchandise or goods outside the ordinary course in anticipation of the Sale or of the Inventory Taking.

(q)     Merchant has not since April 1, 2015 shipped any Excluded Defective Merchandise from the Distribution Centers to the Stores.  Merchant will not ship any Excluded Defective Merchandise from the date of this Agreement from the Distribution Centers to the Stores.

(r)     Other than filing the Bankruptcy Case, no action, arbitration, suit, notice, or legal, administrative or other proceeding before any court or governmental body has been instituted by or against the Merchant, or has been settled or resolved, or to Merchant's knowledge, is threatened against or

24

affects Merchant, relative to Merchant's business or properties, or which questions the validity of this Agreement, or that if adversely determined, would adversely affect the conduct of the Sale.

(s)    Merchant shall not, prior to the Sale Termination Date, offer any promotions or discounts at the Stores, any other retail store location, or any other retail sales channel, except as detailed on Exhibit 11.1(s).

(t)    Merchant hereby acknowledges that, as of and after the date of this Agreement, Agent intends to begin to make arrangements for the purchase of Additional Agent Goods from Agent's suppliers of goods as well as Merchant's existing suppliers of goods, all at no cost or expense whatsoever to Merchant and at Agent's sole risk.  To assist Agent in that regard, from and after the date of this Agreement, Merchant shall use Merchant's commercially reasonable efforts to assist and cause Merchant's employees to assist Agent with Agent's efforts to negotiate orders with Merchant's suppliers for goods that Agent is interested in purchasing as Additional Agent Goods, provided that (i) such assistance does not unreasonably interfere with or disrupt Merchant's business operations, (ii) the appropriate employees to perform such activities then remain employees of Merchant, it being agreed that Merchant shall in no event be required to retain any such employee for the purpose of rendering such assistance, (iii) Merchant shall have no liability whatsoever in connection with any orders placed for such Additional Agent Goods or otherwise in connection with the activities contemplated by this subpart (t).

11.2    Agent's Representations, Warranties and Covenants.  Agent hereby represents, warrants and covenants in favor of Merchant as follows:

(a)    Each entity composing Agent: (i) is a limited liability company duly and validly existing and in good standing under the laws of the State of Delaware; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Agent to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)    Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Agent has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale.  Each of the Agency Documents has been duly executed and delivered by the Agent and constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms.  No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for, Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor, other than as provided herein.  No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)    No action, arbitration, suit, notice or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved or, to Agent's knowledge, has been threatened against or affects Agent, which questions the

25

validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement or which, if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

(d)     The Sale shall be conducted in compliance with all applicable state and local laws, rules and regulations and Merchant's leases and other agreements, except as otherwise provided for in the Sale Guidelines and Approval Order.

(e)     Absent prior consent by the Merchant, Agent will not cause any non-emergency repairs or maintenance (emergency repairs are repairs necessary to preserve the security of a Store premise or to ensure customer safety) to be conducted at the Stores.

(f)     To the best of Agent's knowledge, all Additional Agent Goods are in compliance with all applicable federal, state or local product safety laws, rules and standards.  All Additional Agent Goods shall be of like kind and no lesser quality to the Merchandise located in the Stores.

Section 12.  Insurance.

12.1     Merchant's Liability Insurance.  Subject to approval by the Bankruptcy Court, Merchant shall continue at its cost and expense until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies, including, but not limited to, commercial general liability, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with, Merchant's operation of the Stores; and Merchant shall cause Agent to be named as an additional named insured (as its interest may appear) with respect to all such policies.  Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days' prior notice to Agent of cancellation, non-renewal or material change during the Sale Term.  In the event of a claim under any such policies, Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Agent, or Agent's employees, independent contractors or agents.  Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

12.2     Merchant's Casualty Insurance.  Subject to approval by the Bankruptcy Court, Merchant shall provide, as an Occupancy Expense, throughout the Sale Term fire, flood, theft and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the retail value thereof.  From and after the date of this Agreement until the Sale Termination Date, all such policies will also name Agent as an additional named insured or loss payee, as applicable (as its interest may appear).  In the event of a loss to the Merchandise on or after the date of this Agreement, the Proceeds of such insurance attributable to the Merchandise, shall constitute Proceeds hereunder.  Merchant shall deliver to Agent certificates evidencing such insurance, setting forth the duration thereof and naming the Agent as an additional insured or loss payee, as applicable, in form and substance reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days' prior notice to the Agent of cancellation, non-renewal or material change during the Sale Term.  Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

26

12.3    Agent's Insurance.    Agent shall maintain at Agent's cost as an Expense hereunder throughout the Sale Term, in such amounts as it currently has in effect, commercial general liability policies covering injuries to persons and property in or in connection with Agent's agency at the Store, and shall cause Merchant to be named as an additional insured with respect to such policies. Agent shall deliver to Merchant certificates evidencing such insurance policies setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonably satisfactory to Merchant. In the event of a claim under any such policies, Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Merchant or Merchant's employees, independent contractors or agents (other than Agent or Agent's employees, agents or independent contractors). Agent shall not make any change in the amount of any deductibles or self insurance amounts prior to the Sale Termination Date without Merchant's prior written consent.

12.4    Worker's Compensation Insurance.    Subject to approval by the Bankruptcy Court, Merchant shall at all times during the Sale Term maintain in full force and effect workers' compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements.

Section 13.  Indemnification.

13.1    Merchant's Indemnification.    Merchant shall indemnify and hold Agent and its officers, directors, employees, agents, representatives, and independent contractors (collectively, "Agent Indemnified Parties") harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to: (i) Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof; (iii) any failure of Merchant to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term; (iv) any consumer warranty or products liability claims or other claims of any type or kind and by any party whatsoever relating to Merchandise; (v) any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN Act); (vi) any harassment or any other unlawful, tortious, or otherwise actionable treatment of any customers, employees or agents of Agent by Merchant or any of its representatives; (vi) any failure of Merchant to pay to any Occupancy Expenses or Central Service Expenses during the Sale Term; and (vii) the gross negligence (including omissions) or willful misconduct of the Merchant, its officers, directors, employees, agents (other than Agent) or representatives.

13.2    Agent Indemnification.    Agent shall indemnify and hold the Merchant and its officers, directors, employees, agents and representatives harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: (i) Agent's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment; (iii) any harassment or any other unlawful, tortious or otherwise actionable treatment of any customers, employees or agents

27

of the Merchant by Agent or any of its representatives; (iv) any consumer warranty, products liability claims  or other claims of any type or kind and by any party whatsoever  relating to Additional Agent Goods; (v) as set forth in section 8.3 above; (vi) any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Merchant Indemnified Party by reason of acts or omissions of Agent or Agent's representatives in connection with the Sale, and (vii) the gross negligence (including omissions) or willful misconduct of Agent, its officers, directors, employees, agents or representatives.

Section 14.  <u>Defaults</u>.  The following shall constitute "<u>Events of Default</u>" hereunder:

(a)    The Merchant or Agent shall fail to perform any material obligation hereunder if such failure remains uncured five (5) days after receipt of written notice thereof;

(b)    Any representation or warranty made by the Merchant or Agent proves untrue in any material respect as of the date made and, to the extent curable, continues uncured five (5) days after written notice to the defaulting party, save for and representations regarding Retail Price of the Merchandise or the representations in Section 11.1(o) hereof, in which case Agent's sole remedy shall be such adjustment to the Guaranteed Amount mutually acceptable to the Merchant and Agent;

(c)    The filing of a motion by any party to covert the Merchant's bankruptcy case to a case under another chapter of the Bankruptcy Code (other than chapter 11) or the filing of a motion by any party to appoint a chapter 11 trustee; or

(d)    The Sale is terminated prior to the Sale Termination Date or materially interrupted or impaired at any Store for any reason other than (i) an Event of Default by Agent, or (ii) any other material breach or action by Agent not authorized hereunder.

Upon an Event of Default, the non-defaulting party (in the case of (a) or (b) above), or Agent (in the case of (c) above) may in its discretion elect to terminate this Agreement, and any party's damages or entitlement to equitable relief on account of an Event of Default shall (in addition to the right to terminate as provided above) be determined by a court of competent jurisdiction.

Section 15.  <u>Agent's Security Interest</u>.  In consideration of and effective upon payment by Agent of the Initial Guaranty Payment on the Payment Date and the delivery of the Letter of Credit to the Lender, as Merchant's designee, Merchant hereby grants to Agent first priority, senior security interests in and liens upon: (i) the Merchandise; (ii) to the extent of Merchant's ownership therein, the Additional Agent Goods; (iii) all Proceeds (including, without limitation, credit card Proceeds); (iv) the commission regarding the sale or other disposition of Merchant's Consignment Goods under Section 5.4 hereof; (v) the commission regarding the sale or other disposition of Owned FF&E under Section 7 hereof; (vi) any Sharing Amount, but only up to the amount of Agent's percentage share of such Sharing Amount under Section 3.2(a) hereof, and (vii) all "proceeds" (within the meaning of Section 9-102(a)(64) of the Code) of each of the foregoing (all of which are collectively referred to herein as the "<u>Agent Collateral</u>"), to secure the full payment and performance of all obligations of Merchant to Agent hereunder.  Upon entry of the Approval Order, payment of the Initial Guaranty Payment, and delivery of the Letter of Credit to the Lender, the security interests and liens granted to the Agent hereunder shall be deemed properly perfected without the necessity of filing UCC-1 financing statements or any other documentation.

(a)    Without any further act by or on behalf of the Agent or any other party (including (without limitation) the Lender and Merchant), the Agent's security interests and liens in the Agent

28

Collateral created hereunder are (i) validly created, (ii) effective upon entry of the Approval Order, perfected, and (iii) senior to all other liens and security interests, provided, however, that (i) until the Merchant receives payment in full of the Guaranteed Amount, the Additional Agent Goods Fee, the Sharing Amount (if any), Expenses, the proceeds realized upon the sale of Owned FF&E (less the FF&E Commission) or Additional Guaranteed Amount, and such others amountsdue to Merchant hereunder, the security interest granted to Agent hereunder shall remain junior and subordinate in all respects to the security interests of Lender in the Agent Collateral (other than the Additional Agent Goods and proceeds thereof in which Merchant has not property or other interest and Lender has no security interest or other lien), but solely to the extent and amount of the unpaid portion of the Guaranteed Amount, the Additional Agent Goods Fee, the Sharing Amount (if any), Expenses, the proceeds realized upon the sale of Owned FF&E (less the FF&E Commission) or the Additional Guaranteed Amount, and such others amountsdue to Merchant hereunder, and (ii) upon payment in full of  the Guaranteed Amount, the Additional Agent Goods Fee, the Sharing Amount (if any), Expenses, the proceeds realized upon the sale of Owned FF&E (less the FF&E Commission) or the Additional Guaranteed Amount, and such others amountsdue to Merchant hereunder, any security interest or lien of the Lender in the Agent Collateral shall be junior and subordinate in all respects to the security interest and liens of Agent.  Merchant shall cooperate with Agent with respect to all filings (including (without limitation) UUC-1 financing statements) and other actions to the extent reasonably requested by Agent in connection with the security interests and liens granted under this Agreement.

(b)      Merchant will not sell, grant, assign or transfer any security interest in, or permit to exist any encumbrance on, any of the Agent Collateral other than in favor of the Agent and Lender.

(c)      In the event of an occurrence of an Event of Default by the Merchant hereunder, in any jurisdiction where the enforcement of its rights hereunder is sought, the Agent shall have, in addition to all other rights and remedies, the rights and remedies of a secured party under the Code.

(d)      "Code" shall mean the Uniform Commercial Code as the same may be in effect from time to time in the State of Florida.

Section 16.  Bidding and Auction.  The bidding procedures order shall provide that, in consideration of Agent conducting its due diligence and entering into this Agreement (which may serve as a base by which other offers may be measured and is subject to higher and better offers by way of an auction process) ("Auction"); then in the event that this Agreement shall not be consummated with Agent because Merchant elects as a consequence of the Auction to accept or pursue an alternate bid or sale mechanism through the Bankruptcy Court (including, without limitation, one or more transactions for the purchase or any portion of Merchant's assets and business as a going concern or otherwise) (the "Alternate Transaction"), and provided that there is no Event of Default by Agent then pending hereunder and that each of the Break-Up Fee Conditions (hereinafter defined) are satisfied as determined by the Bankruptcy Court, Merchant shall pay Agent (on the first business day following (i) receipt of the initial guaranty payment in the case of a liquidation Alternate Transaction from the initial guaranty payment received from such Alternate Transaction and available for expenditure by the Merchant, (ii) entry of an order approving an Alternative Transaction other than a liquidation transaction from the Deposit (as defined below) received  from such bidder and available for expenditure by the Merchant, or (iii) such later date as Agent may agree) an amount equal to the sum of (i) $75,000 as a combined break-up fee and expense reimbursement to cover Agent's reasonable out-of-pocket costs and expenses associated with due diligence and professionals' fees and expenses associated with, among other things, negotiating, drafting, and obtaining approval of this Agreement and the bid procedures (the "Bid Protection"), and (ii) Agent's documented, actual out-of-pocket costs of signage and freight in an amount not to exceed  $350,000 (the

29

"Signage Costs"); provided, however, that (x) to participate in the Auction, a potential bidder shall be required to (1) post a deposit in an amount not less than the sum of the Bid Protection and the Signage Costs, and such other amount as the Merchant shall require (the "Deposit") and (2) irrevocably affirm in writing, if such potential bidder is the successful bidder, upon entry of the order approving the transaction with such successful bidder, the Merchant is authorized to, and the Merchant shall, use the Deposit to pay the Agent the Bid Protection and the Signage Costs from the Deposit, (y) if the Agent is not the "successful bidder" at the Auction and the successful bidder is the liquidating agent, the Agent agrees to make the signage available to the successful bidder upon receipt of the Bid Protections and Signage Costs from the Merchant.  At the Auction: (i) the Bid Protections shall not be eligible to be "credit bid" by Agent; (ii) the first overbid by a competing bidder shall be an amount equal a Guaranty Percentage of not less than 28.5% (as quantified by the Merchant, acting reasonably, in the case of a going concern bid), with successive overbids in increments of not more than 0.1% absent Agent's consent; and (iii) all competing liquidation bids shall be on the same terms and conditions as this Agreement other than as to the increased Guaranty Percentage as determined by Merchant in its sole discretion.  For the avoidance of all doubt, the requirements of clause (iii) of the immediately preceding sentence shall not apply to any going concern bids received by Merchant.  For avoidance of doubt, Agent's right to receive payment of the Bid Protections and reimbursement of the Signage Costs as provided herein shall be the sole and exclusive remedy of Agent in the event of termination of the Agency Agreement to accept an Alternate Transaction.  In the event Agent not the "successful bidder" at the auction, but is the "next highest bidder, Agent agrees to serve as the "back up" bidder and close the transaction contemplated by this Agreememt, as may modified by the Agent's bidding at the Auction; provided the Sale Commencement Date occurs no later than May 7, 2015 (absent the Agent's express written consent, which may be withheld or granted in the Agent's sole and absolute discretion or modified at the Auction).

Section 17.  Miscellaneous.

17.1    Notices.    All notices and communications provided for pursuant to this Agreement shall be in writing and sent by email, by hand, by facsimile or by Federal Express or other recognized overnight delivery service, as follows:

|  |  |
|---|---|
| If    to    the    Agent: | HILCO MERCHANT RESOURCES, LLC |
|  | 5 Revere Drive, Suite 206 |
|  | Northbrook, IL 60062 |
|  | Attention: Ian S. Fredericks |
|  | Tel: (847) 418-2075 |
|  | Fax: (847) 897-0859 |
|  | Email: ifredericks@hilcotrading.com |
|  |  |
|  | GORDON BROTHERS RETAIL PARTNERS, LLC |
|  | Prudential Tower |
|  | 800 Boylston Street |
|  | Boston, MA 02119 |
|  | Attn:    Michael Chartock |
|  | Tel:    617.210.7116 |
|  | Email: mchartock@gordonbrothers.com |
|  |  |
| If to the Merchant: | Simply Fashion Stores, Ltd. |
|  | 2110 NW 95th Avenue |
|  | Miami, Florida 33172 |

Attn:  Swapnil Shah
Tel:  305.592.2712
Email: sjs@mahudi.com

With a copy to (which shall not constitute notice)

KapilaMukamal
1000 South Federal Highway, Suite 200
Fort Lauderdale, Florida 33316
Attn: Soneet R. Kapila, CRO
Tel:  954.761.1011
Email:  skapila@kapilamukamal

With a copy to (which shall not constitute notice)

Berger Singerman LLP
1450 Brickell Avenue
Miami, Florida 33131
Attn:  Paul Steven Singerman
Tel:  305.714.4343
Email: Singerman@bergersingerman.com
Attn:  Christopher Andrew Jarvinen
Tel:  305.714.4363
Email: cjarvinen@bergersingerman.com

If to the Lender:          JNS INVT, LLC
                           c/o Genovese Joblove & Battista, P.A.
                           100 Southeast Second Street, 44th Floor
                           Miami, Florida 33131
                           Attn:  Paul J. Battista
                           Tel: 305.349.2300
                           Email: pbattista@gjb-law.com

　　　17.2　　　Governing Law/Exclusive Jurisdiction.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of Florida, without reference to any conflict of laws provisions thereof, except where governed by the Bankruptcy Code.  Each of the parties hereto irrevocably and unconditionally submits, for itself and its properties, to the exclusive jurisdiction of the Bankruptcy Court, in any action or proceeding arising out of or relating to this Agreement.

　　　17.3　　　Amendments.  This Agreement, the Exhibits hereto, and the Agency Documents may not be modified except in a written instrument executed by each of the parties hereto and consented to in writing by the Lender (unless the obligations to the Lender are paid in full), which consent shall not be unreasonably withheld, conditioned or delayed.

　　　17.4　　　No Waiver.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of

31

any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

17.5    <u>Currency</u>.  All reference to dollars in this Agreement and all schedules, exhibits, and ancillary documents related to this Agreement shall refer to US dollars.

17.6    <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and be binding upon Agent and Merchant and their respective successors and assigns, including, but not limited to, any chapter 11 or chapter 7 trustee; provided, however, that this Agreement may not be assigned by Merchant or Agent to any party without the prior written consent of the other (which consent may be granted or withheld in the applicable party's sole discretion).

17.7    <u>Execution in Counterparts</u>.  This Agreement may be executed in one or more counterparts.  Each such counterpart shall be deemed an original but all such counterparts together shall constitute one and the same agreement.  This Agreement, to the extent signed and delivered by means of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto, each other party hereto or thereto shall re-execute original forms hereof and deliver them to all other parties.  No party hereto shall raise the use of a facsimile machine, electronic mail, or other electronic transmission in which the actual signature is evident to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident as a defense to the formation of a contract and each party forever waives such defense.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against which enforcement is sought.

17.8    <u>Section Headings</u>.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

17.9    <u>Wiring of Funds</u>.  All amounts required to be paid by Agent or the Merchant under any provision of this Agreement shall be made by wire transfer of immediately available funds which shall be wired by Agent or Merchant, as applicable, no later as 2:00 p.m. (Eastern Time) on the date that such payment is due; provided, however, that all of the information necessary to complete the wire transfer has been received by Agent or Merchant, as applicable, by 10:00 a.m. (Eastern Time) on the date that such payment is due.  In the event that the date on which any such payment is due is not a business day, then such payment shall be made by wire transfer on the next business day.

17.10    <u>Nature of Remedies</u>.  Except to the extent expressly set forth herein, all rights, remedies, powers, privilege and adjustments under sections 3.1(b), 3.4 and 11.1(o) shall be in addition to and not in limitation of those provided elsewhere in this Agreement or by applicable law.  No failure to exercise and no delay in exercising, on the part of the Agent, any right, remedy, power, privilege or adjustment hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, privilege, or adjustment hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, privilege, or adjustment.  For the avoidance of doubt and notwithstanding anything to the contrary in this Agreement, the rights granted to Agent pursuant to Section 16 shall be the Agent's sole and exclusive rights and remedies in the event of a termination of this Agreement by Merchant under Section 16.

32

17.11   <u>Entire Agreement</u>.  This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

33

IN WITNESS WHEREOF, the Agent and the Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**HILCO MERCHANT RESOURCES, LLC**

By: _____

Print              Name              and              Title:

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By: _____

Print              Name              and              Title:

**SIMPLY FASHION STORES, LTD.**

By: _____~Soneet Kapila~_____

Print Name and Title:    SONEET R. KAPILA
                         C.R.O.

**Agreed and Accepted as to Sections
3.3, 3.4, 8.3, 8.8, 8.10, 15, 16, and 17:**
JNS INVT, LLC

By: _____

Print Name and Title:
Swapnil J. Shah, Lender

## List of Exhibits

Exhibit 1 – Store List.
Exhibit 3.1(b) – Merchandise Level Adjustment Schedule.
Exhibit 3.3(b) – Merchant's Designated Account.
Exhibit 3.4 – Form of Letter of Credit.
Exhibit 4.1(c) – Per Store, Per Diem Occupancy Expenses.
Exhibit 5.1(a) – Inventory Taking Instructions.
Exhibit 5.2(b) – Distribution Center
Exhibit 7.1 – Owned FF&E
Exhibit 11.1(o) – Inventory Mix
Exhibit 11.1(s) – Promotional Calendar
Exhibit 11.1(u) – Locations to be Closed
Exhibit 8.1 – Sale Guidelines

34

IN WITNESS WHEREOF, the Agent and the Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**HILCO MERCHANT RESOURCES, LLC**

By: _____

Print Name and Title: Ian Fredericks

VP & Assistant General Counsel, Managing Member

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By:_____

Print Name and Title:

**SIMPLY FASHION STORES, LTD.**

By:_____

Print Name and Title:

**Agreed and Accepted as to Sections
3.3, 3.4, 8.3, 8.8, 8.10, 15, 16, and 17:**
JNS INVT, LLC

By: _____

Print Name and Title:

## List of Exhibits

Exhibit 1 – Store List.
Exhibit 3.1(b) – Merchandise Level Adjustment Schedule.
Exhibit 3.3(b) – Merchant's Designated Account.
Exhibit 3.4 – Form of Letter of Credit.
Exhibit 4.1(c) – Per Store, Per Diem Occupancy Expenses.
Exhibit 5.1(a) – Inventory Taking Instructions.
Exhibit 5.2(b) – Distribution Center
Exhibit 7.1 – Owned FF&E
Exhibit 11.1(o) – Inventory Mix
Exhibit 11.1(s) – Promotional Calendar
Exhibit 11.1(u) – Locations to be Closed
Exhibit 8.1 – Sale Guidelines

6336455-12
4/22/15 3:15 PM

IN WITNESS WHEREOF, the Agent and the Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**HILCO MERCHANT RESOURCES, LLC**

By:_____
Print Name and Title:

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By:_____
Print Name and Title:
Richard Edwards
Co. President - Retail

**SIMPLY FASHION STORES, LTD.**

By:_____
Print Name and Title:

**Agreed and Accepted as to Sections
3.3, 3.4, 8.3, 8.8, 8.10, 15, 16, and 17:
JNS INVT, LLC**

By: _____
Print Name and Title:

## List of Exhibits

Exhibit 1 – Store List.
Exhibit 3.1(b) – Merchandise Level Adjustment Schedule.
Exhibit 3.3(b) – Merchant's Designated Account.
Exhibit 3.4 – Form of Letter of Credit.
Exhibit 4.1(c) – Per Store, Per Diem Occupancy Expenses.
Exhibit 5.1(a) – Inventory Taking Instructions.
Exhibit 5.2(b) – Distribution Center
Exhibit 7.1 – Owned FF&E
Exhibit 11.1(o) – Inventory Mix
Exhibit 11.1(s) – Promotional Calendar
Exhibit 11.1(u) – Locations to be Closed
Exhibit 8.1 – Sale Guidelines

**Simply Fashions**
Exhibit 1

Store List

| Store # | Location Type | Name | Address | City | State | Zip | Phone | Open Date | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|
| 12 | SIMPLY FASHIONS | CHURCH SQUARE S/C | 917 N. CAROLINE STREET | BALTIMORE | MD | 21205 | 410/844-1426 | 7/18/14 | 2,910 |
| 14 | SIMPLY FASHIONS | LEE STREET SHOPPING CTR | 4523 LEE STREET | ALEXANDRIA | LA | 71302 | 318/619-9940 | 05/29/98 | 3000 |
| 15 | SIMPLY FASHIONS | INWOOD CENTRAL | 8161 ANTOINE | HOUSTON | TX | 77088 | 281/931-5450 | 03/15/02 | 3,272 |
| 16 | SIMPLY FASHIONS | PEMBERTON SQUARE | 3505 PEMBERTON SQUARE BLVD #43 | VICKSBURG | MS | 39180 | 601/629-9562 | 08/28/98 | 4,573 |
| 18 | SIMPLY FASHIONS | GATEWAY SHOPPING CENTER | 5238-14 NORWOOD AVENUE | JACKSONVILLE | FL | 32208 | 904/768-1488 | 02/20/93 | 4532 |
| 19 | SIMPLY FASHIONS | AMERICAN WAY PLAZA | 4667 AMERICAN WAY | MEMPHIS | TN | 38118 | 901/362-2545 | 03/19/93 | 4800 |
| 20 | SIMPLY FASHIONS | JEFFERSON SQUARE S/C | 2801 OLIVE ST STE. 8 | PINE BLUFF | AR | 71603 | 870/534-1432 | 05/28/93 | 4,672 |
| 21 | DOTS | EISENHOWER CROSSING | 4673 PRESIDENTIAL PKWY, SUITE M | MACON | GA | 31206 | 478/960-3928 | 7/3/14 | 4,368 |
| 22 | SIMPLY FASHIONS | FREESTANDING | 69-73 W. CHELTEN AVENUE | PHILADELPHIA | PA | 19144 | 215/435-1317 | 3/21/14 | 4,858 |
| 24 | SIMPLY FASHIONS | CENTER CITY | 1629 POPLAR AVE | MEMPHIS | TN | 38104 | 901/274-9551 | 7/16/05 | 3,800 |
| 26 | SIMPLY FASHIONS | TAMPA FESTIVAL CENTRE | 2525 E. HILLSBOROUGH AVE. STE.101 | TAMPA | FL | 33610 | 813/237-5150 | 10/28/93 | 3,900 |
| 27 | SIMPLY FASHIONS | GENTILLY S/C | 3155 GENTILLY BLVD | NEW ORLEANS | LA | 70122 | 504/286-0793 | 10/01/93 | 3,018 |
| 30 | SIMPLY FASHIONS | MERIDIAN MARKETPLACE | 2526 67TH AVE LOOP, #106 | MERIDIAN | MS | 39307 | 601/553-2990 | 5/2/08 | 3,067 |
| 31 | DOTS | EASTGATE S/C | 26200 EASTGATE BLVD | ROSEVILLE | MI | 48066 | 586/675-0852 | 6/7/14 | 7,450 |
| 32 | SIMPLY FASHIONS | FOWLERS PLAZA | 1433 S. EISENHOWER PKWY | MACON | GA | 31206 | 478/781-9672 | 5/11/07 | 4,300 |
| 33 | SIMPLY FASHIONS | CHATHAM VILLAGE SQUARE | 8658 S. COTTAGE GROVE AVE, UNIT #402 | CHICAGO | IL | 60619 | 312/485-4518 | 1/31/15 | 3,060 |
| 36 | SIMPLY FASHIONS | LINDELL MARKETPLACE | 4167 LINDELL BLVD | ST. LOUIS | MO | 63108 | 314/296-2106 | 01/30/15 | 3,850 |
| 37 | SIMPLY FASHIONS | GENTILLY S/C | 4800 CHEF MENTEUR HWY SUITE F | NEW ORLEANS | LA | 70126 | 504/940-2255 | 10/05/10 | 3,000 |
| 39 | SIMPLY FASHIONS | FREESTANDING | 456 MEETING STREET | CHARLESTON | SC | 29403 | 843/722-2526 | 06/30/00 | 3880 |
| 40 | DOTS | BRICKTOWN SQUARE | 6560 WEST FULLERTON AVE | CHICAGO | IL | 60707 | 224/213-0590 | 1/31/15 | 6,000 |
| 41 | DOTS | EAST FOREST PLAZA | 5424 FOREST DRIVE | COLUMBIA | SC | 29206 | 803/239-6545 | 1/30/15 | 4,723 |
| 43 | SIMPLY FASHIONS | LINCOLN S/C | 26150 GREENFIELD RD | OAK PARK | MI | 48237 | 248/514-1483 | 7/25/14 | 7,800 |
| 44 | SIMPLY FASHIONS | N/A | 2111 HWY 82 EAST, SUITE C | GREENVILLE | MS | 38710 | 662/334-3138 | 02/08/02 | 3,000 |
| 45 | SIMPLY FASHIONS | NORTH EASTWOOD PLAZA | 8939 EAST 38TH STREET | INDIANAPOLIS | IN | 46226 | 317/897-8935 | 02/08/02 | 3,300 |
| 46 | SIMPLY FASHIONS | REDFORD PLAZA | 9189 TELEGRAPH RD, SPACE #260 | REDFORD | MI | 48239 | 313/255-2376 | 4/10/09 | 3,660 |
| 47 | DOTS | SALEM CONSUMER SQUARE | 5477 SALEM AVE | DAYTON | OH | 45426 | 937/823-4770 | 1/30/15 | 3,500 |
| 48 | SIMPLY FASHIONS | SOUTHGATE SHOPPING CENTER | 1631 GORDON HWY., SPACE 11 | AUGUSTA | GA | 30906 | 706/790-0669 | 05/27/94 | 6,570 |
| 49 | SIMPLY FASHIONS | OVERBROOK PLAZA | 5610 LANCASTER AVE UNIT #900 A&B | PHILADELPHIA | PA | 19131 | 267/317-0453 | 11/26/14 | 4,370 |
| 52 | DOTS | VICTORY CROSSING S/C | 4010 A VICTORY BLVD | PORTSMOUTH | VA | 23701 | 757/532-6617 | 1/30/15 | 5,250 |
| 53 | SIMPLY FASHIONS | 95TH & JEFFREY | 2023 E. 95TH STREET | CHICAGO | IL | 60617 | 773/933-8660 | 10/3/08 | 2,717 |
| 54 | SIMPLY FASHIONS | SUPER 1 FOODS S/C | 2600 WAGGONER AVE., STE. 208 | SHREVEPORT | LA | 71108 | 318/636-1354 | 03/27/04 | 12,006 |
| 55 | SIMPLY FASHIONS | NORTHWOOD S/C | 4445 NORTH STATE ST. | JACKSON | MS | 39206 | 601/362-0420 | 04/28/04 | 7,135 |
| 57 | SIMPLY FASHIONS | AMERICANA PLAZA | 2141 AMERICANA BLVD, SUITE 110 & 111 | ORLANDO | FL | 32839 | 407/854-8336 | 2/20/09 | 2,800 |
| 58 | SIMPLY FASHIONS | FAMILY DOLLAR BUILDING | 1024 NORTH STATE STREET | CLARKSDALE | MS | 38614 | 662/627-1040 | 8/27/03 | 3,000 |
| 59 | SIMPLY FASHIONS | LINWOOD SQUARE S/C | 3135 PROSPECT | KANSAS CITY | MO | 64128 | 816/861-1015 | 7/15/94 | 8000 |
| 62 | SIMPLY FASHIONS | MT. CLARE JUNCTION | 1229 W. PRATT STREET, SUITE B | BALTIMORE | MD | 21233 | 410/244-8440 | 10/04/06 | 3,000 |
| 63 | SIMPLY FASHIONS | THE LANDINGS | 16743 TORRENCE AVE | LANSING | IL | 60438 | 708/418-3830 | 5/4/09 | 6,000 |
| 66 | SIMPLY FASHIONS | N.W. JUNCTION S/C | 3188 W. NORTHSIDE DR. | JACKSON | MS | 39213 | 601/366-7365 | 9/25/89 | 2847 |
| 68 | SIMPLY FASHIONS | WYANDOTTE PLAZA | 7722 STATE AVE | KANSAS CITY | KS | 66112 | 913/302-7118 | 4/4/14 | 4,490 |
| 70 | DOTS | OAKLAND POINTE PLAZA | 332 N.TELEGRAPH RD | PONTIAC | MI | 48341 | 248/309-0487 | 1/30/15 | 8,600 |
| 72 | SIMPLY FASHIONS | NORTHSIDE PLAZA | 3018 MEMORIAL PKWY NW | HUNTSVILLE | AL | 35810 | 256/859-8004 | 2/14/09 | 4,000 |
| 75 | DOTS | MARCUS PLAZA | 624 WEST MAIN STREET | NORWICH | CT | 06360 | 860/222-4126 | 11/14/14 | 3,850 |
| 76 | DOTS | WATERTOWER PLAZA | 40 WATERTOWER PLAZA | LEOMINSTER | MA | 01453 | 774/364-2450 | 1/30/15 | 3,600 |
| 77 | DOTS | GATEWAY MARKETPLACE | 1355 W. 8 MILE RD | HIGHLAND PARK | MI | 48203 | 248/228-7987 | 6/7/14 | 4,000 |
| 79 | DOTS | WHITEHALL S/C | 2180 MACARTHUR RD SPACE 6-A | WHITEHALL | PA | 18052 | 484/523-0298 | 1/30/15 | 4,250 |
| 80 | DOTS | ROUNDTREE PLACE | 2477 ELLSWORTH RD | YPSILANTI | MI | 48197 | 734/740-2991 | 1/30/15 | 4,000 |
| 82 | SIMPLY FASHIONS | SOUTHLAND MALL | 20505 S. DIXIE HWY, SUITE #829 | CUTLER BAY | FL | 33189 | 305/234-6131 | 5/1/14 | 5,373 |
| 85 | SIMPLY FASHIONS | K-MART PLAZA | 2107 SOUTH US HWY 1 | FT PIERCE | FL | 34950 | 561/489-8068 | 03/31/00 | 2500 |

**Simply Fashions**
Exhibit 1

Store List

| Store # | Location Type | Name | Address | City | State | Zip | Phone | Open Date | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|
| 86 | SIMPLY FASHIONS | BURLINGTON PLAZA | 3753 AUSTELL RD, SUITE 160 & 170 | AUSTELL | GA | 30106 | 770/819-8150 | 6/26/10 | 3,200 |
| 91 | SIMPLY FASHIONS | CHICAGO HEIGHTS HILLTOP PLAZA | 1333 HILLTOP AVE, UNIT D | CHICAGO HEIGHTS | IL | 60411 | 708/481-8730 | 12/12/13 | 3,708 |
| 92 | DOTS | NEWPORT S/C | 1765 MONMOUTH STREET | NEWPORT | KY | 41071 | 859/414-4068 | 10/25/14 | 4,000 |
| 94 | SIMPLY FASHIONS | PINE HILLS MARKETPLACE | 5311 WEST COLONIAL DRIVE | ORLANDO | FL | 32808 | 407/578-6079 | 02/12/03 | 3,600 |
| 95 | SIMPLY FASHIONS | CAHOKIA VILLAGE S/C | 1024 CAMP JACKSON ROAD | CAHOKIA | IL | 62206 | 618/337-6106 | 11/11/94 | 2908 |
| 97 | SIMPLY FASHIONS | THE SHOPS AT WHITE OAK VILLAGE | 4501 SOUTH LABURNUM AVE SPACE 145 | RICHMOND | VA | 23231 | 804/222-2117 | 9/17/10 | 3,965 |
| 99 | SIMPLY FASHIONS | GREENWOOD WEST | 2304 HWY. 82 W. | GREENWOOD | MS | 38930 | 662/453-7437 | 8/01/90 | 2880 |
| 100 | DOTS | CHERRYDALE POINT S/C | 1510 POINSETT HWY | GREENVILLE | SC | 29609 | 864/270-3583 | 1/30/15 | 3,900 |
| 101 | SIMPLY FASHIONS | NEWMARKET SOUTH S/C | 105 NEW MARKET SQUARE EAST | NEWPORT NEWS | VA | 23605 | 757/244-5041 | 2/10/95 | 4538 |
| 102 | DOTS | FOOD 4 LESS S/C | 6930 S. ASHLAND AVE, SUITE 3 | CHICAGO | IL | 60636 | 312/550-0866 | 6/10/14 | 3,900 |
| 104 | SIMPLY FASHIONS | SOUTHLAKE MALL | 1000 SOUTHLAKE CIRCLE, SUITE 2409 | MORROW | GA | 30260 | 404/615-5158 | 5/31/14 | 3,824 |
| 106 | DOTS | RACEWAY PARK S/C | 13053 ASHLAND AVE | CALUMET PARK | IL | 60827 | 312/848-7624 | 5/31/14 | 4,000 |
| 107 | SIMPLY FASHIONS | POINCIANA PLAZA | 1225 W. 45TH STREET, SUITE #303 & #304 | MAGNOLIA PARK | FL | 33407 | 561/494-0705 | 2/25/2011 | 2,400 |
| 109 | DOTS | HERITAGE PLACE S/C | 12551 OLIVE BLVD | CREVE COEUR | MO | 63141 | 314/304-4598 | 1/30/15 | 4,800 |
| 110 | SIMPLY FASHIONS | POPLAR PLAZA S/C | 4930 POPLAR LEVEL ROAD | LOUISVILLE | KY | 40219 | 502/968-7435 | 2/28/95 | 5000 |
| 111 | SIMPLY FASHIONS | LANGLEY SQUARE | 39 WEST MERCURY BLVD | HAMPTON | VA | 23669 | 757/723-1536 | 11/12/99 | 3440 |
| 114 | SIMPLY FASHIONS | NORTH POINTE S/C | 5430G NORTH TRYON STREET | CHARLOTTE | NC | 28213 | 704/599-9777 | 05/17/96 | 3200 |
| 116 | DOTS | SPENCER SQUARE | 3552 SPENCER HWY | PASADENA | TX | 77504 | 713/205-2976 | 1/30/15 | 4,000 |
| 118 | DOTS | VILLAGE S/C | 3604 VILLAGE COURT | GARY | IN | 46408 | 219/742-8550 | 6/27/14 | 6,500 |
| 122 | DOTS | LYNNHAVEN NORTH S/C | 2720 N. MALL DR SUITE 200 | VIRGINIA BEACH | VA | 23452 | 757/266-1324 | 1/30/15 | 5,000 |
| 123 | DOTS | CEDAR HILLS S/C | 3606 BLANDING BLVD | JACKSONVILLE | FL | 32210 | 904/404-6926 | 11/8/14 | 6,000 |
| 124 | SIMPLY FASHIONS | ROEBUCK MARKETPLACE | 9164 PARKWAY EAST | BIRMINGHAM | AL | 35206 | 205/815-1173 | 8/15/08 | 3,000 |
| 126 | SIMPLY FASHIONS | FREESTANDING | 9 N 52ND ST | PHILADELPHIA | PA | 19139 | 267/449-4409 | 1/30/15 | 6,336 |
| 127 | SIMPLY FASHIONS | RIVER COMMONS | 4021 BEHRMAN PLACE, SPACE 1-2 | NEW ORLEANS | LA | 70114 | 504/366-3967 | 05/01/04 | 3000 |
| 128 | SIMPLY FASHIONS | EASTLAND HILL CENTER | 605 GALLATIN ROAD | NASHVILLE | TN | 37206 | 615/226-1066 | 06/30/00 | 4200 |
| 129 | SIMPLY FASHIONS | WEST TOWN PLAZA | 4263 WEST THIRD STREET | DAYTON | OH | 45417 | 937/263-6167 | 03/20/04 | 4,350 |
| 133 | SIMPLY FASHIONS | GRAND BOULEVARD PLAZA | 5401 S. WENTWORTH AVE., UNIT #7 | CHICAGO | IL | 60609 | 773/924-3379 | 5/01/95 | 3500 |
| 133 | SIMPLY FASHIONS | CAPITOL PLAZA | 2288 EAST SOUTH BLVD | MONTGOMERY | AL | 36116 | 334/284-3433 | 2/28/93 | 3421 |
| 137 | SIMPLY FASHIONS | PARKWAY PLAZA | 2001 NW EVANGELIN THRUWAY, SUITE 400 | LAFAYETTE | LA | 70501 | 337/235-8980 | 04/04/03 | 3,247 |
| 138 | SIMPLY FASHIONS | N/A | 5963 PLANK ROAD, SUITE B | BATON ROUGE | LA | 70805 | 225/355-1336 | 10/06/06 | 10,140 |
| 139 | SIMPLY FASHIONS | DODGE PLAZA | 7748 LANDOVER ROAD | LANDOVER | MD | 20785 | 301/773-3691 | 11/10/95 | 2400 |
| 141 | SIMPLY FASHIONS | FOOD WORLD PLAZA SOUTH | 4200 MCFARLAND BOULEVARD | TUSCALOOSA | AL | 35405 | 205/349-4360 | 01/01/92 | 2600 |
| 144 | SIMPLY FASHIONS | FRAYSER PLAZA | 2146 FRAYSER BOULEVARD | MEMPHIS | TN | 38127 | 901/354-8886 | 04/10/98 | 3000 |
| 145 | SIMPLY FASHIONS | IVES DAIRY CROSSING S/C | 19925 NW 2ND AVE, BAY 1 | MIAMI GARDENS | FL | 33169 | 785/510-2707 | 10/3/14 | 3,000 |
| 148 | SIMPLY FASHIONS | SHOPS AT NORTHEAST VILLAGE | 14477 GRATIOT AVENUE | DETROIT | MI | 48205 | 313/527-0282 | 03/01/01 | 6012 |
| 151 | SIMPLY FASHIONS | TOWN & COUNTRY PLAZA | 3300 N. PACE BLVD. #35 | PENSACOLA | FL | 32505 | 850/432-5711 | 01/01/92 | 4312 |
| 153 | DOTS | SHOPPES AT GARNER | 4446 FAYETTEVILLE RD | RALEIGH | NC | 27603 | 919/368-1387 | 1/30/15 | 4,200 |
| 154 | SIMPLY FASHIONS | NORTHLINE CROSSING S/C | 4400 NORTH FREEWAY E 1000 | HOUSTON | TX | 77022 | 281/507-8484 | 1/31/15 | 4,200 |
| 155 | SIMPLY FASHIONS | CANE RUN | 3230 CRUMS LANE | LOUISVILLE | KY | 40216 | 502/449-0883 | 02/23/96 | 3000 |
| 157 | SIMPLY FASHIONS | EASTOVER S/C | 5037 Indian Head Hwy | Oxon Hill | MD | 20745 | 301/749-1435 | 4/26/96 | 3200 |
| 158 | DOTS | STEELYARD COMMONS S/C | 3495 STEELYARD DRIVE | CLEVELAND | OH | 44109 | 216/212-2560 | 6/21/14 | 6,500 |
| 159 | SIMPLY FASHIONS | WESTERN HILLS MALL | 7201 AARON ARONOV DRIVE, STE. 36A | FAIRFIELD | AL | 35064 | 205/925-6004 | 9/29/06 | 3,850 |
| 160 | SIMPLY FASHIONS | THE SHOPPES OF LIBERTY CITY | 1156 NW 54TH STREET | MIAMI | FL | 33127 | 305/757-0797 | 08/24/00 | 3000 |
| 161 | SIMPLY FASHIONS | BLUE PARKWAY TOWN CENTER | 4307 EAST 50TH TERRACE, SPACE A & B | KANSAS CITY | MO | 64130 | 816/921-2810 | 2/3/06 | 3,176 |
| 162 | SIMPLY FASHIONS | GRIGGS ROAD S/C | 4421 GRIGGS ROAD | HOUSTON | TX | 77021 | 713/741-4604 | 2/15/03 | 5,000 |
| 163 | SIMPLY FASHIONS | MADISON SQUARE | 2585 MADISON AVENUE | MONTGOMERY | AL | 36107 | 334/241-8995 | 10/24/08 | 4,000 |
| 164 | SIMPLY FASHIONS | SELMA MALL | 1391 HIGHLAND AVE., SUITE 113 | SELMA | AL | 36703 | 334/418-8884 | 03/13/96 | 3000 |
| 165 | SIMPLY FASHIONS | FAMILY DOLLAR CENTER | 3111 W. CAPITOL STREET | JACKSON | MS | 39209 | 601/354-5564 | 02/27/04 | 3,297 |

**Simply Fashions**
Exhibit 1

| | Store List | |
|---|---|---|

| Store # | Location Type | Name | Address | City | State | Zip | Phone | Open Date | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|
| 166 | SIMPLY FASHIONS | LANTANA VILLAGE SQUARE | 1301 S. DIXIE HWY | LANTANA | FL | 33462 | 561/586-1959 | 2/13/09 | 3,500 |
| 167 | SIMPLY FASHIONS | AZALEA SHOPPING CENTER | 2121 BEMISS ROAD | VALDOSTA | GA | 31602 | 912/245-8040 | 3/15/96 | 2920 |
| 170 | DOTS | TAYLOR COMMONS | 1341 S. MAIN AVE SUITE 210 | SCRANTON | PA | 18504 | 570/209-0637 | 1/30/15 | 7,040 |
| 173 | SIMPLY FASHIONS | EUTAW VILLAGE | 2710 BRAGG BLVD | FAYETTEVILLE | NC | 28303 | 910/321-9483 | 07/21/2000 | 6,500 |
| 174 | SIMPLY FASHIONS | NORTHSIDE SHOPPING CENTRE | 7900 NORTHWEST 27TH AVE., STE. 11B | MIAMI | FL | 33147 | 305/691-1604 | 07/24/96 | 4,000 |
| 175 | SIMPLY FASHIONS | LAMAR AIRWAYS S/C | 2236 LAMAR AVENUE | MEMPHIS | TN | 38114 | 901/454-9377 | 05/25/96 | 4033 |
| 176 | DOTS | STONY ISLAND PLAZA | 1627 E. 95TH ST | CHICAGO | IL | 60617 | 312/914-1902 | 1/30/15 | 3,500 |
| 178 | DOTS | WEST ALLIS | 6822 W. GREENFIELD AVE. #A-114 | WEST ALLIS | WI | 53214 | 414-207-2971 | 03/13/15 | - |
| 180 | SIMPLY FASHIONS | WEST RIDGE | 3050 MARTIN LUTHER KING JR DR. SPACE F1 | ATLANTA | GA | 30311 | 404/699-7395 | 4/14/04 | 2,886 |
| 182 | SIMPLY FASHIONS | LAUDERHILL MALL | 1341 N.W. 40TH AVENUE | LAUDERHILL | FL | 33313 | 954/587-2859 | 09/01/1989 | 3600 |
| 183 | SIMPLY FASHIONS | SAVE A LOT CTR | 1181 E MAIN STREET | COLUMBUS | OH | 43205 | 614/253-3779 | 5/21/08 | 3,000 |
| 184 | DOTS | MODEL T PLAZA | 14110 WOODWARD AVENUE | HIGHLAND PARK | MI | 48203 | 248/915-8625 | 8/29/14 | 3,840 |
| 185 | DOTS | KING SHOPPING CENTER | 7057 MARTIN LUTHER KING DR | LANDOVER | MD | 20785 | 301/773-5117 | 6/21/99 | 4,360 |
| 186 | DOTS | SOUTHGATE USA S/C | 21640 LIBBY ROAD | MAPLE HEIGHTS | OH | 44137 | 216/347-3418 | 1/31/15 | 4,400 |
| 187 | DOTS | THRUWAY PLAZA | 150 THRUWAY PLAZA DR | CHEEKTOWAGA | NY | 14225 | 716/462-2133 | 1/30/15 | 4,978 |
| 188 | DOTS | MIRACLE MILE S/C | 4128 WILLIAM PENN HIGHWAY | MONROEVILLE | PA | 15146 | 412/552-9383 | 11/17/14 | 4,700 |
| 189 | SIMPLY FASHIONS | MARSHFIELD PLAZA | 11612 S. MARSHFIELD AVE | CHICAGO | IL | 60643 | 773/660-8840 | 9/18/09 | 3,000 |
| 190 | DOTS | SOUTHERN PLAZA | 4200 SOUTH EAST ST #31 | INDIANAPOLIS | IN | 46227 | 317/650-5238 | 1/30/15 | 5,003 |
| 191 | DOTS | FONDREN SOUTHWEST VILLAGE | 11168 FONDREN ROAD | HOUSTON | TX | 77096 | 832/544-0371 | 8/29/14 | 5,500 |
| 192 | SIMPLY FASHIONS | VILLAGE GREEN | 1126 280 BYPASS | PHENIX CITY | AL | 36867 | 334/298-1897 | 2/25/11 | 4,200 |
| 193 | SIMPLY FASHIONS | N/A | 3163 CLEVELAND AVENUE | COLUMBUS | OH | 43224 | 614/268-9112 | 08/15/96 | 4464 |
| 196 | SIMPLY FASHIONS | DUNCAN PLAZA | 17235 NW 27TH AVENUE | MIAMI GARDENS | FL | 33056 | 954/540-4395 | 9/12/14 | 3,022 |
| 197 | SIMPLY FASHIONS | BOSSIER TOWN CENTER | 3143 EAST TEXAS STREET | BOSSIER CITY | LA | 71111 | 318/747-5568 | 10/01/89 | 3,568 |
| 198 | SIMPLY FASHIONS | GATEWAY | 3250 JACKSON AVE | MEMPHIS | TN | 38122 | 901/458-7111 | 10/22/03 | 4,979 |
| 199 | SIMPLY FASHIONS | BEL AIR S/C | 8780 E. 8 MILE ROAD | DETROIT | MI | 48234 | 313/892-1683 | 08/30/96 | 3300 |
| 200 | DOTS | MARKETPLACE AT SMYRNA | 801 INDUSTRIAL BLVD SUITE 140 | SMYRNA | TN | 37167 | 615/427-8693 | 1/31/15 | 5,000 |
| 201 | SIMPLY FASHIONS | GALLERY AT WARREN CONNER | 4905 CONNER AVE | DETROIT | MI | 48215 | 313/824-6314 | 2/11/05 | 4,290 |
| 203 | SIMPLY FASHIONS | ELLIS AVENUE PLAZA | 1335 ELLIS AVENUE, #15 | JACKSON | MS | 39204 | 601/949-8448 | 8/1/97 | 3071 |
| 204 | SIMPLY FASHIONS | RIVERVIEW PLAZA | 264 WEST GENESSEE STREET | SAGINAW | MI | 48602 | 989/753-1260 | 11/05/04 | 3,000 |
| 205 | SIMPLY FASHIONS | CULLEN PLAZA | 9426 CULLEN BLVD | HOUSTON | TX | 77051-3321 | 713/738-8552 | 03/08/02 | 3000 |
| 207 | SIMPLY FASHIONS | THE COMMONS ROUTE 20 | 4417 WEST 5TH AVENUE | GARY | IN | 46406 | 219/949-6428 | 09/25/04 | 4,032 |
| 208 | DOTS | JEFFERSON VILLAGE | 11226 JEFFERSON AVENU | DETROIT | MI | 48214 | 313/815-0246 | 11/7/14 | 3,600 |
| 212 | SIMPLY FASHIONS | ROYAL TOWN CENTER | 8900 B WEST EIGHT MILE ROAD | FERNDALE | MI | 48220 | 248/546-6565 | 03/07/03 | 3,612 |
| 213 | SIMPLY FASHIONS | COLLEGE PARK COMMONS | 7940 WEST OUTER DRIVE | DETROIT | MI | 48235 | 313/533-7030 | 6/5/09 | 3,602 |
| 215 | SIMPLY FASHIONS | SOUTH SLAPPEY VILLAGE | 1030 WEST GORDON AVENUE, SUITE F | ALBANY | GA | 31701 | 229/446-9956 | 9/12/97 | 5840 |
| 216 | SIMPLY FASHIONS | WALNUT HILLS PLAZA | 2047 CRATER RD #104 | PETERSBURG | VA | 23805 | 804/862-8529 | 09/24/99 | 4680 |
| 218 | DOTS | SHOPS AT WHITE OAK VILLAGE | 4501 SOUTH LABURNUM AVE SUITE 560 | RICHMOND | VA | 23231 | 757/603-7020 | 1/30/15 | 4,552 |
| 219 | SIMPLY FASHIONS | COUNTRY CLUB PLAZA | 490 LINCOLN ST | WORCESTER | MA | 01613 | 508/735-9290 | 1/31/15 | 5,355 |
| 221 | SIMPLY FASHIONS | THE CROSSINGS AT HALLS FERRY | 10835 OLD HALLS FERRY RD, STE.A | ST. LOUIS | MO | 63136 | 314/867-7885 | 03/02/99 | 3000 |
| 223 | DOTS | CHICAGO | 741 & 743 EAST 47TH STREET | CHICAGO | IL | 60653 | 773-717-0299 | 02/27/15 | - |
| 224 | SIMPLY FASHIONS | SQUARE 67 | 2550 RED BIRD LANE, SUITE 207 | DALLAS | TX | 75237 | 214/330-9354 | 08/26/98 | 3720 |
| 225 | SIMPLY FASHIONS | GREENS CROSSROADS | 221 WEST GREENS ROAD | HOUSTON | TX | 77067 | 281/872-4744 | 9/25/09 | 3,915 |
| 227 | SIMPLY FASHIONS | PLAZA ON THE BLV | 8035 WEST FLORISSANT AVE, SUITE F & G | JENNINGS | MO | 63136 | 314/385-9597 | 11/3/06 | 3,200 |
| 228 | DOTS | NORTHGATE S/C | 339 SQUIRE ROAD | REVERE | MA | 02151 | 617/716-9973 | 11/22/14 | 4,200 |
| 229 | SIMPLY FASHIONS | JOYLAND S/C | 15550 JOY ROAD | DETROIT | MI | 48228 | 313/838-3836 | 2/27/98 | 3025 |
| 230 | SIMPLY FASHIONS | SILVER MILL COURT S/C | 6115 NORTH TEUTONIA AVE | MILWAUKEE | WI | 53209 | 414/357-4522 | 01/31/03 | 4,300 |
| 231 | SIMPLY FASHIONS | MARLOW HEIGHTS S/C | 3923 BRANCH AVENUE | TEMPLE HILLS | MD | 20748 | 301/316-2020 | 6/25/98 | 2979 |
| 233 | SIMPLY FASHIONS | WESTPORT COMMONS S/C | 3264 W. 87TH STREET | CHICAGO | IL | 60652 | 708/710-9119 | 9/19/14 | 3,500 |

**Simply Fashions**
Exhibit 1

| | | | | Store List | | | | | |
|---|---|---|---|---|---|---|---|---|---|

| Store # | Location Type | Name | Address | City | State | Zip | Phone | Open Date | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|
| 234 | SIMPLY FASHIONS | TOWNE SOUTH | 2525 SOUTH MONROE ST. STE. 20 & 21 | TALLAHASSEE | FL | 32301 | 850/656-7602 | 02/13/03 | 3,500 |
| 236 | SIMPLY FASHIONS | LAWNDALE PLAZA | 3230 WEST ROOSEVELT ROAD | CHICAGO | IL | 60624 | 773/638-1565 | 11/04/98 | 3200 |
| 237 | SIMPLY FASHIONS | BALTIMORE | 2331 CLEANLEIGH DR. | BALTIMORE | MD | 21234 | 443.826.8891 | 03/27/15 | - |
| 239 | SIMPLY FASHIONS | SOUTH WIND PLAZA | 5335 N. MILITARY TRAIL SPACE 31&32 | WEST PALM BEACH | FL | 33407 | 561/684-5399 | 04/10/98 | 3600 |
| 240 | SIMPLY FASHIONS | BUCKNER COMMONS | 9208 EAST RL THORNTON FREEWAY, STE.110 | DALLAS | TX | 75228 | 214/321-3733 | 02/27/04 | 4,500 |
| 241 | DOTS | TINLEY PARK PLAZA | 15967 SOUTH HARLEM AVE | TINLEY PARK | IL | 60477 | 312/718-1235 | 1/30/15 | 5,000 |
| 242 | SIMPLY FASHIONS | SOUTH PHILADELPHIA S/C | 2426 SOUTH 23RD STREET | PHILADELPHIA | PA | 19145 | 215/764-0260 | 3/1/14 | 2,380 |
| 246 | SIMPLY FASHIONS | CITY PLAZA | 3447 UNION BLVD | ST. LOUIS | MO | 63115 | 314/381-9088 | 11/09/98 | 3000 |
| 247 | SIMPLY FASHIONS | SPEEDWAY SUPERCENTER | 5824 CRAWFORDSVILLE RD | INDIANAPOLIS | IN | 46224 | 314/240-0334 | 11/17/06 | 3,600 |
| 248 | SIMPLY FASHIONS | FREESTANDING | 2000 E. 71ST STREET | CHICAGO | IL | 60649 | 773/324-9770 | 4/16/10 | 4,320 |
| 249 | DOTS | CROSSROADS CENTER | 6777 SPENCER HWY | PASADENA | TX | 77505 | 832/392-5687 | 1/30/15 | 3,000 |
| 252 | SIMPLY FASHIONS | JEWEL OSCO S/C | 117 WEST 87TH STREET | CHICAGO | IL | 60620 | 773/874-6063 | 05/12/98 | 6562 |
| 254 | DOTS | 30TH STREET S/C | 3034 CROMER AVE | CANTON | OH | 44709 | 234/804-2546 | 1/30/15 | 3,279 |
| 255 | DOTS | MANCHESTER PARKADE | 370 WEST MIDDLE TURNPIKE | MANCHESTER | CT | 06040 | 860/306-5958 | 2/11/15 | 4,691 |
| 256 | DOTS | SOUTHFIELD | 20176 W. 8 MILE ROAD | SOUTHFIELD | MI | 48075 | 248-945-0282 | 02/27/15 | - |
| 257 | SIMPLY FASHIONS | Baseline Plaza | 20212 W EIGHT MILE RD | SOUTHFIELD | MI | 48075 | 248/945-0282 | 09/25/98 | 2800 |
| 258 | SIMPLY FASHIONS | SHOPPES ON MAIN | 3662 EAST MAIN STREET, UNIT D | COLUMBUS | OH | 43213 | 614/231-2324 | 4/22/11 | 3,000 |
| 259 | SIMPLY FASHIONS | SOUTH DEKALB PLAZA | 2774 CANDLER RD | DECATUR | GA | 30034 | 404/212-3880 | 6/23/99 | 3000 |
| 262 | SIMPLY FASHIONS | MEADOWBROOK EAST | 6707 MEADOWBROOK DRIVE | FT. WORTH | TX | 76112 | 817/457-0580 | 9/19/03 | 4,875 |
| 263 | SIMPLY FASHIONS | CHARITON SQUARE | 4236 SOUTH BROADWAY | ST. LOUIS | MO | 63111 | 314/832-9969 | 09/19/03 | 2,160 |
| 264 | SIMPLY FASHIONS | LAMAR CROSSING | 2938 LAMAR AVE, SUITE 116 | MEMPHIS | TN | 38114 | 901/743-8466 | 5/19/06 | 4,264 |
| 265 | SIMPLY FASHIONS | WYOMING VILLAGE | 1242 28TH STREET SW | WYOMING | MI | 49509 | 616/531-6051 | 6/20/08 | 4,650 |
| 266 | SIMPLY FASHIONS | STATE STREET | 2524 STATE STREET | EAST ST. LOUIS | IL | 62205 | 618/875-5461 | 03/31/00 | 3000 |
| 268 | SIMPLY FASHIONS | EASTLAND CENTER | 18000 VERNIER RD SPACE #741 | HARPER WOODS | MI | 48225 | 313/527-1949 | 12/10/10 | 4,154 |
| 269 | SIMPLY FASHIONS | ST. STEPHENS SQUARE | 2312 ST. STEPHENS RD. SUITE 6 | MOBILE | AL | 36617 | 334/452-9331 | 06/23/00 | 2,977 |
| 270 | SIMPLY FASHIONS | HIGHLAND LAKES CENTER | 7459 WEST COLONIAL DRIVE | ORLANDO | FL | 32818 | 407/298-5200 | 6/3/11 | 3,032 |
| 271 | DOTS | CARRIAGE CROSSING MARKETPLACE | 10233 EAST SHELBY DR | COLLIERVILLE | TN | 38017 | 901/229-7596 | 1/30/15 | 4,080 |
| 272 | SIMPLY FASHIONS | ERDMAN PLAZA | 3933 ERMAN AVE | BALTIMORE | MD | 21213 | 410/276-1441 | 3/28/97 | 4,000 |
| 273 | DOTS | NORTHWEST CROSSING | 5762 HOLLISTER STREET | HOUSTON | TX | 77040 | 281/543-9144 | 1/30/15 | 4,000 |
| 274 | SIMPLY FASHIONS | WOODLAND VILLAGE | 6046-6048 WOODLAND AVENUE | PHILADELPHIA | PA | 19142 | 215/990-8309 | 11/20/14 | 2,964 |
| 275 | SIMPLY FASHIONS | CROSS COUNTRY PLAZA | 3201 MACON ROAD | COLUMBUS | GA | 31906 | 706/569-5800 | 05/04/02 | 3,906 |
| 278 | SIMPLY FASHIONS | EDENS PLAZA | 4105 WEST BELTLINE BLVD #50 | COLUMBIA | SC | 29204 | 803/251-2445 | 1/29/10 | 3,000 |
| 281 | SIMPLY FASHIONS | WHITEHAVEN PLAZA | 4275 ELVIS PRESLEY BLVD | MEMPHIS | TN | 38116 | 901/332-2273 | 05/04/02 | 3,410 |
| 282 | SIMPLY FASHIONS | RACEWAY PARK S/C | 13065 S. ASHLAND AVENUE | CALUMET PARK | IL | 60827 | 312/502-5380 | 10/03/14 | 4,000 |
| 283 | SIMPLY FASHIONS | ALBANY CROSSING | 244 CORDELE RD, SUITE 125 | ALBANY | GA | 31705 | 229/883-7722 | 5/13/11 | 2,800 |
| 284 | SIMPLY FASHIONS | OAKLAND POINTE | 362 TELEGRAPH ROAD | PONTIAC | MI | 48341 | 248/333-3131 | 9/15/06 | 5,340 |
| 285 | SIMPLY FASHIONS | ONE & OLNEY SQUARE | 5675 NORTH FRONT ST #100 | PHILADELPHIA | PA | 19120 | 267/353-3188 | 4/18/14 | 4,042 |
| 287 | DOTS | NORTHWEST CROSSING | 130 BLACKHORSE PIKE | AUDUBON | NJ | 08106 | 609/314-5040 | 1/30/15 | 4,037 |
| 288 | SIMPLY FASHIONS | CLEVELAND AVENUE CROSSING | 854 CLEVELAND AVENUE, SUITE 108 | EAST POINT | GA | 30344 | 404/780-4596 | 10/22/14 | 3,000 |
| 301 | SIMPLY FASHIONS | CLOVERLEAF S/C | 1814-A N. FRONTAGE ROAD | MERIDIAN | MS | 39301 | 601/693-6801 | 01/01/92 | 7380 |
| 302 | SIMPLY FASHIONS | BATESVILLE S/C | 103 KEATING ROAD | BATESVILLE | MS | 38606 | 662/563-0217 | 01/01/92 | 3000 |
| 303 | SIMPLY FASHIONS | NORTHTOWN PLAZA | 5510 NORTH FREEWAY | HOUSTON | TX | 77076 | 713/697-3451 | 7/05/90 | 3835 |
| 317 | SIMPLY FASHIONS | HAMMOND AIRE PLAZA | 9626 AIRLINE HIGHWAY, STE. C-3 | BATON ROUGE | LA | 70827 | 225/927-6216 | 03/30/93 | 6000 |
| 327 | SIMPLY FASHIONS | WALZEM PLAZA | 5334 WALZEM ROAD | SAN ANTONIO | TX | 78218 | 210/656-7141 | 01/01/92 | 4400 |
| 337 | DOTS | TOWN & COUNTRY | 3816 E. BROAD STREET | COLUMBUS | OH | 43213 | 740/919-1112 | 8/29/14 | 5,887 |
| 338 | DOTS | SOUTH PHILADELPHIA S/C | 2300 W. PASSYUNK AVE | PHILADELPHIA | PA | 19145 | 267/670-1143 | 8/1/14 | 4,428 |
| 343 | DOTS | EASTOWN S/C | 3954 LINDEN AVE | DAYTON | OH | 45432 | 937/307-9240 | 8/29/14 | 4,045 |
| 344 | DOTS | NORTHERN LIGHTS | 3487 CLEVELAND AVE | COLUMBUS | OH | 43224 | 614/802-7240 | 8/29/14 | 4,500 |

**Simply Fashions**
Exhibit 1

Store List

| Store # | Location Type | Name | Address | City | State | Zip | Phone | Open Date | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|
| 348 | DOTS | CENTURY CENTER | 373 MEMORIAL AVENUE | W. SPRINGFIELD | MA | 01089 | 413/313-4745 | 11/8/14 | 3,550 |
| 360 | SIMPLY FASHIONS | FIVE POINTS WEST S/C | 2209 BESSEMER ROAD | BIRMINGHAM | AL | 35208 | 205/780-4206 | 08/30/90 | 4000 |
| 365 | SIMPLY FASHIONS | CROSS CREEK | 5648 GEORGETOWN ROAD | INDIANAPOLIS | IN | 46254 | 317/388-0444 | 09/19/03 | 2,400 |
| 369 | SIMPLY FASHIONS | FREESTANDING | 2419 MURPHY MILL RD | DOTHAN | AL | 36303 | 334/792-7332 | 10/15/2010 | 4,030 |
| 375 | SIMPLY FASHIONS | ROSE PLAZA | 4025 S. BROADWAY AVENUE | TYLER | TX | 75701 | 903/581-2778 | 4/30/92 | 2700 |
| 377 | DOTS | LINCOLN S/C | 26130 GREENFIELD ROAD | OAK PARK | MI | 48237 | 313/410-4264 | 8/29/14 | 4,800 |
| 500 | SIMPLY FASHIONS | ANDERSON ROAD PLAZA | 2600 ANDERSON ROAD | GREENVILLE | SC | 29611 | 864/269-1204 | 01/01/92 | 5,900 |
| 501 | SIMPLY FASHIONS | METRO PLAZA | 1634 EAST 63RD STREET | KANSAS CITY | MO | 64110 | 816/363-0780 | 12/15/12 | 3,000 |
| 504 | SIMPLY FASHIONS | HIGHLAND PARK PLACE | 14515 SOUTH WOODWARD AVENUE | DETROIT | MI | 48203 | 313/865-6550 | 08/04/05 | 5111 |
| 506 | DOTS | LIVONIA MARKETPLACE | 29508 SEVEN MILE ROAD | LIVONIA | MI | 48152 | 248/412-3564 | 10/24/14 | 4,000 |
| 507 | SIMPLY FASHIONS | EDISTO VILLAGE SHOPPING CENTER | 403 RIVERSIDE DRIVE S.W. | ORANGEBURG | SC | 29115 | 803/533-0700 | 07/09/05 | 3328 |
| 508 | DOTS | WESTSHORE PLAZA | 1795 E. SHERMAN BLVD | MUSKEGON | MI | 49444 | 231/215-6635 | 02/13/15 | 6,400 |
| 509 | DOTS | KLINE PLAZA | 130 B KLINE VILLAGE | HARRISBURG | PA | 17104 | 717/317-3256 | 11/19/14 | 5,200 |
| 510 | DOTS | CLINTON POINTE | 33816 GRATIOT AVENUE | CLINTON TOWNSHIP | MI | 48035 | 586/348-2803 | 10/24/14 | 3,250 |
| 511 | SIMPLY FASHIONS | OAK STREET SHOPPING CENTER | 845 OAK STREET | ATLANTA | GA | 30310 | 404/753-0408 | 3/9/1995 | 3420 |
| 512 | DOTS | NORGATE PLAZA | 7235 N. KEYSTONE AVE. SUITE H | INDIANAPOLIS | IN | 46240 | 317/448-3811 | 11/8/14 | 4,500 |
| 513 | SIMPLY FASHIONS | MLK PLAZA | 1300 NORTH GRAND AVE | SAINT LOUIS | MO | 63113 | 314-535-5758 | 6/13/2003 | 3000 |
| 514 | SIMPLY FASHIONS | NORTH CHARLESTON CENTER | 5900 RIVERS AVE-SUITE H | NORTH CHARLESTON | SC | 29406 | 843-554-0730 | 4/1/1998 | 3200 |
| 515 | SIMPLY FASHIONS | SUMTER SQUARE SHOPPING CENTER | 1009 BROAD STREET | SUMTER | SC | 29150 | 803/773-0972 | 5/28/1992 | 2875 |
| 516 | DOTS | COTTMAN & BUSELTON S/C | 2121 COTTMAN AVE | PHILADELPHIA | PA | 19149 | 267/572-0157 | 1/31/15 | 4,426 |
| 520 | SIMPLY FASHIONS | BORDEAUX SHOPPING CENTER | 3200 CLARKSVILLE HIGHWAY | NASHVILLE | TN | 37208 | 615/726-1184 | 5/13/1992 | 3000 |
| 523 | SIMPLY FASHIONS | WESTLAND SHOPPING CENTER | 31284 MICHIGAN AVENUE | WESTLAND | MI | 48185 | 734/728-3634 | 3/29/2000 | 3000 |
| 524 | DOTS | THE SHOPS AT STERLING PONDS | 33329 VAN DYKE AVE | STERLING HEIGHTS | MI | 48312 | 586/212-3674 | 10/24/14 | 4,803 |
| 525 | SIMPLY FASHIONS | NORTHWEST PLAZA | 3269 W. SIEBENTHALER AVE., UNIT 5 | DAYTON | OH | 45406 | 937/274-0096 | 1/28/1996 | 2864 |
| 526 | SIMPLY FASHIONS | DORCHESTER SQUARE | 4391 DORCHESTER ROAD | NORTH CHARLESTON | SC | 29405 | 843-566-0028 | 08/01/05 | 2970 |
| 527 | DOTS | CANTON CENTRE | 4060 TUSCARAWAS STREET W. | CANTON | OH | 44708 | 234/850-4204 | 10/3/14 | 5,086 |
| 528 | SIMPLY FASHIONS | GEORGETOWN PLAZA SHOPPING CENTER | 4941 WEST 38TH STREET | INDIANAPOLIS | IN | 46254 | 317/328-8958 | 4/1/1998 | 4200 |
| 529 | SIMPLY FASHIONS | EASTGATE SHOPPING CENTER | 3134 LOUISVILLE AVENUE | MONROE | LA | 71201 | 318/362-1206 | 7/31/2003 | 4500 |
| 531 | DOTS | MIDDLESEX S/C | 1310 EASTERN BLVD | BALTIMORE | MD | 21221 | 410/999-5097 | 10/25/14 | 3,000 |
| 535 | SIMPLY FASHIONS | CRICHTON PLAZA | 3038 A  SPRINGHILL AVE. | MOBILE | AL | 36607 | 251/479-5811 | 8/24/1995 | 3300 |
| 537 | SIMPLY FASHIONS | CHESAPEAKE CROSSING  SHOPPING CENTER | 1949 S. MILITARY HWY. | CHESAPEAKE | VA | 23320 | 757/545-1863 | 6/27/1999 | 3000 |
| 538 | SIMPLY FASHIONS | CROSSROADS PLAZA | 1958 STONE ROSE DRIVE | ROCKY MOUNT | NC | 27802 | 252/446-6001 | 5/26/1993 | 4000 |
| 539 | SIMPLY FASHIONS | HATTIESBURG SHOPPING CENTER | 5891 U.S. HIGHWAY 49 | HATTIESBURG | MS | 39402 | 601/268-3725 | 10/23/2000 | 2700 |
| 541 | DOTS | LIBERTY CENTER | 3728 LIBERTY STREET | ERIE | PA | 16508 | 814/450-9296 | 11/25/14 | 5,796 |
| 543 | SIMPLY FASHIONS | LEHMBERG CROSSING | 993 EAST ALABAMA STREET | EAST COLUMBUS | MS | 39702 | 662/329-3237 | 4/26/2001 | 3200 |
| 544 | DOTS | SHOP CITY PLAZA | 179 SHOP CITY PLAZA | SYRACUSE | NY | 13206 | 315/412-5800 | 10/10/14 | 4,959 |
| 545 | DOTS | GREAT SOUTHERN S/C | 3831 SOUTH HIGH STREET | COLUMBUS | OH | 43207 | 614/867-2491 | 10/3/14 | 4,500 |
| 549 | SIMPLY FASHIONS | FREEDOM SQUARE SHOPPING CENTER | 1615 SOUTH IRBY STREET | FLORENCE | SC | 29505 | 843-661-7847 | 10/26/1995 | 3440 |
| 554 | DOTS | TOWN CENTER MARKET | 2821 CHASTAIN MEADOWS PKWY NW #120 | MARIETTA | GA | 30066 | 404/858-2805 | 10/6/14 | 4,800 |
| 555 | SIMPLY FASHIONS | IROQUOIS MANOR | 5326 SOUTH THIRD STREET | LOUISVILLE | KY | 40214 | 502/368-7228 | 9/27/1990 | 3360 |
| 556 | SIMPLY FASHIONS | WESLEY CHAPEL SQUARE SHOPPING CENTER | 2389 WESLEY CHAPEL ROAD | DECATUR | GA | 30035 | 770/593-0905 | 8/02/2005 | 2800 |
| 558 | SIMPLY FASHIONS | SHELBY PLAZA | 4673 ELVIS PRESLEY BLVD. | MEMPHIS | TN | 38116 | 901/396-7433 | 7/28/1993 | 2800 |
| 559 | DOTS | AUSTINTOWN PLAZA | 6000 MAHONING AVENUE #252 | YOUNGSTOWN | OH | 44515 | 330/369-6989 | 10/29/14 | 4,500 |
| 562 | SIMPLY FASHIONS | NORTH POINT CENTER | 3409 DICKERSON PIKE, STE 106 | NASHVILLE | TN | 37207 | 615/227-8765 | 5/13/2004 | 4000 |
| 563 | DOTS | CONSUMER SQUARE WEST | 3650 SOLDANO BLVD | COLUMBUS | OH | 43228 | 516/507-0202 | 2/13/15 | 3,685 |
| 565 | SIMPLY FASHIONS | BROADWAY  CENTER | 2043-A  BROADWAY STREET | KNOXVILLE | TN | 37917 | 865/637-7025 | 8/4/1994 | 3000 |
| 571 | SIMPLY FASHIONS | WESTWOOD SHOPPING CENTER | 3709 JEWELLA AVE | SHREVEPORT | LA | 71109 | 318/631-0970 | 4/19/2000 | 4055 |
| 575 | SIMPLY FASHIONS | VILLAGE SHOPPING CENTER | 3552 VILLAGE COURT | GARY | IN | 46408 | 219/884-5180 | 6/14/2000 | 4550 |

4/10/2015

**Simply Fashions**
**Exhibit 1**

| Store List |
|---|

| Store # | Location Type | Name | Address | City | State | Zip | Phone | Open Date | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|
| 576 | SIMPLY FASHIONS | SOUTHGATE SHOPPING CENTER | 4439 WEST FUQUA ROAD | HOUSTON | TX | 77045 | 713/413-3397 | 9/26/2000 | 3300 |
| 577 | SIMPLY FASHIONS | HICKORY RIDGE CROSSING | 3641 HICKORY HILL | MEMPHIS | TN | 38115 | 901/566-9443 | 8/05/00 | 4000 |
| 581 | SIMPLY FASHIONS | GAINSVILLE SHOPPING CENTER | 1208 NORTH MAIN STREET, UNIT 1208 | GAINESVILLE | FL | 32608 | 352/264-7990 | 7/9/05 | 3000 |
| 584 | SIMPLY FASHIONS | SOUTHGATE PLAZA | 303-B SOUTH SLAPPEY DRIVE | ALBANY | GA | 31701 | 229/446-2340 | 4/25/2002 | 3456 |
| 595 | SIMPLY FASHIONS | PARKWAY PLAZA | 1223 SILAS CREEK PARKWAY | WINSTON-SALEM | NC | 27127 | 336/724-3676 | 6/24/06 | 5,630 |
| 599 | SIMPLY FASHIONS | COURTHOUST SQUARE | 100 WEST ARIZONA AVE | RUSTON | LA | 71270 | 318/255-5955 | 6/17/05 | 3,315 |
| 617 | SIMPLY FASHIONS | ASHER | 6420 COLONEL GLENN ROAD, SUITE 5 | LITTLE ROCK | AR | 72204 | 501/568-7334 | 7/1/05 | 2,400 |
| **247** | | | | | | | | | **5,125** |

Hilco Merchant Resources, LLC

4/10/2015

**Simply Fashions**
**Exhibit 3.1(b)**

| Merchandise Threshold Schedule | | |
|---|---|---|
| Retail Value | Adjustment Points | Adjusted Guaranty |
| 16,000,000 | | 27.50% |
| 15,900,000 | 0.16% | 27.34% |
| 15,800,000 | 0.16% | 27.18% |
| 15,700,000 | 0.16% | 27.02% |
| 15,600,000 | 0.17% | 26.85% |
| 15,500,000 | 0.17% | 26.68% |
| 15,400,000 | 0.18% | 26.50% |
| 15,300,000 | 0.18% | 26.32% |
| 15,200,000 | 0.19% | 26.13% |
| 15,100,000 | 0.19% | 25.94% |
| 15,000,000 | 0.20% | 25.74% |

Note(s):
1. Adjustments between the increments shall be on a prorata basis.
3. In the event that the Retail value of the Merchandise is less than $15,000,000, each $100,000 (or pro rata portion thereof) increment shall decrease the Guaranty by 0.23%.

**Simply Fashions**
Exhibit 4.1(c)

| Occupancy Per Diem | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Store # | Store Name | RENT | AD VALOREM TAX | FILTER SERVICE | INSURANCE - BUSINESS | LICENSE - CITY | LICENSE- STATE & COUNTY | MAINTENANCE | SECURITY | TELEPHONE | UTILITIES | WASTE PICK UP | Total Occupancy | % Rent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12 | CHURCH SQUARE S/C | 129 | - | - | 3 | 1 | 1 | 2 | - | - | 21 | - | 157 | |
| 14 | LEE STREET SHOPPING CTR | 49 | 2 | - | 4 | - | 2 | 3 | 1 | 2 | 23 | 3 | 89 | |
| 15 | INWOOD CENTRAL | - | 3 | - | 4 | - | 0 | 4 | 1 | 2 | 17 | 2 | 32 | 5% |
| 16 | PEMBERTON SQUARE | 55 | 2 | - | 4 | 0 | - | 4 | - | 2 | 16 | - | 83 | |
| 18 | GATEWAY SHOPPING CENTER | 82 | 6 | - | 4 | 0 | 1 | 2 | 1 | 2 | 42 | - | 140 | |
| 19 | AMERICAN WAY PLAZA | 115 | 1 | - | 4 | 1 | 1 | 42 | 1 | 2 | 28 | 3 | 198 | |
| 20 | JEFFERSON SQUARE S/C | 66 | 2 | - | 4 | 0 | - | 1 | 1 | 2 | 17 | 7 | 99 | |
| 21 | EISENHOWER CROSSING | 166 | 17 | - | 8 | 2 | - | 26 | - | 1 | 27 | 1 | 249 | |
| 22 | FREESTANDING | 86 | - | - | 3 | 0 | - | 4 | 1 | 2 | 44 | 8 | 148 | |
| 24 | CENTER CITY | 136 | 16 | - | 4 | 1 | 1 | 13 | 1 | 2 | 18 | 3 | 195 | |
| 26 | TAMPA FESTIVAL CENTRE | 115 | 21 | - | 10 | 1 | 0 | 24 | 1 | 2 | 25 | 8 | 208 | |
| 27 | GENTILLY S/C | 167 | 16 | - | 4 | 3 | 0 | 34 | 1 | 2 | 18 | 6 | 251 | |
| 30 | MERIDIAN MARKETPLACE | 66 | 23 | - | 7 | 0 | - | 6 | 1 | 2 | 23 | 3 | 130 | |
| 31 | EASTGATE S/C | 85 | - | - | 4 | - | - | 4 | 1 | 1 | 50 | 2 | 146 | |
| 32 | FOWLERS PLAZA | - | 2 | - | 4 | 1 | - | 8 | 1 | 2 | 24 | 3 | 43 | 3% |
| 33 | CHATHAM VILLAGE SQUARE | 275 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 331 | |
| 36 | LINDELL MARKETPLACE | 122 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 178 | |
| 37 | GENTILLY S/C | 115 | 14 | - | 12 | 2 | 0 | 17 | 1 | 2 | 19 | - | 181 | |
| 39 | FREESTANDING | 79 | 28 | - | 4 | 2 | - | 8 | 1 | 2 | 41 | 4 | 168 | |
| 40 | BRICKTOWN SQUARE | 304 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 360 | |
| 41 | EAST FOREST PLAZA | 193 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 250 | |
| 43 | LINCOLN S/C | - | 29 | - | 30 | 1 | - | 32 | - | 1 | 36 | 2 | 131 | 4% |
| 44 | N/A | 73 | 10 | - | 5 | 0 | - | 7 | 1 | 2 | 22 | 3 | 122 | |
| 46 | NORTH EASTWOOD PLAZA | - | 1 | - | 4 | 0 | - | 3 | 1 | 2 | 21 | 2 | 34 | 5% |
| 46 | REDFORD PLAZA | 121 | 13 | - | 8 | - | - | 30 | 1 | 2 | 34 | 2 | 212 | |
| 47 | SALEM CONSUMER SQUARE | - | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 56 | 5% |
| 48 | SOUTHGATE SHOPPING CENTER | 104 | 1 | - | 4 | 0 | - | 4 | 1 | 2 | 39 | 2 | 157 | |
| 49 | OVERBROOK PLAZA | 122 | 5 | - | 1 | 1 | - | 3 | - | - | 31 | - | 163 | |
| 52 | VICTORY CROSSING S/C | 184 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 240 | |
| 53 | 95TH & JEFFREY | 75 | 23 | - | 4 | 0 | - | 24 | 1 | 2 | 15 | 4 | 148 | |
| 54 | SUPER 1 FOODS S/C | 115 | 7 | - | 4 | 3 | 0 | 5 | 1 | 2 | 32 | 4 | 173 | |
| 55 | NORTHWOOD S/C | 137 | 4 | - | 4 | 0 | - | 4 | 1 | 2 | 38 | - | 190 | |
| 57 | AMERICANA PLAZA | - | 6 | - | 9 | - | 0 | 14 | 1 | 2 | 19 | 2 | 53 | 4% |
| 58 | FAMILY DOLLAR BUILDING | 46 | 3 | - | 4 | 0 | - | 3 | 1 | 4 | 26 | 3 | 89 | |
| 59 | LINWOOD SQUARE S/C | 187 | 1 | - | 4 | 1 | - | 9 | 1 | 2 | 68 | - | 272 | |
| 62 | MT. CLARE JUNCTION | - | 5 | - | 4 | 0 | 1 | 5 | 1 | 2 | 19 | - | 37 | 7% |
| 63 | THE LANDINGS | 190 | - | - | 4 | - | - | - | 1 | 2 | 17 | 3 | 216 | |
| 66 | N.W. JUNCTION S/C | 83 | 8 | - | 6 | 0 | - | 17 | 1 | 2 | 17 | 2 | 136 | |
| 68 | WYANDOTTE PLAZA | 98 | - | - | 3 | 0 | - | 4 | 1 | 2 | 27 | 3 | 138 | |
| 70 | OAKLAND POINTE PLAZA | 204 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 260 | |
| 72 | NORTHSIDE PLAZA | 93 | 1 | - | 4 | - | 0 | 4 | 2 | 2 | 33 | 3 | 141 | |
| 73 | MARCUS PLAZA | 36 | - | - | 4 | - | - | 12 | - | - | 9 | 0 | 61 | |
| 76 | WATERTOWER PLAZA | 203 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 260 | |
| 77 | GATEWAY MARKETPLACE | 203 | 49 | - | 5 | 1 | - | - | 1 | 1 | 22 | - | 282 | |
| 78 | WHITEHALL S/C | 220 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 276 | |
| 80 | ROUNDTREE PLACE | 178 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 234 | |
| 82 | SOUTHLAND MALL | 121 | 8 | - | 4 | 1 | 1 | 8 | - | 1 | 27 | - | 170 | |
| 83 | K-MART PLAZA | 49 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 106 | |
| 84 | BURLINGTON PLAZA | 82 | 7 | - | 5 | - | 1 | 10 | 1 | 2 | 27 | 2 | 136 | |
| 91 | CHICAGO HEIGHTS HILLTOP PLAZA | 137 | - | - | 4 | - | - | 10 | 1 | 2 | 8 | 3 | 166 | |
| 92 | NEWPORT S/C | 56 | - | - | 3 | 1 | - | 3 | - | 1 | 8 | - | 71 | |
| 94 | PINE HILLS MARKETPLACE | 58 | 4 | - | 4 | - | 0 | 3 | 1 | 2 | 29 | 2 | 102 | |
| 95 | CAHOKIA VILLAGE S/C | 66 | - | - | 4 | 1 | - | 4 | 1 | 2 | 19 | 2 | 99 | |
| 97 | THE SHOPS AT WHITE OAK VILLAGE | 82 | 2 | - | 4 | - | 1 | 3 | 1 | 2 | 16 | 4 | 114 | |
| 99 | GREENWOOD WEST | 49 | 3 | - | 4 | 0 | - | 7 | 1 | 2 | 11 | - | 77 | |
| 100 | CHERRYDALE POINT S/C | 203 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 260 | |
| 101 | NEWMARKET SOUTH S/C | 77 | 6 | - | 4 | 2 | - | 13 | 1 | 2 | 15 | 2 | 122 | |

1 of 5

Simply Fashions
Exhibit 4.1(c)

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | **Occupancy Per Diem** | | | | | | | |

| Store # | Store Name | RENT | AD VALOREM TAX | FILTER SERVICE | INSURANCE - BUSINESS | LICENSE - CITY | LICENSE- STATE & COUNTY | MAINTENANCE | SECURITY | TELEPHONE | UTILITIES | WASTE PICK UP | Total Occupancy | % Rent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 102 | FOOD 4 LESS S/C | 253 | - | - | 4 | - | - | 4 | - | 1 | 16 | - | 278 | |
| 104 | SOUTHLAKE MALL | 113 | - | - | 4 | 4 | - | 7 | - | 2 | 20 | 3 | 151 | |
| 106 | RACEWAY PARK S/C | 148 | 49 | - | 3 | 1 | - | 20 | 1 | 1 | 21 | 3 | 247 | |
| 107 | POINCIANA PLAZA | - | 17 | - | 7 | 1 | 0 | 13 | 1 | 2 | 26 | 4 | 70 | 3% |
| 109 | HERITAGE PLACE S/C | 206 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 262 | |
| 110 | POPLAR PLAZA S/C | 79 | 3 | - | 4 | - | - | 13 | 1 | 2 | 26 | 2 | 130 | |
| 111 | LANGLEY SQUARE | 100 | 1 | - | 4 | 1 | - | 3 | 1 | 2 | 16 | - | 128 | |
| 114 | NORTH POINTE S/C | 90 | 4 | - | 4 | 1 | - | 12 | 1 | 2 | 17 | 2 | 132 | |
| 116 | SPENCER SQUARE | 220 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 276 | |
| 118 | VILLAGE S/C | - | - | - | 3 | 1 | 0 | 5 | - | 1 | 40 | 3 | 54 | 8% |
| 122 | LYNNHAVEN NORTH S/C | 166 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 222 | |
| 123 | CEDAR HILLS S/C | 93 | - | - | 4 | 5 | - | 4 | - | - | 33 | 0 | 139 | |
| 124 | ROEBUCK MARKETPLACE | 96 | 1 | - | 4 | 4 | 0 | 3 | 1 | 2 | 23 | - | 130 | |
| 126 | FREESTANDING | 165 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 222 | |
| 127 | RIVER COMMONS | 56 | 10 | - | 7 | 2 | 0 | 5 | 1 | 2 | 18 | 4 | 104 | |
| 128 | EASTLAND HILL CENTER | 99 | 19 | - | 4 | 2 | 1 | 23 | 1 | 2 | 22 | 4 | 176 | |
| 129 | WEST TOWN PLAZA | 47 | 2 | - | 4 | - | - | 35 | 1 | 2 | 25 | 2 | 119 | |
| 130 | GRAND BOULEVARD PLAZA | 149 | 34 | - | 4 | 0 | - | 28 | 1 | 2 | 23 | 4 | 244 | |
| 133 | CAPITOL PLAZA | 47 | 0 | - | 4 | 2 | 0 | 18 | 1 | 2 | 33 | 3 | 111 | |
| 137 | PARKWAY PLAZA | 38 | 1 | - | 4 | 1 | 0 | 5 | 1 | 2 | 21 | 3 | 75 | |
| | N/A | 168 | 3 | - | 4 | 1 | 0 | 3 | 1 | 2 | 28 | 4 | 213 | |
| | DODGE PLAZA | 104 | 3 | - | 4 | 0 | 0 | 2 | 1 | 2 | 15 | 3 | 135 | |
| 141 | FOOD WORLD PLAZA SOUTH | 70 | 4 | - | 4 | 2 | 0 | 10 | 1 | 2 | 23 | 3 | 118 | |
| 144 | FRAYSER PLAZA | 74 | 7 | - | 5 | 1 | 1 | 16 | 1 | 2 | 24 | 3 | 133 | |
| 147 | IVES DAIRY CROSSING S/C | 104 | 7 | - | 3 | 7 | - | 9 | - | 0 | 15 | 2 | 147 | |
| 148 | SHOPS AT NORTHEAST VILLAGE | 110 | 1 | - | 4 | 3 | - | 4 | 1 | 2 | 32 | - | 157 | |
| 151 | TOWN & COUNTRY PLAZA | 66 | 10 | - | 9 | - | 0 | 9 | 1 | 2 | 26 | 4 | 127 | |
| 153 | SHOPPES AT GARNER | 188 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 244 | |
| 154 | NORTHLINE CROSSING S/C | 267 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 324 | |
| 155 | CANE RUN | 90 | 2 | - | 4 | - | - | 2 | 1 | 2 | 30 | 2 | 133 | |
| 157 | EASTOVER S/C | 192 | 17 | - | 5 | 2 | 0 | 20 | 1 | 2 | 25 | 5 | 269 | |
| 158 | STEELYARD COMMONS S/C | 339 | 81 | - | 3 | - | - | 54 | - | 1 | 40 | 9 | 529 | |
| 159 | WESTERN HILLS MALL | 98 | 0 | - | 4 | 1 | 0 | 3 | - | 2 | 38 | 1 | 148 | |
| 160 | THE SHOPPES OF LIBERTY CITY | 152 | 35 | - | 16 | 4 | 0 | 18 | 1 | 2 | 23 | - | 252 | |
| 161 | BLUE PARKWAY TOWN CENTER | 104 | 14 | - | 5 | 1 | - | 26 | 1 | 2 | 18 | - | 170 | |
| 162 | GRIGGS ROAD S/C | 181 | 17 | - | 13 | 2 | - | 27 | 1 | 2 | 24 | 4 | 272 | |
| 163 | MADISON SQUARE | 69 | 7 | - | 7 | 2 | 0 | 10 | 1 | 2 | 34 | 4 | 135 | |
| 164 | SELMA MALL | 54 | 0 | - | 4 | 1 | 0 | 15 | 1 | 2 | 22 | 4 | 104 | |
| 165 | FAMILY DOLLAR CENTER | 42 | 4 | - | 4 | 0 | - | 3 | 1 | 2 | 28 | 2 | 86 | |
| 166 | LANTANA VILLAGE SQUARE | - | 1 | - | 4 | 1 | 0 | 3 | 1 | 2 | 26 | 5 | 42 | 3% |
| 167 | AZALEA SHOPPING CENTER | - | 4 | - | 5 | 1 | - | 13 | 1 | 2 | 19 | 4 | 48 | 3% |
| 170 | TAYLOR COMMONS | 192 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 248 | |
| 173 | EUTAW VILLAGE | 119 | 1 | - | 4 | 0 | - | 7 | 1 | 2 | 21 | 3 | 157 | |
| 174 | NORTHSIDE SHOPPING CENTRE | 176 | 20 | - | 13 | 0 | 0 | 30 | 1 | 2 | 29 | - | 271 | |
| 175 | LAMAR AIRWAYS S/C | 103 | 13 | - | 6 | 1 | 1 | 23 | 1 | 2 | 22 | 3 | 174 | |
| 176 | STONY ISLAND PLAZA | 219 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 276 | |
| 178 | WEST ALLIS | 216 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 272 | |
| 180 | WEST RIDGE | 99 | 12 | - | 6 | - | - | 19 | 1 | 2 | 25 | 2 | 164 | |
| 182 | LAUDERHILL MALL | 151 | 9 | - | 4 | 2 | 0 | 4 | 1 | 2 | 30 | 6 | 208 | |
| 183 | SAVE A LOT CTR | 88 | - | - | 4 | 0 | - | - | 1 | 2 | 22 | - | 117 | |
| 184 | MODEL T PLAZA | 179 | - | - | 3 | 2 | - | 26 | - | 1 | 16 | 2 | 230 | |
| 185 | KING SHOPPING CENTER | 95 | 25 | - | 4 | - | 0 | 32 | 1 | 2 | 39 | 1 | 199 | |
| 186 | SOUTHGATE USA S/C | 121 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 177 | |
| 187 | THRUWAY PLAZA | 227 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 283 | |
| 188 | MIRACLE MILE S/C | 237 | - | - | 2 | 0 | - | 5 | - | - | 15 | 4 | 264 | |
| 189 | MARSHFIELD PLAZA | 165 | 38 | - | 7 | 1 | - | 37 | 1 | 2 | 21 | 4 | 275 | |
| 190 | SOUTHERN PLAZA | 196 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 252 | |

2 of 5

Simply Fashions
Exhibit 4.1(c)

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Occupancy Per Diem | | | | | | |

| Store # | Store Name | RENT | AD VALOREM TAX | FILTER SERVICE | INSURANCE - BUSINESS | LICENSE - CITY | LICENSE- STATE & COUNTY | MAINTENANCE | SECURITY | TELEPHONE | UTILITIES | WASTE PICK UP | Total Occupancy | % Rent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 191 | FONDREN SOUTHWEST VILLAGE | 188 | 14 | - | 5 | 2 | - | 16 | - | 1 | 15 | 4 | 245 | |
| 192 | VILLAGE GREEN | 69 | 1 | - | 4 | 1 | 0 | 4 | 1 | 2 | 34 | 2 | 119 | |
| 193 | N/A | 86 | - | - | 4 | - | - | 22 | 1 | 2 | 29 | 3 | 147 | |
| 196 | DOLPHIN PLAZA | 51 | 10 | - | 6 | 7 | 1 | 13 | - | 1 | 22 | 5 | 117 | |
| 197 | BOSSIER TOWN CENTER | 127 | 4 | - | 4 | 2 | 0 | 17 | 1 | 2 | 25 | 4 | 186 | |
| 198 | GATEWAY | 50 | 11 | - | 7 | 1 | 1 | 17 | 1 | 2 | 30 | 3 | 120 | |
| 199 | BEL AIR S/C | 71 | 0 | - | 4 | 4 | - | 4 | 1 | 2 | 23 | 2 | 111 | |
| 200 | MARKETPLACE AT SMYRNA | 275 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 331 | |
| 202 | GALLERY AT WARREN CONNER | 178 | 13 | - | 4 | 0 | - | 21 | 1 | 2 | 32 | 4 | 255 | |
| 203 | ELLIS AVENUE PLAZA | 77 | 5 | - | 4 | 4 | 0 | 3 | 1 | 2 | 24 | 3 | 119 | |
| 204 | RIVERVIEW PLAZA | 56 | 0 | - | 4 | 0 | - | 3 | 1 | 2 | 25 | 1 | 93 | |
| 205 | CULLEN PLAZA | 127 | 15 | - | 9 | 1 | - | 25 | 1 | 2 | 15 | 1 | 197 | |
| 207 | THE COMMONS ROUTE 20 | 43 | 1 | - | 4 | 1 | - | 4 | 1 | 2 | 34 | 2 | 91 | |
| 208 | JEFFERSON VILLAGE | 134 | - | - | 4 | - | - | 2 | - | - | 14 | - | 154 | |
| 212 | ROYAL TOWN CENTER | 137 | 1 | - | 4 | - | - | 3 | 1 | 2 | 22 | 3 | 172 | |
| 213 | COLLEGE PARK COMMONS | 95 | 2 | - | 4 | - | - | 3 | 1 | 2 | 20 | 3 | 129 | |
| 215 | SOUTH SLAPPEY VILLAGE | 78 | 10 | - | 7 | 0 | - | 9 | 1 | 2 | 29 | 2 | 138 | |
| 216 | WALNUT HILLS PLAZA | 107 | 2 | - | 4 | 2 | 3 | 6 | 1 | 2 | 22 | 2 | 150 | |
| 218 | SHOPS AT WHITE OAK VILLAGE | 244 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 300 | |
| 219 | COUNTRY CLUB PLAZA | 209 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 265 | |
| 221 | THE CROSSINGS AT HALLS FERRY | 133 | 23 | - | 5 | 1 | - | 21 | 1 | 2 | 14 | 2 | 201 | |
| 223 | CHICAGO | 258 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 314 | |
| 224 | SQUARE 67 | 68 | 10 | - | 7 | 0 | - | 18 | 1 | 0 | 17 | 2 | 124 | |
| 225 | GREENS CROSSROADS | 93 | 3 | - | 4 | 1 | - | 4 | 1 | 2 | 19 | 2 | 130 | |
| 227 | PLAZA ON THE BLV | 155 | 20 | - | 4 | 1 | - | 32 | 1 | 2 | 15 | - | 229 | |
| 228 | NORTHGATE S/C | 289 | 35 | - | 2 | 5 | - | 25 | - | - | 5 | 0 | 360 | |
| 229 | JOYLAND S/C | 130 | 1 | - | 4 | 2 | - | 3 | 1 | 2 | 27 | 3 | 173 | |
| 230 | SILVER MILL COURT S/C | 80 | 0 | - | 4 | 1 | 0 | 24 | 1 | 2 | 41 | 4 | 157 | |
| 231 | MARLOW HEIGHTS S/C | 118 | 2 | - | 4 | - | 0 | 3 | 1 | 2 | 25 | 4 | 159 | |
| 233 | WESTPORT COMMONS S/C | 112 | - | - | 3 | 1 | - | 6 | - | 1 | 18 | - | 141 | |
| 234 | TOWNE SOUTH | - | 2 | - | 4 | 0 | - | 4 | 1 | 2 | 27 | 1 | 42 | 3% |
| 235 | LAWNDALE PLAZA | 211 | 31 | - | 4 | 0 | - | 54 | 1 | 2 | 19 | - | 322 | |
| 238 | BALTIMORE | 187 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 243 | |
| 239 | SOUTH WIND PLAZA | 78 | 5 | - | 4 | 1 | 0 | 3 | 1 | 2 | 16 | - | 109 | |
| 240 | BUCKNER COMMONS | - | 15 | - | 5 | 0 | - | 17 | 1 | 2 | 22 | - | 63 | 3% |
| 241 | TINLEY PARK PLAZA | 187 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 243 | |
| 242 | SOUTH PHILADELPHIA S/C | 78 | 6 | - | 3 | 2 | - | 8 | 1 | 2 | 24 | 6 | 129 | |
| 246 | CITY PLAZA | 151 | 22 | - | 6 | 1 | 1 | 53 | 1 | 2 | 17 | 2 | 255 | |
| 247 | SPEEDWAY SUPERCENTER | 48 | 1 | - | 4 | 0 | - | 3 | 1 | 2 | 22 | 2 | 81 | |
| 248 | FREESTANDING | 66 | - | - | 4 | 0 | - | 2 | 1 | 2 | 28 | 4 | 108 | |
| 249 | CROSSROADS CENTER | 132 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 188 | |
| 252 | JEWEL OSCO S/C | 165 | 43 | - | 4 | 0 | - | 102 | 1 | 2 | 39 | 7 | 363 | |
| 254 | 30TH STREET S/C | 110 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 166 | |
| 255 | MANCHESTER PARKADE | 184 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 240 | |
| 256 | SOUTHFIELD | - | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 56 | 4% |
| 257 | Baseline Plaza | 102 | 7 | - | 4 | 0 | - | 24 | 1 | 2 | 16 | - | 155 | |
| 258 | SHOPPES ON MAIN | 88 | 0 | - | 4 | - | - | 5 | 1 | 2 | 19 | - | 118 | |
| 259 | SOUTH DEKALB PLAZA | 88 | 9 | - | 4 | - | 1 | 21 | 1 | 2 | 24 | 3 | 152 | |
| 262 | MEADOWBROOK EAST | 41 | 15 | - | 8 | 0 | - | 21 | 1 | 2 | 23 | 3 | 113 | |
| 263 | CHARITON SQUARE | - | 1 | - | 4 | 1 | 1 | 8 | 1 | 2 | 13 | 2 | 32 | 3% |
| 264 | LAMAR CROSSING | 102 | 27 | - | 6 | 1 | 1 | 21 | 1 | 2 | 30 | 3 | 195 | |
| 265 | WYOMING VILLAGE | - | 0 | - | 4 | 0 | - | - | 1 | 2 | 28 | - | 35 | 3% |
| 266 | STATE STREET | 116 | 7 | - | 5 | 0 | - | 10 | 1 | 2 | 15 | 2 | 159 | |
| 268 | EASTLAND CENTER | 82 | 1 | - | 4 | 1 | - | 3 | - | 2 | 40 | - | 132 | |
| 269 | ST. STEPHENS SQUARE | 82 | 5 | - | 6 | 2 | 0 | 11 | 1 | 2 | 25 | 3 | 136 | |
| 270 | HIGHLAND LAKES CENTER | 62 | 14 | - | 4 | - | 0 | 14 | 1 | 2 | 17 | - | 114 | |
| 271 | CARRIAGE CROSSING MARKETPLACE | - | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 56 | 5% |

Simply Fashions
Exhibit 4.1(c)

| | Occupancy Per Diem | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Store # | Store Name | RENT | AD VALOREM TAX | FILTER SERVICE | INSURANCE - BUSINESS | LICENSE - CITY | LICENSE- STATE & COUNTY | MAINTENANCE | SECURITY | TELEPHONE | UTILITIES | WASTE PICK UP | Total Occupancy | % Rent |
| 272 | ERDMAN PLAZA | 110 | 13 | - | 6 | - | 1 | 19 | 1 | 2 | 23 | 2 | 176 | |
| 273 | NORTHWEST CROSSING | 267 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 323 | |
| 274 | WOODLAND VILLAGE | 147 | 14 | - | 2 | 2 | - | 30 | - | - | 21 | 3 | 219 | |
| 275 | CROSS COUNTRY PLAZA | 118 | 13 | - | 7 | 2 | - | 3 | 1 | 2 | 29 | - | 175 | |
| 278 | EDENS PLAZA | 47 | 3 | - | 4 | 1 | - | 3 | 1 | 2 | 30 | 2 | 92 | |
| 281 | WHITEHAVEN PLAZA | 77 | 1 | - | 4 | 1 | 1 | 3 | 1 | 2 | 25 | 3 | 117 | |
| 282 | RACEWAY PARK S/C | 204 | 60 | - | 3 | 1 | - | 23 | - | 0 | 13 | 2 | 306 | |
| 283 | ALBANY CROSSING | 101 | 5 | - | 15 | 0 | - | 15 | 1 | 2 | 18 | 2 | 159 | |
| 284 | OAKLAND POINTE | 99 | 0 | - | 4 | 1 | - | 4 | 1 | 2 | 23 | - | 134 | |
| 285 | ONE & OLNEY SQUARE | 185 | 38 | - | 7 | 0 | - | 18 | 1 | 1 | 32 | 7 | 290 | |
| 287 | NORTHWEST CROSSING | 232 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 289 | |
| 288 | CLEVELAND AVENUE CROSSING | 110 | - | - | 3 | 5 | - | 2 | - | 1 | 29 | - | 150 | |
| 301 | CLOVERLEAF S/C | 108 | 4 | - | 4 | 0 | - | 4 | 1 | 2 | 32 | 3 | 157 | |
| 302 | BATESVILLE S/C | 66 | 8 | - | 5 | 0 | - | 9 | 1 | 2 | 16 | 4 | 110 | |
| 303 | NORTHTOWN PLAZA | 136 | 24 | - | 6 | 0 | - | 21 | 1 | 2 | 17 | 4 | 211 | |
| 317 | HAMMOND AIRE PLAZA | 132 | 9 | - | 11 | 1 | 0 | 31 | 1 | 2 | 32 | 4 | 223 | |
| 327 | WALZEM PLAZA | 57 | 5 | - | 4 | 0 | - | 13 | 1 | 2 | 23 | 3 | 108 | |
| 337 | TOWN & COUNTRY | 173 | 12 | - | 5 | 1 | 0 | 16 | - | 1 | 19 | 4 | 231 | |
| 338 | SOUTH PHILADELPHIA S/C | 147 | 10 | - | 3 | 0 | - | 2 | - | 1 | 24 | 5 | 192 | |
| 343 | EASTOWN S/C | 38 | - | - | 2 | - | 0 | 7 | - | 1 | 23 | 2 | 73 | |
| 344 | NORTHERN LIGHTS | 151 | - | - | 2 | - | 0 | 8 | - | 1 | 24 | - | 186 | |
| 348 | CENTURY CENTER | 185 | 8 | - | 5 | 1 | - | 6 | - | - | 14 | 4 | 224 | |
| 360 | FIVE POINTS WEST S/C | 159 | 1 | - | 4 | 2 | 0 | 3 | 1 | 2 | 27 | 2 | 202 | |
| 365 | CROSS CREEK | 69 | 1 | - | 4 | - | - | 13 | 1 | 2 | 17 | - | 107 | |
| 369 | FREESTANDING | 111 | 1 | - | 4 | 2 | 0 | 6 | 1 | 2 | 26 | 4 | 156 | |
| 375 | ROSE PLAZA | 86 | 9 | - | 6 | - | - | 10 | 1 | 2 | 17 | 3 | 134 | |
| 377 | LINCOLN S/C | 147 | 8 | - | 10 | - | - | 10 | - | 1 | 20 | 2 | 198 | |
| 500 | ANDERSON ROAD PLAZA | - | 4 | - | 4 | - | - | 31 | 1 | 2 | 25 | 3 | 69 | 5% |
| 501 | METRO PLAZA | 110 | 1 | - | 4 | 0 | - | 2 | 1 | 2 | 32 | 2 | 154 | |
| 504 | HIGHLAND PARK PLACE | 165 | 0 | - | 4 | 1 | - | 5 | 1 | 2 | 32 | - | 210 | |
| 506 | LIVONIA MARKETPLACE | 104 | - | - | 3 | 1 | - | 5 | - | 1 | 16 | - | 130 | |
| 507 | EDISTO VILLAGE SHOPPING CENTER | 41 | 13 | - | 5 | 1 | - | 6 | 1 | 2 | 20 | - | 89 | |
| 508 | WESTSHORE PLAZA | 214 | 8 | - | 5 | 1 | 0 | 8 | 1 | 2 | 24 | 2 | 270 | |
| 509 | KLINE PLAZA | 172 | 43 | - | 7 | 3 | - | 34 | - | - | 19 | 5 | 282 | |
| 510 | CLINTON POINTE | 69 | - | - | 3 | - | - | 3 | - | 1 | 3 | 2 | 73 | |
| 511 | OAK STREET SHOPPING CENTER | 88 | 2 | - | 4 | 1 | - | 3 | 1 | 2 | 34 | 2 | 137 | |
| 512 | NORGATE PLAZA | 136 | - | - | 4 | - | - | 0 | - | - | 13 | 0 | 153 | |
| 513 | MLK PLAZA | 123 | 25 | - | 9 | 2 | 1 | 28 | 1 | 2 | 18 | - | 209 | |
| 514 | NORTH CHARLESTON CENTER | 103 | 9 | - | 7 | - | 2 | 10 | 1 | 2 | 24 | 5 | 163 | |
| 515 | SUMTER SQUARE SHOPPING CENTER | 85 | 11 | - | 5 | 1 | - | 11 | 1 | 2 | 17 | 2 | 135 | |
| 516 | COTTMAN & BUSELTON S/C | 236 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 292 | |
| 521 | BORDEAUX SHOPPING CENTER | 87 | 8 | - | 6 | 1 | 1 | 19 | 1 | 2 | 26 | 3 | 154 | |
| 523 | WESTLAND SHOPPING CENTER | 74 | 17 | - | 5 | - | - | 11 | 1 | 2 | 18 | 3 | 130 | |
| 524 | THE SHOPS AT STERLING PONDS | 144 | 2 | - | 3 | 6 | - | 9 | - | 1 | 11 | 1 | 179 | |
| 525 | NORTHWEST PLAZA | 55 | - | - | 8 | 0 | - | 3 | 1 | 2 | 20 | 2 | 90 | |
| 526 | DORCHESTER SQUARE | 73 | 11 | - | 7 | - | 2 | 18 | 1 | 2 | 28 | 4 | 145 | |
| 527 | CANTON CENTRE | 227 | 5 | - | 3 | - | 0 | 14 | - | 0 | 19 | - | 267 | |
| 528 | GEORGETOWN PLAZA SHOPPING CENTER | 61 | 11 | - | 5 | - | - | 16 | 1 | 2 | 29 | 2 | 127 | |
| 529 | EASTGATE SHOPPING CENTER | 105 | 8 | - | 4 | 1 | 0 | 13 | 1 | 2 | 21 | 2 | 158 | |
| 531 | MIDDLESEX S/C | 196 | 10 | - | 3 | 2 | 2 | 23 | - | 1 | 9 | 5 | 250 | |
| 532 | CRICHTON PLAZA | 73 | 1 | - | 4 | 2 | 0 | 20 | 1 | 2 | 32 | 3 | 137 | |
| 537 | CHESAPEAKE CROSSING  SHOPPING CENTER | 90 | 7 | - | 4 | 2 | - | 10 | 1 | 2 | 23 | 2 | 140 | |
| 538 | CROSSROADS PLAZA | - | 1 | - | 4 | 0 | - | 5 | 1 | 2 | 31 | 3 | 47 | 4% |
| 540 | HATTIESBURG SHOPPING CENTER | 104 | 4 | - | 4 | 0 | - | 28 | 1 | 2 | 19 | 2 | 164 | |
| 541 | LIBERTY CENTER | 100 | - | - | 2 | - | - | 4 | - | - | 5 | 0 | 112 | |
| 543 | LEHMBERG CROSSING | - | 3 | - | 4 | - | 0 | 3 | 1 | 2 | 15 | 2 | 29 | 4% |
| 544 | SHOP CITY PLAZA | 104 | 15 | - | 4 | 1 | - | 23 | - | 1 | 12 | - | 160 | |

Simply Fashions
Exhibit 4.1(c)

| Occupancy Per Diem |
|---|

| Store # | Store Name | RENT | AD VALOREM TAX | FILTER SERVICE | INSURANCE - BUSINESS | LICENSE - CITY | LICENSE- STATE & COUNTY | MAINTENANCE | SECURITY | TELEPHONE | UTILITIES | WASTE PICK UP | Total Occupancy | % Rent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 545 | GREAT SOUTHERN S/C | 104 | - | - | 3 | - | 0 | 29 | - | 0 | 12 | - | 149 | |
| 549 | FREEDOM SQUARE SHOPPING CENTER | 103 | 4 | - | 4 | 2 | - | 4 | 1 | 2 | 20 | 2 | 141 | |
| 554 | TOWN CENTER MARKET | 169 | 5 | - | 5 | - | 1 | 11 | - | 1 | 18 | 2 | 213 | |
| 555 | IROQUOIS MANOR | 62 | 9 | - | 5 | - | - | 11 | 1 | 2 | 27 | 2 | 118 | |
| 556 | WESLEY CHAPEL SQUARE SHOPPING CENTER | 108 | 2 | - | 4 | - | 1 | 39 | 1 | 2 | 26 | 3 | 186 | |
| 558 | SHELBY PLAZA | 88 | 1 | - | 4 | 1 | 1 | 15 | 1 | 2 | 13 | 3 | 128 | |
| 559 | AUSTINTOWN PLAZA | 128 | - | - | 3 | 2 | 1 | 2 | - | 1 | 10 | 3 | 148 | |
| 562 | NORTH POINT CENTER | 132 | 1 | - | 4 | 1 | 1 | 4 | 1 | 2 | 28 | 3 | 176 | |
| 563 | CONSUMER SQUARE WEST | 160 | 8 | - | 5 | 1 | 0 | 13 | 1 | 2 | 24 | 2 | 216 | |
| 565 | BROADWAY CENTER | 89 | 1 | - | 4 | 1 | 1 | - | 1 | 2 | 16 | 2 | 115 | |
| 571 | WESTWOOD SHOPPING CENTER | 113 | 19 | - | 8 | 2 | 0 | 18 | 1 | 2 | 36 | 3 | 202 | |
| 575 | VILLAGE SHOPPING CENTER | - | 7 | - | 5 | 1 | - | 17 | 1 | 2 | 35 | 2 | 69 | 8% |
| 576 | SOUTHGATE SHOPPING CENTER | 129 | 14 | - | 10 | 1 | - | 29 | 1 | 2 | 21 | - | 207 | |
| 577 | HICKORY RIDGE CROSSING | 58 | 1 | - | 4 | 1 | 1 | 3 | 1 | 2 | 22 | 3 | 94 | |
| 581 | GAINSVILLE SHOPPING CENTER | 84 | 13 | - | 4 | 1 | - | 20 | 1 | 2 | 22 | 3 | 150 | |
| 584 | SOUTHGATE PLAZA | 121 | 7 | - | 7 | 0 | - | 10 | 1 | 2 | 26 | 2 | 174 | |
| 595 | PARKWAY PLAZA | 91 | 17 | - | 10 | 0 | - | 17 | 1 | 2 | 24 | 2 | 164 | |
| 599 | COURTHOUST SQUARE | 86 | 2 | - | 4 | - | 0 | 2 | 1 | 2 | 12 | 3 | 111 | |
| 617 | ASHER | 59 | 3 | - | 4 | 1 | - | 11 | 1 | 2 | 18 | - | 100 | |
| **247** | **Total** | **27,968** | **2,098** | **-** | **1,217** | **211** | **51** | **3,150** | **198** | **382** | **5,803** | **578** | **41,655** | |

Note:
For stores indicating percentage rent amounts, these are straight percentage rent locations; there is no base rent associated with these stores and the percentage rent amount is a straight percentage of sales with no minimum threshold or breakpoint.

# Simply Fashions

Exhibit 5.2(b)

| Distribution Center Merchandise |
|:---:|

As reflected in **Simply Fashions Stores Inventory Including Cost and Retail 4-7-15.xlsx** , locations:

| Location # | Description |
|---|---|
| 751 | Dots DOTCOM |
| 752 | SF DOTCOM |
| 0 | Simply Warehouse |
| 2 | Pallet Simply Fashions |
| 3 | Dots Warehouse |
| 6 | SIMPLY FASHION TIERING WAREHOUSE |

**Simply Fashions**
Exhibit 11.1(o)

| Level and Mix |
|---|

| Dept # | Dept Name | Class | Class Name | Sub Class | SubClass Name | Current Retail | % of Total Retail |
|---|---|---|---|---|---|---|---|
| 01-51 | JUNIOR | 01-51-10 | JUNIOR TOPS | 01-51-10-10 | JR WOV S/L | 365,562 | 2.3% |
| 01-51 | JUNIOR | 01-51-10 | JUNIOR TOPS | 01-51-10-20 | JR WOV S/S | 212,525 | 1.3% |
| 01-51 | JUNIOR | 01-51-10 | JUNIOR TOPS | 01-51-10-30 | JR WOV L/S | 287,484 | 1.8% |
| 01-51 | JUNIOR | 01-51-10 | JUNIOR TOPS | 01-51-10-50 | JR KNI S/L | 402,431 | 2.5% |
| 01-51 | JUNIOR | 01-51-10 | JUNIOR TOPS | 01-51-10-60 | JR KNI S/S | 597,669 | 3.7% |
| 01-51 | JUNIOR | 01-51-10 | JUNIOR TOPS | 01-51-10-70 | JR KNI L/S | 159,444 | 1.0% |
| 01-51 | JUNIOR | 01-51-10 | JUNIOR TOPS | 01-51-10-80 | JR 2-FOR CAMI'S | 205,825 | 1.3% |
| 01-51 | JUNIOR | 01-51-10 | JUNIOR TOPS | 01-51-10-82 | JR 2-FOR S/S | 266,602 | 1.7% |
| 01-51 | JUNIOR | 01-51-10 | JUNIOR TOPS | 01-51-10-84 | JR 2-FOR L/S | 56,432 | 0.4% |
| 01-51 | JUNIOR | 01-51-20 | JUNIOR BOTTOMS | 01-51-20-10 | JR SKIRTS | 154,237 | 1.0% |
| 01-51 | JUNIOR | 01-51-20 | JUNIOR BOTTOMS | 01-51-20-15 | JR DEN SKIRTS | 45,467 | 0.3% |
| 01-51 | JUNIOR | 01-51-20 | JUNIOR BOTTOMS | 01-51-20-25 | JR JEANS | 495,408 | 3.1% |
| 01-51 | JUNIOR | 01-51-20 | JUNIOR BOTTOMS | 01-51-20-30 | JR PANTS | 439,848 | 2.7% |
| 01-51 | JUNIOR | 01-51-20 | JUNIOR BOTTOMS | 01-51-20-40 | JR CAPRIS | 70,313 | 0.4% |
| 01-51 | JUNIOR | 01-51-20 | JUNIOR BOTTOMS | 01-51-20-45 | JR DEN CAPRIS | 15,610 | 0.1% |
| 01-51 | JUNIOR | 01-51-20 | JUNIOR BOTTOMS | 01-51-20-60 | JR ROMPERS | 65,339 | 0.4% |
| 01-51 | JUNIOR | 01-51-20 | JUNIOR BOTTOMS | 01-51-20-70 | JR SHORTS | 196,081 | 1.2% |
| 01-51 | JUNIOR | 01-51-20 | JUNIOR BOTTOMS | 01-51-20-75 | JR DEN SHORTS | 89,385 | 0.6% |
| 01-51 | JUNIOR | 01-51-20 | JUNIOR BOTTOMS | 01-51-20-80 | JR LEGGING | 146,850 | 0.9% |
| 01-51 | JUNIOR | 01-51-30 | JUNIOR COORDINATES | 01-51-30-10 | JR WOV COOR | 3,894 | 0.0% |
| 01-51 | JUNIOR | 01-51-30 | JUNIOR COORDINATES | 01-51-30-35 | JR DEN COOR | 3,034 | 0.0% |
| 01-51 | JUNIOR | 01-51-30 | JUNIOR COORDINATES | 01-51-30-50 | JR KNI COOR | 125,096 | 0.8% |
| 01-51 | JUNIOR | 01-51-30 | JUNIOR COORDINATES | 01-51-30-55 | JR ACT WEAR | 174,086 | 1.1% |
| 01-51 | JUNIOR | 01-51-40 | JUNIOR OUTERWEAR | 01-51-40-10 | JR SWEATERS | 66,019 | 0.4% |
| 01-51 | JUNIOR | 01-51-40 | JUNIOR OUTERWEAR | 01-51-40-20 | JR JKT | 67,534 | 0.4% |
| 01-51 | JUNIOR | 01-51-50 | JUNIOR DRESSES | 01-51-50-10 | JR DRESSES | 840,702 | 5.3% |
| 01-51 | JUNIOR | 01-51-50 | JUNIOR DRESSES | 01-51-50-20 | JR JUMPSUITS | 44,724 | 0.3% |
| 02-52 | PLUS TOPS | 02-52-10 | PLUS TOPS | 02-52-10-10 | PL WOV S/L | 227,074 | 1.4% |
| 02-52 | PLUS TOPS | 02-52-10 | PLUS TOPS | 02-52-10-20 | PL WOV S/S | 238,095 | 1.5% |
| 02-52 | PLUS TOPS | 02-52-10 | PLUS TOPS | 02-52-10-30 | PL WOV L/S | 184,972 | 1.2% |
| 02-52 | PLUS TOPS | 02-52-10 | PLUS TOPS | 02-52-10-50 | PL KNI S/L | 333,008 | 2.1% |
| 02-52 | PLUS TOPS | 02-52-10 | PLUS TOPS | 02-52-10-60 | PL KNI S/S | 626,283 | 3.9% |
| 02-52 | PLUS TOPS | 02-52-10 | PLUS TOPS | 02-52-10-70 | PL KNI L/S | 126,577 | 0.8% |
| 02-52 | PLUS TOPS | 02-52-10 | PLUS TOPS | 02-52-10-80 | PL 2-FOR CAMI'S | 199,656 | 1.2% |
| 02-52 | PLUS TOPS | 02-52-10 | PLUS TOPS | 02-52-10-82 | PL 2-FOR S/S | 249,928 | 1.6% |
| 02-52 | PLUS TOPS | 02-52-10 | PLUS TOPS | 02-52-10-84 | PL 2-FOR L/S | 23,408 | 0.1% |
| 02-52 | PLUS TOPS | 02-52-30 | PLUS KNIT COORDINATES | 02-52-30-50 | PL KNI COOR | 120,831 | 0.8% |
| 02-52 | PLUS TOPS | 02-52-30 | PLUS KNIT COORDINATES | 02-52-30-55 | PLUS ACT WEAR | 151,667 | 0.9% |
| 02-52 | PLUS TOPS | 02-52-40 | PLUS OUTERWEAR | 02-52-40-10 | PL SWEATERS | 24,530 | 0.2% |
| 02-52 | PLUS TOPS | 02-52-40 | PLUS OUTERWEAR | 02-52-40-20 | PL JKTS | 67,848 | 0.4% |
| 02-52 | PLUS TOPS | 02-52-50 | PLUS DRESSES | 02-52-50-10 | PLUS DRESSES | 651,277 | 4.1% |
| 02-52 | PLUS TOPS | 02-52-50 | PLUS DRESSES | 02-52-50-20 | PLUS JUMPSUITS | 49,374 | 0.3% |
| 02-53 | SUPER TOPS | 02-53-10 | SUPER PLUS TOPS | 02-53-10-10 | SP WOV S/L | 48,298 | 0.3% |
| 02-53 | SUPER TOPS | 02-53-10 | SUPER PLUS TOPS | 02-53-10-20 | SP WOV S/S | 69,083 | 0.4% |
| 02-53 | SUPER TOPS | 02-53-10 | SUPER PLUS TOPS | 02-53-10-30 | SP WOV L/S | 61,847 | 0.4% |
| 02-53 | SUPER TOPS | 02-53-10 | SUPER PLUS TOPS | 02-53-10-50 | SP KNI S/L | 39,373 | 0.2% |
| 02-53 | SUPER TOPS | 02-53-10 | SUPER PLUS TOPS | 02-53-10-60 | SP KNI S/S | 199,100 | 1.2% |
| 02-53 | SUPER TOPS | 02-53-10 | SUPER PLUS TOPS | 02-53-10-70 | SP KNI L/S | 13,976 | 0.1% |
| 02-53 | SUPER TOPS | 02-53-10 | SUPER PLUS TOPS | 02-53-10-80 | SP 2-FOR CAMI'S | 52,483 | 0.3% |
| 02-53 | SUPER TOPS | 02-53-10 | SUPER PLUS TOPS | 02-53-10-82 | SP 2-FOR S/S | 64,081 | 0.4% |
| 02-53 | SUPER TOPS | 02-53-30 | SUPER KNIT COORDINATES | 02-53-30-50 | SP KNI COOR | 9,674 | 0.1% |
| 02-53 | SUPER TOPS | 02-53-30 | SUPER KNIT COORDINATES | 02-53-30-55 | SUPER ACT WEAR | 67,490 | 0.4% |
| 02-53 | SUPER TOPS | 02-53-40 | SUPER PLUS OUTERWEAR | 02-53-40-10 | SP SWEATERS | 4,395 | 0.0% |
| 02-53 | SUPER TOPS | 02-53-40 | SUPER PLUS OUTERWEAR | 02-53-40-20 | SP JKT | 683 | 0.0% |
| 02-53 | SUPER TOPS | 02-53-50 | SUPER PLUS DRESSES | 02-53-50-10 | SP DRESS/JSUITS/RMPR | 94,210 | 0.6% |
| 03-52 | PLUS BOTTOMS | 03-52-20 | PLUS BOTTOMS | 03-52-20-10 | PL SKIRTS | 163,242 | 1.0% |
| 03-52 | PLUS BOTTOMS | 03-52-20 | PLUS BOTTOMS | 03-52-20-15 | PL DEN SKIRT | 34,321 | 0.2% |
| 03-52 | PLUS BOTTOMS | 03-52-20 | PLUS BOTTOMS | 03-52-20-25 | PL JEANS | 262,407 | 1.6% |
| 03-52 | PLUS BOTTOMS | 03-52-20 | PLUS BOTTOMS | 03-52-20-30 | PL PANTS | 332,219 | 2.1% |
| 03-52 | PLUS BOTTOMS | 03-52-20 | PLUS BOTTOMS | 03-52-20-40 | PL CAPRIS | 93,552 | 0.6% |
| 03-52 | PLUS BOTTOMS | 03-52-20 | PLUS BOTTOMS | 03-52-20-45 | PL DEN CAPRI | 17,856 | 0.1% |
| 03-52 | PLUS BOTTOMS | 03-52-20 | PLUS BOTTOMS | 03-52-20-60 | PL ROMPERS | 32,800 | 0.2% |
| 03-52 | PLUS BOTTOMS | 03-52-20 | PLUS BOTTOMS | 03-52-20-70 | PL SHORTS | 225,859 | 1.4% |
| 03-52 | PLUS BOTTOMS | 03-52-20 | PLUS BOTTOMS | 03-52-20-75 | PL DEN SHORTS | 68,151 | 0.4% |
| 03-52 | PLUS BOTTOMS | 03-52-20 | PLUS BOTTOMS | 03-52-20-80 | PL LEGGING | 152,883 | 1.0% |

| Dept # | Dept Name | Class | Class Name | Sub Class | SubClass Name | Current Retail | % of Total Retail |
|--------|-----------|-------|-----------|-----------|---------------|---------------|--------------------|
| 03-52 | PLUS BOTTOMS | 03-52-30 | PLUS WOVEN COORDINATES | 03-52-30-10 | PL WOV COOR | 11,334 | 0.1% |
| 03-52 | PLUS BOTTOMS | 03-52-30 | PLUS WOVEN COORDINATES | 03-52-30-35 | PL DEN COOR | 8,475 | 0.1% |
| 03-53 | SUPER BOTTOMS | 03-53-20 | SUPER PLUS BOTTOMS | 03-53-20-10 | SP SKIRTS | 55,061 | 0.3% |
| 03-53 | SUPER BOTTOMS | 03-53-20 | SUPER PLUS BOTTOMS | 03-53-20-15 | SP DEN SKIRT | 7,338 | 0.0% |
| 03-53 | SUPER BOTTOMS | 03-53-20 | SUPER PLUS BOTTOMS | 03-53-20-25 | SP JEANS | 63,450 | 0.4% |
| 03-53 | SUPER BOTTOMS | 03-53-20 | SUPER PLUS BOTTOMS | 03-53-20-30 | SP PANTS | 150,750 | 0.9% |
| 03-53 | SUPER BOTTOMS | 03-53-20 | SUPER PLUS BOTTOMS | 03-53-20-40 | SP CAPRIS | 56,316 | 0.4% |
| 03-53 | SUPER BOTTOMS | 03-53-20 | SUPER PLUS BOTTOMS | 03-53-20-45 | SP DEN CAPRI | 21,660 | 0.1% |
| 03-53 | SUPER BOTTOMS | 03-53-20 | SUPER PLUS BOTTOMS | 03-53-20-70 | SP SHORTS | 31,815 | 0.2% |
| 03-53 | SUPER BOTTOMS | 03-53-20 | SUPER PLUS BOTTOMS | 03-53-20-75 | SP DEN SHORTS | 13,683 | 0.1% |
| 03-53 | SUPER BOTTOMS | 03-53-20 | SUPER PLUS BOTTOMS | 03-53-20-80 | SP LEGGINGS | 41,406 | 0.3% |
| 03-53 | SUPER BOTTOMS | 03-53-30 | SUPER WOVEN COORDINATES | 03-53-30-10 | SP WOV COOR | 4,444 | 0.0% |
| 03-53 | SUPER BOTTOMS | 03-53-30 | SUPER WOVEN COORDINATES | 03-53-30-35 | SP DEN COOR | 1,712 | 0.0% |
| 08-59 | CLOSEOUTS | 08-59-10 | CLOSEOUTS JUNIOR | 08-59-10-99 | JR CLOSEOUTS | 369,150 | 2.3% |
| 08-59 | CLOSEOUTS | 08-59-20 | CLOSEOUTS PLUS | 08-59-20-99 | PLUS CLOSEOUTS | 330,962 | 2.1% |
| 07-60 | ACCESSORIES | 07-60-10 | ACCESSORIES EARRINGS | 07-60-10-01 | GOLD/SILVER | 211,973 | 1.3% |
| 07-60 | ACCESSORIES | 07-60-10 | ACCESSORIES EARRINGS | 07-60-10-02 | COLOR | 235,875 | 1.5% |
| 07-60 | ACCESSORIES | 07-60-10 | ACCESSORIES EARRINGS | 07-60-10-03 | CLIPS | 25,867 | 0.2% |
| 07-60 | ACCESSORIES | 07-60-10 | ACCESSORIES EARRINGS | 07-60-10-05 | TRIOS | 79,081 | 0.5% |
| 07-60 | ACCESSORIES | 07-60-12 | ACCESSORIES SETS | 07-60-12-01 | NECK & EAR | 579,970 | 3.6% |
| 07-60 | ACCESSORIES | 07-60-12 | ACCESSORIES SETS | 07-60-12-03 | BRACELETS SETS | - | 0.0% |
| 07-60 | ACCESSORIES | 07-60-13 | ACCESSORIES BRACELETS | 07-60-13-01 | BRACELETS | 210,762 | 1.3% |
| 07-60 | ACCESSORIES | 07-60-19 | NOVELTY / GIFTS | 07-60-19-01 | NOVELTY JEWELRY | 41,368 | 0.3% |
| 07-60 | ACCESSORIES | 07-60-19 | NOVELTY / GIFTS | 07-60-19-02 | RINGS | 41,956 | 0.3% |
| 07-60 | ACCESSORIES | 07-60-19 | NOVELTY / GIFTS | 07-60-19-10 | BEAUTY PRODUCTS | 72,705 | 0.5% |
| 07-60 | ACCESSORIES | 07-60-19 | NOVELTY / GIFTS | 07-60-19-20 | ELECTRONICS | 16,493 | 0.1% |
| 07-60 | ACCESSORIES | 07-60-20 | ACCESSORIES WATCHES | 07-60-20-01 | WATCHES | 65,416 | 0.4% |
| 07-60 | ACCESSORIES | 07-60-30 | ACCESSORIES HATS | 07-60-30-01 | HATS | 29,821 | 0.2% |
| 07-60 | ACCESSORIES | 07-60-35 | ACCESSORIES SCARVES | 07-60-35-99 | SCARVES | 102,959 | 0.6% |
| 07-60 | ACCESSORIES | 07-60-40 | ACCESSORIES BELTS | 07-60-40-02 | BELTS | 67,969 | 0.4% |
| 07-60 | ACCESSORIES | 07-60-50 | ACCESSORIES HANDBAGS | 07-60-50-01 | HANDBAGS | 211,394 | 1.3% |
| 07-60 | ACCESSORIES | 07-60-60 | ACCESSORIES SUNGLASSES | 07-60-60-01 | SUNGLASSES | 50,153 | 0.3% |
| 07-60 | ACCESSORIES | 07-60-80 | ACCESSORIES COLD WEATHER | 07-60-80-01 | COLD WEATHER | 4,833 | 0.0% |
| 07-60 | ACCESSORIES | 07-60-90 | ACCESS SOCKS | 07-60-90-01 | SOCKS | 72,337 | 0.5% |
| 07-60 | ACCESSORIES | 07-60-95 | ACCESSORIES MISCELLANOUS | 07-60-95-01 | FRAGRANCES | 52,774 | 0.3% |
| 07-60 | ACCESSORIES | 07-60-95 | ACCESSORIES MISCELLANOUS | 07-60-95-10 | MISCELLANEOUS | 14,910 | 0.1% |
| 07-61 | LINGERIE | 07-61-01 | LINGERIE JUNIOR | 07-61-01-01 | BRAS | 131,791 | 0.8% |
| 07-61 | LINGERIE | 07-61-01 | LINGERIE JUNIOR | 07-61-01-02 | PANTIES | 308,752 | 1.9% |
| 07-61 | LINGERIE | 07-61-01 | LINGERIE JUNIOR | 07-61-01-03 | 1.49 PANTIES | 7,727 | 0.0% |
| 07-61 | LINGERIE | 07-61-01 | LINGERIE JUNIOR | 07-61-01-04 | DAYWEAR | 7,917 | 0.0% |
| 07-61 | LINGERIE | 07-61-01 | LINGERIE JUNIOR | 07-61-01-05 | SLEEPWEAR | 197,349 | 1.2% |
| 07-61 | LINGERIE | 07-61-02 | LINGERIE PLUS | 07-61-02-01 | BRAS | - | 0.0% |
| 07-61 | LINGERIE | 07-61-02 | LINGERIE PLUS | 07-61-02-02 | PANTIES | - | 0.0% |
| 07-61 | LINGERIE | 07-61-02 | LINGERIE PLUS | 07-61-02-03 | 2.49 PANTIES | 6,867 | 0.0% |
| 07-61 | LINGERIE | 07-61-02 | LINGERIE PLUS | 07-61-02-04 | DAYWEAR | - | 0.0% |
| 07-61 | LINGERIE | 07-61-02 | LINGERIE PLUS | 07-61-02-05 | SLEEPWEAR | - | 0.0% |
| 07-61 | LINGERIE | 07-61-03 | LINGERIE SUPER | 07-61-03-01 | BRAS | - | 0.0% |
| 07-61 | LINGERIE | 07-61-03 | LINGERIE SUPER | 07-61-03-01 | PANTIES | - | 0.0% |
| 07-61 | LINGERIE | 07-61-03 | LINGERIE SUPER | 07-61-03-05 | SLEEPWEAR | - | 0.0% |
| 07-62 | SHOES | 07-62-10 | SHOES | 07-62-10-01 | SHOES | 602,004 | 3.8% |
| 07-62 | SHOES | 07-62-10 | SHOES | 07-62-10-20 | BOOTS | 29,786 | 0.2% |
| 07-62 | SHOES | 07-62-10 | SHOES | 07-62-10-25 | W W BOOTS | 3,368 | 0.0% |
| 07-62 | SHOES | 07-62-10 | SHOES | 07-62-10-50 | 2 OR MORE | 366,185 | 2.3% |
| 07-63 | ACC/CLOSEOUTS | 07-63-01 | ACC/CLOSEOUTS | 07-63-01-10 | ACCESSORY CLOSEOUTS | 692 | 0.0% |
| 07-63 | ACC/CLOSEOUTS | 07-63-01 | ACC/CLOSEOUTS | 07-63-01-20 | LINGERIE CLOSEOUTS | 296 | 0.0% |
| 07-63 | ACC/CLOSEOUTS | 07-63-01 | ACC/CLOSEOUTS | 07-63-01-30 | SHOE CLOSEOUTS | 981 | 0.0% |
| | | | | | **Total** | **16,000,000** | **100.0%** |

**<u>EXHIBIT "3"</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:                                        Chapter 11 Cases

ADINATH CORP. and SIMPLY                      Case No. 15-16885-LMI
FASHION STORES, LTD., [1]                     Jointly Administered

      Debtors.
_____/


**NOTICE OF (I) PROPOSED SALE OF ALL OR SUBSTANTIALLY ALL OF THE
DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND
ENCUMBRANCES, (II) AUCTION AND (III) SALE HEARING**

      **PLEASE TAKE NOTICE** that on April 17, 2015, Simply Fashion Stores, Ltd.,
as debtors and debtors in possession in the above-captioned chapter 11 case (the "Debtor"), filed
a motion (the "Sale Motion") with the United States Bankruptcy Court for the Southern District
of Florida (the "Court") seeking, (i) authority to sell all or substantially all of their assets free and
clear of all liens, claims, and encumbrances (the "Sale"), (ii) approval of certain procedures for
the solicitation of bids and the conduct of an auction with respect to the Sale (the "Bidding

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification
    number are: (i) Adinath Corp. (4843); and (ii) Simply Fashion Stores, Ltd. (6230).  The address for
    each of the Debtors is 2110 N.W. 95th Avenue, Miami, FL 33172.

Procedures") and (iii) scheduling of a hearing with the Court for approval of the Sale (the "Sale Hearing").

PLEASE TAKE FURTHER NOTICE that an auction (the "Auction") is currently scheduled to be conducted at the offices of Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131 on May 5, 2015 at 2:00 p.m. (prevailing Eastern Time), at which time all prospective bidders may bid and participate pursuant to the terms of the Bidding Procedures.

As described in the Bidding Procedures, the Debtors are soliciting bids for any and all of their assets. The Debtors will consider bids for all of their assets, distinct lots of assets and individual assets, and will consider bids to enter into one or more agency agreements for the liquidation of some or all of their assets. The Debtor, in its business judgment, and after review of all bids submitted, will determine the proposed transaction or transactions that generate the maximum value for its estate.

The Auction will continue until such time as the highest or otherwise best offer is determined. The Debtor may adopt rules for the Auction that will promote the goals of the Auction process and that are not inconsistent with any of the provisions of the Bidding Procedures. Only bidders who submit bids in accordance with the Bidding Procedures will be allowed to attend the Auction. A copy of the Sale Motion, which contains the Bidding Procedures, may be obtained by (a) contacting the attorneys for the Debtor, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131, Attn. Paul Steven Singerman, Esq. and Christopher A. Jarvinen, Esq., Telephone: (305) 755-9500; (b) accessing the Court's website at http://www.flsb.uscourts.gov (please note that a PACER password is needed to access documents on the Court's website); (c) viewing the docket of these cases at the Clerk of the Court, United States Bankruptcy Court for the Southern District of Florida, C. Clyde Atkins United States Courthouse, 301 North Miami Avenue, Room 150, Miami, FL 33128; or (d) accessing the public website maintained by the Debtors' court-appointed claims and noticing agent, Prime Clerk LLC, at http://cases.primeclerk.com/simplyfashion.

PLEASE TAKE FURTHER NOTICE that the Sale Hearing is currently scheduled to be held on May 6, 2015 at 8:00 a.m. (prevailing Eastern Time) at the United States Bankruptcy Court for the Southern District of Florida, C. Clyde Atkins United States Courthouse, 301 North Miami Avenue, Courtroom 8, Miami, FL 33128, before the Honorable Laurel M. Isicoff, United States Bankruptcy Judge, to consider the Debtors' selection of the highest or best bid and the Sale. The Sale Hearing may be adjourned, from time to time, without further notice to creditors or parties in interest other than by announcement of the adjournment in open Court or on the Court's docket.

PLEASE TAKE FURTHER NOTICE THAT OBJECTIONS TO ANY RELIEF REQUESTED IN THE SALE MOTION, INCLUDING THE DEBTOR'S REQUEST TO APPROVE THE SALE OF PURCHASED ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, MUST BE IN WRITING, FILED, AND SERVED SO AS TO BE ACTUALLY RECEIVED BY MAY 5, 2015 AT 4:00 P.M. (PREVAILING EASTERN TIME) by: (i) the Debtors, c/o KapilaMukamal LLP, 1000 South

Federal Highway, Suite 200, Fort Lauderdale, FL 33316, Attn: Soneet R. Kapila, CRO; (ii) the Debtors, 2110 N.W. 95th Avenue, Miami, FL 33172, Attn: Swapnil Shah; (iii) counsel to the Debtors, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131, Attn: Paul Steven Singerman, Esq. and Christopher A. Jarvinen, Esq.; (iv) the Stalking Horse Bidder, (a) Hilco Merchant Resources, LLC, 5 Revere Drive, Suite 206, Northbrook, IL 60062, Attention Ian S. Fredericks, and (b) Gordon Brothers Retail Partners, LLC, Prudential Tower, 800 Boylston Street, Boston, MA 02119, Attention Michael Chartock; (v) counsel to the Stalking Horse Bidder, Bilzin Sumberg Baena Price & Axelrod LLP, 1450 Brickell Avenue, 23rd Floor, Miami, FL 33131, Attn: Scott L. Baena, Esq.,and Jay Sakalo, Esq.; (vi) counsel to the Official Committee of Unsecured Creditors, if one is appointed; and (vi) the U.S. Trustee, 51 S.W. First Avenue, Room 1204, Miami, FL 33130 (collectively, the "Objection Notice Parties").

   This notice is qualified in its entirety by any order approving the Bidding Procedures (the "Bidding Procedures Order"). All persons and entities are urged to read the Bidding Procedures Order, when entered, and the provisions thereof carefully. To the extent that this notice is inconsistent with the Bidding Procedures Order, the terms of the Bidding Procedures Order shall govern.

Dated: April ____, 2015

6336578-3