

**ORDERED in the Southern District of Florida on May 6, 2015.**

Laurel M. Isicoff, Judge
United States Bankruptcy Court

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**
www.flsb.uscourts.gov

In re:

ADINATH CORP. and SIMPLY
FASHION STORES, LTD.,

        Debtors.

_____/

Chapter 11 Cases

Case No. 15-16885-LMI
Jointly Administered

**FINAL ORDER PURSUANT TO SECTIONS 361, 363, 364(c) AND (d) OF THE
BANKRUPTCY CODE AND RULE 4001 OF THE FEDERAL RULES OF
BANKRUPTCY PROCEDURE AUTHORIZING (A) DEBTORS IN POSSESSION TO
OBTAIN SENIOR SECURED POST-PETITION FINANCING, (B) GRANTING
CERTAIN PRIMING LIENS, (C) MODIFYING THE AUTOMATIC STAY, (D)
GRANTING SUPER-PRIORITY ADMINISTRATIVE CLAIM STATUS, AND (E)
AUTHORIZING USE OF CASH COLLATERAL AND GRANTING ADEQUATE
<u>PROTECTION THEREFOR</u>**

        This matter came on for hearing on May 6, 2015 at 8:00 a.m. (the "<u>Final Hearing</u>") upon

the Emergency Motion of Adinath Corp. ("<u>Adinath</u>") and Simply Fashion Stores, Ltd. (the

"<u>Borrower</u>", "<u>Debtor-Borrower</u>" or "<u>Simply Fashion Stores</u>" and together with Adinath, each a

"<u>Debtor</u>" and collectively, the "<u>Debtors</u>") in the above captioned chapter 11 cases (together with

any successor cases, the "Cases"), seeking entry of that certain Interim Order, dated April 17, 2015 [D.E. 42][1] and this final order (the "Final Order") authorizing, inter alia, the Debtors to:

(i)    obtain senior secured post-petition financing from JNS INVT, LLC, a Florida limited liability company (in its capacity as the debtor-in-possession lender, the "DIP Lender" and in its capacity as the prepetition senior secured lender to Simply Fashion Stores, the "Prepetition Lender")),[2] pursuant to the terms and conditions of the Interim Order, this Final Order and any promissory note and loan and security documents to be executed by the Debtors in connection with and consistent with the terms and conditions of such financing (collectively, the "DIP Loan Documents").

(ii)    borrow on a revolving line of credit basis, pursuant to the Interim Order, this Final Order and the DIP Loan Documents, one or more advances in an amount not to exceed $1,250,000 (the "DIP Loan") outstanding at any time through the Maturity Date (as defined below), pursuant to the Budget attached hereto as Exhibit "A" (the "Budget"), at an annual interest rate of six (6%) percent with no commitment fee, exit fee, unused line fee or similar fee to the DIP Lender;

(iii)    grant to the DIP Lender, pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code and the terms of the DIP Loan Documents, but subject in all events to the Carve Out (as defined and set forth below), perfected and enforceable liens and security interests comprised of (a) a first priority valid, binding, enforceable priming lien and security interest,

---

[1] The Interim Order was entered after the Court conducted an interim emergency hearing on the Motion on April 17, 2015 (the "Interim Hearing")

[2] The Debtors have disclosed and the Court notes that the DIP Lender is affiliated with the Debtors through certain common owners.

pursuant to section 364(d) of the Bankruptcy Code, on and against all tangible and intangible assets of the Debtors, whether owned as of the Petition Date or acquired thereafter, including all assets comprising the Prepetition Collateral (as defined below)(provided that with respect to any real property leased by the Debtors from any landlord, the Postpetition Liens will be limited to and shall attach solely to any proceeds of the disposition of such real property lease(s)), the Debtor-Borrower's rights under section 506(c) of the Bankruptcy Code, and all rights, claims and causes of action of the Debtor-Borrower (collectively the "Collateral"), senior in priority to any prior perfected and/or duly enforceable lien of any person or entity existing as of the Petition Date, including the Prepetition Lender, but subject only to the Iberiabank Lien, (b) a first priority valid, binding, enforceable lien and security interest, pursuant to section 364(c)(2) of the Bankruptcy Code, on and against the Collateral that is not otherwise subject of a prior perfected and duly enforceable lien or security interest as of the Petition Date, (c) a junior priority valid, binding, enforceable lien and security interest, pursuant to section 364(c)(3) of the Bankruptcy Code, on and against the Collateral that is otherwise subject of a prior perfected and duly enforceable lien or security interest as of the Petition Date, and (d) all proceeds and products of and from the Collateral, and all substitutions, renewals, improvements and replacements of any of the Collateral; and further including all proceeds and products of any of the foregoing Collateral, including without limitation, all insurance policies insuring the foregoing Collateral or any part thereof and proceeds of said insurance, and including unearned premiums (collectively, the "Proceeds")(the Collateral and the Proceeds are collectively referred to herein as "Postpetition Collateral");

(iv)    incur all of the obligations, liabilities and indebtedness under and in respect of the DIP Loan, including attorneys' fees and expenses and financial advisory fees and expenses of the

DIP Lender (collectively, the "DIP Obligations") and pay all amounts contemplated to be paid thereunder;

(iv)    use the proceeds of the DIP Loan in a manner consistent with the terms and conditions of the Interim Order, this Final Order, the DIP Loan Documents and in accordance with the Budget, subject to the Permitted Budget Variance (as defined below), solely for the purposes set forth in the Budget, including for (a) working capital and general corporate purposes, (b) payment of certain of the costs of administration of the Cases, to the extent set forth in the Budget, (c) payment of interest, fees and costs to the DIP Lender under the Interim Order and this Final Order, and d) payment of insurance on the Collateral;

(v)    grant to the DIP Lender, pursuant to section 364(c)(1) of the Bankruptcy Code, a super-priority administrative expense claim in respect of all DIP Obligations with priority over all administrative expenses, subject only to the Carve-Out (as defined below) and the other terms and conditions contained herein;

(vi)    authorizing the Debtors to use the Cash Collateral (as defined below) of the Prepetition Lender and grant adequate protection in connection therewith as more fully set forth below;

(vii)    vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order and this Final Order;  and

(viii)    schedule the Final Hearing to consider entry of this Final Order granting the relief requested in the Motion on a final basis and approve the form of notice with respect to the Final Hearing.

The Court, having considered the Motion, the First Day Declaration of Soneet R. Kapila,

the Debtors' Chief Restructuring Officer, in support of the chapter 11 petitions and first day motions and applications which was filed contemporaneously with the Motion, the Interim Order and the evidence submitted, adduced or proffered at the Interim Hearing and the Final Hearing, the notice of the Interim Hearing and the Final Hearing having been given in accordance with the Interim Order and Bankruptcy Rules 2002, 4001(b) and (d) and 9014, and all objections, if any to the interim and final relief requested in the Motion having been withdrawn, resolved or overruled by the Court, and it appearing to the Court that granting the relief requested in the Motion and entering this Final Order is necessary to avoid immediate and irreparable harm to the Debtors, their creditors and their estates, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates and their creditors, and equity holders, and is essential for the continued operation of the Debtors' business; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING AND THE FINAL HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.    **Petition Date**. On April 16, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Florida (the "Court"). The Debtors are continuing in the management and operation of their business and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B.    **Jurisdiction and Venue**. This Court has jurisdiction over the Cases pursuant to 28 U.S.C. §§ 157 and 1334 and over the persons and property affected by this Interim Order.

Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue of the Debtors' Cases is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

C.      **Creditors' Committee**.  On April 22, 2015, the Office of the United States Trustee appointed a Committee of Creditors Holding Unsecured Claims [D.E. 79] (the "Committee").

D.      **Notice**.  Notice of the Final Hearing and the emergency relief requested in the Motion has been provided by the Debtors in accordance with the Interim Order and Bankruptcy Rules 2002, 4001(b) and (d) and 9014, and the Local Rules of this Court,    No other or further notice is or shall be required.

E.      **Debtors Acknowledgements and Agreements**.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest as set forth in paragraph 23 herein, the Debtors (on behalf of and for themselves and their estates) admit, stipulate, acknowledge and agree that (collectively, paragraphs E(i) through E(vii) below are referred to herein as the "Debtors' Stipulations").

(i)      Prior to the Petition Date, the Prepetition Lender provided loans and other financial accommodations to or for the benefit of Simply Fashion Stores, as the Borrower, pursuant to the terms of (a) that certain Loan and Security Agreement, dated July 29, 2013, as amended thereafter (collectively, the "Prepetition Loan Agreement"), (b) that certain Promissory Note (Line of Credit), dated August 22, 2013, as amended or amended and restated thereafter (collectively, the "Prepetition Note"), (c) those certain Uniform Commercial Code Financing Statements filed with the Alabama Secretary of State from time to time (the "UCC-1s"), and (d) any and all other documents executed and delivered in connection therewith (collectively, the "Prepetition Loan Documents");

(ii)     As of the Petition Date, the Prepetition Loan Documents provided for the Borrower to borrow under a line of credit up to a maximum amount equal to $14,000,000;

(iii)     As of the Petition Date, the outstanding principal balance due under the Prepetition Note was approximately $9,000,000 (collectively, together with any amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition Loan Documents, plus (without limitation) accrued and unpaid interest, any fees, expenses, and disbursements (including, without limitation, attorneys' fees, consultant fees, related expenses and disbursements), indemnification obligations, and other charges or amounts of whatever nature, whether or not contingent, whenever arising, as provided in the Loan Documents, the "Prepetition Obligations");

(iv)     The Prepetition Obligations are secured by a prepetition continuing and unconditional first priority lien and security interest (collectively the "Prepetition Senior Liens")[3] in favor of the Prepetition Lender in and to any and all property of the Debtor-Borrower, of any kind or description, whether tangible or intangible, whether now existing or hereafter arising or acquired, and wherever now or hereafter located, together with all additions and accessions thereto, substitutions, betterments and replacements therefor, products and proceeds therefrom, and all of the Debtor-Borrower's books and records and recorded data relating thereto (regardless of the medium of recording or storage), including, without limitation, the following (all of which property, along with the products and proceeds therefrom, are individually and collectively referred to as the "Prepetition Collateral") (each capitalized term set forth below having the meaning set forth for such term in the Prepetition Loan Agreement except as otherwise

---

[3]     The Prepetition Senior Liens are subject only to a lien in favor of Iberiabank in respect of the Iberiabank Obligations, as defined in in the Motion.

indicated):

   (i)     Any and all leasehold interests under the Debtor-Borrower's Leases and in
           its parcels of leased real property;

   (ii)    All Accounts and all Goods whose sale, lease or other disposition by the
           Debtor-Borrower has given rise to Accounts and have been returned to, or
           repossessed or stopped in transit by, the Debtor-Borrower, or rejected or
           refused by an Account Debtor;

   (iii)   All Inventory, including, but not limited to, raw materials, work-in-process,
           finished goods, merchandise, articles of clothing, adornments, accessories
           or jewelry being offered for sale or about to be so offered whether in
           transit, or in the Debtor-Borrower's possession, custody and/or control,
           including, without limitation, located in any of the Debtor-Borrower's
           warehouses or other premises leased or owned by the Debtor-Borrower;

   (iv)    All Consumer Goods and Goods (other than Inventory), including
           embedded software, Equipment vehicles, furniture and Fixtures of the
           Debtor-Borrower;

   (v)     All Software and computer programs of the Debtor-Borrower;

   (vi)    All Securities, Investment Property, Financial Assets and Deposit Accounts
           of the Debtor-Borrower;

   (vii)   All Chattel Paper, Electronic Chattel Paper, Instruments, Documents.
           Letter of Credit Rights, all proceeds of letters of credit, Health-Care
           Insurance Receivables. Supporting Obligations, notes secured by real
           estate, Commercial Tort Claims and General Intangibles, including
           Payment Intangibles, of the Debtor-Borrower; and

   (viii)  All Proceeds (whether Cash Proceeds or Noncash Proceeds) of the
           foregoing property of the Debtor-Borrower, including all insurance policies
           and proceeds of insurance payable by reason of loss or damage to the
           foregoing property, including unearned premiums, and of eminent domain
           or condemnation awards.

       Subject to the provisions of paragraph 23 of this Final Order, the Debtors (for themselves

and their estates) acknowledge and agree that: (a) as of the Petition Date, the Prepetition Senior

Liens on the Prepetition Collateral were valid, binding, enforceable, nonavoidable and properly

perfected; (b) the Prepetition Senior Liens have priority over any and all other liens on the

Prepetition Collateral, subject only to certain liens otherwise permitted by the Prepetition Loan Agreement and the Iberiabank Lien (as defined in the Motion) and only to the extent any such permitted liens and Iberiabank Lien were valid, binding, enforceable, non-avoidable, properly perfected and senior in priority to the Prepetition Senior Liens as of the Petition Date, (c) the Prepetition Obligations constitute legal, valid, binding, and nonavoidable obligations of the Debtor-Borrower, enforceable in accordance with the terms of the applicable Prepetition Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code and as set forth in this Final Order); (d) no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Senior Liens or the Prepetition Obligations exist, and no portion of the Prepetition Senior Liens or Prepetition Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement or subordination (whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors expressly, forever and irrevocably waive, discharge, release and acquit the Prepetition Lender and each of its respective former and current attorneys, advisors and professionals (collectively, the "Lender Parties") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, defenses, offsets, objections, counterclaims, causes of actions, choses of action, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened, including, without limitation, all legal and equitable theories of recovery arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the Prepetition Loan Documents, the

prepetition relationship between the Debtors and the Prepetition Lender or the Lender Parties and/or the transactions that occurred in connection therewith, or as contemplated hereunder or thereunder, including, without limitation, (1) any so-called "lender liability" or equitable subordination claims or defenses, and (2) any and all claims and causes of action with respect to the Prepetition Senior Liens, the Prepetition Obligations or any payments or transfers in connection therewith, including, without limitation, to the validity, priority, perfection or avoidability of the liens or claims of the Prepetition Lender; and (f) the Debtors expressly, forever and irrevocably waive, discharge, and release rights they may have to challenge any of the Prepetition Senior Liens or the Prepetition Obligations.

(v)     The Debtors represent that all of the Debtor-Borrower's cash and cash equivalents, including the cash in its deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitute the "cash collateral" of the Prepetition Lender (as such term is defined in section 363(a) of the Bankruptcy Code) (the "Cash Collateral"), and is Prepetition Collateral of the Prepetition Lender.

(vi)     The Debtors agree that until such time as all DIP Obligations are indefeasibly paid in full in cash (or otherwise satisfied according to such terms as may be mutually agreed among the Debtors and the DIP Lender), the Debtors shall not in any way prime or seek to prime the Postpetition Liens (as defined below) provided to the DIP Lender under the Interim Order or this Final Order by offering a subsequent lender or a party-in-interest a superior or *pari passu* lien or claim on the Postpetition Collateral (as defined below) or a claim pursuant to section 364(d) of the Bankruptcy Code or otherwise.

(vii)     Without the prior express written approval of the DIP Lender, the Debtors shall not (i) file with the Bankruptcy Court any pleading or request to (A) limit, alter, modify, or

terminate any provision of the Interim Order or this Final Order, or any protection granted to DIP

Lender thereunder or hereunder, or (B) extinguish, subordinate or diminish any security interest,

lien or claim of the DIP Lender, or (ii) seek, consent to, or join in the approval of any matter or

any plan of reorganization which purports to do any of the things prohibited by the Interim Order

or this Final Order.

       F.      **<u>Findings Regarding the Post-Petition Financing</u>**.  The ability of the Debtors to

finance their operations requires the use of the DIP Loan and Cash Collateral, absent which

immediate and irreparable harm will result to the Debtors, their estates and their creditors. In the

absence of the DIP Loan and the use of Cash Collateral, the continued operation of the Debtors'

business would not be possible and serious and irreparable harm to the Debtors, their estates and

their creditors would occur. The Debtors do not have sufficient available sources of working

capital and financing to operate their business in the ordinary course of business or to maintain

their property without the DIP Loan and the use of Cash Collateral.  The relief requested in the

Motion is therefore necessary, essential, and appropriate for the continued operation of the

Debtors' business and the management and preservation of their property. The DIP Lender and

the Debtors (through the Chief Restructuring Officer) have negotiated at arms' length and in

good faith regarding the DIP Loan and the Debtors' use of Cash Collateral to fund the continued

operation of the Debtors' business during the period covered by the Interim Order and this Final

Order.  As a result, the Debtors requested and obtained the immediate entry of the Interim Order

pursuant to Bankruptcy Rule 4001(b)(2), and have requested the entry of this Final Order.  Good

and sufficient cause has been shown for the entry of the Interim Order and this Final Order.

Among other things, the entry of the Interim Order and this Final Order is in the best interests of

the Debtors, their creditors and their estates because it will enable the Debtors to (i) continue the

orderly operation of their business and avoid an immediate shutdown of operations; (ii) meet their obligations for payroll, necessary ordinary course expenditures, and other operating expenses; (iii) pay necessary fees and expenses under the Bankruptcy Code and make payments authorized under other Orders entered by this Court; all in accordance with the Budget (as defined herein); (iv) obtain needed goods and services; and (v) retain customer, supplier and employee confidence by demonstrating that they have the financial ability to maintain normal operations; thereby avoiding immediate and irreparable harm to the Debtors' estates.

G.    **No Credit Available on More Favorable Terms**.  The Debtors have been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors have also been unable to obtain secured credit, allowable only under sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code on more favorable terms and conditions than those provided in the DIP Loan Documents, the Interim Order and this Final Order.  The Debtors are unable to obtain credit for borrowed money without granting to the DIP Lender the DIP Protections (as defined below).

H.    **Use of Cash Collateral**.  The Prepetition Lender is entitled to receive adequate protection to the extent of any diminution in value of its interests in the Prepetition Collateral (including the Cash Collateral), including resulting from the use of the Cash Collateral, the authorized use, sale or lease of the Prepetition Collateral, the subordination of the Prepetition Senior Liens to the Carve Out (as described herein), and the imposition of the automatic stay (collectively, the "Diminution in Value") pursuant to sections 361, 362, and 363 of the Bankruptcy Code.  The Debtors have requested that the Prepetition Lender consent to the Debtors' use of the Cash Collateral and the Prepetition Collateral pursuant to the terms and conditions of this Final Order.  Subject to the entry of and continued effectiveness of this Final

6392307-3                                      12

Order, the Prepetition Lender has consented to the Debtors' use of the Cash Collateral during the period covered by this Final Order strictly on the terms and conditions set forth herein.

I.    **Use of Proceeds of the DIP Loan and Use of Cash Collateral**.  The Cash Collateral and the proceeds of the DIP Loan shall be used, in each case in a manner consistent with the terms and conditions of the DIP Loan Documents, the Interim Order and this Final Order, and in strict compliance with the Budget, subject to the Permitted Budget Variance, solely for the purposes set forth in the Budget, including among other things, for (a) working capital and general corporate purposes, including the payroll and overhead associated with operating the Debtors' business, (b) payment of certain of the costs of administration of the Cases, limited to the extent set forth in the Budget, (c) payment of principal, interest, fees and costs to the DIP Lender under the DIP Loan Documents, the Interim Order and this Final Order, and (d) payment of the maintenance of and insurance on the Prepetition Collateral and the Postpetition Collateral. The Budget, and any subsequent or amended budgets (including for any period that extends beyond the period covered by the Budget) shall be in form and substance acceptable to the DIP Lender (for so long as the DIP Loan is outstanding) and the Prepetition Lender in their respective sole discretion.

J.    **Payment of Post-Petition Principal, Interest and Expenses**.  The Debtors are authorized to pay, and the DIP Lender is entitled to receive, (i) any and all interest due under the DIP Loan in accordance herewith, which interest shall be paid monthly in arrears commencing on May 1, 2015 and continuing monthly thereafter on the first day of each month, (ii) the costs and expenses of the DIP Lender in connection with the Cases and in accordance herewith, and (iii) principal repayments under the DIP Loan as agreed between the DIP Lender and the Debtors (through their Chief Restructuring Officer) or as required hereunder.

6392307-3                                          13

K.    **Extension of Financing**.  The DIP Lender has indicated a willingness to provide interim financing to the Debtors in accordance with the Interim Order, this Final Order and the DIP Loan Documents and subject to (i) the entry of the Interim Order and this Final Order, and (ii) findings by the Court that such financing is essential to the Debtors' estates, that the DIP Lender is a good faith financier, and that the DIP Lender's claims, super priority claims, senior security interests and priming liens and other protections granted pursuant to the Interim Order, this Final Order and the DIP Loan will not be affected by any subsequent reversal, modification, vacatur or amendment of the Interim Order, this Final Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

L.    **Business Judgment and Good Faith Pursuant to Section 364(e).**  (i) The terms and conditions of the DIP Loan and the DIP Loan Documents, and the fees and costs to be paid thereunder, are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration; (ii) the DIP Loan, the Interim Order and this Final Order were negotiated in good faith and at arms' length between the Debtors (through the Chief Restructuring Officer) and the DIP Lender; and (iii) use of the proceeds to be extended under the DIP Loan will be so extended in good faith, and for valid business purposes and uses, as a consequence of which the DIP Lender is entitled to the full protection and benefits of section 364(e) of the Bankruptcy Code.

M.    **Non-Preclusive Effect of Findings Regarding Financing**.  Notwithstanding anything in this Final Order to the contrary, (1) (i) the findings or other provisions set forth in the Interim Order or this Final Order with respect to the DIP Loan, (ii) the DIP Loan Documents, (iii) the repayment of the DIP Loan in accordance with the Budget shall not have

any res judicata, collateral estoppel or other preclusive effect in connection with, and shall not serve as a defense to, any Challenge (as defined in paragraph 23 of this Final Order) or other cause of action initiated by the Committee against (a) the Prepetition Lender or its members, shareholders or investors, (b) the Debtors' equity holders, or (c) any affiliates of the Prepetition Lender or the Debtors, provided however, that this recital M does not otherwise expand the Committee's rights as set forth in paragraph 23 of this Final Order, and (2) the provisions of this recital M shall not affect the protections afforded to the DIP Lender in respect of the DIP Loan under Section 364(e) of the Bankruptcy Code as otherwise set forth herein.

**NOW, THEREFORE**, on the Motion of the Debtors and the record before this Court with respect to the Motion, and with the consent of the Debtors, the Prepetition Lender, the Committee and the DIP Lender to the form and substance of, and the entry of, this Final Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1.      The Motion is granted in accordance with and limited to the terms and conditions set forth in this Final Order and the DIP Loan Documents.

2.      All objections to the Motion as it relates to the relief sought therein and to the entry of this Final Order have been resolved by the provisions hereof or are overruled.

3.      Notwithstanding any provision of the Bankruptcy Code or the Bankruptcy Rules to the contrary, this Final Order shall take effect immediately upon entry and shall remain in effect until 11:59 p.m. (Prevailing Eastern Time) on the last day of the Budget, unless such Budget is extended by a subsequent budget proposed by the Debtors and agreed to by the DIP Lender and the Prepetition Lender in their respective sole discretion.  Subject in all events to the terms and conditions of this Final Order, including in respect of an Event of Default (as defined below),

upon the expiration of the Budget (or any subsequent budget as provided for herein), the DIP Lender's willingness to make the DIP Loan and the Prepetition Lender's consent to the use of Cash Collateral shall cease and terminate.  Notwithstanding anything herein to the contrary, the DIP Loan shall mature, the DIP Lender's obligations to make any further advances under the DIP Loan shall terminate, and all of the DIP Obligations shall become immediately due and payable in full, on (i) the later of May 11, 2015, or (ii) one business day after the date the Debtors receive the Initial Guaranteed Payment (as defined in that certain Agency Agreement with is the subject of this Court's Order, dated April 23, 2015 [D.E. 83] regarding bidding procedures for the Debtors' proposed sale of substantially all of their assets, but in no event later than May 15, 2015 (the "Maturity Date").

4.     The Debtors, the Prepetition Lender, the DIP Lender, and their respective advisors and employees have acted in good faith in negotiating, consenting, and agreeing to the DIP Loan and the Debtors' use of the Cash Collateral as contemplated and provided by this Final Order. The negotiation of the terms and provisions of this Final Order has been conducted at arms' length, and such terms and provisions are fair and reasonable under the circumstances and reflect the Debtors' exercise of reasonable business judgment consistent with the Debtors' fiduciary duties.

5.     Nothing in this Final Order shall in any way be construed or interpreted to impose or allow the imposition upon the Prepetition Lender, the DIP Lender or any of its respective advisors or employees, any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts.

6392307-3                                              16

6.     Based on the findings set forth in this Final Order and the reliance of the Prepetition Lender and the DIP Lender in good faith on the terms hereof, if any of the provisions of this Final Order are hereafter modified, vacated or stayed by an Order of this Court or another court, such stay, modification or vacation shall not affect the validity and enforceability of any lien, claim, security interest, priority or protection authorized for the benefit of the Prepetition Lender or the DIP Lender hereunder that is granted or attaches prior to the effective date of such stay, modification or vacation, and any use of DIP Loan or the Cash Collateral by the Debtors pursuant to this Final Order prior to the effective date of such modification, stay or vacation shall be governed in all respects by the original provisions of this Final Order.

7.     This Final Order is without prejudice to the rights of the Prepetition Lender or the DIP Lender to seek a modification of this Final Order, including a request for additional adequate protection or the termination of the DIP Loan or the Debtors' right to use Cash Collateral, after notice and hearing, including a hearing noticed on an emergency basis.  The Prepetition Lender and the DIP Lender have each expressly reserved, and this Final Order is without prejudice to, any and all rights and remedies of the Prepetition Lender or the DIP Lender, including the appropriateness of any adequate protection that may be proposed in connection with the DIP Loan or any authorization to use Cash Collateral.

8.     The DIP Lender and the Prepetition Lender shall receive such protections and be entitled to such rights as are set forth in the Interim Order and this Final Order.  The Debtors and all other relevant parties are expressly and immediately authorized, empowered and directed (i) to execute and deliver to DIP Lender the DIP Loan Documents in a form consistent with the terms of this Final Order, (ii) to consummate the transactions described herein and therein and incur and perform on a final basis the DIP Obligations in accordance with, and subject to, the terms of the

6392307-3                                    17

Interim Order, this Final Order and the DIP Loan Documents, and (iii) to execute and deliver all instruments and documents which reasonably may be required or necessary for the performance by the Debtors under the DIP Loan and the creation and perfection of the Postpetition Liens described in and provided for by the Interim Order, the Final Order and the DIP Loan Documents. The Debtors are authorized to perform all acts, and subject to the provisions of this Final Order, pay the principal, interest, fees, expenses and other amounts described in this Final Order and the DIP Loan Documents as such become due, including, without limitation, attorneys' and financial advisors' fees and disbursements pursuant to the terms hereof.

9.     In order to enable them to continue to operate their business during the period covered by this Final Order, subject to the terms and conditions of this Final Order, the DIP Loan Documents and the Budget, the Debtors are authorized under the DIP Loan to borrow up to the amounts set forth in the Budget. Notwithstanding any provision of its certificate or articles of incorporation, bylaws, operating agreement, partnership agreement, membership agreement, certificate of formation, certificate of limited partnership, regulations, or comparable governing documents to the contrary, each Debtor is authorized to, and each officer, member, manager, partner, or other comparable authorized signatory of each Debtor is authorized to cause such Debtor to, jointly and severally guarantee and pay the DIP Obligations of each other Debtor obligated under this Final Order and the DIP Loan Documents, and pledge, mortgage and grant security interests in its assets to secure such DIP Obligations, and to execute and enter into any and all of the DIP Loan Documents and all other documents and transactions necessary to implement and effectuate the terms of the DIP Loan, this Final Order and the DIP Loan Documents.

10.   The proceeds of the DIP Loan (net of any amounts used to pay fees, costs and expenses under this Final Order or the DIP Loan Documents) and the Cash Collateral shall be used, in each case in a manner consistent with the terms and conditions of this Final Order and the DIP Loan Documents, and in accordance with the Budget, subject to the Permitted Budget Variance.

11.   Effective immediately upon the entry of the Interim Order and this Final Order, the DIP Lender was and is granted, pursuant to subsections 364(c)(2), (c)(3) and 364(d) of the Bankruptcy Code, perfected and enforceable liens and security interests (collectively, the "Postpetition Liens") comprised of (a) a first priority valid, binding, enforceable priming lien and security interest, pursuant to section 364(d) of the Bankruptcy Code, on and against all of the Postpetition Collateral, senior in priority to any prior perfected and/or duly enforceable lien of any person or entity existing as of the Petition Date, including the Prepetition Lender, but subject only to the Iberiabank Lien, (b) a first priority valid, binding, enforceable lien and security interest, pursuant to section 364(c)(2) of the Bankruptcy Code, on and against the Postpetition Collateral that is not otherwise subject of a prior perfected and duly enforceable lien or security interest as of the Petition Date, and (c) a junior priority valid, binding, enforceable lien and security interest, pursuant to section 364(c)(3) of the Bankruptcy Code, on and against the Postpetition Collateral that is otherwise subject of a prior perfected and duly enforceable lien or security interest as of the Petition Date; provided however, that the Postpetition Liens shall not encumber the Debtors' avoidance claims or causes of action arising under chapter 5 of the Bankruptcy Code and the proceeds thereof (the "Avoidance Actions") or the proceeds generated from the sale of the Debtors' real property leasehold interests.  The Postpetition Liens shall be

cross-collateralized as to all of the Postpetition Collateral.  Notwithstanding anything herein to the contrary, the Postpetition Liens shall at all times be subject to the Carve Out.

12.    Except as set forth in this Final Order and except for the Iberiabank Lien and the Carve Out, the Postpetition Liens granted pursuant to this Final Order shall be priming and senior in priority and shall not be made subject to, or pari passu with any prepetition lien or security interest by any court order heretofore or hereafter entered in the Cases and shall be valid and enforceable against any trustee or examiner appointed in the Cases, upon the conversion of the Cases to cases under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (any "Successor Cases"), and/or upon the dismissal of the Cases, provided however, that this provision shall not apply to any bankruptcy case filed by one or more of the Debtors in the future after the closing of these Cases or any related chapter 7 case.   The Postpetition Liens shall not be subject to sections 506(c), 510, 549, 550 or 551 of the Bankruptcy Code or challenge on any basis.

13.    Except with respect to the Carve-Out, all DIP Obligations shall be an allowed super priority administrative expense claim (the "DIP Super priority Claim" and, together with the Postpetition Liens, the "DIP Protections") with priority in the Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code.  Except in respect of the administrative expense claims provided for in the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under

sections 328, 330, and 331 of the Bankruptcy Code or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or *pari passu* with the DIP Protections or the DIP Obligations, or with any other claims of the DIP Lender arising hereunder.

14.     The Debtors may use the Cash Collateral during the period covered by the Budget in accordance herewith solely to pay the ordinary, necessary and reasonable expenses of operating their business exclusively in accordance with and subject to the Budget.  The Debtors' actual disbursements for any given week during the period covered by the Budget shall not exceed the sum of (x) 120% of the disbursements projected for such week in the Budget, plus (y) any unused portion of the disbursements projected for any prior week in the Budget (but excluding, for avoidance of doubt, any amounts in excess of 100% of the projected disbursements for any week).  The Budget and any modification to, or extension, amendment or update of the Budget, shall be in a form and substance acceptable to the DIP Lender, for so long as the DIP Loan is outstanding, and the Prepetition Lender in their respective sole discretion.

15.     The Postpetition Liens, DIP Super-Priority Claim, the Adequate Protection Liens (as defined below) and the Super-priority Claim (as defined below) to the extent granted hereunder to and for the benefit of the Prepetition Lender and the DIP Lender, respectively, shall be subject and subordinate to the following expenses (collectively, the "Carve Out"):

> a.   the claims of the respective retained professionals of the Debtors in these Cases, as well as the Chief Restructuring Officer and his professional firm (collectively, the "Retained Professionals") for fees and expenses incurred at any time on and after the Petition Date and prior to the delivery of a Carve-Out Trigger Notice[4];

---

4   As used herein, "Carve-Out Trigger Notice" means, upon the occurrence of an Event of Default, a written notice delivered by the DIP Lender or Prepetition Lender to respective counsel for the Debtors and the Committee expressly stating that the Carve-Out has been invoked and terminating the right of the Debtors to pay professional fees incurred after such date outside of the Carve-Out. Upon receipt of the Carve-Out Trigger Notice, the Debtors shall provide immediate notice by facsimile (or other electronic means) to the professionals

provided that, in each case, such fees and expenses of the Retained Professionals are ultimately allowed, if and as applicable, on a final basis by this Court under sections 330 or 331 or allowed pursuant to the Court-approved terms applicable to the retention of the Debtors' Chief Restructuring Officer and his professional firm (such fees and expenses described in this clause (i), the "Pre-Termination Date Expenses" and the permitted amount thereof, the "Pre-Termination Date Amount");

b.   the claims of the Retained Professionals for fees and expenses which were incurred on and after the delivery of a Carve-Out Trigger Notice; provided that, in each case, such fees and expenses of the Retained Professionals are ultimately allowed, if and as applicable, on a final basis by this Court under sections 330 or 331 of the Bankruptcy Code, or allowed pursuant to the Court-approved terms applicable to the retention of the Debtors' Chief Restructuring Officer and his professional firm, and do not exceed $300,000 in the aggregate for all of the Retained Professionals, plus the fees and expenses incurred by any professionals engaged by any successor to the Debtors, including, without limitation, any trustee appointed under chapter 11 or 7 of the Bankruptcy Code or any examiner with expanded powers, in an aggregate amount not to exceed $5,000 (such fees and expenses described in this clause "(ii)" the "Post-Termination Date Expenses" and the permitted amount thereof, the "Post-Termination Amount" and, together with the Pre-Termination Date Amount, the "Professional Fees");

c.   the claims of the respective retained professionals of the Committee in these Cases (collectively, the "Committee Professionals") for fees and expenses incurred at any time on and after the Petition Date and prior to the delivery of a Carve-Out Trigger Notice capped at $50,000, which amount shall only be used to pay those fees and expenses incurred by the Committee Professionals in connection with the investigation of the validity, enforceability or priority of the Prepetition Obligations or of any claims, defenses or causes of action against the Prepetition Lender; provided that, in each case, such fees and expenses of the Committee Professionals are ultimately allowed, if and as applicable, on a final basis by this Court under sections 330 or 331 or allowed pursuant to the Court-approved terms applicable to the retention of such Committee Professionals;

d.   the reasonable and documented expenses payable to the members of any Statutory Committee, subject to the approval of the Court upon motion and a hearing;

e.   the unpaid fees and expenses of the United States Trustee and the Clerk of the Court (or any agent thereof) pursuant to 28 U.S.C. § 1930(a)(6) or otherwise; and

---

retained in the Cases informing them that a Carve-Out Trigger Notice has been received and further advising them that the Debtors' ability to pay professional fees incurred subsequent to the date thereof is subject to the Carve-Out.

      f.  unpaid operating expenses (including the Chief Restructuring Officer and his professional firm) in accordance with the Budget that were incurred prior to the delivery of a Carve-Out Trigger Notice, solely to the extent that such claims would have been authorized to be paid by the Debtors prior to such date, pursuant to the Budget, if the Carve-Out Trigger Notice had not been delivered.

16.    The following events shall each constitute an event of default hereunder, (collectively, the "Events of Default"):

      a.  the failure of the Debtors to repay the DIP Obligations in full on the Maturity Date;

      b.  the violation of or failure by the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under the Final Order (including under the Budget);

      c.  the obtaining of credit or the incurring of indebtedness that is (i) secured by a security interest, mortgage or other lien on all or any portion of the Postpetition Collateral which is equal or senior to any security interest, mortgage or other lien of the DIP Lender or Prepetition Lender, or (ii) entitled to priority administrative status which is equal or senior to that granted to the DIP Lender or Prepetition Lender herein;

      d.  any lien or security interest purported to be created under the Prepetition Loan Documents shall cease to be, or shall be asserted by the Debtors not to be, a valid and perfected lien on or security interest in any Prepetition Collateral, with the priority required by the Prepetition Loan Documents or herein;

      e.  the entry of an order by the Court granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor to execute upon or enforce a lien on or security interest in any Postpetition Collateral, or (ii) with respect to any lien of or the granting of any lien on any Postpetition Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a material adverse effect on the business, operations, property, assets, or condition, financial or otherwise, of the Debtors;

      f.  the reversal, vacatur, or modification (without the express prior written consent of the DIP Lender and the Prepetition Lender, in their respective sole discretion) of the Interim Order or this Final Order;

      g.  dismissal of the Cases or conversion of the Cases to chapter 7 cases, or appointment of a chapter 11 trustee or examiner with enlarged powers or other responsible person;

h.   the sale of any portion of the Debtors' assets outside the ordinary course of business without the prior written consent of the DIP Lender or the Prepetition Lender, in their respective sole discretion;

i.   the effective date of any confirmed chapter 11 plan of reorganization or liquidation; and

j.   the granting of any motion providing for reconsideration, stay, or vacatur of the Interim Order or this Final Order; or (1) the Debtors shall assert in any pleading filed in any court that any material provision of the Interim Order or this Final Order is not valid and binding for any reason, or (2) any material provision of the Interim Order or this Final Order shall, for any reason, cease to be valid and binding without the prior written consent of the DIP Lender and the Prepetition Lender in their respective sole discretion.

17.   Immediately upon the occurrence and during the continuation of an Event of Default, the DIP Lender may declare a termination of the obligations to advance any additional amounts under the DIP Loan or the Prepetition Lender may declare a termination, reduction or restriction of the ability of the Debtors to use any Cash Collateral (any such declaration shall be referred to herein as a "Termination Declaration"). The Termination Declaration shall be given by e-mail or facsimile (or other electronic means) contemporaneously to counsel to the Debtors, counsel to the Committee, and the U.S. Trustee (the earliest date any such Termination Declaration is made shall be referred to herein as the "Termination Declaration Date"). On the Termination Declaration Date, the Debtors' right to use Cash Collateral shall automatically cease, except as provided herein, and notwithstanding anything herein to the contrary, the DIP Lender shall not be obligated to advance any additional funds under the DIP Loan.   Within seven (7) business days after the Termination Declaration Date (the "Remedies Notice Period"), the Debtors and/or the Committee shall be entitled to seek an emergency hearing with the Court seeking an emergency determination of whether an Event of Default has occurred and/or any other appropriate relief related to the Debtors' continued use of Cash Collateral on a non-

consensual basis, with the rights and objections of all parties reserved with respect thereto. Unless the Court determines otherwise during the Remedies Notice Period (which shall be extended, if necessary, to accommodate the Court's calendar for an emergency hearing), the automatic stay shall automatically be terminated at the end of the Remedies Notice Period without further notice to or order of the Court, and the Debtors shall no longer have the right to use or seek to use Cash Collateral and each of the DIP Lender and the Prepetition Lender, as the case may be, shall be permitted to exercise any and all remedies set forth herein, in the Prepetition Loan Documents or the DIP Loan Documents, as applicable, and as otherwise available at law against the Postpetition Collateral, without further order of or notice, application or motion to the Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the liens and security interest in the Postpetition Collateral or any other rights and remedies granted to the Prepetition Lender and the DIP Lender with respect thereto pursuant to the Prepetition Loan Documents, the Interim Order, the Final Order or the DIP Loan Documents, as applicable.  In addition, the Prepetition Lender and/or the DIP Lender shall have the right to file an emergency motion with the Court during the Remedies Notice Period seeking, among other things, relief from the automatic stay otherwise applicable to the Prepetition Lender and/or the DIP Lender so as to be able to exercise its rights and remedies at law or in equity to satisfy the Prepetition Obligations, the DIP Obligations, the Superpriority Claims, the Adequate Protection Liens, the Prepetition Loan Documents and any other obligation under the Interim Order or this Final Order.  Upon an Event of Default, the rights of the DIP Lender or the Prepetition Lender to enter onto one of the Debtor's premises leased from any real property landlord shall be governed by (i) any rights agreed to in writing by such landlord(s) and the DIP Lender or Prepetition Lender prior to the

entry onto such leased premises, (ii) any rights of the Debtors or the DIP Lender or Prepetition

Lender under the Bankruptcy Code or applicable non-bankruptcy law, if any, and (ii) such rights

as may be granted by the Court on a separate motion (including a motion for relief from stay)

with notice and an opportunity to be heard by creditors and parties in interest, including the such

landlord(s) as applicable, as is appropriate under the circumstances.

18.     This Final Order shall be sufficient and conclusive evidence of the validity,

perfection, and priority of the Postpetition Liens and the Adequate Protection Liens (as defined

below) without the necessity of filing or recording any financing statement, deed of trust,

mortgage, or other instrument or document which may otherwise be required under the law of

any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering

into any deposit account control agreement) to validate or perfect the Postpetition Liens or the

Adequate Protection Liens, or to entitle the DIP Lender or the Prepetition Lender to the priorities

granted herein.  Notwithstanding the foregoing, the Debtors, the Prepetition Lender and the DIP

Lender are authorized, but not required, to file or record financing statements, trademark filings,

copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take

possession of or control over, or take any other action in order to validate and perfect the liens

and security interests granted to them hereunder.  Whether or not the Prepetition Lender or DIP

Lender shall, in its sole discretion, choose to file such financing statements, trademark filings,

copyright filings, mortgages, notices of lien or similar instruments, or take possession of or

control over, or otherwise confirm perfection of the liens and security interests granted to them

hereunder, such liens and security interests shall be deemed valid, perfected, allowed,

enforceable, non-avoidable and not subject to challenge or dispute or subordination, at the time

and on the date of entry of the Interim Order and this Final Order.  Upon the request of the

6392307-3

Prepetition Lender or the DIP Lender, without any further consent of any party, each Debtor is authorized to take, execute, deliver and file such instruments (in each case without representation or warranty of any kind) to enable the Prepetition Lender or the DIP Lender to further validate, perfect, preserve and enforce the Adequate Protection Liens and the Postpetition Liens.  The Debtors shall execute and deliver to the Prepetition Lender and the DIP Lender all such agreements, financing statements, instruments and other documents as the Prepetition Lender or the DIP Lender may reasonably request to more fully evidence, confirm, validate, perfect, preserve and enforce the Adequate Protection Liens and the Postpetition Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.  A certified copy of this Final Order may, in the discretion of the Prepetition Lender or the DIP Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are authorized to accept such certified copy of this Final Order for filing and recording. The Prepetition Lender or the DIP Lender, in its discretion, may also file a photocopy of this Final Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtors have real or personal property, and in such event, the subject filing or recording officer shall be authorized and is directed to file or record such copy of this Final Order.

19.     Nothing herein shall be construed as consent to the allowance of, or obligate an obligation of the Prepetition Lender or the DIP Lender to pay, any professional fees or expenses of the Debtors, the Committee or of any person or shall affect the right of the Prepetition Lender or the DIP Lender to object to the allowance and payment of such fees and expenses or to permit the Debtors to pay any such amounts not set forth in the Budget.  The Prepetition Lender or the

DIP Lender each reserve the right to object to any request or application for the payment of professional fees that may be submitted or filed in the Cases.

20.    Nothing contained in this Final Order shall be deemed a consent by the DIP Lender or the Prepetition Lender to any charge, lien, assessment or claim against the Postpetition Collateral under section 506(c) of the Bankruptcy Code or otherwise, and the Prepetition Lender and DIP Lender each reserve all rights in connection therewith.

21.    On account of the Debtors' use of the Cash Collateral during the Interim Period, the Prepetition Lender is granted the following adequate protection:

(a)    Pursuant to section 361 and 363(e) of the Bankruptcy Code, the Prepetition Lender is granted additional and replacement continuing valid, binding, enforceable, non-avoidable, and automatically perfected postpetition security interests in and liens on (the "Adequate Protection Liens") the Postpetition Collateral to the extent of any Diminution in Value; provided however, that the Adequate Protection Liens shall not encumber the Avoidance Actions.  The Adequate Protection Liens shall be shall be subject and subordinate in priority to (i) the Carve Out, (ii) the Postpetition Liens, and (ii) any liens, security interests and other encumbrances, existing as of the Petition Date, that are valid, perfected, enforceable and unavoidable and that are (as of the Petition Date) senior to the Prepetition Senior Liens in favor of the Prepetition Lender in accordance with applicable non-bankruptcy law.

(b)    The Adequate Protection Liens and the Postpetition Liens granted under this Final Order shall be valid, perfected, and enforceable against the Postpetition Collateral from and after the Petition Date and shall not be subject to dispute, avoidance, recharacterization or subordination.  Notwithstanding the automatic perfection of the Adequate Protection Liens and the Postpetition Liens granted pursuant to this Final Order, the Prepetition Lender and the DIP

6392307-3

28

Lender are each  authorized, but not required, to file or record financing statements, trademark filings, mortgages, notices of lien and other similar instruments in any jurisdiction, or to take any other action it deems necessary or appropriate in order to validate or perfect such Adequate Protection Liens and the Postpetition Liens.  A certified copy of this Final Order may, in the discretion of the Lender, be filed with or recorded in any filing or recording offices in addition to, or in lieu of, such financing statements, mortgages, notices of lien or other similar instruments, and all filing or recording offices are authorized to accept such certified copy of this Final Order for filing and recording.  The Debtors are authorized and directed to execute and deliver all instruments and documents prepared by the Prepetition Lender, and to pay all reasonable fees and expenses, that are reasonably required or necessary to facilitate any such filings or recordings elected to be made by the Prepetition Lender.

(c)     The Adequate Protection Liens granted hereunder shall be valid and enforceable against any trustee appointed in these Cases, or in any prior or subsequent proceeding affecting the Debtors, including any conversion of these Cases to cases under chapter 7 of the Bankruptcy Code. The Adequate Protection Liens shall not be subject to sections 506(c), 510, 549, or 550 of the Bankruptcy Code or challenge on any basis.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the Adequate Protection Liens.

(d)     As additional adequate protection hereunder, to the extent of the Diminution in Value of the Prepetition Collateral, including the Cash Collateral, from and after the Petition Date in excess of the value of the Adequate Protection Liens granted herein, the Prepetition Lender shall have an administrative expense claim under sections 361, 363, 503(b) and 507(b) of the

Bankruptcy Code with priority over all other administrative expense claims against the Debtors or the Debtors' estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code (the "Super-Priority Claim"), subject only to the Carve-out and the DIP Super Priority Claim. Such Super-Priority Claim (without the need to file any further, notice or pleading, or to make any demand), shall be deemed an allowed claim pursuant to section 507(b) of the Bankruptcy Code.

(e)    As additional adequate protection to the Prepetition Lender hereunder, the Debtors are authorized and directed to make payments to the Prepetition Lender (i) in an amount equal to the interest accrued on the Prepetition Obligations from and after the Petition Date, which payments shall be made in arrears and shall commence on May 1, 2015 and continue on the first day of each month thereafter, and (ii) in an amount equal to the reasonable fees and expenses of the Prepetition Lender's attorneys and financial advisors incurred in connection with the Cases from and after the Petition Date, which payments shall be made in accordance herewith, provided however, that to the extent that it is determined by an order of the Court, which has become final and non-appealable, that the Prepetition Lender's claims were undersecured as of the Petition Date under section 506(c) of the Bankruptcy Code, then the Committee may seek to (a) recharacterize all payments of interest made pursuant to this Final Order as payments of principal thereon, and (b) disgorge all payments of fees and expenses paid post-petition in respect of the Prepetition Lender, solely to the extent such payments exceed the allowed principal amount of such secured claim. The Prepetition Lender reserves all rights to contest any such relief requested by the Committee.

(f)    The Debtors shall provide the Prepetition Lender with the following information during the period covered by the Budget:

(i)    a weekly report, in form and with supporting information in detail reasonably acceptable to the Lender, reconciling the Debtors' sources, uses and disbursements of cash for the week most recently ended with the sources, uses and disbursements projected for such week in the Budget, along with a certification of the Debtors' Chief Restructuring Officer certifying that the Debtors are in compliance with the disbursements limitations set forth in this Final Order as of the end of the week most recently ended; and

(ii)    all of the financial information, operational information and related reports, documents and analysis required under the terms of the Prepetition Loan Agreement or as reasonably requested by the Prepetition Lender.

22.    Neither the Cash Collateral, nor proceeds of the Postpetition Collateral, nor proceeds from DIP Loan, nor the Carve Out funds (except as specifically provided for in the Carve Out) may be used: (a) in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type (i) adverse to the interests of the DIP Lender, the Prepetition Lender or their respective rights and remedies under the Prepetition Loan Documents, the Interim Order or this Final Order, (ii) invalidating, setting aside, avoiding, recharacterizing or subordinating, in whole or in part, (1) the obligations under the DIP Lien, the Interim Order, this Final Order or the Prepetition Loan Documents, or (2) the Prepetition Senior Liens, the Postpetition Liens, the Adequate Protection Liens, the DIP Superpriority Claim or the Super-Priority Claim; (iii) for  monetary, injunctive or other affirmative relief against the DIP Lender and the Prepetition Lender, or (iv) preventing,

hindering or otherwise delaying the exercise by the DIP Lender or the Prepetition Lender of any rights and/or remedies under the Interim Order, this Final Order, the Prepetition Loan Documents, or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court or otherwise) by the DIP Lender or the Prepetition Lender upon any of the Collateral or Postpetition Collateral; (b) for objecting to, contesting, or interfering with in any way the DIP Lender or the Prepetition Lender's enforcement or realization upon any of the Postpetition Collateral once an Event of Default has occurred; (c) for using or seeking to use Cash Collateral, or selling or otherwise disposing of the Postpetition Collateral, without the consent of the DIP Lender or the Prepetition Lender; (d) for objecting to or challenging in any way the claims, liens, or interests (including interests in the Collateral and Postpetition Collateral) held by or on behalf of the DIP Lender or Prepetition Lender; (e) for asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions, against DIP Lender or Prepetition Lender or the Lender Parties; (f) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Prepetition Obligations under the Prepetition Loan Documents or Prepetition Senior Liens or any other rights or interests of DIP Lender or Prepetition Lender; or (g) for preventing, hindering or otherwise delaying the exercise by the DIP Lender and Prepetition Lender of any rights and remedies granted under the Interim Order or this Final Order.

23.    Nothing in this Final Order shall prejudice the rights of the Committee, who is granted standing by the Court pursuant hereto, or any party in interest who is hereinafter granted standing by the Court upon motion and a hearing, to seek, solely in accordance with the provisions of this paragraph 23, to assert claims against any of the Prepetition Lender or the

Lender Parties on behalf of the Debtors, their estates, or their creditors, or to otherwise object to or to challenge the findings, Debtors' Stipulations, or any other stipulations or findings herein, including, but not limited to those in relation to: (a) the validity, extent, priority, or perfection of the mortgage, security interests, and Prepetition Senior Liens of the Prepetition Lender; (b) the validity, allowability, priority, fully secured status or amount of the Prepetition Obligations under the Prepetition Loan Documents; (c) any liability of the Prepetition Lender with respect to anything arising from the Prepetition Loan Documents or relating to the Prepetition Lender's relationship to the Debtors; and (d) any claims against the Prepetititon Lender and the Lender Parties under Chapter 5 of the Bankruptcy Code.  The Committee and any party in interest who is granted standing by this Court, must commence an adversary proceeding raising such claim, objection or challenge, including, without limitation, any claim or cause of action against the Prepetition Lender or the Lender Parties (each, a "Challenge") on or before June 22, 2015 (the "Challenge Period"). The Challenge Period may only be extended for cause shown on motion and hearing brought prior to its expiration, or by written consent of the Prepetition Lender, in its sole discretion.  Only those parties in interest (including, without limitation, the Committee), that have properly initiated a Challenge as outlined above prior to the expiration of the Challenge Period shall be permitted to participate in the prosecution of such Challenge.  The Committee is hereby granted standing and the authority to file an objection or complaint on behalf of the Debtors' estates raising any and all Challenges against the Prepetition Lender and the Lender Parties without further motion seeking authority to bring such action and without further order of the Court, and shall be authorized to pursue, prosecute and settle, on behalf of the Debtors' estates, any such Challenge.  As to (i) any parties in interest, including the Committee, who fail to file a Challenge prior to the expiration of the Challenge Period, or if any such Challenge is

filed and overruled or dismissed, and (ii) any and all matters included within a Challenge as defined above that are not expressly the subject of a timely Challenge, the Court finds, concludes and adjudges that: (A) any and all such Challenges by any party (including, without limitation, the Committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed in these Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed in any Successor Cases), shall be and are deemed to be forever waived, released and barred, (B) all unchallenged matters, Debtors' Stipulations, findings, waivers, releases, waivers, releases, affirmations and other stipulations, including as to the validity, perfection, priority, allowability, enforceability or non-avoidability as to the Prepetition Lender's claims, liens, and interests, shall be of full force and effect and forever binding upon the Debtors, the Debtors' bankruptcy estates and all creditors, interest holders, and other parties in interest in these Cases and in any Successor Cases, and (C) any and all claims or causes of action against the Prepetition Lender and the Lender Parties that could have been the subject of a Challenge, or were the subject of a Challenge and were overruled or dismissed, shall be forever waived and released by the Debtors' estates, all creditors, interest holders and other parties in interest in these Cases and in any Successor Cases

24.    All net proceeds of the sale or other disposition of any Postpetition Collateral outside the ordinary course of business, prior to the occurrence of an Event of Default, shall be paid to the DIP Lender pending the application thereof to the DIP Obligations according to the provisions of this Final Order and subject, in all respects, to the Carve Out.

25.    The Prepetition Lender and the DIP Lender have acted in good faith in connection with this Final Order and their respective reliance on this Final Order is in good faith. Based on the findings set forth in this Final Order and in accordance with section 364(e) of the Bankruptcy

Code, which is applicable to the DIP Loan and use of Cash Collateral contemplated by this Final Order, in the event any or all of the provisions of this Final Order are hereafter modified, stayed, amended or vacated by a subsequent order of this or any other Court, the Prepetition Lender and the DIP Lender are each entitled to the protections provided in section 364(e) of the Bankruptcy Code and no such modification, stay, amendment or vacation shall affect the validity and enforceability of any advances made hereunder or the liens or priority authorized or created by this Final Order. Notwithstanding any such modification, amendment or vacation, any claim or lien granted to the Prepetition Lender or the DIP Lender hereunder arising prior to the effective date of such modification, amendment or vacation of any Adequate Protection Liens, Super-Priority Claim or DIP Protections granted to the Prepetition Lender or the DIP Lender shall be governed in all respects by the original provisions of this Final Order, and the Prepetition Lender and the DIP Lender shall be entitled to all of the rights, remedies, privileges and benefits, including the Adequate Protection Liens, the Super-Priority Claim and the DIP Protections granted herein, with respect to any such claim or lien.  Since the DIP Loans and the consent to use of Cash Collateral are made in reliance on this Final Order, the Prepetition Obligations owed to the Prepetition Lender and the DIP Loan owed to the DIP Lender prior to the effective date of any stay, modification or vacation of this Final Order cannot, as a result of any subsequent order in the Cases or in any Successor Cases, be subordinated, lose their lien priority or super priority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the Prepetition Lender and the DIP Lender under this Final Order and/or the DIP Loan Documents.

26.    All costs and expenses of the DIP Lender and the Prepetition Lender in connection with the Cases, including, without limitation, legal, accounting, financial advisory

fees, will be paid by the Debtors. The DIP Lender and the Prepetition Lender shall provide to the U.S. Trustee, counsel to the Debtors and counsel to the Statutory Committee (the "Fee Notice Parties"), on a monthly basis, the total amount of professional fees and expenses described in this subsection that are incurred per calendar month in the Cases, upon request, along with summary invoices relating to such fees and expenses. Under no circumstances shall professionals for the DIP Lender and the Prepetition Lender be required to comply with the U.S. Trustee fee guidelines. In the event any of the Fee Notice Parties object to such fees or expenses, or any portion thereof, such objecting Fee Notice Party shall send written notice of such objection to the DIP Lender and the Prepetition Lender within five (5) days of receipt of the invoice. Any unresolved objection shall be resolved by the Court after notice and hearing. Absent any objections, the Debtors shall pay such requested fees and expenses within five (5) days of receipt of the invoices.

27.    The automatic stay imposed under section 362(a) of the Bankruptcy Code is modified pursuant to the extent necessary to implement this Final Order, including, without limitation to (1) permit the Debtors to grant the Postpetition Liens and to incur all liabilities and DIP Obligations to the DIP Lender hereunder, and (2) authorize the DIP Lender to retain and apply payments hereunder in accordance with the provisions of this Interim Order.

28.    The DIP Lender and the Prepetition Lender may, but are not required to, file proofs of claim in the Cases or any Successor Cases. Any order entered by the Court in relation to the establishment of a bar date for any claim (including without limitation administrative claims) in the Cases or any Successor Cases shall not apply to the DIP Lender or the Prepetition Lender. Notwithstanding any order entered by the Court in relation to the establishment of a bar date in the Cases or Successor Cases to the contrary, the DIP Lender and the Prepetition Lender

are authorized and entitled, in their respective sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim in the Cases or any Successor Cases.

29.    Notwithstanding anything herein to the contrary and for purposes of this Final Order, the Postpetition Liens and the Adequate Protection Liens shall not apply to any Prepetition Collateral or Postpetition Collateral that was not the subject of a lien or security interest existing on and as of the Petition Date, or a lien on the Debtors' leasehold interests that is avoidable (and is avoided by a final and non-appealable order of the Court) under the Bankruptcy Code, provided however, that in all events and notwithstanding the first part of this section 29, the DIP Obligations shall be secured by, and the Postpetition Liens shall encumber, the Debtors' Inventory as a priming lien under section 364(d) of the Bankruptcy Code in addition to the other Postpetition Collateral not specifically limited by this section.

30.    Notwithstanding Bankruptcy Rules 4001 and 6004, or any other law that would serve to stay or limit the immediate effect of this Order, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.

31.    This Court has and will retain jurisdiction to enforce this Final Order according to its terms.

# # #

<u>Submitted by:</u>
Paul J. Battista, Esq
Genovese Joblove & Battista, P.A.
100 S.E. Second Street, 44th Floor
Miami, FL 33131
Telephone:  (305) 349-2300
pbattista@gjb-law.com

<u>Copies to:</u>
Paul J. Battista, Esq.
[Attorney Battista is directed to serve a copy of this order on all required parties and to file a Certificate of Service.]

# EXHIBIT A
# BUDGET

**SIMPLY FASHION STORES, LTD.**
**Case No. 15 - 16888 - LMI**
**United States Bankruptcy Court -Southern District of Florida - Miami Division**
**Weekly Operating Cash Budget**
**Based on an Wind Down of the Company's Stores with the Retention of the Stalking Horse Going Out of Business Agent**

Source: Sales projections and historical sales reports provided by management, Great Plains general ledger account and disbursements reports for various expense accounts and sales taxes, P&L statements provided by client, supporting invoices and checks, and terms of the Stalking Horse Agency Agreement.

| | Budget 4/18/2015 | Actual 4/18/2015 | Variance 4/18/2015 | Budget 4/25/2015 | Actual 4/25/2015 | Variance 4/25/2015 | 5/2/2015 | 5/9/2015 | GOB Liquidator Period 5/16/2015 | 5/23/2015 | 5/30/2015 | 6/6/2015 | 6/13/2015 | 6/20/2015 | 6/27/2015 | 7/4/2015 | 7/11/2015 | 7/18/2015 | 7/25/2015 | Total (Actual plus Budget) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Proceeds:** | | | | | | | | | | | | | | | | | | | | |
| Net Sales | $ 140,000 | $ 155,933 | $ (15,933) | $ 519,088 | $ 636,118 | $ (117,031) | $ 1,069,088 | $ 1,100,000 | $ (433,363) | $ 312,177 | $ 1,022,318 | $ 951,588 | $ 737,046 | $ (162,682) | $ 268,678 | $ 262,031 | $ 345,739 | $ 40,229 | $ 7,500 | $ 2,365,004 |
| Total Agent Proceeds | - | - | - | - | - | - | - | 3,740,000 | - | - | - | - | - | - | - | - | 728,660 | - | - | 8,489,084 |
| FF&E - stores | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 728,650 |
| **Total Proceeds** | 140,000 | 155,933 | (15,933) | 519,088 | 636,118 | (117,031) | 1,069,088 | 4,840,000 | 172,152 | (121,186) | 1,022,318 | 951,588 | 737,046 | 105,996 | 629,626 | 262,031 | 1,074,389 | 40,229 | 7,500 | 11,582,829 |
| **Operating Cash Outflows:** | | | | | | | | | | | | | | | | | | | | |
| Total Store Expenses | 647,320 | 591,424 | 55,896 | 798,345 | 156,191 | 642,155 | 979,784 | 1,131,584 | 700,993 | 228,584 | 729,093 | 820,814 | 542,300 | 185,743 | 432,266 | 145,611 | 275,107 | 103,664 | - | 7,023,157 |
| Total Home Office expenses | 130,284 | 116,831 | 13,453 | 118,420 | 80,358 | 38,062 | 245,830 | 176,238 | 124,042 | 88,611 | 99,742 | 74,111 | 90,042 | 138,611 | 99,742 | 59,611 | 81,042 | 48,611 | 40,242 | 1,563,665 |
| **Total Operating Cash Outflows** | 777,604 | 708,255 | 69,349 | 916,765 | 236,549 | 680,217 | 1,225,613 | 1,307,823 | 825,035 | 317,195 | 828,835 | 894,925 | 632,342 | 324,354 | 532,008 | 205,221 | 356,150 | 152,275 | 40,242 | 8,586,822 |
| **Total Bankruptcy expenses** | - | - | - | 10,000 | - | 10,000 | 10,000 | 153,965 | 23,400 | 20,000 | 421,473 | 103,865 | - | - | 343,317 | 103,865 | - | 13,325 | 283,053 | 1,476,263 |
| **Net cash flow (deficit) after Expenses** | $ (637,604) | $ (552,322) | $ (85,282) | $ (407,678) | $ 399,570 | $ (807,248) | $ (166,526) | $ 3,378,212 | $ (676,283) | $ (458,381) | $ (227,990) | $ (47,202) | $ 104,704 | $ (218,358) | $ (246,699) | $ (47,055) | $ 718,239 | $ (125,371) | $ (315,795) | $ 1,519,744 |
| Beginning cash balance | 23,544 | 149,620 | (126,076) | 635,940 | 177,299 | 458,641 | 635,940 | 1,010,342 | 3,208,555 | 2,532,271 | 2,073,890 | 1,845,900 | 1,798,698 | 1,903,403 | 1,685,045 | 1,439,346 | 1,392,291 | 2,110,530 | 1,985,159 | 149,620 |
| Net cash flow | (637,604) | (552,322) | (85,282) | (407,678) | 399,570 | (807,248) | (166,526) | 3,378,212 | (676,283) | (458,381) | (227,990) | (47,202) | 104,704 | (218,358) | (246,699) | (47,055) | 718,239 | (125,371) | (315,795) | 1,519,744 |
| DIP facility advances | 1,250,000 | 580,000 | 670,000 | 600,000 | (600,000) | 500,000 | | | | | | | | | | | | | | 1,680,000 |
| DIP facility paydowns | | | | (500,000) | 500,000 | | | (1,180,000) | | | | | | | | | | | | (1,680,000) |
| **Ending cash balance** | $ 635,940 | $ 177,299 | $ 458,642 | $ 228,262 | $ 676,868 | $ (448,606) | $ 1,010,342 | $ 2,532,271 | $ 2,073,890 | $ 1,845,900 | $ 1,798,698 | $ 1,903,403 | $ 1,685,045 | $ 1,439,346 | $ 1,392,291 | $ 2,110,530 | $ 1,985,159 | $ 1,669,364 | $ - | $ 1,669,364 |
| Beginning DIP Facility balance | | | | 1,250,000 | 580,000 | 670,000 | 680,000 | 1,180,000 | | | | | | | | | | | | |
| DIP facility advances | 1,250,000 | 580,000 | 670,000 | 600,000 | (600,000) | | | | | | | | | | | | | | | 1,680,000 |
| DIP facility paydowns | | | | (500,000) | 500,000 | | (1,180,000) | | | | | | | | | | | | | (1,680,000) |
| **Ending DIP Facility balance** | $ 1,250,000 | $ 580,000 | $ 670,000 | $ 1,250,000 | $ 680,000 | $ 570,000 | $ 1,180,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

**See Accompanying Significant Notes and Assumptions**

The CRO from time to time makes written or oral forward-looking statements concerning expectations, beliefs, plans, objectives, future events or performance and underlying assumptions and other statements that are not historical facts. These statements are "forward-looking statements." Generally, the inclusion of the words "believe", "could", "should", "estimate", "expect", "intend", "anticipate", "will", "plan", "target", "forecast" and similar expressions identify statements that constitute "forward-looking statements." All statements addressing developments that the CRO expects or anticipates will occur in the future, including statements relating to values, future financial condition, assets, real property and timing of their disposition, as well as statements expressing optimism or pessimism about future results, are forward-looking statements.

The forward-looking statements are based upon the CRO's then-current views and assumptions regarding future developments and are applicable only as of the dates of such statements. By their nature, all forward-looking statements involve risks and uncertainties. The CRO assumes no obligation to update or review any forward-looking information to reflect actual results, changes in assumptions or changes in other factors affecting forward-looking information, whether as a result of new information, future events or otherwise. There can be no assurance that the CRO has correctly identified and appropriately assessed all factors affecting the Company and its assets. For these reasons, you are cautioned not to place undue reliance on any forward-looking statements.

**SIMPLY FASHION STORES, LTD.**
**Case No. 15 - 16888 - LMI**
**United States Bankruptcy Court -Southern District of Florida - Miami Division**
**Weekly Operating Cash Budget**
**Based on a Wind Down of the Company's Stores with the Retention of the Stalking Horse Going Out of Business Agent**

Source: Sales projections and historical sales reports provided by management, Great Plains general ledger account and disbursements reports for various expense accounts and sales taxes, P&L statements provided by client, supporting invoices and checks, and terms of the Stalking Horse Agency Agreement.

| | Notes | Budget 4/18/2015 | Actual 4/18/2015 | Variance 4/18/2015 | Budget 4/25/2015 | Actual 4/25/2015 | Variance 4/25/2015 | 5/2/2015 | 5/9/2015 | 5/16/2015 | 5/23/2015 | 5/30/2015 | 6/6/2015 | 6/13/2015 | 6/20/2015 | 6/27/2015 | 7/4/2015 | 7/11/2015 | 7/18/2015 | 7/25/2015 | Total (Actual plus Budget) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Proceeds:** | | | | | | | | | | | | | | | | | | | | | |
| Store Sale Deposits | 1 | $ 140,000 | $ 177,535 | $ (37,535) | $ 1,069,088 | $ 1,215,718 | $ (146,631) | $ 1,069,088 | $ 1,100,000 | | | | | | | | | | | $ | $ 3,562,340 |
| Less Sales tax | 2 | | (21,602) | 21,602 | | (550,000) | (579,600) | 29,600 | | | (433,363) | | | (162,682) | | | | | | | (1,197,246) |
| Net Sales | | $ 140,000 | $ 155,933 | $ (15,933) | $ 519,088 | $ 638,118 | $ (117,031) | $ 1,069,088 | $ 1,100,000 | $ | $ (433,363) | $ | $ | $ | $ (162,682) | $ | $ | $ | $ | $ | 2,365,094 |
| Agent Proceeds: | | | | | | | | | | | | | | | | | | | | | |
| Guaranteed payment | 3 | | | | | | | | 3,740,000 | | | 660,000 | | | | | | | | | 4,400,000 |
| Central service | 4 | | | | | | | | | 2,143 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 77,143 |
| Absorption | 5 | | | | | | | | | 83,310 | 291,585 | 291,585 | 192,446 | 192,446 | 192,446 | 192,446 | 192,446 | 82,477 | | | 1,711,187 |
| Payroll | 6 | | | | | | | | | 86,699 | 13,092 | 606,893 | 91,642 | 455,170 | 68,731 | 364,136 | 54,985 | 26,747 | 32,729 | | 1,990,824 |
| Payroll - fringe benefits | 6 | | | | | | | | | | | 109,241 | | 81,931 | | 65,544 | | 39,015 | | | 295,730 |
| Bank service fees | 5 | | | | | | | | | | | 7,100 | | | | | | 7,100 | | | 14,200 |
| Sharing Amounts | 7 | | | | | | | | | | | | | | | | | | | | |
| Total Agent Proceeds: | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | 3,740,000 | 172,152 | 312,177 | 1,022,318 | 951,588 | 737,046 | 268,678 | 629,626 | 262,031 | 345,739 | 40,229 | 7,500 | 8,489,084 |
| FF&E - stores | 8 | | | | | | | | | | | | | | | | | 728,650 | | | 728,650 |
| FF&E - DC/ Warehouse | 9 | | | | | | | | | | | | | | | | | | | | - |
| Automobiles | 10 | | | | | | | | | | | | | | | | | | | | - |
| **Total Proceeds** | | 140,000 | 155,933 | (15,933) | 519,088 | 638,118 | (117,031) | 1,069,088 | 4,840,000 | 172,152 | (121,186) | 1,022,318 | 951,588 | 737,046 | 105,996 | 629,626 | 262,031 | 1,074,389 | 40,229 | 7,500 | 11,582,829 |
| **Operating Cash Outflows:** | | | | | | | | | | | | | | | | | | | | | |
| **Store expenses** | | | | | | | | | | | | | | | | | | | | | |
| Payroll and related taxes | 11 | 645,920 | 579,975 | 65,945 | 176,554 | 156,191 | 20,364 | 856,893 | 143,484 | 606,893 | 143,484 | 606,893 | 143,484 | 455,170 | 107,613 | 364,136 | 86,091 | 216,747 | 51,244 | | 4,518,297 |
| Temp labor | 12 | | 133 | (133) | 3,000 | | 3,000 | 3,000 | | | | | | | | | | | | | 3,133 |
| Rent | 13 | | | | 400,000 | | 400,000 | 903,000 | | | 601,920 | | | | | | | | | | 1,504,920 |
| Shipping/ freight | 14 | | | | 66,000 | | 66,000 | 10,691 | | | | | | | | | | | | | 15,000 |
| Credit card fees | 15 | 1,400 | | 1,400 | 10,691 | | 10,691 | 48,000 | | | | | | | | | | | | | 10,691 |
| Utilities, waste & telephone | 16 | | 9,561 | (9,561) | 58,000 | | 58,000 | 40,000 | 50,000 | 67,000 | 58,000 | 48,000 | 50,000 | 67,000 | 58,000 | 48,000 | 33,000 | 44,220 | 38,280 | | 619,061 |
| Iberia - POS | 17 | | | | 40,000 | | 40,000 | 1,600 | | | | 40,000 | | | | | | | | | 40,000 |
| Repairs & maintenance | 18 | | | | 19,000 | | 19,000 | | 19,000 | 19,000 | 19,000 | 19,000 | 12,540 | 12,540 | 12,540 | 12,540 | 12,540 | 12,540 | 12,540 | | 182,780 |
| Licenses | 18 | | 30 | (30) | 1,600 | | 1,600 | 8,000 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | | | | 19,230 |
| Security | 18 | | | | | | | 10,000 | | | | | 5,280 | | | | | 5,280 | | | 18,560 |
| Supplies | 18 | | | | 10,000 | | 10,000 | | | | | | | | | | | | | | 10,000 |
| Bank service charge | 18 | | 1,725 | (1,725) | | | | 7,100 | | | | 7,100 | | | | | 7,100 | | | | 23,025 |
| Auto expense | 18 | | | | 10,000 | | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | | | | | 45,000 |
| Travel & lodging | 18 | | | | 1,500 | | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 990 | 990 | 990 | 990 | | | | | 11,460 |
| Other | 19 | | | | 2,000 | | 2,000 | 2,000 | | | | | | | | | | | | | 2,000 |
| **Total Store Expenses** | | 647,320 | 591,424 | 55,896 | 798,345 | 156,191 | 642,155 | 979,784 | 1,131,584 | 700,993 | 228,584 | 729,093 | 820,814 | 542,300 | 185,743 | 432,266 | 145,611 | 275,107 | 103,664 | - | 7,023,157 |
| **Home Office & DC expenses** | | | | | | | | | | | | | | | | | | | | | |
| Payroll and related taxes | 11 | 106,284 | 98,521 | 7,763 | 41,920 | 39,359 | 2,561 | 140,330 | 44,238 | 40,242 | 12,111 | 40,242 | 12,111 | 40,242 | 12,111 | 40,242 | 12,111 | 40,242 | 12,111 | 40,242 | 624,456 |
| Health insurance | 20 | 24,000 | 16,625 | 7,375 | 24,000 | 40,999 | (16,999) | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | | | 345,624 |
| Temp labor | 12 | | | | 2,000 | | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | | | | 24,000 |
| Rent | 21 | | | | | | | | | | | | | | | 5,000 | | | | | 5,000 |
| Utilities, waste & telephone | 16 | | | | | | | 13,000 | | 4,300 | | 13,000 | | | 4,300 | | 13,000 | | 4,300 | | 51,900 |
| Supplies | 19 | | | | 1,000 | | 1,000 | 5,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | | 80,000 |
| Repairs, maintenance & janitorial | 18 | | | | 5,000 | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | | 60,000 |
| Insurance - business | 22 | | 1,685 | (1,685) | | | | 50,000 | | 34,000 | | | | | 35,000 | | | | | | 120,685 |
| IT - support and services | 23 | | | | 35,000 | | 35,000 | | 5,000 | 5,000 | 5,000 | 5,000 | 10,000 | 5,000 | 10,000 | | 10,000 | | | | 110,000 |
| Copy machines \ printers | 24 | | | | 4,000 | | 4,000 | | | 4,000 | | | | | | | | | | | 8,000 |
| Security | 18 | | | | 1,000 | | 1,000 | 1,000 | 500 | | 1,000 | 500 | | 1,000 | | | | | | | 4,000 |
| Bank svc charge | 18 | | | | | | | 1,000 | | | | | | | | | 1,000 | | | | 3,000 |
| Advertising \ promotion | 25 | | | | | | | | | | | | | | | | | | | | - |
| Ordinary course professional | 26 | | | | | | | | | | | | 15,000 | | | | | | | | 15,000 |
| Inventory counter | 27 | | | | | | | 90,000 | | | | | | | | | | | | | 90,000 |

**SIMPLY FASHION STORES, LTD.**
**Case No. 15 - 16888 - LMI**
**United States Bankruptcy Court -Southern District of Florida - Miami Division**
**Weekly Operating Cash Budget**
**Based on a Wind Down of the Company's Stores with the Retention of the Stalking Horse Going Out of Business Agent**

Source: Sales projections and historical sales reports provided by management, Great Plains general ledger account and disbursements reports for various expense accounts and sales taxes, P&L statements provided by client, supporting invoices and checks, and terms of the Stalking Horse Agency Agreement.

| | Notes | Budget 4/18/2015 | Actual 4/18/2015 | Variance 4/18/2015 | Budget 4/25/2015 | Actual 4/25/2015 | Variance 4/25/2015 | 5/2/2015 | 5/9/2015 | 5/16/2015 | 5/23/2015 | 5/30/2015 | 6/6/2015 | 6/13/2015 | 6/20/2015 | 6/27/2015 | 7/4/2015 | 7/11/2015 | 7/18/2015 | 7/25/2015 | Total (Actual plus Budget) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | GOB Liquidator Period | | | | | | | | |
| Travel & lodging | 18 | | | - | | | - | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | | 18,000 |
| Other | 19 | | | - | | | - | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | | 36,000 |
| Document storage/ moving | 19 | | | - | | | - | | | | | | | | | 15,000 | | | 5,000 | | 20,000 |
| **Total Home Office expenses** | | 130,284 | 116,831 | 13,453 | 118,420 | 80,358 | 38,062 | 245,830 | 176,238 | 124,042 | 88,611 | 99,742 | 74,111 | 90,042 | 138,611 | 99,742 | 59,611 | 81,042 | 48,611 | 40,242 | 1,563,665 |
| **Total Operating Cash Outflows** | | 777,604 | 708,255 | 69,349 | 916,765 | 236,549 | 680,217 | 1,225,613 | 1,307,823 | 825,035 | 317,195 | 828,835 | 894,925 | 632,342 | 324,354 | 532,008 | 205,221 | 356,150 | 152,275 | 40,242 | 8,586,822 |
| *Bankruptcy related expenses:* | | | | | | | | | | | | | | | | | | | | | |
| CRO | 28 | | | | | | - | | | | 38,160 | | | | | 46,640 | | | 38,160 | | 122,960 |
| KapilaMukamal | 28 | | | | | | | | | | 172,540 | | | | | 142,152 | | | 132,448 | | 447,140 |
| Professionals to be retained to terminate 401K plan | 28 | | | | | | | | | | | 20,000 | | | | | | | | | 20,000 |
| Berger Singerman | 28 | | | | | | | | | | | 160,000 | | | 120,000 | | | | 80,000 | | 360,000 |
| Prime Clerk | 28 | | | | | | | | | | | 30,773 | | | 14,525 | | | | 32,445 | | 77,743 |
| Lease disposition | 29 | | | | | | | | | | | | | | | | | | | | |
| Noticing costs | 30 | | | | | | | | 30,100 | | | | | | | | | | | | 30,100 |
| Adequate protection - | 31 | | | | | 10,000 | 10,000 | 10,000 | | 20,000 | 20,000 | 20,000 | 20,000 | | | | | | | | 30,100 |
| Cash collateral - interest | 32 | | | | | | | | | | | 103,865 | | | | | 103,865 | | | | 311,595 |
| DIP facility interest | 33 | | | | | | | | | 3,400 | | | | | | | | | | | 3,400 |
| US Trustee Fees | 34 | | | | | | | | | | | | | | | | | | 13,325 | | 13,325 |
| **Total Bankruptcy expenses** | | | | - | | 10,000 | 10,000 | 10,000 | 153,965 | 23,400 | 20,000 | 421,473 | 103,865 | | | 343,317 | | | 103,865 | 13,325 | 283,063 | 1,476,263 |
| **Net cash flow (deficit) after Expenses** | | $ (637,604) | $ (552,322) | $ (85,282) | $ (407,678) | $ 399,570 | $ (807,248) | $ (166,526) | $ 3,378,212 | $ (676,283) | $ (458,381) | $ (227,990) | $ (47,202) | $ 104,704 | $ (218,358) | $ (245,699) | $ (47,055) | $ 718,239 | $ (125,371) | $ (315,795) | $ 1,519,744 |
| Beginning cash balance | 35 | $ 23,544 | $ 149,620 | $ (126,076) | $ 177,299 | $ 458,641 | $ - | $ 635,940 | $ 177,299 | $ 3,208,555 | $ 2,532,271 | $ 2,073,890 | $ 1,845,900 | $ 1,798,698 | $ 1,903,403 | $ 1,685,045 | $ 1,439,346 | $ 1,392,291 | $ 2,110,530 | $ 1,985,159 | $ 149,620 |
| Net cash flow | | (637,604) | (552,322) | (85,282) | (407,678) | 399,570 | (807,248) | (166,526) | 3,378,212 | (676,283) | (458,381) | (227,990) | (47,202) | 104,704 | (218,358) | (245,699) | (47,055) | 718,239 | (125,371) | (315,795) | 1,519,744 |
| DIP facility advances | | 1,250,000 | 580,000 | 670,000 | | 600,000 | (600,000) | | 1,180,000 | | | | | | | | | | | | 1,680,000 |
| DIP facility paydowns | | | | | (500,000) | | 500,000 | | (1,180,000) | | | | | | | | | | | | (1,680,000) |
| **Ending cash balance** | | $ 635,940 | $ 177,299 | $ 458,642 | $ 228,262 | $ 676,868 | $ (448,606) | $ 1,010,342 | $ 3,208,555 | $ 2,532,271 | $ 2,073,890 | $ 1,845,900 | $ 1,798,698 | $ 1,903,403 | $ 1,685,045 | $ 1,439,346 | $ 1,392,291 | $ 2,110,530 | $ 1,985,159 | $ 1,669,364 | $ 1,669,364 |
| Beginning DIP Facility balance | | $ - | $ - | $ - | $ 1,250,000 | $ 580,000 | $ 670,000 | $ 680,000 | $ 1,180,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| DIP facility advances | | 1,250,000 | 580,000 | 670,000 | | 600,000 | (600,000) | | 1,180,000 | | | | | | | | | | | | 1,680,000 |
| DIP facility paydowns | | | | | (500,000) | | 500,000 | | (1,180,000) | | | | | | | | | | | | (1,680,000) |
| **Ending DIP Facility balance** | | $ 1,250,000 | $ 580,000 | $ 670,000 | $ 1,250,000 | $ 680,000 | $ 670,000 | $ 1,180,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

**See Accompanying Significant Notes and Assumptions**

The CRO from time to time makes written or oral forward-looking statements concerning expectations, beliefs, plans, objectives, future events or performance and underlying assumptions and other statements that are not historical facts. These statements are "forward-looking statements." Generally, the inclusion of the words "believe," "could", "should", "estimate", "expect", "intend", "anticipate", "will", "plan", "target", "forecast" and similar expressions identify statements that constitute "forward-looking statements." All statements addressing developments that the CRO expects or anticipates will occur in the future, including statements relating to values, future financial condition, assets, real property and timing of their disposition, as well as statements expressing optimism or pessimism about future results, are forward-looking statements.

The forward-looking statements are based upon the CRO's then-current views and assumptions regarding future developments and are applicable only as of the dates of such statements. By their nature, all forward-looking statements involve risks and uncertainties. The CRO assumes no obligation to update or review any forward-looking information to reflect actual results, changes in assumptions or changes in other factors affecting forward-looking information, whether as a result of new information, future events or otherwise. There can be no assurance that the CRO has

**SIMPLY FASHION STORES, LTD.**
**Case No: 15 - 16888 - LMI**
**United States Bankruptcy Court**
**Southern District of Florida**
**Miami Division**

**Weekly Operating Cash Budget**

**The assumptions provided in the operating budget are based on an wind down of the company's stores with the retention of the Stalking Horse Going Out of Business Agent.**

**Note 1)** Stores sale deposits for the week ending 4/18/2015 were based on the actual sales and estimated cash transferred from the store bank accounts and credit card accounts effective Friday 4/17/2015. The subsequent weeks store sale estimates (inclusive of sales taxes) were based on data provided by Management.

**Note 2)** The sales tax was estimated by applying a 7.5% sales tax rate based on historical averages.

**Note 3)** The Guaranteed Payment is based on 27.5% of the aggregate Retail Price of the Merchandise, estimated at $16,000,000, based on the Stalking Horse Agency Agreement ("Agency Agreement").

**Note 4)** Central Service expense paid by Agent to Merchant, per the Agency Agreement.

**Note 5)** Per the Agency Agreement, the Agent will reimburse the Merchant for store level Occupancy Expenses based on a per diem reimbursement of $41,655 per day and reimbursement for allowable expenses paid by the Merchant. Reimbursement estimates are reduced based on anticipated store closings and reductions in the workforce.

**Note 6)** Per the Agency Agreement, the Agent will reimburse the Merchant for store level payroll expenses, including benefits in an amount not to exceed 18% of the base payroll in the aggregate. Reimbursement estimates are reduced based on anticipated store closings and reductions in the workforce.

**Note 7)** Merchant is entitled to potential sharing proceeds based on achieving certain thresholds pursuant to the Agency Agreement. This budget does not inclwarde an estimate for potential sharing proceeds.

**Note 8)** The proceeds from the sale of stores FF&E is based on 247 stores multiplied by $2,950, as provided for in the Agency Agreement.

**Note 9)** The FF&E maintained in the Distribution Center and and Warehouse will be liquidated. The budget doesn not inlcude an estimate becuase it will be based on proceeds realized from the sale.

**Note 10)** The automobiles will be liquidated, however, the budget doesn not inlcude an estimate becuase it will be based on proceeds realized from the sale.

**Note 11)** The payroll estimate is based on actual payroll for the week ending 4/11/2015 and paid 4/17/2015.  Payroll estimates for subsequent weeks are based on anticipated reductions in the workforce. The bi-weekly net payroll disbursement is made on Friday beginning 4/17/2015 and the tax and other liabilities are made the following week.

**Note 12)** Temporary labor is an estimate based on the potential use of short term labor as a result of the reduction in the workforce of full time employees.

**Note 13)** The stores rent for the week ending 4/17/2015 was calculated based on rent due from the April rent roll and prorated for the post petition period. The rent expense for the weeks ending 5/16/2015 was based on May's rent roll. The rent expense for the weeks ending 6/6/2015 was based on May's rent roll, reduced by 33% for anticipated store closings. The rent expense does not include any estimate for stores that base their rent payments as a percentage of sales.

**Note 14)** Shipping costs are based on estimates provided by Management, and assuming no new inventory purchases.

**Note 15)** Credit card fees are estimated based on historical credit cards fees as compared to sales.

**Note 16)** Utility payments were based on a 3 month average paid from January through March 2015.

**Note 17)** The Iberia Bank payments are for debt service related to the Point of Sale system.

**Note 18)** Expenses were estimated based on a monthly or weekly average derived from the P&L statements for the period January 2014 through January 2015, adjusted to account for the wind down of the business.

**Note 19)** Estimate for supplies, storage, moving and other expenses.

**Note 20)** The health insurance estimate is an average of weekly payments made to the third party administrator for the period January through March 2015. The company's health insurance is a self funded policy, actual claims incurred but not reported could be substantially higher and is not practical to estimate unreported claims.

**Note 21)** Rent for the Birmingham, AL corporate office and warehouse was pre-paid in January 2015 for the period January through June 2015 for at total payment of $160,000. An estimate for a new economical facility to house accounting and other back office functions is included.

**Note 22)** Insurance expenses were calculated based on down payments required and the installment schedule and invoice provided by the insurance agent.

**Note 23)** IT support and services were estimated based on an average of historical expenses and information provided by management

**SIMPLY FASHION STORES, LTD.**
**Case No: 15 - 16888 - LMI**
**United States Bankruptcy Court**
**Southern District of Florida**
**Miami Division**

**Weekly Operating Cash Budget**

**The assumptions provided in the operating budget are based on an wind down of the company's stores with the retention of the Stalking Horse Going Out of Business Agent.**

**Note 24)** Estimates for leased copiers and printers for the home office were provided by Management, based on monthly payments made by credit cards to the leasing companies.

**Note 25)** Advertising and promotional expenses are incorporated in the Agency Agreement.

**Note 26)** Ordinary course professionals were estimated to provide services including, but not limited to, tax, legal, and managerial professional during the liquidation process.

**Note 27)** The inventory cost counter expense was allocated and split 50/50 between the Merchant and Agent, per the Agency Agreement.

**Note 28)** Assumes bankruptcy professionals will issue invoices on a monthly basis at the end of each month and that those invoices will be processed for payment by the 25th of the month following the month of service absent objections. Assumes a 20% holdback will be required by the bankruptcy court for Berger Singerman. Bankruptcy retainers held by professionals are assumed to be applied at the end of the case.

**Note 29)** On April 23, 2015 the Debtor entered into an agreement with Hilco Real Estate, LLC ("Hilco") to provide real estate consulting and advisory services in connection with disposition of the Debtor's real estate leases. At this time it is impractical to forecast potential benefits and related costs that may result related to this agreement and dispositions of the leases; as such, these potential benefits and related costs are not included in this budget.

**Note 30)** The estimated cost to provide national noticing of going out of business sale.

**Note 31)** Utility deposits for adequate protection were based on 50% of the monthly average payment from January through March 2015 and reduced by deposits currently held by the utility providers.

**Note 32)** Cash collateral interest payments are pursuant to ¶9(e) of the Cash Collateral Order.

**Note 33)** The DIP facility interest at 6% was estimated based on the cash needs of the Debtor and the interest expense associated with the borrowing.

**Note 34)** The US Trustee fee was estimated based on disbursements for the second calendar quarter between $5,000,000 and $14,999,999.99 and due no later than one month following the end of each calendar quarter.

**Note 35)** The beginning cash balance as of 4/16/2015.

*Kapila/Mukamal*
CPAs, Forensic and Insolvency Advisors